> In accordance with FAR 1.301(b) and Subpart 1.5 and as required by section 22 of the Office of Federal Procurement Policy Act, DLA intends to have this revised DLAR language [pertaining to authorized economic price adjustment clauses] published for public comment, because the coverage will have a significant effect beyond the internal operating procedures of DLA and may have a modest impact on contractors and offerors.

Def.'s Ex. 20. Defendant's own requests for the class deviation and proposed FAR revision at issue acknowledge that the impact of its request was significant enough to trigger the regulatory publication requirements of FAR subpart 1.5 (as to the proposed FAR revision) and § 22 of the OFPP Act. Although defendant did not reference the DLAR, the terms of the DLAR apply as well to requests for class deviations and impose the same standard for Federal Register publication as FAR § 1.505-1 and § 22 of the OFPP Act.

The court finds that, based on the regulatory publication requirements and the acknowledged impact of the proposed class deviation, publication of the class deviation was required by the DLAR and § 22 of the OFPP Act. Defendant did not publish notice of the proposed class deviation and, contrary to defendant's assertion, the published notice of the proposed permanent revision did not provide notice of the class deviation. Because defendant obtained the class deviation in contravention of the publication requirements established by DLAR § 1.490, defendant's own regulation, and § 22 of the OFPP Act, the class deviation was not authorized and is not valid for plaintiff's 1997, 1998, and 1999 contracts.

b. Whether the Class Deviation Expired After Three Years

Plaintiff contends that even if the class deviation were deemed to be valid, it had expired before the date of plaintiff's 1999 contract. See Pl.'s Mot. and Opp. at 33. The class deviation was approved by a letter from the Director of Defense Procurement to DLA's Deputy Director of Acquisition dated October 5, 1995. See Pl.'s App. at 496A. Plaintiff argues that, on October 5, 1998, three years after the alleged approval date, the class deviation expired. Pl.'s Mot. and Opp. at 32-33.

DLAR §1.490(a)(i) states that, with respect to requests for authority to deviate from the provisions of the FAR or DFARS, "[r]equests for new deviations which will be needed beyond the normal three year expiration period should be submitted . . . as permanent deviations to be incorporated into the DLAD." Pl.'s App. at 99 (emphasis added). Citing DLAR § 1.490(a)(i), plaintiff asserts that class deviations are limited to three years and any request for a deviation longer than "the normal three year expiration

period" must be submitted for approval as a permanent deviation. See Pl.'s Mot. and Opp. at 33.

As further support for its position, plaintiff relies on the text of defendant's request for the class deviation in which defendant specifically stated, "D[E]SC requests that the substance of the new deviation be incorporated into the DLAR because the class deviation will be needed beyond the normal three-year expiration period." Pl.'s App. at 526. Plaintiff claims that, based on the effective date of its last contract award (March 8, 1999), the class deviation does not apply because it expired nearly five months earlier. See Pl.'s Mot. and Opp. at 33; Pl.'s App. at 144.

Defendant denies the expiration of its class deviation asserting that the § 4.105.1 of the Defense Logistics Acquisition Directive (DLAD) (formerly DLAR) does not prescribe a time limit. Def.'s Reply at 16. Alternatively, defendant argues that, even if a three-year time limit were found to apply, the three contracting actions alleged to be covered by the class deviation, namely the solicitations for plaintiff's 1997, 1998, and 1999 contracts, fall within the prescribed time period. See Tr. at 39.

As an initial matter, the court notes that defendant's suggestion that the class deviation applied to the solicitations rather than the contracts is inconsistent both with the regulatory language of FAR § 1.404, which provides that a class deviation applies to a class of contracts, see FAR § 1.404, and with the language in defendant's application for the class deviation. See Pl.'s App. at 496A (seeking the approval of a class deviation from the requirements of FAR §§ 16.203-1 and 16.203-4(a) when using economic price adjustment clauses in fixed-price contracts).

According the ordinary and common meaning of the words "normal" and "expiration" to their use in the phrase "normal three year expiration period" in DLAR § 1.490(a)(1), see 2A Sutherland § 47:27, at 336-338, the court understands "normal" to mean "[a]ccording to a regular pattern . . .[or] . . .to an established rule or norm," see Black's Law Dictionary (7th ed. 1999), and understands "expiration" to mean "[a] coming to an end." Id. Applying the "plain meaning rule" of statutory interpretation, see 2A Sutherland § 46:01, at 113, to interpret the phrase "beyond the normal three year expiration period" in DLAR § 1.490 (a)(1), the court construes that language to impose, in ordinary circumstances, a three-year time limitation on the validity of a class deviation. In this case, defendant did not argue that an extension of time was warranted by any circumstance out of the ordinary. Absent argument by the parties that a special circumstance warranted deviation from the "normal . . . expiration period," the court finds that plaintiff's 1999 contract was awarded after the expiration of the class deviation and was therefore not covered by it.

D. Whether Defendant Was Required to Label Clause B19.33 As A Deviation

FAR § 52.103(a) requires the identification, by number, title and date, of provisions and clauses used in a solicitation or contract and states that "if the FAR provision or clause is used with an authorized deviation . . . the contracting officer shall then insert (DEVIATION) after the date." FAR § 52.103(a); Pl.'s App. at 89. FAR § 52.252-5 governs the use of authorized deviations in provisions and states that "[w]henever any FAR or supplemental provision is used with an authorized deviation, the contracting officer shall identify it by the same number, title and date assigned to the provision when it is used without deviation . . . except that the contracting officer shall insert (DEVIATION) after the date of the provision." FAR § 52.252-5; Pl.'s App. at 93.

Plaintiff argues that, in violation of FAR §§ 52.103(a) and 52.252-5, defendant did not label the EPA clause, Clause B19.33, as a "DEVIATION" and, as a result, defendant failed expressly to notify the contractor in its contract that defendant was deviating from the FAR in establishing and adjusting the contract prices. Pl.'s Mot. and Opp. at 28-29.

Alleging that these regulatory provisions only apply if defendant deviates from a clause prescribed by the FAR, defendant argues that such designation was unnecessary because its EPA clause was not a prescribed FAR clause. See Tr. at 82-83. Moreover, citing FAR §12.301(d),[16] defendant asserts that, after 1996, when it began procuring its fuel supply pursuant to FAR Part 12, "the 'deviation' designation was not mandated, because FAR [§] 52.252-2 was not a required clause." Def.'s Reply at 12 n.4.

Plaintiff states that a material issue exists with respect to whether the subject procurements were in fact "undertaken under FAR subpart 12" because military jet fuel is not used by commercial airlines. Tr. at 57. Nonetheless, plaintiff asserts that even if FAR Subpart 12 properly applies to its contracts, "there are only certain portions of the

---

[16]FAR § 12.301(d) provides:

> Notwithstanding prescriptions contained elsewhere in the FAR, when acquiring commercial items, contracting officers shall be required to use only those provisions and clauses prescribed in this part. The provisions and clauses prescribed in this part shall be revised, as necessary, to reflect the applicability of statutes and executive orders to the acquisition of commercial items.

FAR §12.301(d).

FAR from which . . . [the contracts] are exempt." Tr. at 56. Plaintiff contends:

> There are certain items that are viewed as commercial items and you are permitted to put aside some of the standard FAR clauses but where you are using a required clauses and there's no argument that FAR 16.203 which is economic price adjustment clauses somehow doesn't apply . . . . Where you're going to deviate from the requirements that you still do have to follow you've got to give notice.

Id. at 55-56.

FAR Subpart 52 "gives instructions for using provisions and clauses in solicitations and/or contracts . . . ." FAR § 52.000. FAR § 52.103(b) requires clear identification "by number, title, date, and name" of "[a]ny provision or clause that supplements the FAR." If such supplemental provision or clause is used with an authorized deviation, FAR § 52.103(b) also requires the insertion of the term "(DEVIATION)" after the name of the regulation. FAR § 52.101(b)(2)(i)(C) defines "[p]rovisions or clauses that supplement the FAR" to include those provisions or clauses "[d]eveloped for use at a suborganizational level of an agency, not meant for repetitive use, but intended to meet the needs of an individual acquisition and, thus, impractical to include in either an agency or suborganization acquisition regulation."

Defendant here concedes that its EPA clauses are "clauses that supplement the FAR" as contemplated by FAR § 52.101(b)(2)(i)(C), but denies any regulatory requirement to attach the "(Deviation)" label to its agency-drafted EPA clause. Defendant's Supplemental Brief (Def.'s Supp. Br.) at 3-4. Defendant asserts that "[t]he requirements of FAR § 52.103(a) apply only when 'any FAR provision or clause' is used." Id. at 2. Moreover, defendant argues that attaching the "(Deviation)" label to its EPA clause "would have served little or no purpose - and, indeed, could have caused confusion," id. at 3, because "DESC's EPA clause (Clause B19.33, "Economic Price Adjustment-Published Market Price") . . . upon its face, is unlike anything in the FAR." Id. at 2.

Defendant's argument, however, ignores the labeling requirements set forth in FAR § 52.103(b). FAR § 52.103(b) requires that "[a]ny provision or clause that supplements the FAR" must be clearly identified "by number, title, date, and name," and further requires that if such supplemental provision or clause is used with an authorized deviation, it must also be labeled "(DEVIATION)." The court finds that the labeling requirements prescribed in FAR § 52.103(b) apply in this case and that defendant failed to comply with that regulatory requirement.

E. Whether Plaintiff is Entitled to Recover Under a Quantum Valebant Theory for Defendant's Use of the Unauthorized EPA Clause in Plaintiff's Contracts

Defendant argues that La Gloria has failed to demonstrate that it was harmed by the use of the EPA clauses in its contracts and thus cannot recover. Def.'s Mot. at 31. Defendant contends that "La Gloria first must demonstrate that the [challenged EPA] clause did not perform as required, i.e., did not protect the Government and the contractor from substantial fluctuations in costs." Def.'s Reply at 25. Quoting LaBarge Products, Inc. v. West, 46 F.3d 1547, 1557 (Fed. Cir. 1995), defendant states that, notwithstanding even a clear violation of the FAR, the Federal Circuit requires that a plaintiff show that it was "harmed . . .in [a] concrete way contemplated by the FAR" to be entitled to relief. Def.'s Mot. at 31. Defendant asserts that "simply alleging that the mechanism was not one 'permitted' by the FAR (even if true), is an allegation only of wrong without harm and, therefore, [plaintiff's complaint] must be dismissed." Def.'s Reply at 25.

Plaintiff contends that it has been harmed as a matter of law "[i]n the absence of an enforceable [contract] price." Pl.'s Mot. and Opp. at 47. Plaintiff argues that it is entitled to recover under a quantum valebant theory the fair market value of the fuel delivered to defendant. Pl.'s Mot. and Opp. at 33-37.

In Barrett I, the plaintiff sued DESC after fully performing its contracts for the supply of military jet fuel seeking, inter alia, damages under a quantum valebant theory of relief. See Barrett I, 42 Fed. Cl. at 134. The trial court found that plaintiff was entitled to damages on a quantum valebant theory, Barrett I, 42 Fed. Cl. at 134, and, in a subsequent proceeding, declined to award damages to the United States on a counterclaim. Barrett II, 45 Fed. Cl. at 170. On appeal, the Federal Circuit declined to disturb the trial court's finding that "once the unauthorized [price escalation] clause is struck out, . . . [the] express contract simply incorporates an implied-in-fact promise by the government to pay at least fair market value for the fuel delivered by [the contractor] under the contract." 242 F.3d at 1059 (quoting Barrett II, 45 Fed. Cl. at 170). The Federal Circuit stated:

> Given that the price escalation clause was unauthorized and unenforceable, . . . we agree with the Court of Federal Claims' implicit legal conclusion that there was no longer any express clause covering price escalation, and thus, nothing to preclude an implied in fact agreement on that term. We also agree with the Court of Federal Claims' factual finding of a promise by the government to pay at least fair market value.

242 F.3d at 1060.

The EPA clause addressed in Barrett III is substantially the same as the EPA clause used in La Gloria's contracts, which have also been fully performed. Moreover, there is evidence in this case that supports a finding that defendant promised to pay fair market value for the military fuel it procured. In discussing DESC's rationale for using its EPA clause in its fuel supply contracts with La Gloria, defendant points to the 1993 memorandum prepared by the DLA requesting "an interim deviation from FAR [§] 16.203 to permit DFSC [DESC's predecessor agency] to continue the use of . . . [its EPA] provisions . . . " following the MAPCO decision. Def.'s Mot. at 21-22; Def.'s Ex. 4. The 1993 memorandum requesting such deviation states:

> D[E]SC contracts contain EPA provisions based on market indexes of the product being purchased or of a similar product. All EPA references are tested for accuracy and then recommended for use by D[E]SC's Office of Market research and analysis. These EPA provisions ensure that the Government, like commercial customers, will pay the market price for the fuel throughout the duration of the contract, whether market prices increase or decrease.

Def.'s Mot. at 21-22; Def.'s Ex. 4. The court construes DESC's representation that "the [g]overnment, like commercial customers, [would] pay the market price for the fuel throughout the duration of the contract," Def.'s Mot. at 22, to be a commitment to pay fair market value to contractors supplying the fuel.

The Federal Circuit decision in Barrett III teaches that the use of an illegal EPA clause together with an implied-in-fact governmental promise to pay at least fair market value entitles a plaintiff to quantum valebant relief. Because it is the court's view that the EPA clause used in plaintiff's contracts was unauthorized and that the government evinced an intention to pay fair market value for its fuel supply procurements, the court finds that, consistent with the Federal Circuit's guidance in Barrett III, plaintiff is entitled to quantum valebant relief. In determining the quantum valebant relief, the measure of actual harm incurred by La Gloria must be determined. Thus, contrary to defendant's assertions, plaintiff is entitled to prove harm by establishing, under an appropriate valuation methodology, that it failed to receive fair market value.

F. Whether the Doctrine of Judicial Estoppel Requires the Same Fair Market Value Calculation to Which Defendant Stipulated In Prior Litigation

Plaintiff argues that defendant is estopped by the doctrine of judicial estoppel from

asserting a different fair market value calculation than the calculation to which defendant stipulated in Pride Cos. v. United States, 2000 U.S. Claims LEXIS 213 (May 10, 2000). Pl.'s Mot. and Opp. at 37-42.

Citing Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1453-54 (Fed. Cir. 1988), defendant states that "the court of appeals has held that a party may take a position strictly contrary to one that it litigated successfully against a different party unless the current adversary demonstrates '(1) personal reliance on the decision granted in the prior suit, (2) prejudice to its litigation of the issues in the current suit by reason of the decision in the prior suit, or (3) . . . apparent misuse of the court.'" Def.'s Reply at 29. Defendant contends that the different plaintiff here, La Gloria, has neither demonstrated direct reliance on Pride Cos. nor any litigating prejudice. Id. at 30. Defendant asserts that "[l]itigants may adjust their positions based upon new information." Id. (quoting Data Gen'l Corp. v. Johnson, 78 F.3d 1556, 1565 (Fed. Cir. 1996)).

Judicial estoppel is the well-settled doctrine that "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." Davis v. Wakelee, 156 U.S. 680, 689 (1895). In Pride Cos., the defendant conceded liability, 2000 U.S. Claims LEXIS 213, at *2-3, and although defendant disputed whether plaintiff suffered any harm, see id. at *3, the parties stipulated to a formula for determining the fair market value of fuel in a market neighboring plaintiff's. Id. at *4. It is difficult to characterize defendant's position in Pride Cos. as a case where a party "succeeds in maintaining [a] position." Davis, 156 U.S. at 689. Rather, that position appears to be a litigating concession which did not yield success to defendant. In these circumstances, the calculation of fair market value in Pride Cos. does not appear to the court to be an apt subject for application of the doctrine of judicial estoppel.

### G. Whether Plaintiff Has Waived its Claims of Illegality

In defendant's responsive briefing to plaintiff's cross-motion for partial summary judgment, defendant argues for the first time in this case that La Gloria has waived its right to challenge the legality of the EPA clause used in its contracts because plaintiff completed its contract performance without objection. Def.'s Reply at 18-24. See Tr. at 100. Among the authorities on which defendant relies is the Federal Circuit's recent decision in American Tel. & Tel. Co. v. United States, 307 F.3d 1375 (Fed. Cir. 2002) (AT&T). See Def.'s Reply at 22-23.

After determining that plaintiff had failed to state a valid claim, the Federal Circuit in AT&T observed that, even if plaintiff had stated a valid claim, it had waived its claim.

307 F.3d at 1380. The Federal Circuit noted, in particular, that plaintiff was a sophisticated contractor, that had "successfully underbid technically superior competitors to win the . . . contract, and [had] retained the contract with a vigorous defense against a competitor's protest action." Id. The court declined to relieve AT & T "of the risk that it so aggressively pursued" stating that "the proper time for AT & T to have raised the issues that it now presents was at the time of contract negotiation, when effective remedy was available. This, AT & T did not do." Id. at 1381. Quoting Whittaker Elec. Sys. v. Dalton, 124 F.3d 1443, 1446 (Fed. Cir. 1997), the Federal Circuit noted in AT&T, "The doctrine of waiver precludes a contractor from challenging the validity of a contract, whether under a DAR [defense acquisition regulation] or on any other basis, where it fails to raise the problem prior to execution, or even prior to litigation, on which it later bases its challenge." 307 F.3d at 1381 (internal citations omitted).

Plaintiff contends that it has not waived its claim. See Pl.'s Reply at 17-29. In support of its position, plaintiff quotes the Federal Circuit's opinion in Beta Sys., Inc. v. United States, 838 F.2d 1179, 1185 (Fed. Cir. 1988), stating that "[t]he government's insistence during negotiations on use of [the EPA clause] in its entirety, and the contractor's acquiescence, does not immunize the government from the consequences of failure of the EPA clause to comply with the law stated as in the DAR." Pl.'s Reply at 19. Plaintiff asserts that "Beta Systems is binding precedent that is materially indistinguishable from the present case." Id.

The court agrees with plaintiff that the facts in Beta Systems are substantially similar to the facts in this case and preclude the application of the waiver doctrine. Each of La Gloria's contracts contained a statement that defendant's use of Clause B19.33 as an EPA clause was non-negotiable. See Pl.'s App. at 154, 246; Tr. at 8-9, 58. It is the view of the court that defendant is unable to invoke the waiver doctrine when the terms of the solicitation expressly prohibited bidders from challenging defendant's use of an unauthorized economic price escalation clause. The government appears to have benefitted from its market position with its resort to self-help measures to circumvent the terms of the FAR in the administration of its fuel supply procurements.[16] In these

---

[16]As the purchaser of military fuel supplies, defendant acknowledged in an internal memorandum requesting an interim deviation from FAR § 16.203 pending defendant's application for a permanent deviation:

> [W]e request approval to continue using product index escalators to adjust the prices of fuel we purchase. We have made successful use of these or similar provisions with DLA's approval since the early 1980's. However, a court has ruled that the provisions are not specifically authorized by the FAR, and are

circumstances, the court declines to apply to waiver doctrine.

## III. Conclusion

For the foregoing reasons, defendant's motion is DENIED. Plaintiffs' motion is GRANTED on the issue of quantum valebant relief and with respect to the invalidity of the individual and class deviations. Plaintiff's motion is DENIED with respect to the applicability of the judicial estoppel doctrine to the calculation of fair market value. On or before May 6, 2003, the parties shall submit a joint status report proposing a schedule for further proceedings in this case.

IT IS SO ORDERED.

EMILY C. HEWITT
Judge

---

therefore invalid.

> .... We intend to seek a permanent deviation from the FAR in order to validate our EPA provisions. However, that can be a time consuming process. It makes good business sense to continue doing business as we have been for many years while our permanent deviation request is pending. There is no good alternative to our present system of price escalation.

Pl.'s App. at 234.