IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HERMES CONSOLIDATED, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 02-1460C (Judge Block) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S SUPPLEMENTAL BRIEF

I. Hermes Is Not Entitled To A Remedy Unless It Can Show Harm

In our moving brief, we explained that Hermes must allege and prove that it was harmed or prejudiced by the Government's allegedly wrongful action. Def. MSJ at 27-29. We use the term "harm" in the sense of "the fact of harm," or "the objective fact of injury," a prerequisite for entitlement to a remedy, whether damages or some other remedy. See 1 D.B. Dobbs, Law of Remedies § 1.1, at 3 n.14 (2d ed. 1993) ("Dobbs").[1] The requirement for injury is illustrated by Plaintiffs in Winstar-Related Cases, 37 Fed. Cl. 174, 184 (1997), a case upon which Hermes relies. There, the Court stressed the importance of the existence of harm to the viability of plaintiffs' claims, while distinguishing harm from damages.[2]

Generally, contract remedies relate to one of three interests: expectation, reliance, or restitution. Restatement (Second) Contracts § 344 (1981). Unsurprisingly, Hermes' briefs do not indicate that any such interests are implicated. Indeed, during contract performance, Hermes

---

[1] There are four general kinds of remedies: damages, restitution, coercive remedies, and declaratory remedies. 1 Dobbs § 1.1, at 2.

[2] In Gold Line, the Court rejected a harm argument such as this one, asserting that harm would be assessed at the damages phase. See Pl. Br. at 15 (citing 54 Fed. Cl. at 297). If this suggests that harm and damages are the same, we respectfully submit that the Court erred.

evidently found the EPA clauses to its liking. Thus, year after year, Hermes performed the contracts at issue without objection, and the Government paid the agreed amount. Even after contract performance, Hermes has yet to allege: (1) that it did not receive everything it reasonably expected, (2) that the contracts did not perform as expected, (3) that the EPA clauses did not protect it from "significant fluctuations" in costs, see FAR 16.203-3, or (4) that the contracts were the product of fraud, duress, or improper inducement. At its worst, Hermes' complaint is that the contracting officer failed to obtain a FAR deviation to accept an EPA clause. But, the absence of a timely signature of an agency official, which subsequent circumstances demonstrate could have been obtained, cannot conceivably cause harm.

Hermes' claims are viable only if there is evidence that the EPA clauses at issue harmed Hermes by depriving it of the fruits of the bargain to which it was entitled by law or contract. The FAR does not mandate any particular level of payment, and the contract amounts were paid. To the extent that faulty performance of the clauses could cause harm, Hermes must demonstrate that those clauses failed to protect it from significant fluctuations in either material costs or established prices. It has not done so. In circumstances such as these, where the contracts have been fully performed and paid without protest, the Court should leave the parties as it found them. See St. Louis Hay & Co. v. United States, 191 U.S. 159, 163 (1903) (enforcing price of invalid oral contract). See also 3 Dobbs § 12.17(6), at 418 (seller who has fully performed normally has a damages action and no claim for restitution).

## II. Hermes' Arguments Regarding "Harm" Are Unfounded

Hermes maintains that no showing of harm is necessary. Pl. Br. at 8. First, Hermes argues that showing harm is unnecessary because harm does need not be proven in breach of contract actions. Id. at 8-11. Second, Hermes argues that its request for "general damages"

excuses it from proving harm. Id. at 11–14. Third, Hermes argue that it already has produced evidence of damages. Id. at 14-18. Hermes is wrong in all respects.

A. The Alleged Breach Does Not Equate To Harm

Hermes' first argument fails because of its faulty premise, i.e., that there has been a breach of contract.[3] A contract breach is defined as the nonperformance of a duty that is due under a contract. Restatement (Second) Contracts § 235. Here, there is no credible allegation that the Government failed to meet its contractual responsibilities.[4] In fact, the premise of Hermes' case is that the Government violated a regulatory obligation, which, Hermes asserts, overrides the fact that the Government met its contractual obligations completely. As explained in our moving brief, a plaintiff must show that it was harmed or prejudiced by a regulatory violation. Def. MSJ at 27-29 (discussing LaBarge Products, Inc. v. West, 46 F.3d. 1547 (Fed. Cir. 1995), and PCL Construction, 41 Fed. Cl. 242).[5] The Federal Circuit reiterated the LaBarge requirement in Promac, Inc. v. West, 203 F.3d 786 (Fed. Cir. 2000). There, the court affirmed a

---

[3] Elsewhere, Hermes asserts that the remedy it seeks is restitutionary. Pl. Br. at 59, n.60. However, restitution is inapplicable, because it is aimed at preventing unjust enrichment or restoring the status quo ante when a contract cannot be performed. LaSalle Talman Bank v. United States, 317 F.3d 1363, 1369 (Fed. Cir. 2003); Glendale Fed. Bank v United States, 239 F.3d 1374, 1381 (Fed. Cir. 2001); Acme Process Equip. Co. v. United States, 171 Ct. Cl. 324, 347 F.2d 509, 529 (1965) (quoting Restatement, Contracts § 348, cmt. c), rev'd on other grounds, 385 U.S. 138 (1966). These contracts were fully performed. To obtain "restitution," Hermes would, at minimum, have to demonstrate that there was a "total breach or . . . a repudiation," which it cannot show. Mobil Oil Explor'n & Prod'g S.E., Inc. v. United States, 530 U.S. 604, 608 (2000); accord California Fed. Bank v. United States, 43 Fed. Cl. 445, 450 (1999), aff'd in relevant part and rev'd in part, 245 F.3d 1342 (Fed. Cir. 2001), cert. denied, 70 U.S.L.W. 3323, 3361 (Jan. 22, 2002); A. Corbin, Contracts § 1104, at 558, 562 (1964).

[4] Hermes' "breach" allegation is based upon the alleged regulatory violation. Compl. ¶¶ 42-50.

[5] The assertion that the LaBarge court did not find the conduct "illegal," Pl. Br. at 13 n.10, is wrong. The court said the actions "clearly violated the FAR . . . ." 46 F.3d at 1556.

denial of relief because the contractor was not harmed by the alleged regulatory violation (receipt of price information not received by other bidders) – indeed, it benefitted from the "violation." Id. at 788; accord In re Lees, ASBCA No. 52040, 01-1 BCA ¶ 31,360 (denying relief where procurement violated FAR but contractor had "unclean hands"), aff'd mem. (Fed. Cir.), cert. denied, 123 S. Ct. 117 (2002).

Hermes' first argument also relies upon the assertion that "[v]irtually any breach gives an injured party a claim for damages." Pl. Br. at 9 (quoting United States v. Winstar Corp., 518 U.S. 839 (1996)).[6] However, as we have explained, Hermes is not an "injured" party, and refuses to identify any injury apart from the purported breach. Instead, Hermes insists that, according to Rumsfeld v. Applied Cos., Inc., 318 F.3d 1317 (Fed. Cir. 2002) (withdrawn and reissued to correct a factual error, ___ F.3d ___, 2003 WL 1733711 (Fed. Cir. April 2, 2003)), proof of breach alone equates to an "entitlement to damages." Pl. Br. at 10. However, that is not the holding of that case. The issue there was whether the breach of a requirements contract might entitle a contractor to lost profits. The court stated the applicable principle that a non-breaching party is "not entitled to be put in a better position by the recovery than if the [breaching party] had fully performed the contract," and must demonstrate that the remedy sought (lost profits) was the proximate result of the breach. Id. at *6. Hermes' position ignores this principle by seeking to substitute a higher payment than that yielded by full performance.

---

[6] We are not asserting that harm is never present in illegality cases. Indeed, had DESC asserted that this contract was void and refused to pay according to its terms, equitable principles might come to Hermes' aid and require that DESC pay at least the value of the benefit it received. E.g., Urban Data Sys. v. United States, 699 F.2d 1147 (Fed. Cir. 1983) (statute prohibited Government from paying cost plus a percentage of cost). Harm would be evident in such a case.

B. Hermes Is Not Entitled To General Damages

Hermes' second argument is that it need not prove that it was harmed, because it is seeking what it refers to as "general damages" (quoting 3 Dobbs § 12.4(1)). Pl. Br. at 11-14. However, at least in this circuit, the opposite is true. Thus, for example, in San Carlos Irrigation District v. United States, 111 F.3d 1557 (Fed. Cir. 1997), the court denied an award of "general damages" absent proof of causation, noting that "[n]ot every injury resulting from a breach of contract is remediable in damages." Id. at 1563

Indeed, this second argument is built upon a misapplication of its own sources. As Dobbs explains, "general damages" also are called "market damages," and are the remedy that is appropriate in those cases in which "harms are measured by market value." 3 Dobbs § 3.2, at 288. Hermes places the cart before the horse by failing to identify the harm that might be measured by market damages. Thus, although it is true that, in some cases, where a breach has caused an injury, the most suitable remedy might be general or market damages, absent proof of injury, this is not such a case.[7]

The cases upon which Hermes relies for its argument are ones in which one party has failed to meet its contractual obligations, and harm is evident. What must be measured in those cases is the value of the withheld performance. Thus, for example, in Schonfeld v. Hilliard, 218 F.3d 164, 175-76 (1st. Cir. 2001), a case upon which Hermes relies, the court explained:

> A plaintiff is seeking general damages when he tries to recover

---

[7] For example, if a purchaser refuses delivery of items it has contracted to buy and the seller resells the items at market value, the seller's damages might be measured by the difference between the market price and the contract price. See U.C.C. § 2-708(1). Here, Hermes has obtained everything for which it bargained, and, therefore, "market value" is not a relevant measure of damages.

> "the value of the very performance promised." [Citation omitted]. General damages are sometimes called "market" damages because, when the promised performance is the delivery of goods, such damages are measured by the difference between the contract price and the market value of the goods at the time of the breach. [Citation omitted].

The court continued: "When the defendant's conduct results in the loss of an income-producing asset with an ascertainable market value, the most accurate and immediate measure of damages is the market value of the asset at the time of breach – not the lost profits that the asset could have produced in the future." Id. at 176 (emphasis added). Here, given the fact that Hermes won the contracts and received millions of dollars without complaint, it is easy to conclude that the Government has done nothing that "results in [a] loss" – and Hermes has yet to identify any "loss." To do so, Hermes should, at a minimum, show that the combination of its base prices and some presumably "legal" escalation clauses[8] would have resulted in a greater return than Hermes actually received. There is no such evidence.

C. Hermes Has Offered No Evidence Of Harm

Finally, Hermes asserts that it has produced evidence in this case from which a fact finder could infer harm. Pl. Br. at 14. In fact, that "evidence" shows no such thing. At the outset, we note that Hermes denies its very burden of proof. As explained in our moving brief, in MAPCO, 27 Fed. Cl. at 412, this Court held that where, as here, EPA clauses are used pursuant to the authority of FAR 16.203-3 ("Limitations"), they must address "one of the two mischiefs" described there. The "two mischiefs" reflect the two conditions set forth in FAR 16.203-3, whose existence permits the use of an EPA clause, i.e., the necessity to "protect the

---

[8] The Government could have chosen either a cost index escalator or, if Hermes prices could have met the qualifications of FAR 16.203-4, a contractor "established price" escalator. FAR 16.203-1.

contractor and the Government against significant fluctuations in labor or material costs or . . . provide for contract price adjustment in the event of changes in the contractor's established prices." In MAPCO, the contractor was not protected from substantial fluctuations in crude oil costs. Here, Hermes does not allege – and refuses to address – whether the EPA clauses protected it from "one of the two mischiefs."

Concerning its alleged evidence of harm, first, Hermes asserts that, because it "did not receive a lawful price for its fuel, it has been harmed as a matter of law." Pl. Br. at 14. But, the regulation at issue does not specify a price.[9] Consequently, Hermes alleges only that the price "adjustment" mechanism was illegal. Our point is that even a theoretically "illegal" adjustment mechanism, when coupled with a bid price attuned to that mechanism, might very well yield the same price. Moreover, Hermes fails to demonstrate that the price adjustment mechanism did not protect it from significant fluctuations in cost and, therefore, that it was illegal or harmful.

Hermes also asserts that it was " not paid fair market value in accordance with the purpose of DESC's pricing clause." Pl. Br. at 14. We do not understand what this means. Hermes agreed to unambiguous EPA clauses, which were applied without protest. Those clauses embody the parties' entire agreement concerning the amount Hermes would be paid. Thus, Hermes' assertion that the Government agreed to pay, or that the clause guaranteed Hermes would be paid "fair market value" is true only if "fair market value" refers to the price indicated by the proper application of the clause itself. We have yet to see evidence that the clauses did not satisfy their purpose, or that the prices were miscalculated. Thus, we reject Hermes' use of

---

[9] This distinguishes this case from Nautilus Shipping Corp. v. United States, 141 Ct. Cl. 391 (1958), where sales contracts were reformed when the Government charged purchasers more than the price required by statute.

the undefined term "fair market value" to the extent that it refers to something that is yet due.

Remarkably, plaintiff's counsel argues in his declaration that Hermes needs discovery to determine whether it "was paid fair market value" or was "harmed," under contracts that began almost two decades ago. Pl. App. 1214. Sophisticated firms such as Hermes surely know whether they receive "fair market value," if that term has meaning.

Finally, Hermes proffers the pro forma assertions of its executive that Hermes would not have agreed to the EPA clause had it known the clause was unlawful. Pl. Br. at 14. But that evidence only assumes the contract was illegal, and is nothing more than an assertion that Hermes would not knowingly involve itself in something "illegal." There is no evidence that the clauses depressed Hermes' offer prices or, when those prices were adjusted, deprived Hermes of reasonably expected earnings.

Hermes also asserts that the damages calculations in its claims show it has been harmed. This, again, puts the cart before the horse. As we have explained, first, Hermes must demonstrate that the Government breached a duty owed to Hermes, and that the breach deprived Hermes of its reasonable expectations. If Hermes can do so, it may attempt to quantify the resulting damages.

The fallacy of Hermes' position is exposed by this argument:

> Thus at a minimum, the initial price was improperly impacted by DESC's use of the illegal price clause and [Hermes] was thereby harmed, regardless of whether, as a matter of happenstance, changes in [Hermes'] costs tracked precisely every change in prices calculated pursuant to the illegal clause.
>
> In addition, DESC's proposed new standard does not make good sense or good law. It is essentially arguing that the government should not be held liable for using a plainly illegal price clause as long as, by pure chance, the clause happened to operate approximately like a lawful clause would have.

Pl. Br. at 17-18.

Essentially, Hermes asserts that, regardless of whether it was in fact protected or harmed, the Government should be punished. This is not the law.[10]

III. Summary

Hermes' contract revenues, and the very fact that it won the contracts at issue, were the product of Hermes' bids and the price adjustment formulas in the contracts. Hermes understood that mechanism, and its expert and officials acknowledge in their affidavits that Hermes' base prices depended upon the operation and features of that mechanism.

During performance, the unique pairing of Hermes' base price and the escalation mechanism to which Hermes calibrated its bids determined Hermes' contract revenues. Hermes has yet to complain that it bid too low, that the adjustment mechanism did not act as it expected, that the contracts did not satisfy reasonable expectations, or that the clauses did not protect against significant cost fluctuations, as intended. See FAR 16.203-3.

Under these circumstances, Hermes cannot demonstrate that anything the Government did diminished Hermes' lot in any way. Accordingly, Hermes need not be made whole – because it is whole. Nonetheless, Hermes argues that the Government must undergo the ordeal of "expert roulette," where "experts" will square off to second-guess the prices the market has forged. But, this will not produce a "remedy." In fact, Hermes does not seek a "remedy." Rather, Hermes would have the Court punish the Government for what Hermes charges is "illegal" behavior. Cf. Leesona Corp. v. United States, 220 Ct. Cl. 234, 252, 599 F.2d 958, 969

[10] In fact, proper operation of the clauses would not be happenstance at all. The EPA clauses referenced market prices. Surely Hermes does not assert that all contracts with market-based EPA clauses result in prices below fair market value.

(1979) (finding no waiver of sovereign immunity allowing punitive damages). Of course, no schedule of fines exists for the charged behavior, and no fund exists into which any such fine might be deposited. Undeterred, Hermes suggests that the fine be "fair market value" – a term not found in its contracts – and that the recipient be Hermes. This is a recipe for a windfall.

Hermes is not, as it pretends, an "innocent bystander being taken advantage of by a predator government." American Telephone & Telegraph Co. v. United States, 177 F.3d 1368, 1384-85 (Fed. Cir. 1999) (en banc)(concurring opinion). Hermes "knew exactly what [it was] doing when [it] entered into this deal. . . . The law in a case like this leaves the parties where it found them." Id. at 1385.

Respectfully submitted,

ROBERT D. McCALLUM, JR.
Assistant Attorney General

DAVID M. COHEN
Director

s/ Steven J. Gillingham
STEVEN J. GILLINGHAM
Senior Trial Counsel
KYLE CHADWICK
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tele: (202) 616-2311
Fax: (202) 353-7988

Attorneys for Defendant

OF COUNSEL:

BERNARD A. DUVAL
Counsel

HOWARD M. KAUFER

Assistant Counsel
Office of Counsel
Defense Energy Support Center
Ft. Belvoir, VA

April 18, 2003

CERTIFICATE OF FILING

I hereby certify that on April _28__, 2003, a copy of the foregoing document was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Steven J. Gillingham