IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HERMES CONSOLIDATED, INC.,<br>Doing Business As Wyoming Refining Company,<br><br>Plaintiff,<br>vs.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 02-1460C<br>(Judge Block) |

**PLAINTIFF'S REPLY TO DEFENDANT'S SUPPLEMENTAL BRIEF**

Plaintiff, Hermes Consolidated, Inc., doing business as Wyoming Refining Company ("Wyoming"), respectfully submits this Reply to Defendant's Supplemental Brief.

## I. WYOMING HAS CARRIED ITS BURDEN OF DEMONSTRATING THAT IT IS ENTITLED TO A REMEDY FOR DESC'S VIOLATION OF LAW

This Court already has rejected DESC's harm argument at least four times: in *Pride*, in *Gold Line*, and, most recently, in *La Gloria* and *Phoenix Petroleum*.[1] In each instance, the Court has found that the damages phase of the litigation is the appropriate time to compare the fair market value of the fuel delivered with how much the contractors were paid for their goods. We have previously discussed the rulings in *Pride* and *Gold Line*, in which the Court twice rejected DESC's argument that there is an additional "harm" wicket through which a plaintiff, like Wyoming, must go to establish liability in this type of case. *See* Pl.'s Reply at 15-16.

*La Gloria* and *Phoenix Petroleum* have now joined the unbroken line of the *Pride* and *Gold Line* precedent. In *La Gloria*, DESC argued, like here, that the contractor "has failed to demonstrate that it was harmed by the use of the EPA clauses in its contracts and thus cannot

[1] *La Gloria Oil & Gas Co. v. United States*, No. 02-465C, 2003 U.S. Claims LEXIS 89 (Fed. Cl. Apr. 15, 2003); *Phoenix Petroleum Co. v. United States*, No. 97-315C (Fed. Cl. Apr. 30, 2003). Copies of the *La Gloria* and *Phoenix Petroleum* decisions are attached hereto at Tabs 1 and 2.

recover." 2003 U.S. Claims LEXIS 89, at *40. The Court disagreed. First, it noted that, in *Barrett*, the Federal Circuit "agree[d] with the Court of Federal Claims' factual finding of a promise by the government to pay at least fair market value" (*id.* at *42 (quoting *Barrett*, 242 F.3d at 1060)) and found that, as in *Barrett*, "there is evidence in the case that supports a finding that defendant promised to pay fair market value for the military fuel it procured." Id. at *43. The Court concluded that the presence of that evidence, coupled with its finding that the EPA clause is unlawful, was all plaintiff needed to establish DESC's liability:

> [t]he Federal Circuit decision in *Barrett III* [, 242 F.3d at 1060,] teaches that the use of an illegal EPA clause together with an implied-in-fact governmental promise to pay at least fair market value entitles a plaintiff to *quantum valebant* relief. . . . In determining the *quantum valebant* relief, the measure of actual harm incurred by La Gloria must be determined. Thus, contrary to defendant's assertions, plaintiff is entitled to prove harm by establishing, under an appropriate valuation methodology, that it failed to receive fair market value.

*Id*. at *44. Wyoming has presented the same evidence of the parties' intent in this case, the EPA clause used in this case is illegal for the reasons already discussed, and thus Wyoming is entitled, without any further showing, to summary judgment as to liability.

This line of precedent continues with *Phoenix Petroleum*. The Court stated that, having found DESC's EPA clause to be "invalid," the clause is stricken and the express contract incorporates DESC's implied-in-fact promise to pay at least fair market value for the fuel delivered. *Phoenix Petroleum*, slip op. at 5. Citing *Gold Line*, the Court found that plaintiff was entitled to *quantum valebant* relief or, in the alternative, reformation of the EPA clause. *Id*. (citation omitted). The Court concluded that, "[a]s there is clearly a genuine dispute as to material issues of fact regarding harm or damages in the instant case, [DESC's] argument must fail." *Id*.

DESC, apparently undaunted by the consistent and repeated rejection by this Court of its harm argument, goes so far as to file a Supplemental Brief in this case to reargue its discredited harm point. (*See* Def.'s Supp. at 1-10). In so doing, DESC simply ignores precedent contrary to

its position, tries to recast Wyoming's claims, misstates the precedent upon which Wyoming relies, and raises arguments that are not relevant to the legal issue presented.

At the outset, DESC disclaims knowledge of any possible contract interests that could have been implicated by its use of an illegal pricing clause in its contracts with Wyoming, which resulted in Wyoming being paid less than fair market value for the fuel it sold DESC. (Def.'s Supp. at 1-2). By so doing, DESC ignores the fact that Wyoming expected that its contracts would contain a lawful pricing clause and that the contracts would not be breached. Moreover, both parties expected the pricing clause in the contracts to operate so that DESC would pay Wyoming fair market value for its fuel. *See Barrett*, 242 F.3d at 1060. It is, at a minimum, those "expectation" interests, among others, that DESC's conduct has upset.

DESC also contends that Wyoming is not entitled to a restitutionary remedy because that remedy "is aimed at preventing unjust enrichment." (Def.'s Supp. at 3 n.3.) DESC's argument is obviously conclusory, as it is entirely founded upon the false, and certainly unproven, assertion that the use of the illegal pricing clause resulted in Wyoming receiving fair market value for the fuel it provided and thus, that DESC was not unjustly enriched by receiving fuel for which it paid less than full market value. In fact, Wyoming's argument that the illegal pricing clause resulted in payments less than fair market value is supported by the *MAPCO*, *Barrett*, and *Pride* decisions, in which this Court held that DESC, using essentially an identical pricing clause, paid contractors tens of millions of dollars less than the fair market value of their fuel. The pricing clause DESC used in Wyoming's contracts is illegal, and it impacted both Wyoming's base bid price and how that base price was subsequently adjusted during the performance of the contracts. Wyoming calculates that the illegal clause resulted in it being paid more than $33 million less than the fair market value of the fuel it provided. (Compl. ¶¶ 33**,** 41, 50, 56, 65, 80, 89). DESC, therefore, was unjustly enriched by, at a minimum, the difference between the amount it paid Wyoming for its fuel and the fair market value of the fuel. A restitutionary remedy is an appropriate method by which to disgorge DESC of its ill-gotten gains and to compensate Wyoming for the fair market value of the fuel it provided to DESC.

Next, DESC responds to Wyoming's harm argument by recharacterizing both Wyoming's Complaint and its argument. Wyoming's Complaint is plain: It seeks contractual relief for DESC's failure to comply with law and regulation in awarding and administering the contracts. (Compl. ¶¶ 17-89). There can be no doubt that a violation of a regulation – especially one, like here, that was enacted for the benefit of the contractor and the violation of which directly affected the price received by the contractor for its goods – gives rise to contractual relief. In *Norby Lumber Co. v. United States*, 46 Fed. Cl. 47, 52 (2000), this Court expressly held that a plaintiff seeking money damages based on violation of environmental regulations states a breach of contract claim. *See also Northrop Grumman Corp. v. United States*, No. 97-276C, slip op. at 11-13 (Fed. Cl. Dec. 20, 1999) (denying government's motion to dismiss a claim for breach of contract founded upon a violation of regulation) (App. 1623-25); *Slagan v. John Whitman & Assocs.*, No. 97-3961, 1997 U.S. Dist. LEXIS 14146, at *14 (E.D. Pa. Sept. 10, 1997) ("Whether under the Restatement's implied duty of good faith performance of a contract or the doctrine of necessary implication, the Court finds that Plaintiff's employment contract contained the implied term that his conduct would be lawful."); *Space Age Eng'g v. United States*, 4 Cl. Ct. 739, 742 (1984) ("a plaintiff may rely on the violation of a statute or regulation to show its implied contract for fair consideration has been breached"); *see, e.g.*, *Kelso v. Kirk Bros. Mech. Contractors, Inc.*, 16 F.3d 1173, 1176 (Fed. Cir. 1994) ("failure to comply with federal labor standards may justify a default termination"); *Hartzell v. Burdick*, 398 N.Y.S.2d 649, 650 (N.Y. City Ct. 1997) ("failure to observe the mandate of the statute would be a breach of contract").[2] Indeed, among other contractual theories, Wyoming seeks recovery for breach of contract here. (Compl. ¶¶ 42-50.) DESC cites no authority for its assertion that Wyoming is not

[2] Indeed, so fundamental to a contract is the parties' compliance with the law that the law is read into the contract quite apart from the parties' intent. *College Point Boat Corp. v. United States*, 267 U.S. 12, 15 (1925).

seeking contractual relief or that the principles governing contractual relief do not apply to Wyoming's claims.[3]

Wyoming's harm argument is equally plain – but also misconstrued by DESC. Wyoming's argument that there is no requirement to prove DESC's concept of harm is not limited to Wyoming's breach of contract theory of recovery. Rather, Wyoming contends, as this Court already has expressly found three times, that in this type of case a plaintiff is not required to prove DESC's idea of harm to establish DESC's liability. *See* Pl.'s Reply at 8-14. In support of its position, Wyoming has cited abundant precedent – including *Barrett*, *Urban Data*, *MAPCO*, *Gold Line*, *Pride*, *La Gloria*, and *Phoenix Petroleum* – many of which involved implied-in-fact theories and none of which were limited to a breach of contract theory of liability. *See* Pl.'s Reply 13-14. Amazingly, in more than nine pages of argument, DESC does not devote a single word addressing this unbroken line of precedent supporting Wyoming's argument.[4]

---

[3] DESC does not offer a single case to support its argument that a plaintiff alleging a breach of contract is not required to make a separate showing of harm, but that such a showing is required by a plaintiff alleging that the government violated a regulation. (Def.'s Supp. at 3-4 & 3 n.4). That is not surprising, because it would be quite odd indeed if the law were that one standard of proof were required to establish liability for otherwise lawful governmental conduct that breaches a government contract and a different, more stringent standard of proof were required to establish liability for ***unlawful*** governmental conduct that results in either a breach of a government contract or the nullification of a contract provision or the entire contract. As Wyoming already has demonstrated, the law recognizes no such distinction. *See* Pl.'s Reply at 8-14.

[4] DESC reliance on *LaBarge Products, Inc. v. West*, 46 F.3d 1547 (Fed. Cir. 1995), is strained at best. (Def.'s Supp. at 3 and 3 n.5). In *LaBarge*, the contract price was not illegal in large part because the contractor did not participate in the government's allegedly illegal attempt to lower bid prices or reduce its bid price in response thereto. *Id.* at 1556. *LaBarge* at most stands for the unremarkable proposition that the government's unsuccessful attempt to establish an illegal price is not actionable. DESC does not have the luxury of arguing that position here. Similarly, *PCL Construction Services, Inc. v. United States*, 41 Fed. Cl. 242 (1998), also cited by DESC, did not involve an illegal price and, in any event, the issue before the Court was not the price to be paid, but rather the "color" of the appropriations available to pay it. *Id.* at 245-46.

Neither does DESC have a persuasive response to Wyoming's general damages point. *See* Pl.'s Reply at 11-14. General damages are a specie of remedy and, contrary to DESC's position, are not narrowly limited only to breach of contract claims.[5] In fact, DESC cites nothing to the contrary; once again, it does not even attempt to respond to the numerous cases Wyoming cites that involved implied-in-fact contracts in which plaintiffs established liability without having to make the separate showing of harm that DESC is attempting to contrive here. *See* Pl.'s Reply at 13-14 (citing, among others, *Barrett*, *Urban Data*, *MAPCO*, and *Pride*).[6]

Finally, as Wyoming already has demonstrated, the prices in Wyoming's contracts were illegal. Thus, it is difficult to imagine a greater "but for" nexus than that present here between the government's violation of the law and the contract price: each month DESC adjusted the price of fuel upward or downward illegally and paid prices for fuel that the Federal Circuit has held to be "unenforceable." *Barrett*, 242 F.3d at 1060; *see* Pl.'s Reply at 14. Because Wyoming did not receive a lawful price for its fuel, it has been harmed as a matter of law. In addition to the economic harm Wyoming already has alleged and demonstrated, the *Gold Line* Court has reminded that a contractor, like Wyoming, is "entitled . . . to have its prices adjusted in a manner consistent with law." 54 Fed. Cl. at 298; *accord Nat'l Mar. Union of Am. v. Commander, Military Sealift Command*, 824 F.2d 1228, 1237 (D.C. Cir. 1987) (government contractor "that claims illegality in a procurement alleges an injury"). In any event, Wyoming has demonstrated

[5] As noted above, Wyoming is proceeding also under a breach of contract theory, and DESC appears to concede that Wyoming is seeking general damages pursuant to that breach count.

[6] *San Carlos Irrigation Dist. v. United States*, 111 F.3d 1557 (Fed. Cir. 1997), is readily distinguishable. *San Carlos* involves speculative – not general – damages: "we hold that the damages alleged by SCIDD . . . are ***too speculative*** to create contractual liability on the part of the government." *Id.* at 1562 (emphasis added); *see id.* at 1563 (noting that "'remote and consequential damages'" are not recoverable in a common-law suit for breach of contract" (quotation omitted)). SCIDD sought to recover for a loss of water that might have been directed to its use "*nine years* after the breach." *Id.* at 1563. The case is silent on the point for which DESC cites it: *i.e.*, the rule in this circuit is that a plaintiff must prove DESC's concept of harm in order to recover general damages. (Def.'s Supp. at 5-6). Once again, DESC's authority fails to support its novel harm argument.

that the DESC pricing clause used in its contracts is illegal, and that alone is enough to entitle Wyoming to summary judgment as to liability.

**CONCLUSION**

For the reasons set forth herein, as well as in Wyoming's Cross-Motion for Partial Summary Judgment and Opposition to Defendant's Motion for Partial Summary Judgment, and Wyoming's Reply to Defendant's Opposition to Plaintiffs' Cross-Motion for Partial Summary Judgment, Wyoming respectfully requests that its Cross-Motion for Partial Summary Judgment be granted and that DESC's Motion for Partial Summary Judgment be denied.

Respectfully submitted,

s/J. Keith Burt

J. Keith Burt
Mayer, Brown, Rowe & Maw
1909 K Street, N.W.
Washington, D.C. 20006
(202) 263-3208 (Phone)
(202) 263-5208 (Fax)

Attorneys for Plaintiff,
Hermes Consolidated, Inc.,
Doing Business As
Wyoming Refining Company

*Of Counsel:*

Adrian L. Steel, Jr.
Nicole H. Fradette
Mayer, Brown, Rowe & Maw
1909 K Street, N.W.
Washington, DC 20006

May 5, 2003

1

LEXSEE 2003 US Claims LEXIS 89

LA GLORIA OIL AND GAS COMPANY, Plaintiff, v. THE UNITED STATES, Defendant.

No. 02-465 C

UNITED STATES COURT OF FEDERAL CLAIMS

2003 U.S. Claims LEXIS 89

April 15, 2003, Filed

DISPOSITION:
Defendant's motion for summary judgment denied. Plaintiff's motion for summary judgment granted in part and denied in part.

COUNSEL:
[*1] J. Keith Burt, Washington, DC, for plaintiff. Kerry L. Edwards, Washington, DC, of counsel.

Steven J. Gillingham, with whom were Robert D. McCallum, Assistant Attorney General, David M. Cohen, Director, and Kyle Chadwick, United States Department of Justice, Washington, DC, for defendant. Bernard A. Duval, Donald S. Tracy, and Karen E. Schools, Defense Energy Support Center, Fort Belvoir, VA, of counsel.

JUDGES:
EMILY C. HEWITT, Judge.

OPINIONBY:
EMILY C. HEWITT

OPINION:

OPINION AND ORDER

HEWITT, Judge

Plaintiff, La Gloria Oil and Gas Company (La Gloria), seeks damages from defendant, the Defense Energy Support Center (DESC), n1 arising out of the use of an allegedly illegal economic price adjustment clause in a series of six competitively-awarded fuel supply contracts. The parties have filed cross-motions for partial summary judgment. For the following reasons, defendant's motion is DENIED, and plaintiff's motion is GRANTED on the issue of quantum valebant relief and with respect to the invalidity of the individual and class deviations. Plaintiff's motion is DENIED with respect to the applicability of the judicial estoppel doctrine to the calculation of fair market value.

- - - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - - -

n1 DESC is part of the Defense Logistics Agency (DLA) in the Department of Defense (DoD). Complaint (Compl.) P 7. Facts cited to the briefing of only one of the parties do not appear to be in dispute.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

[*2]

I. Background

Between 1993 and 1999, DESC awarded La Gloria six contracts to supply military jet and diesel fuel at various locations in the United States. n3 Plaintiff's Cross-Motion for Partial Summary Judgment and Opposition to Defendant's Motion for Partial Summary Judgment (Pl.'s Mot. and Opp.) at 6; Complaint (Compl.) PP 1, 10, 24. The contracts were valued at approximately $ 157 million. Compl. P 10. Each contract was to be performed for a one-year period. Defendant's Motion for Partial Summary Judgment (Def.'s Mot.) at 2.

- - - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n3 DESC awarded the following contracts to La Gloria: DLA600-93-D-0559 (1993 contract), SPO600-95-D-0480 (1995 contract), SPO600-96-D-047565 (1996 contract), SPO600-97-D-0464 (1997 contract), SPO600-98-D-0468 (1998 contract), and SPO600-99-D-0478 (1999 contract). Pl.'s Mot. and Opp. at 6 n.7; Plaintiff's Appendix (Pl.'s App.) at 106-45.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

Plaintiff's contracts contained a standard economic price adjustment (EPA) clause used by DESC. Compl. P 11. Plaintiff's 1993 contract contained [*3] an EPA clause that adjusted the prices paid to La Gloria based on changes in price indexes published by the Department of Energy in the Petroleum Marketing Monthly (PMM Indexes). Id. at P 13, 16; Def.'s Mot. at 6-7. Plaintiff's 1995, 1996, 1997, 1998, and 1999 contracts each contained an EPA clause that adjusted the prices paid to La Gloria based on changes reported in Platts Oilgram Price Report (Platts), a daily industry publication. Def.'s Mot. at 7. Except for the use of the different indexes, the EPA clauses in the 1993 and subsequent contracts were substantially identical to the EPA clause denominated B19.33 (Clause B19.33).

La Gloria alleges that the EPA clauses used in its contracts violated the Federal Acquisition Regulation (FAR). Compl. PP 3, 13-17. Based on the alleged illegality of the EPA clauses, plaintiff claims that it "is entitled to recover based on the fair market value of the fuel it delivered to DESC . . . by way of reformation, quantum valebant, or rescission and restitution." Id. at P 33.

Defendant denies that the EPA clauses in plaintiff's contracts are illegal. Def.'s Mot. at 16-20. Defendant argues that even if the EPA clauses do not comply [*4] with the FAR, DESC may use the clauses based on properly obtained and approved deviations. Id. at 9-10. Defendant also contends that plaintiff cannot maintain its suit based on the alleged illegality of the EPA clauses because plaintiff has failed to show that it suffered any harm. Id. at 31-32.

The parties have cross-moved for partial summary judgment on the issue of liability.

II. Discussion

A. Standard of Review

Summary judgment is proper when no genuine issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. Rule 56 of the Rules of the Court of Federal Claims (RCFC); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387 (Fed. Cir. 1987). A genuine dispute of material fact that may significantly affect the outcome of the matter precludes the entry of judgment. Anderson, 477 U.S. at 248. When considering cross-motions for summary judgment, as in this case, the court evaluates each motion under the same standard. Cubic Defense Sys., Inc. v. United States, 45 Fed. Cl. 450, 457 (1999). Issues [*5] of contract interpretation are appropriate for summary judgment. See Dalton v. Cessna Aircraft Co., 98 F.3d

1298, 1305 (Fed. Cir. 1996); P.J. Maffei Bldg. Wrecking v. United States, 732 F.2d 913, 916 (Fed. Cir. 1984). The cross-motions focus on issues of contract interpretation--whether defendant's EPA clause is authorized by the FAR, or if not, whether the use of the clause was authorized by deviations from the FAR.

B. Whether the EPA Clauses Used in Plaintiff's Contracts were Illegal

Plaintiff argues that defendant's EPA clause violates the terms of the FAR, that defendant has conceded its EPA clauses do not comply with the FAR, and that the testimony of a FAR drafter supports a finding that defendant's EPA clauses are illegal. Pl.'s Mot. and Opp. at 9-22.

Defendant challenges the holdings in Barrett Refining Corp. v. United States, 242 F.3d 1055 (Fed. Cir. 2001) (Barrett III) and MAPCO Alaska Petroleum, Inc. v. United States, 27 Fed. Cl. 405 (1992) (MAPCO), see Def.'s Mot. at 25-26; Defendant's Reply and Opposition to Plaintiffs' (sic) Cross-Motion for Partial Summary Judgment (Def.'s Reply) at 2-3, and [*6] denies making any concession that its EPA clauses are illegal. See Def.'s Reply at 8-10. Defendant contends that the declaration of Ms. Etha Quinn, one of the FAR drafters, reflects her personal opinion and "is not admissible regulatory history." Def.'s Reply at 10-11. Because defendant has asserted in this case substantially identical arguments to those addressed by this court in MAPCO and Gold Line Refining, Ltd. v. United States, 54 Fed. Cl. 285 (2002) (Gold Line), the court addresses defendant's contentions as economically as possible.

1. The Applicable FAR Provisions and the Case Law Interpreting Those Provisions

The FAR authorizes the use of an EPA clause in a fixed-price contract to "provide[] for [the] upward and downward revision of the stated contract price upon the occurrence of specified contingencies." 48 C.F.R. § 16.203-1 (FAR § 16.203-1) (2003). n4 The FAR recognizes three general types of economic price adjustments: (1) adjustments based on a contractor's established prices; (2) adjustments based on actual costs of labor or material; and (3) adjustments based on cost indexes of labor or material. [*7] FAR § 16.203-1. Significantly, FAR § 16.203-1 does not authorize an adjustment based on price indexes. In deciding to use an EPA clause in a contract, a contracting officer must determine that it is "necessary either to protect the contractor and the Government against significant fluctuations in labor or material costs or to provide for contract price adjustment in the event of changes in the contractor's established prices." n5 FAR § 16.203-3.

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n4 This language in the current version of the FAR was in effect prior to defendant's issuance of the solicitations for the fuel supply contracts that are the subject of this case. See FAR § 16.203-1 (1992).

n5 When the government shifted in the 1980s to the use of illegal EPA clauses based on price indexes, its purpose was to shift risk off of the government and onto the contractor. See Appendix to Plaintiff's Cross-Motion for Partial Summary Judgment and Opposition to Defendant's Motion for Partial Summary Judgment (Pl.'s App.) at 239-40; Appendix to Defendant's Motion for Partial Summary Judgment (Def.'s Ex.) 4.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -
[*8]

In MAPCO, n6 this court considered the enforceability of EPA clause, Clause B19.33, the same EPA clause that La Gloria challenges in this case. The plaintiff-contractor in MAPCO challenged the legality of the EPA clause using the PMM Index contained in its fuel supply contract with DESC because the PMM Index was a price index, rather than a cost index of labor or material permitted under FAR § 16.203-1. 27 Fed. Cl. at 406-08. Following careful analysis of the pertinent FAR provisions, review of the regulatory history, examination of the record, and consideration of the parties' arguments, the court held that the EPA clauses were "plainly inconsistent with the FAR." Id. at 408. The court found

that, "having chosen to use the mechanism of an economic price adjustment clause, defendant [was] obligated to comply with applicable regulations limiting its use . . . . [but that defendant] offered no principled reason for not doing so." Id. at 416. The court determined that the EPA clause used in the fuel supply contract did not comply with FAR § 16.203. Id.

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n6 After the parties settled their dispute, the court denied defendant's motion to reconsider its refusal to vacate the opinion granting summary judgment to plaintiff on all liability issues. See MAPCO Alaska Petroleum, Inc. v. United States, 30 Fed. Cl. 153 (1993). The court stated that "in the circumstances at bar, [it found] vacatur to be contrary to the public interest." Id. at 155.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -
[*9]

Subsequently, in Barrett Refining Corp. v. United States, 42 Fed. Cl. 128 (1998) (Barrett I), another plaintiff-contractor sought damages from the DESC on the ground that the government had used an unauthorized EPA clause, the same Clause B19.33 at issue in this case, in its fuel supply contract. Barrett I, 42 Fed. Cl. at 133. At trial in that case, the government "conceded that the pricing mechanisms used in the contracts . . . were unauthorized." Id. at 130. After further proceedings to determine whether the government was entitled to damages on its counterclaim, the Federal Circuit affirmed on appeal that the Court of Federal Claims properly exercised jurisdiction over plaintiff's claims for quantum valebant relief because plaintiff's claim was premised on an implied-in-fact contract. Barrett III, 242 F.3d at 1059, aff'g-in-part and rev'g-in-part Barrett v. United States, 45 Fed. Cl. 166, 170 (1999) (Barrett II ). n7

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n7The Federal Circuit vacated, on other grounds, part of the decision of Court of Federal Claims and remanded. See 50 Fed. Cl. 567 (2001) (on remand).

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -
[*10]

La Gloria asserts here that FAR § 16.203 is a mandatory regulatory provision. Plaintiff's Reply to Defendant's Opposition to Plaintiff's Cross-Motion for Partial Summary Judgment (Pl.'s Reply) at 4-10. La Gloria argues that in Barrett III, the Federal Circuit adopted the court's holding in MAPCO, thereby establishing the illegality of defendant's EPA clause. Pl.'s Mot. and Opp. at 9-13.

Defendant disputes the correctness of the MAPCO decision and asserts that FAR § 16.203 does not prohibit use of the EPA clauses in plaintiff's contracts. Def.'s Mot. at 25-30. Moreover, defendant argues that Barrett III does not establish the illegality of the EPA clause. "Because the 'illegality' issue was not raised in the trial court, it also was not before the appeals court in Barrett [III]." Id. at 4. Stating that "FAR 16.203-1 does not purport to be proscriptive," defendant contends that the regulations governing EPA clauses do not prohibit use of DESC's EPA clause. Id. at 25-26. Defendant also argues that the MAPCO decision is irrelevant to most of this case because five of the six contracts challenged in this action were authorized by deviations, id. [*11] at 15, an argument addressed in Part II.C of this opinion.

Defendant's position with respect to FAR § 16.203, specifically whether or not FAR § 16.203-1 is mandatory and whether Clause B19.33 comports with the FAR, has been directly considered and addressed by this court in MAPCO and most recently in Gold Line. For the reasons stated briefly above and in detail in those decisions, it is the view of this court that Clause B19.33 was not a type of EPA clause permitted by the FAR.

2. Defendant's Prior Statements Concerning the Illegality of the Challenged EPA Clause

Plaintiff also contends that, by seeking FAR deviations to permit continued use of the challenged EPA clauses after the MAPCO decision, defendant has conceded the illegality of the price adjustment clauses in plaintiff's contracts. Pl.'s Mot. and Opp. at 13-15. Plaintiff argues that prior statements by defendant concerning the challenged EPA clause constitute "admissions" of illegality. Id. Plaintiff cites Barrett I, Phoenix Petroleum Co. v. United States, 40 Fed. Cl. 862 (1998), rev'd, 215 F.3d 1345 (1999), and Pride Cos. v. United States, 2000 U.S. Claims LEXIS 213 [*12] (May 10, 2000) (Pride Cos.), to support its argument that defendant has acknowledged the illegality of its EPA clause in cases before both the Federal Circuit and this court. Pl.'s Mot. and Opp. at 13-14.

Defendant states that plaintiff has "unfairly characterized" its statements and positions in other cases. Def.'s Reply at 8. Citing Swift & Co. v. Hocking Valley Ry. Co., 243 U.S. 281, 289, 61 L. Ed. 722, 37 S. Ct. 287 (1917) and Hegeman-Harris & Co. v. United States, 440 F.2d 1009, 1012, 194 Ct. Cl. 574 (Ct. Cl. 1971), defendant asserts that "admissions and concessions of law are generally not . . . binding upon a court, and thus, do not bind parties." Id. Thus, defendant reasons that "even if [its] conduct were interpreted as an admission," it would not be binding on the court because "whether the EPA clauses complied with the FAR is a question of law." Id.

The court agrees that defendant is not bound by its positions in Barrett III or the other cases. But the court notes that defendant's own explanation of why it sought FAR deviations for its 1993 and subsequent procurements supports the court's view that Clause B19.33 violates the FAR. n8

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n8 In a memorandum accompanying DESC's internal agency request for a deviation from FAR § 16.203, dated January 5, 1993, defendant references the decision of the United States Court of Federal Claims in MAPCO. See Pl.'s App. at 234-35, 238. Reviewing the relevant FAR provisions, defendant states that "the types of EPA provisions specifically authorized by the FAR are not satisfactory alternatives to the market indexes DFSC utilizes in petroleum contracting." Id. at 238. Defendant explains:

> DFSC has studied and used EPA provisions for many years and has tried several different types . . . . Crude oil escalators, which would reflect 80-90 per cent of the refiner's cost to produce a petroleum product, and are authorized by FAR 16.203-1(b, c), are not normally reflective of product prices and create evaluation problems in competitive procurements. Refinery postings, on the other hand, which are authorized by FAR 16.203-1(a), are not always available or reliable . . . .

Id.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

[*13]

3. Ms. Quinn's Declaration

Plaintiff relies on a declaration by Ms. Etha Quinn, the principal drafter of FAR § 16.203, for support of its argument. Plaintiff contends that because the drafters of the FAR expressly considered and rejected establishing prices based on price indexes, defendant's interpretation of FAR § 16.203 cannot stand. n9 Pl.'s Mot. and Opp. at 15-18.

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n9 Ms. Quinn's declaration was originally submitted to the court in the MAPCO case. Pl.'s Mot. and Opp. at 16 n.19.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

Defendant urges the court to disregard Ms. Etha Quinn's declaration because

"with respect to the [challenged] EPA provisions . . . the FAR Project did not draft the provisions at issue, it simply preserved and repackaged them." Def.'s Reply at 10 (emphasis deleted) (citing MAPCO, 27 Fed. Cl. at 409). Defendant asserts that Ms. Quinn "has no relevant insight into the intent of the provisions, and is not competent to testify about them." Id. Defendant contends that "Ms. Quinn's opinion is not admissible [*14] regulatory history." Id. at 10-11 (relying on MAPCO, 27 Fed. Cl. at 409 n.6 (finding that "post hoc statements by drafting officials . . . hold no probative value, especially when 'uttered in the context of a vigorous dispute'")).

The court agrees with defendant that the court should not rely on Ms. Quinn's declaration to establish the interpretation of FAR § 16.203. At the time of the 1978 FAR Project, FAR § 16.203 was based on the then-existing Defense Acquisition Regulation (DAR) and Federal Procurement Regulation (FPR). Pl.'s Mot. and Opp. at 16. The charter of the 1978 FAR Project was to "unify and simplify federal procurement system" without making substantive or policy changes to the existing regulations. Id. In her declaration, Ms. Quinn stated that the drafters of FAR § 16.203 rejected a specific proposal, submitted during the period for public comment, to change the current regulation FAR § 16.203-1 to include price indexes. Id. She explained that the proposal was rejected because "to add a new provision providing for price indexes in addition to cost indexes would have been a substantive policy change from the DAR and FPR which was not permitted [*15] by the Office of Federal Procurement Policy guidelines." Id. Ms. Quinn's declaration is of limited assistance to the court, however, because her testimony was prepared in connection with the MAPCO litigation. See id. at 16 n.19.

The court observes that, while attacking Ms. Quinn's declaration, defendant does not dispute various factual statements in her testimony which are consistent with the views of the court in MAPCO, Gold Line and here that price indexes are not contemplated by FAR § 16.203. However, for the reasons stated by this court in MAPCO, the court does not rely on Ms. Quinn's testimony. n10

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n10 The court notes that, notwithstanding that her testimony was prepared in connection with litigation, Ms. Quinn's testimony is entirely consistent with the regulatory history describing the purpose of the 1978 FAR Project. As the court in MAPCO observed:

Periodically between [the commencement of the 1978 FAR Project] and September 19, 1983, [the publication date of the final draft of the FAR] . . . the Office of Federal Procurement Policy ran a statement as to the purposes underlying the FAR:

The fundamental purposes of the FAR are to reduce proliferation of regulations; to eliminate conflicts and redundancies; and to provide an acquisition regulation that is simple, clear and understandable. The intent is not to create new policy. However, because new policies may arise concurrently with the FAR project, the notice of availability of draft regulations will summarize the section or part available for review and describe any new policies therein.

See, e.g., "Types of Contracts," 46 Fed. Reg. 42,303 (1981) (emphasis added). No new policies were described in the portion of the draft summarizing FAR Part 16, which governs the present dispute. See id. at 42,304.

27 Fed. Cl. at 409. The portion of the draft summarizing FAR Part 16 that governed the dispute in MAPCO also governs the dispute in this case.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

[*16]

C. Whether FAR Deviations Permit Use of the EPA Clause in Plaintiff's Contracts

Defendant argues that, consistent with FAR subpart 1.4, five of the six contracts awarded to plaintiff contained EPA clauses that were used in

accordance with agency-authorized deviations. See Def.'s Mot. at 12-13. Defendant asserts that it obtained individual deviations for two of its contracts with plaintiff, specifically, its 1995 and 1996 contracts, Def.'s Reply at 11; Transcript of March 7, 2003 Oral Argument (Tr.) at 23-29, and that it obtained a class deviation which applied to three of its contracts with plaintiff, specifically, its 1997, 1998, and 1999 contracts. Def.'s Reply at 11. Defendant notes that, in an internal memorandum concerning the deviations, DESC "plainly recorded [its] disagreement with MAPCO" but decided to obtain the deviations as a "prudent response to the MAPCO decision . . . ." Def.'s Reply at 8.

Plaintiff contends that the deviations were not issued in compliance with the applicable regulatory law and are therefore invalid. n11 Pl.'s Mot. and Opp. at 22-32. Plaintiff also argues that even if the class deviation were found valid, it expired on October 5, 1998 and [*17] cannot apply to the last contract awarded to La Gloria in 1999. Id. at 32-33.

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n11 The court declines to address at length plaintiff's arguments concerning defendant's alleged violation of the Regulatory Flexibility Act (RFA), 5 U.S.C. §§ 601-612. See Pl.'s Mot. and Opp. at 29-32; Pl.'s Reply at 15-16. The express terms of the RFA provide that only "a small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review of agency compliance with the requirements [of certain prescribed statutory provisions]." 5 U.S.C. § 611(a)(1). Contrary to plaintiff's argument that it is entitled to argue defendant's failure to comply with all the applicable regulations in procuring its military fuel supplies, see Pl.'s Reply at 29, it is the view of the court that because plaintiff is not a small business, it lacks standing to challenge defendant's compliance with the requirements of the RFA.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

As defined in FAR § 1.401(a), a deviation [*18] is "the issuance or use of a policy, procedure, solicitation provision . . ., contract clause . . ., method, or practice of conducting acquisition actions of any kind at any stage of the acquisition process that is inconsistent with the FAR." FAR § 1.403 governs individual deviations. FAR § 1.404 governs class deviations.

1. Whether the 1995 and 1996 Contracts Were Authorized by Individual Deviations

FAR § 1.403 addresses individual deviations. At the time that DESC sought individual deviations for plaintiff's 1995 and 1996 contracts, FAR § 1.403 stated that "individual deviations affect only one contracting action." See Pl.'s Mot. and Opp. at 23 n.26 (emphasis added); Pl.'s App. at 74.

Plaintiff interprets the regulatory language to require that an individual deviation apply only to "one contract." Pl.'s Mot. and Opp. at 23. La Gloria asserts that, in violation of the law, DESC obtained two "individual" deviations that each applied to more than one contract. Pl.'s Mot. and Opp. at 22-23; Tr. at 42. Plaintiff argues that the deviations are invalid and cannot be applied to its 1995 and 1996 contracts. See Pl.'s Mot. and Opp. at 22.

In support of its position, plaintiff [*19] points out that in March 2002, a language change from the term "contracting action" to "contract action" became effective throughout the FAR. See Pl.'s Mot. and Opp. at 23 n.26; Final Rule for Federal Acquisition Regulation: Definitions for "Contract Action" and " Contracting Action," 67 Fed. Reg. 13053-1 (Mar. 20, 2002). Asserting that the change in language "was merely editorial," plaintiff states that corresponding changes were made to FAR § 1.404 which addresses class deviations and to FAR § 5.001 which defines a contract action. Pl.'s Mot. and Opp. at 23 n.26. Noting that prior to the March 2002 language change throughout the FAR, a "contracting action" was defined for purposes of FAR subpart 5 as "an action resulting in a contract," see FAR § 5.001, plaintiff argues that the same definition must "have been intended in FAR subpt. 1.4[.]" Pl.'s Mot. and Opp. at 23 n.25. Plaintiff further argues that DLAR § 1.403, a provision of the Defense Logistics

Acquisition Directive corresponding to FAR § 1.403, n12 as in effect both before and after the March 2002 FAR language change provided that individual deviations "affect only one contract or transaction." [*20] Pl.'s Mot. and Opp. at 23; Appendix to Plaintiff's Cross-Motion for Partial Summary Judgment and Opposition to Defendant Motion for Partial Summary Judgment (Pl.'s App.) at 99.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n12 The current Defense Logistics Acquisition Directive (DLAD) was formerly known as the DLAR or Defense Logistics Acquisition Regulation.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Plaintiff complains that defendant obtained two "individual" deviations for fuel supply procurements that were not single contract actions as contemplated by the FAR but resulted in the award of as many as 30 contracts worth $ 4 billion dollars. See Pl.'s Mot. and Opp. at 23; Pl.'s Reply at 11; Tr. at 42-44. Challenging defendant's practice of "seeking one deviation for 'all domestic fuel solicitations' for an indefinite period," plaintiff contends that "DESC could rely on individual deviations to support its use of price indexes only by obtaining a separate deviation for each contract." Pl.'s Mot. and Opp. at 23.

Plaintiff argues that defendant's fuel procurements, which occurred in the fall and [*21] again in the spring, involved a "class of contracts" and therefore, required a class deviation rather than individual deviations. Pl.'s Reply at 11. Plaintiff notes that DESC itself had previously treated "the same [type of fuel supply] procurements" as a class of contracts. Pl.'s Mot. and Opp. at 24. In particular, plaintiff points to an occasion when the Commander of DESC authorized an exemption from the statutory requirement for public advertising for "the proposed class of contracts." n13 See Pl.'s App. at 220-23.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n13 Plaintiff recognizes that the documented findings supporting the DESC Commander's decision to authorize the exemption from the statutory formal advertising requirement for the "class of [fuel supply] contracts" accompanied a 1984 procurement, nine years before the earliest of the contracts in dispute here. Pl.'s Mot. and Opp. at 24 n.27. But plaintiff points out that the fundamental structure of defendant's fall and spring procurements for fuel supplies has remained the same, id., a point defendant does not dispute. See Def.'s Mot. at 6 (stating "all of DESC's contracts contained a version of a DESC economic price adjustment clause ('EPA') that DESC had used since 1984.")

Plaintiff asserts that defendant's own documented characterization of the fuel supply procurements as a "class of contracts" rather than as an "individual contract action" evidences an inconsistency in defendant's view and "at a bare minimum, . . . creates a genuine issue of material fact concerning whether a 'class' deviation was required." Pl.'s Reply at 11; see Pl.'s Mot. and Opp. at 24. The court believes this issue is resolvable as a matter of law and notes but, does not rely on, the fact that this extrinsic evidence is consistent with the court's interpretation of the FAR.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*22]

Defendant contends that "[plaintiff's] reading of 'contracting action' is crabbed and unconventional." Def.'s Reply at 13. Defendant claims that it properly obtained individual deviations for multiple contracts awarded under one solicitation because the multiple contracts were part of a single " contracting action." Def.'s Reply at 12-13.

Defendant asserts that the FAR broadly defines "contracting" to include "selection and solicitation of sources, preparation and award of contracts, and all phases of contract administration." Def.'s Reply at 13. Citing FAR § 1.201, defendant contends that FAR § 5.001 "does not limit a 'contracting action' to only one contract" but rather defines a contracting action as "an action resulting in a contract." Id. (second emphasis added). Reasoning that a "'

contracting action' includes the issuance of a single solicitation to obtain multiple contracts," defendant claims that approval of a deviation for a solicitation is sufficient and that subsequent approval of a deviation for the resulting contract awards is unnecessary. Id.

In light of the rule of statutory construction that "[a] statute should be construed so [*23] that effect is given to all its provisions," 2A Norman J. Singer, Sutherland Statutes and Statutory Construction (Sutherland) § 46:06, at 181 (6th ed. 2000), the court has some difficulty discerning what would be left over to constitute a class of contracts requiring a class deviation if defendant's interpretation of "contracting action" in the pre-March 2002 FAR is correct. However, the court will consider the possibility that the language of FAR § 1.403 that was in effect when defendant obtained the two individual deviations could be reasonably subject to both of the interpretations urged by the parties. If the pertinent regulatory language, in particular, the term " contracting language" would be "capable of being understood by reasonably well-informed persons in two or more senses," see 2A Sutherland, § 46:04, at 145-46, the court may "take into account some background or contextual considerations" to clarify the meaning of the regulatory language. 2A Sutherland , § 46.04, at 153.

Of particular interest is the discussion in the Federal Register addressing the 2002 language change throughout the FAR from "contracting action" to " contract action." The proposed [*24] rule states that "the Councils do not intend to make any substantive change to the FAR by this proposal." Proposed Rule for Federal Acquisition Regulation: Definitions for "Contract Action" and " Contracting Action," 65 Fed. Reg. 34894 (May 30, 2000). The final rule states that it "amends the FAR to provide for consistent use of the term 'contract action,'" and to that end, "the rule changes the term 'contracting action' to ' contract action' throughout the FAR and makes other editorial changes to clarify the text." Final Rule for Federal Acquisition Regulation: Definitions for " Contract Action" and "Contracting Action," 67 Fed. Reg. 13053-1 (Mar. 20, 2002).

The regulatory provision in effect from March 2002 forward states that "individual deviations affect only one contract action." FAR § 1.403. The court interprets "one contract action" to mean, unambiguously, an action related to one contract award.

The interpretation of FAR § 1.403 before and after March 2002 as referring to a single contract award is supported as well by the text of FAR § 5.001, in effect both before and after March 2002, which defined a "contract action" as "an action resulting in [*25] a contract," see 50 Fed. Reg. 1726, 1728 (Jan. 11, 1985) (emphasis supplied), not, as defendant urges, an action resulting in many contracts. See Def.'s Reply at 13. It is also supported by the text of DLAR § 1.403 in effect both before and after the March 2002 change in FAR § 1.403, which provides that individual deviations "affect only one contract or transaction." See Pl.'s App. at 99. Because the court construes the term " contracting action" in FAR § 1.403 to apply to only one contract, it is the opinion of the court that defendant obtained the two individual deviations, each of which applied to multiple contracts, in violation of the FAR. Accordingly, the court finds that the two individual deviations were invalid and that plaintiff's 1995 and 1996 contracts were not authorized by those deviations.

2. Whether the 1997, 1998, and 1999 Contracts Were Authorized by a Class Deviation

In contrast to an individual deviation, a class deviation applies to "more than one contract action." FAR § 1.404. The FAR also provides that "when an agency knows that it will require a class deviation on a permanent basis, it should propose a FAR revision, if appropriate. [*26] " FAR § 1.404. In this case, defendant sought internal agency approval of a permanent regulatory revision in the same document in which it requested a class deviation. See Def.'s Exs. 20-21, 23; Tr. at 34. This is important because the dispute about the validity of the defendant's class deviation revolves around this issue of whether the proposed deviation is required to be published, and if so, whether it was published. It is undisputed that defendant did publish its proposed permanent FAR revision, and defendant relies on that publication for compliance

with the publication requirements applicable to its class deviation.

a. Whether Publication of the Deviation Request Was Required

Citing FAR subpart 1.5, DLAR § 1.490(b), and section 22 of the Office of Federal Procurement Policy Act (the OFPP Act), plaintiff argues that defendant was required to publish for public comment each of its requests to deviate from the FAR. Pl.'s Mot. and Opp. at 24. Plaintiff also argues that DLAR § 1.490 required defendant to seek DAR Council review and approval of its request for a class deviation. Id. Plaintiff contends that defendant's "failure to publish its deviations or to seek DAR Council [*27] review of its class deviation renders all of the deviations unenforceable." Id. at 25.

Contrary to the argument in plaintiff's briefing, the FAR does not specifically address publication requirements for class deviations. The FAR does require that "for significant revisions" to FAR provisions, "the opportunity to submit written comments on the proposed significant revisions shall be provided by placing notice in the Federal Register." FAR §§ 1.505-1, 1.5502-2; Pl.'s App. at 76 (emphasis added). Under FAR subpart 1.5, a revision is deemed significant if it "alters the substantive meaning of any coverage in the FAR System having significant cost or administrative impact on contractors [or having] . . . a significant effect beyond the internal operating procedures of the issuing agency." FAR § 1.505-1.

DLAR § 1.490(b), by contrast, does require publication for certain class deviations. It provides that "requests for class deviations which have a significant cost or administrative impact upon contractors or offerors must be published in the Federal Register" and, following publication, must be approved by the DAR council. See Pl.'s App. at 99; DLAR § 1.490(b).

[*28] Section 22 of the OFPP Act does not specifically address class deviations but contains publication requirements for certain categories of procurement changes, in particular, changes in "procurement policy, regulation, procedure or form." 41 U.S.C. § 418b. Section 22 of the OFPP Act provides:

No procurement policy, regulation, procedure, or form (including amendments or modifications thereto) relating to the expenditure of appropriated funds that has

(1) a significant effect beyond the internal operating procedures of the agency issuing the procurement policy, regulation, procedure or form, or

(2) a significant cost or administrative impact on contractors or offerors,

may take effect until 60 days after the procurement policy, regulation, procedure, or form is published for public comment in the Federal Register pursuant to subsection (b) of this section.

41 U.S.C. § 418b. The court believes that there is some argument for placing a class deviation in all of these categories, but it surely involves a change in a "regulation," that is, the plan to deviate immediately from FAR § 16.203, as well as a change in a "form, [*29] " that is, the approval of the immediate use of the non-standard EPA Clause B19.33.

Defendant's view is that the 1995 publication in the Federal Register of notice of defendant's proposed FAR revision also, in effect, publicized defendant's request for a class deviation pending approval of the revision, n14 Def.'s Reply at 15, and that plaintiff's reliance on § 22 of the OFFP Act is misplaced because "the class deviation was published as the proposed rule." Id. The court disagrees. Notwithstanding that the proposed revision was "substantively identical" to the class deviation, see Def.'s Reply at 14, notice of the proposed revision does not provide notice of defendant's intent to use immediately its illegal EPA clause prior to the FAR revision, as is required by DLAR § 1.490(b). The fact is that the class deviation was never published. Final approval for the proposed permanent deviation did not occur until 1999, after the date of the contracts at issue in this case. See Pl.'s Mot. and Opp. at 25 n.29.

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n14 Defendant notes that, following the 1992 approval by DLA's Director of Defense Procurement for use of certain DESC-prescribed clauses, see Supplemental Appendix to Defendant's Reply and Opposition to Plaintiffs' (sic) Cross-Motion for Partial Summary Judgment (Def.'s Supp.) Ex. 1, Pentagon officials informed DESC in 1993 that a deviation for the its EPA clauses was not needed. See Def.'s Reply at 14 n.6; Def.'s Supp. Ex. 2. However, defendant observes that in 1994, DESC decided to resume seeking a deviation on the ground that the 1992 approval might not provide the same immunity for DESC's use of its EPA clause as a deviation would. Def.'s Reply at 14 n.6. These internal views are not material to the legality of defendant's use of either individual or class deviations in this case.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*30]

As plaintiff argues in it briefing, the Federal Register notice failed to serve as publication of the purported class deviation because the proposed rule in the Federal Register did not "even remotely refer[] to a class deviation." Pl.'s Reply at 12. Plaintiff notes the difference between notice of a permanent revision (or permanent deviation) and notice of a class deviation, and points out that published notice of a permanent FAR revision informs the public of a potential, but not immediate, change in the law, while published notice of a class deviation informs the public of an immediate, but not permanent, change in the law. n15 Id. at 12-13. The court notes that defendant's effort to make an immediate change in policy is relevant as well to the issue of compliance with § 22 of the OFFP Act. Defendant's notice of a possible FAR revision failed to afford notice in compliance with the OFPP Act.

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n15 In further support of its argument that defendant was required to publish notice of its class deviation, plaintiff relies on defendant's statement in a brief filed with the Federal Circuit in Barrett III. In that briefing, DESC stated: "It was not until 1996, that DESC learned that approval by the Director of Defense [Procurement] was not sufficient for obtaining a deviation from FAR 16.203 and that publication of the deviation in the Federal Register was also required." Pl.'s App. at 547 (emphasis added).

Plaintiff also argues that, although defendant failed to comply with the publication requirements for the class deviation challenged in this case, defendant did publish--pending approval of the proposed permanent deviations --the temporary deviations from FAR requirements for other procurements during the same time period DESC sought the permanent class deviation at issue here. See Pl.'s Mot. and Opp. at 26-27. Plaintiff specifically references (1) DoD's proposed deviation "from the [FAR] record keeping and physical inventory requirements for Special Tooling, Special Test Equipment and Plant Equipment with an acquisition cost of $ 1,500 or less" published in March 1995, see Pl.'s App. at 560 (quoting 60 Fed. Reg. 15,740 (Mar. 27, 1995)) and (2) DoD's proposed deviation "from the [FAR] that simplifies the method of determining the rental charges for government property" published in September 1995, see Pl.'s App. at 563 (quoting 60 Fed. Reg. 46,259 (Sept. 6, 1995)). Pl.'s Mot. and Opp. at 26-27. The court notes that the extrinsic evidence is consistent with the court's interpretation of the publication requirement for class deviations, but does not rely on that fact for its interpretation of the plain language of the statute and regulations.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*31]

In defendant's memorandum, dated January 4, 1995, accompanying its request for internal regulatory approval of the class deviation and the proposed FAR revision, defendant concedes that the substance of the class deviation is of a type and significance that requires publication under the DLAR and the OFPP Act:

In accordance with FAR 1.301(b) and Subpart 1.5 and as required by section 22 of the Office of Federal Procurement Policy Act, DLA intends to have this revised DLAR language [pertaining to authorized economic price adjustment clauses] published for public comment, because the coverage will have a significant effect beyond the internal operating procedures of DLA and may have a modest impact on contractors and offerors.

Def.'s Ex. 20. Defendant's own requests for the class deviation and proposed FAR revision at issue acknowledge that the impact of its request was significant enough to trigger the regulatory publication requirements of FAR subpart 1.5 (as to the proposed FAR revision) and § 22 of the OFPP Act. Although defendant did not reference the DLAR, the terms of the DLAR apply as well to requests for class deviations and impose the same standard for Federal [*32] Register publication as FAR § 1.505-1 and § 22 of the OFPP Act.

The court finds that, based on the regulatory publication requirements and the acknowledged impact of the proposed class deviation, publication of the class deviation was required by the DLAR and § 22 of the OFPP Act. Defendant did not publish notice of the proposed class deviation and, contrary to defendant's assertion, the published notice of the proposed permanent revision did not provide notice of the class deviation. Because defendant obtained the class deviation in contravention of the publication requirements established by DLAR § 1.490, defendant's own regulation, and § 22 of the OFPP Act, the class deviation was not authorized and is not valid for plaintiff's 1997, 1998, and 1999 contracts.

b. Whether the Class Deviation Expired After Three Years

Plaintiff contends that even if the class deviation were deemed to be valid, it had expired before the date of plaintiff's 1999 contract. See Pl.'s Mot. and Opp. at 33. The class deviation was approved by a letter from the Director of Defense Procurement to DLA's Deputy Director of Acquisition dated October 5, 1995. See Pl.'s App. at 496A. Plaintiff argues [*33] that, on October 5, 1998, three years after the alleged approval date, the class deviation expired. Pl.'s Mot. and Opp. at 32-33.

DLAR § 1.490(a)(i) states that, with respect to requests for authority to deviate from the provisions of the FAR or DFARS, "requests for new deviations which will be needed beyond the normal three year expiration period should be submitted . . . as permanent deviations to be incorporated into the DLAD." Pl.'s App. at 99 (emphasis added). Citing DLAR § 1.490(a)(i), plaintiff asserts that class deviations are limited to three years and any request for a deviation longer than "the normal three year expiration period" must be submitted for approval as a permanent deviation. See Pl.'s Mot. and Opp. at 33.

As further support for its position, plaintiff relies on the text of defendant's request for the class deviation in which defendant specifically stated, "DESC requests that the substance of the new deviation be incorporated into the DLAR because the class deviation will be needed beyond the normal three-year expiration period." Pl.'s App. at 526. Plaintiff claims that, based on the effective date of its last contract award (March 8, 1999), the class [*34] deviation does not apply because it expired nearly five months earlier. See Pl.'s Mot. and Opp. at 33; Pl.'s App. at 144.

Defendant denies the expiration of its class deviation asserting that the § 4.105.1 of the Defense Logistics Acquisition Directive (DLAD) (formerly DLAR) does not prescribe a time limit. Def.'s Reply at 16. Alternatively, defendant argues that, even if a three-year time limit were found to apply, the three contracting actions alleged to be covered by the class deviation, namely the solicitations for plaintiff's 1997, 1998, and 1999 contracts, fall within the prescribed time period. See Tr. at 39.

As an initial matter, the court notes that defendant's suggestion that the class deviation applied to the solicitations rather than the contracts is inconsistent both with the regulatory language of FAR § 1.404, which provides that a class deviation applies to a class of contracts, see FAR § 1.404, and with the language in defendant's application for the class deviation. See Pl.'s

App. at 496A (seeking the approval of a class deviation from the requirements of FAR §§ 16.203-1 and 16.203-4(a) when using economic price adjustment clauses in fixed-price [*35] contracts).

According the ordinary and common meaning of the words "normal" and " expiration" to their use in the phrase "normal three year expiration period" in DLAR § 1.490(a)(1), see 2A Sutherland § 47:27, at 336-338, the court understands "normal" to mean "according to a regular pattern . . .[or] . . .to an established rule or norm," see Black's Law Dictionary (7th ed. 1999), and understands "expiration" to mean "[a] coming to an end." Id. Applying the "plain meaning rule" of statutory interpretation, see 2A Sutherland § 46:01, at 113, to interpret the phrase "beyond the normal three year expiration period" in DLAR § 1.490(a)(1), the court construes that language to impose, in ordinary circumstances, a three-year time limitation on the validity of a class deviation. In this case, defendant did not argue that an extension of time was warranted by any circumstance out of the ordinary. Absent argument by the parties that a special circumstance warranted deviation from the "normal . . . expiration period," the court finds that plaintiff's 1999 contract was awarded after the expiration of the class deviation and was therefore not covered by it.

D. Whether [*36] Defendant Was Required to Label Clause B19.33 As A Deviation

FAR § 52.103(a) requires the identification, by number, title and date, of provisions and clauses used in a solicitation or contract and states that "if the FAR provision or clause is used with an authorized deviation . . . the contracting officer shall then insert (DEVIATION) after the date." FAR § 52.103(a); Pl.'s App. at 89. FAR § 52.252-5 governs the use of authorized deviations in provisions and states that "whenever any FAR or supplemental provision is used with an authorized deviation, the contracting officer shall identify it by the same number, title and date assigned to the provision when it is used without deviation . . . except that the contracting officer shall insert (DEVIATION) after the date of the provision." FAR § 52.252-5; Pl.'s App. at 93.

Plaintiff argues that, in violation of FAR §§ 52.103(a) and 52.252-5, defendant did not label the EPA clause, Clause B19.33, as a "DEVIATION" and, as a result, defendant failed expressly to notify the contractor in its contract that defendant was deviating from the FAR in establishing and adjusting the contract prices. Pl.'s Mot. and Opp. at 28-29.

Alleging that [*37] these regulatory provisions only apply if defendant deviates from a clause prescribed by the FAR, defendant argues that such designation was unnecessary because its EPA clause was not a prescribed FAR clause. See Tr. at 82-83. Moreover, citing FAR § 12.301(d), n16 defendant asserts that, after 1996, when it began procuring its fuel supply pursuant to FAR Part 12, "the 'deviation' designation was not mandated, because FAR [ § ] 52.252-2 was not a required clause." Def.'s Reply at 12 n.4.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n16 FAR § 12.301(d) provides:

Notwithstanding prescriptions contained elsewhere in the FAR, when acquiring commercial items, contracting officers shall be required to use only those provisions and clauses prescribed in this part. The provisions and clauses prescribed in this part shall be revised, as necessary, to reflect the applicability of statutes and executive orders to the acquisition of commercial items.

FAR § 12.301(d).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Plaintiff states that a material issue exists with respect to whether the [*38] subject procurements were in fact "undertaken under FAR subpart 12" because military jet fuel is not used by commercial airlines. Tr. at 57. Nonetheless, plaintiff asserts that even if FAR Subpart 12 properly applies to

its contracts, "there are only certain portions of the FAR from which . . . [the contracts] are exempt." Tr. at 56. Plaintiff contends:

> There are certain items that are viewed as commercial items and you are permitted to put aside some of the standard FAR clauses but where you are using a required clauses and there's no argument that FAR 16.203 which is economic price adjustment clauses somehow doesn't apply . . . . Where you're going to deviate from the requirements that you still do have to follow you've got to give notice.

Id. at 55-56.

FAR Subpart 52 "gives instructions for using provisions and clauses in solicitations and/or contracts . . . ." FAR § 52.000. FAR § 52.103(b) requires clear identification "by number, title, date, and name" of "any provision or clause that supplements the FAR." If such supplemental provision or clause is used with an authorized deviation, FAR § 52.103(b) also requires the insertion of the term "(DEVIATION)" [*39] after the name of the regulation. FAR § 52.101(b)(2)(i)(C) defines "provisions or clauses that supplement the FAR" to include those provisions or clauses "developed for use at a suborganizational level of an agency, not meant for repetitive use, but intended to meet the needs of an individual acquisition and, thus, impractical to include in either an agency or suborganization acquisition regulation."

Defendant here concedes that its EPA clauses are "clauses that supplement the FAR" as contemplated by FAR § 52.101(b)(2)(i)(C), but denies any regulatory requirement to attach the "(Deviation)" label to its agency-drafted EPA clause. Defendant's Supplemental Brief (Def.'s Supp. Br.) at 3-4. Defendant asserts that "the requirements of FAR § 52.103(a) apply only when 'any FAR provision or clause' is used." Id. at 2. Moreover, defendant argues that attaching the "( Deviation)" label to its EPA clause "would have served little or no purpose - and, indeed, could have caused confusion," id. at 3, because "DESC's EPA clause (Clause B19.33, "Economic Price Adjustment-Published Market Price") . . . upon its face, is unlike anything in the FAR." Id. at 2.

Defendant's argument, however, [*40] ignores the labeling requirements set forth in FAR § 52.103(b). FAR § 52.103(b) requires that "any provision or clause that supplements the FAR" must be clearly identified "by number, title, date, and name," and further requires that if such supplemental provision or clause is used with an authorized deviation, it must also be labeled "(DEVIATION)." The court finds that the labeling requirements prescribed in FAR § 52.103(b) apply in this case and that defendant failed to comply with that regulatory requirement.

E. Whether Plaintiff is Entitled to Recover Under a Quantum Valebant Theory for Defendant's Use of the Unauthorized EPA Clause in Plaintiff's Contracts

Defendant argues that La Gloria has failed to demonstrate that it was harmed by the use of the EPA clauses in its contracts and thus cannot recover. Def.'s Mot. at 31. Defendant contends that "La Gloria first must demonstrate that the [ challenged EPA] clause did not perform as required, i.e., did not protect the Government and the contractor from substantial fluctuations in costs." Def.'s Reply at 25. Quoting LaBarge Products, Inc. v. West, 46 F.3d 1547, 1556 (Fed. Cir. 1995), defendant [*41] states that, notwithstanding even a clear violation of the FAR, the Federal Circuit requires that a plaintiff show that it was "harmed . . .in [a] concrete way contemplated by the FAR" to be entitled to relief. Def.'s Mot. at 31. Defendant asserts that "simply alleging that the mechanism was not one 'permitted' by the FAR (even if true), is an allegation only of wrong without harm and, therefore, [plaintiff's complaint] must be dismissed." Def.'s Reply at 25.

Plaintiff contends that it has been harmed as a matter of law "in the absence of an enforceable [contract] price." Pl.'s Mot. and Opp. at 47. Plaintiff argues that it is entitled to recover under a quantum valebant theory the fair market value of the fuel delivered to defendant. Pl.'s Mot. and Opp. at 33-37.

In Barrett I, the plaintiff sued DESC after fully performing its contracts

for the supply of military jet fuel seeking, inter alia, damages under a quantum valebant theory of relief. See Barrett I, 42 Fed. Cl. at 134. The trial court found that plaintiff was entitled to damages on a quantum valebant theory, Barrett I, 42 Fed. Cl. at 134, and, in a subsequent proceeding, [*42] declined to award damages to the United States on a counterclaim. Barrett II, 45 Fed. Cl. at 170. On appeal, the Federal Circuit declined to disturb the trial court's finding that "once the unauthorized [price escalation] clause is struck out, . . . [the] express contract simply incorporates an implied-in-fact promise by the government to pay at least fair market value for the fuel delivered by [the contractor] under the contract." 242 F.3d at 1059 (quoting Barrett II, 45 Fed. Cl. at 170). The Federal Circuit stated:

> Given that the price escalation clause was unauthorized and unenforceable, . . . we agree with the Court of Federal Claims' implicit legal conclusion that there was no longer any express clause covering price escalation, and thus, nothing to preclude an implied in fact agreement on that term. We also agree with the Court of Federal Claims' factual finding of a promise by the government to pay at least fair market value.

242 F.3d at 1060.

The EPA clause addressed in Barrett III is substantially the same as the EPA clause used in La Gloria's contracts, which have also been fully performed. [*43] Moreover, there is evidence in this case that supports a finding that defendant promised to pay fair market value for the military fuel it procured. In discussing DESC's rationale for using its EPA clause in its fuel supply contracts with La Gloria, defendant points to the 1993 memorandum prepared by the DLA requesting "an interim deviation from FAR [ § ] 16.203 to permit DFSC [DESC's predecessor agency] to continue the use of . . . [its EPA] provisions . . . " following the MAPCO decision. Def.'s Mot. at 21-22; Def.'s Ex. 4. The 1993 memorandum requesting such deviation states:

> DESC contracts contain EPA provisions based on market indexes of the product being purchased or of a similar product. All EPA references are tested for accuracy and then recommended for use by DESC's Office of Market research and analysis. These EPA provisions ensure that the Government, like commercial customers, will pay the market price for the fuel throughout the duration of the contract, whether market prices increase or decrease.

Def.'s Mot. at 21-22; Def.'s Ex. 4. The court construes DESC's representation that "the government, like commercial customers, [would] pay the market [*44] price for the fuel throughout the duration of the contract," Def.'s Mot. at 22, to be a commitment to pay fair market value to contractors supplying the fuel.

The Federal Circuit decision in Barrett III teaches that the use of an illegal EPA clause together with an implied-in-fact governmental promise to pay at least fair market value entitles a plaintiff to quantum valebant relief. Because it is the court's view that the EPA clause used in plaintiff's contracts was unauthorized and that the government evinced an intention to pay fair market value for its fuel supply procurements, the court finds that, consistent with the Federal Circuit's guidance in Barrett III, plaintiff is entitled to quantum valebant relief. In determining the quantum valebant relief, the measure of actual harm incurred by La Gloria must be determined. Thus, contrary to defendant's assertions, plaintiff is entitled to prove harm by establishing, under an appropriate valuation methodology, that it failed to receive fair market value.

F. Whether the Doctrine of Judicial Estoppel Requires the Same Fair Market Value Calculation to Which Defendant Stipulated In Prior Litigation

Plaintiff argues [*45] that defendant is estopped by the doctrine of judicial estoppel from asserting a different fair market value calculation than the calculation to which defendant stipulated in Pride Cos. v. United States, 2000 U.S. Claims LEXIS 213 (May 10, 2000). Pl.'s Mot. and Opp. at 37-42.

Citing Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1453-54 (Fed. Cir. 1988), defendant states that "the court of appeals has held that a party may

take a position strictly contrary to one that it litigated successfully against a different party unless the current adversary demonstrates '(1) personal reliance on the decision granted in the prior suit, (2) prejudice to its litigation of the issues in the current suit by reason of the decision in the prior suit, or (3) . . . apparent misuse of the court.'" Def.'s Reply at 29. Defendant contends that the different plaintiff here, La Gloria, has neither demonstrated direct reliance on Pride Cos. nor any litigating prejudice. Id. at 30. Defendant asserts that "litigants may adjust their positions based upon new information." Id. (quoting Data Gen'l Corp. v. Johnson, 78 F.3d 1556, 1565 (Fed. Cir. 1996)). [*46]

Judicial estoppel is the well-settled doctrine that "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." Davis v. Wakelee, 156 U.S. 680, 689, 39 L. Ed. 578, 15 S. Ct. 555 (1895). In Pride Cos., the defendant conceded liability, 2000 U.S. Claims LEXIS 213, at *2-3, and although defendant disputed whether plaintiff suffered any harm, see 2000 U.S. Claims LEXIS 213 at *3, the parties stipulated to a formula for determining the fair market value of fuel in a market neighboring plaintiff's. 2000 U.S. Claims LEXIS 213 at *4. It is difficult to characterize defendant's position in Pride Cos. as a case where a party "succeeds in maintaining [a] position." Davis, 156 U.S. at 689. Rather, that position appears to be a litigating concession which did not yield success to defendant. In these circumstances, the calculation of fair market value in Pride Cos. does not appear to the court to be an apt subject for application of the doctrine of judicial estoppel.

G. Whether Plaintiff Has Waived its Claims of Illegality

In defendant's responsive briefing to [*47] plaintiff's cross-motion for partial summary judgment, defendant argues for the first time in this case that La Gloria has waived its right to challenge the legality of the EPA clause used in its contracts because plaintiff completed its contract performance without objection. Def.'s Reply at 18-24. See Tr. at 100. Among the authorities on which defendant relies is the Federal Circuit's recent decision in American Tel. & Tel. Co. v. United States, 307 F.3d 1374 (Fed. Cir. 2002) (AT&T). See Def.'s Reply at 22-23.

After determining that plaintiff had failed to state a valid claim, the Federal Circuit in AT&T observed that, even if plaintiff had stated a valid claim, it had waived its claim. 307 F.3d at 1380. The Federal Circuit noted, in particular, that plaintiff was a sophisticated contractor, that had "successfully underbid technically superior competitors to win the . . . contract, and [had] retained the contract with a vigorous defense against a competitor's protest action." Id. The court declined to relieve AT & T "of the risk that it so aggressively pursued" stating that "the proper time for AT & T to have raised the issues [*48] that it now presents was at the time of contract negotiation, when effective remedy was available. This, AT & T did not do." Id. at 1381. Quoting Whittaker Elec. Sys. v. Dalton, 124 F.3d 1443, 1446 (Fed. Cir. 1997), the Federal Circuit noted in AT&T, "The doctrine of waiver precludes a contractor from challenging the validity of a contract, whether under a DAR [defense acquisition regulation] or on any other basis, where it fails to raise the problem prior to execution, or even prior to litigation, on which it later bases its challenge." 307 F.3d at 1381 (internal citations omitted).

Plaintiff contends that it has not waived its claim. See Pl.'s Reply at 17-29. In support of its position, plaintiff quotes the Federal Circuit's opinion in Beta Sys., Inc. v. United States, 838 F.2d 1179, 1185 (Fed. Cir. 1988), stating that "the government's insistence during negotiations on use of [the EPA clause] in its entirety, and the contractor's acquiescence, does not immunize the government from the consequences of failure of the EPA clause to comply with the law stated as in the DAR." Pl.'s Reply at 19. Plaintiff asserts [*49] that "Beta Systems is binding precedent that is materially indistinguishable from the present case." Id.

The court agrees with plaintiff that the facts in Beta Systems are

substantially similar to the facts in this case and preclude the application of the waiver doctrine. Each of La Gloria's contracts contained a statement that defendant's use of Clause B19.33 as an EPA clause was non-negotiable. See Pl.'s App. at 154, 246; Tr. at 8-9, 58. It is the view of the court that defendant is unable to invoke the waiver doctrine when the terms of the solicitation expressly prohibited bidders from challenging defendant's use of an unauthorized economic price escalation clause. The government appears to have benefitted from its market position with its resort to self-help measures to circumvent the terms of the FAR in the administration of its fuel supply procurements. n17 In these circumstances, the court declines to apply to waiver doctrine.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n17 As the purchaser of military fuel supplies, defendant acknowledged in an internal memorandum requesting an interim deviation from FAR § 16.203 pending defendant's application for a permanent deviation:

We request approval to continue using product index escalators to adjust the prices of fuel we purchase. We have made successful use of these or similar provisions with DLA's approval since the early 1980's. However, a court has ruled that the provisions are not specifically authorized by the FAR, and are therefore invalid.

. . . . We intend to seek a permanent deviation from the FAR in order to validate our EPA provisions. However, that can be a time consuming process. It makes good business sense to continue doing business as we have been for many years while our permanent deviation request is pending. There is no good alternative to our present system of price escalation.

Pl.'s App. at 234.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

[*50]

III. Conclusion

For the foregoing reasons, defendant's motion is DENIED. Plaintiffs' motion is GRANTED on the issue of quantum valebant relief and with respect to the invalidity of the individual and class deviations. Plaintiff's motion is DENIED with respect to the applicability of the judicial estoppel doctrine to the calculation of fair market value. On or before May 6, 2003, the parties shall submit a joint status report proposing a schedule for further proceedings in this case.

IT IS SO ORDERED.

EMILY C. HEWITT

Judge

2

# In the United States Court of Federal Claims

FILED
APR 30 2003
U.S. COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PHOENIX PETROLEUM COMPANY, Plaintiff, | * | |
| v. | * | No. 97-315C |
| THE UNITED STATES, Defendant. | * | (Filed: April 30, 2003) |

## OPINION

In this Government contracts action, plaintiff claims that it is entitled to quantum meruit recovery because an economic price adjustment ("EPA") clause in its jet fuel contract with the Government allegedly violated § 16.203 of the Federal Acquisition Regulation ("FAR") and was, therefore, illegal. This case is before the Court on defendant's motion for summary judgment, and on plaintiff's cross-motion for partial summary judgment. Defendant argues that the Court should grant summary judgment for defendant because (1) the EPA clause was authorized and enforceable, (2) plaintiff was not harmed by the EPA clause, and (3) plaintiff waived its right to bring the claim. Plaintiff counters that it is entitled to partial summary judgment on the issue of the legality of the EPA clause. After careful evaluation of both parties' briefs, and after hearing oral argument, the Court denies defendant's motion for summary judgment and grants plaintiff's cross-motion for partial summary judgment.

## FACTS

On September 8, 1989, the Defense Fuel Supply Center ("DFSC")[1] awarded contract DLA600-89-D-0572 ("572 contract") to plaintiff, Phoenix Petroleum Company ("Phoenix"), to deliver JP-4 jet fuel to four (and later five) military bases in Pennsylvania and Ohio for one year. The 572 contract contained an EPA clause, B19.33, which provided that the contract price for jet fuel would be adjusted on a monthly basis. Specifically, the B19.33 clause provided that the

[1] DFSC later changed its name to the Defense Energy Support Center.

contract price would be adjusted upward or downward based on indexes of the sales of refined petroleum products as reported in *Petroleum Marketing Monthly* ("PMM"), a publication of the Department of Energy, Energy Information Administration. Plaintiff completed the 572 contract in September 1990.

On September 1, 1995, plaintiff submitted a claim to the DFSC contracting officer seeking an adjustment of the final prices under the 572 contract. Plaintiff based its claim on an opinion from this Court, MAPCO Alaska Petroleum, Inc. v. United States, 27 Fed.Cl. 405 (1992), holding that clause B19.33 was invalid. In MAPCO, the Court noted that FAR § 16.203-1 provides for only three types of economic price adjustments, and found that EPA clause B19.33 did not fit within any of the three EPA types. Id. at 408-11. The Court held that the contract did not comply with FAR § 16.203 and was, therefore, illegal. Id. at 416.

The contracting officer denied plaintiff's claim. Plaintiff then filed the instant action in this Court alleging that contract 572 was illegal because EPA clause B19.33 violated FAR § 16.203. Plaintiff seeks to recover, under a *quantum meruit* theory, the difference between the fair market value of the fuel that plaintiff supplied to the United States and the amounts plaintiff received under the contract.

On defendant's motion for summary judgment, this Court dismissed plaintiff's action on standing and *res judicata* grounds. Phoenix Petroleum Co. v. United States, 40 Fed. Cl. 862 (1998). The United States Court of Appeals for the Federal Circuit, however, reversed this Court's dismissal. Phoenix Petroleum Co. v. United States, 215 F.3d 1345, 1999 WL 521189 (Fed. Cir. 1999). This action is now before the Court on defendant's motion for summary judgment and plaintiff's cross-motion for partial summary judgment.

## DISCUSSION

### 1. Legality of EPA Clause B19.33

At the outset, the Court notes that, in at least two other cases, the Government has conceded that the DFSC EPA clauses based on PMM indexes were invalid. Barrett Refining Corp. v. United States, 42 Fed. Cl. 128, 130 (1998) ("The Government concedes that the pricing mechanisms used in the contracts at bar were unauthorized."); Pride Cos. v. United States, No. 95-597C, 2000 U.S. Claims LEXIS 213, at *2-3 (May 10, 2000) ("The Government concedes that the contracts were illegal...."). Moreover, in responding to plaintiff's appeal of this Court's dismissal of the instant case on standing and *res judicata* grounds, the Federal Circuit noted that "[t]he Government has never successfully challenged these holdings and has stipulated to the illegality of B19.33 in this case." Phoenix Petroleum Co., 1999 WL 521189, at **2.[2]

---

[2] Defendant now contends it did not stipulate to the illegality of B19.33 in the instant case. This Court notes, however, that the defendant never sought correction, reconsideration, or review by the Court of Appeals as to the Government's purported stipulation.

Additionally, in denying plaintiff's claim on other grounds, the cognizant contracting officer conceded the illegality of the B19.33.

Apparently having second thoughts about its concessions in Barrett and Pride, and its purported stipulation in the instant case, defendant now asserts that the EPA clause B19.33 is legal and enforceable, and that the Court in MAPCO Alaska Petroleum, Inc. v. United States, 27 Fed.Cl. 405 (1992), and in Gold Line Refining, Ltd. v. United States, 54 Fed. Cl. 285 (2002), erred in holding that the clause was invalid. Defendant argues that the statement in FAR § 16.203-1, "Economic price adjustments are of three general types," is a simple declarative statement, not mandatory prohibitory, or exclusionary, and that there is no language in FAR that expressly limits the contracting officer to the three types of EPAs described in that section. Accordingly, defendant contends that B19.33 was a permissible EPA clause. Defendant argues further that, even if FAR limits EPA clauses to the three general types listed in FAR § 16.203-1, the B19.33 clause was an adjustment based on an "established price," the first of the three EPAs permitted by FAR. 48 C.F.R. § 16.203-1(a).

This Court has ruled on the legality of the DFSC's EPA clause B19.33 in at least two previous cases: MAPCO and, more recently, Gold Line. In both cases, this Court held that the clause was not one the three types of EPAs permitted under FAR § 16.203-1 and that, therefore, the clause was invalid. MAPCO, 27 Fed.Cl. at 408 ("[T]he court is satisfied that the EPA clauses are plainly inconsistent with the FAR."); Gold Line, 54 Fed. Cl. at 295 ("Seeing no salient distinction between the legal arguments addressed in MAPCO and advanced by defendant here, the court concludes that Clause B19.33 did not comply with the FAR.").

FAR 16.203-1, which governs the use of EPAs in fixed-price contracts, states:

> A fixed-price contract with economic price adjustment provides for upward and downward revision of the stated contract price upon the occurrence of specified contingencies. Economic price adjustments are of three general types:
>
> (a) Adjustments based on established prices. These price adjustments are based on increases or decreases from an agreed-upon level in published or otherwise established prices of specific items or the contract end items.
>
> (b) Adjustments based on actual costs of labor or material. These price adjustments are based on increases or decreases in specified costs of labor or material that the contractor actually experiences during contract performance.
>
> (c) Adjustments based on cost indexes of labor or material. These price adjustments are based on increases or decreases in labor or material cost standards or indexes that are specifically identified in the contract.

48 C.F.R. § 16.203-1.

Additionally, the FAR expressly limits the use of EPAs to certain specific circumstances:

> A fixed-price contract with economic price adjustment shall not be used unless the contracting officer determines that it is necessary either to protect the contractor and the Government against significant fluctuations in labor or material costs or to provide for contract price adjustment in the event of changes in the contractor's established prices.

48 C.F.R. § 16.203-3.

The Court finds defendant's arguments–that clause B19.33 was valid under the FAR–to be unpersuasive. Defendant's same arguments were thoroughly analyzed and rejected in both MAPCO and Gold Line, and defendant has not demonstrated that the Court's holdings in those cases were erroneous. Additionally, the Federal Circuit recently noted that "[t]he determination in MAPCO that only the price escalation term was unenforceable and invalid...is consistent with our case law." Barrett Refining Corp.v. United States, 242 F.3d 1055, 1060 n.2 (Fed. Cir. 2001).

This Court is persuaded, as was the Court in Gold Line, that "[t]he rules of statutory construction provide that, if a statute provides that a thing shall be done in a certain way, there is a rebuttable presumption under the rules of statutory construction that an implied prohibition against doing that thing in any other way exists." Gold Line, 54 Fed. Cl. at 292. Therefore, the Court "agrees with the Court in MAPCO that the phrase 'of three general types' in FAR 16.203-1, limits the permissible categories of EPA clauses." Id.; MAPCO, 27 Fed.Cl. at 412.

Furthermore, this Court agrees with the holding in Gold Line that the term "established prices" in FAR § 16.203-1(a) means "contractor's established prices," as provided in FAR § 16.203-3. "Because it is located in the same section, the language of 16.203-3 plainly gives meaning to the phrase 'established prices' used in § 16.203-1(a)." Id. at 295; see also MAPCO, 27 Fed.Cl. at 410 (concluding, based on rules of statutory construction, that "established prices" as used in § 16.203-1(a) means "contractor's established prices.") Thus, clause B19.33 does not fit in one of the three types of EPA clauses prescribed by FAR § 16.203-1 and is, therefore, invalid.

Accordingly, the Court grants plaintiff's cross-motion for partial summary judgment as to the issue of the illegality of the EPA clause.

**2. Harm to Plaintiff**

Alternatively, defendant asserts that, even if the Court holds that clause B19.33 was illegal, plaintiff has failed to demonstrate that it was harmed by DFSC's use of the illegal clause. Plaintiff counters that it has submitted various spreadsheets and other documentation demonstrating its damages resulting from pricing based on clause B19.33. In his August 20, 2002 declaration, Stephen Wang, plaintiff's president, states that plaintiff's damages amounted to

approximately $4 million to $6 million. Defendant, however, disputes plaintiff's assertion that it suffered damages. Defendant asserts that, to establish liability, plaintiff must show that the EPA clause failed to perform correctly or failed to accomplish the objectives of FAR. Defendant further argues that the plaintiff has not shown that the clause failed to reflect market conditions, protect it against cost fluctuations, or otherwise do what the parties intended.

This Court, however, agrees with the Court in Gold Line, which noted that "the proper inquiry for the court is not whether clause B19.33 operated consistently with the 'objectives' of the FAR, but whether the clause complied with the requirements of the FAR." Gold Line, 54 Fed. Cl. at 295. Having found clause B19.33 to be invalid, the clause is stricken, and then the "express contract simply incorporates an implied-in-fact promise by the government to pay at least fair market value for the fuel delivered by [the contractor] under the contract." Barrett Refining Corp., 242 F.3d at 1059. Accordingly, "plaintiff is entitled to quantum valebant relief or, in the alternative, reformation of the EPA clause, the illegal contract term, in either case tailored to further, to the extent possible, the mutual intent of the parties to adjust prices in accordance with the FAR." Gold Line, 54 Fed. Cl. at 298.

On a motion for summary judgment, the moving party bears the burden of demonstrating the absence of genuine disputes over material facts. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). As there is clearly a genuine dispute as to material issues of fact regarding harm or damages in the instant case, defendant's argument must fail.

**3. Waiver**

Finally, defendant argues that, even if the Court were to find that clause B19.33 was invalid and that plaintiff was harmed by its application, plaintiff failed to challenge the clause during the execution of the 572 contract, or at any time before its completion, and thereby waived any right it may have had to later object to the clause.

As fluctuations in economic conditions are unpredictable, misapplication of rules governing EPA clauses could potentially harm either the Government or the contractor, depending on what economic conditions ultimately come to pass. The Court finds, therefore, that the FAR provisions at issue were intended to benefit both contractors and the Government. Under such circumstances, "'if government officials make a contract they are not authorized to make, in violation of a law enacted for the contractor's protection, the contractor is not bound by estoppel, acquiescence, or failure to protest.'" Cessna Aircraft Co. v. Dalton, 126 F.3d 1442, 1451 (Fed. Cir. 1997) (quoting LaBarge Prods., Inc. v. West, 46 F.3d 1547, 1552 (Fed.Cir.1995)).

The facts in Beta Systems, Inc. v. United States, 838 F.2d 1179 (Fed. Cir. 1988), are analogous to those in the instant case. There, at issue was an EPA clause that was intended to adjust the contract price for changes in labor and material costs, which was based on an index published by the Bureau of Labor Statistics. Id. at 1180. During contract performance, the

contracting officer reduced the contract price in accordance with the EPA clause, while Beta Systems' costs allegedly dramatically increased due to unusual increases in the price of aluminum, the major material used for the contract. Id. Beta Systems argued that the use of the index to adjust its contract was improper because it violated the Defense Acquisition Regulation ("DAR") provision governing the use of indexes in adjusting contract prices, which provided:

> An index should be structured to encompass a large sample of relevant items yet bear a logical relationship to the type of contract costs being measured. The basis of the index should not be so large and diverse that it is significantly affected by fluctuations not relevant to the contract performance, yet must be significantly broad so as to assure the minimal effect of any single company, including the anticipated contractors.

Id. at 1185 (quoting DAR 3-404.3(c)(3)c.5 (1981)).

In Beta Systems, the defendant argued that the contractor knew or should have known that the index used in the contract might not track the price of aluminum. The Federal Circuit, however, held that if the use of Bureau of Labor Statistics in the Beta Systems contract violated the DAR, even given the legal presumption that the Government did not intend to use an index that would violate the law, "the government can not, by law, benefit from it." Id. at 1185-86.

Similarly, in the instant case, the EPA clause in the contract at issue was based on an index that did not comply with the applicable FAR provisions. However, "[t]he risk of unintentional failure of a contract term to comply with a legal requirement does not fall solely on the contractor." Id. at 1185.

Defendant asserts that, in Gold Line–where the legality of DFSC's clause B19.33 was also at issue–the Court erred in rejecting defendant's waiver argument. Defendant argues that in the instant case, as in Gold line, the Federal Circuit's holding in Whittaker Elec. Sys. v. Dalton, 124 F.3d 1443 (Fed.Cir.1997) is dispositive. In Whittaker, a contractor negotiated and performed a contract with an option clause that purportedly contained a regulatory violation, which the contractor argued rendered the contract void *ab initio*. The Federal Circuit held that "[t]he doctrine of waiver precludes a contractor from challenging the validity of a contract... where it fails to raise the problem prior to execution, or even prior to litigation, on which it later bases its challenge." Id. at 1446. The Court in Gold Line, however, found the Whittaker holding to be distinguishable from its case. Gold Line, 54 Fed. Cl. at 296. In Gold Line, the Court found that "[t]he alleged breach of procurement regulations in Whittaker occurred after the contract award, while the breach in this case was 'inherent in' the award." Id. (quoting Applied Devices Corp. v. United States, 591 F.2d 635, 640-41 (1979)).

This Court finds that the Gold Line Court's rejection of defendant's waiver argument was well reasoned. The holding in Whittaker, which dealt with an allegedly illegal option clause, is inapposite to the instant case, where the illegal contract clause was central to the mechanism by

which performance of the entire contract was priced. While a contractor may waive, by its silence, the Government's breach of a contract resulting from a violation of a provision of law as to which the contractor derives an incidental benefit, "such cases must be distinguished from those in which a breach of law is inherent in the very writing of the contract involved. In such cases reformation is available despite the initial adherence of the contractor to the contract provision now shown to be illegal." Applied Devices, 591 F.2d at 641. The Court, therefore, finds that plaintiff has not waived its right to object to the 572 contract on grounds that the EPA clause B19.33 was illegal.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is DENIED, and plaintiff's cross-motion for partial summary judgment is GRANTED.

Lawrence S. Margolis

LAWRENCE S. MARGOLIS
Senior Judge, U.S. Court of Federal Claims

April 30, 2003