# In the United States Court of Federal Claims

**No. 02-1460 C**
**(Filed: August 6, 2003)**

---

**HERMES CONSOLIDATED, INC., d/b/a WYOMING REFINING COMPANY,**

***Plaintiff,***

**v.**

**THE UNITED STATES**

***Defendant*.**

---

**Government contract; Jet fuel; Federal Acquisition Regulations; Waiver; Laches**

*J. Keith Burt*, Mayer, Brown, Rowe & Maw, Washington, DC, attorney of record for the plaintiff, *Adrian L. Steel, Jr.*, *Nicole H. Freighted*, Mayer, Brown Rowe & Maw, Washington, DC, of counsel.

*Steven J. Gillingham*, Department of Justice, Commercial Litigation Branch, Civil Division, *Bernard A. Duval*, Defense Energy Support Center, Fort Belvoir, VA., of counsel.

## OPINION AND ORDER

**Block, *Judge*.**

This case is an action for breach of contract which arises out of nine separate contracts for the sale of jet fuel between plaintiff Hermes Consolidated, Inc., d/b/a. Wyoming Refining Company ("Wyoming"), and the United States military, acting through the Defense Energy Supply Center ("DESC"). It is one of eighteen similar cases filed in this court. In those cases where the court has sought to address the underlying substantive issue of liability, either a decision on the merits has been rendered in favor of the applicable plaintiff, or the government has refused to contest liability. *See Calcasieu Refining Co. v. United States*, No. 02-1219 C (Fed. Cl. July 31, 2003); *Berry Petroleum v. United States*, No. 02-1462 C (Fed. Cl. June 10, 2003); *La Gloria Oil & Gas Co. v. United States*, 56 Fed. Cl. 211 (2003); *Gold Line Refining, Ltd. v. United States*, 54 Fed. Cl. 285 (2002) (*Gold Line II*); *Barrett Refining Corp. v. United States*, 45 Fed. Cl. 166, *aff'd in part, vacated in part*, 242 F.3d 1055 (Fed. Cir. 2001) *(Barrett I)*; *Pride Companies, L.P. v. United States*, 2000 U.S. Claims LEXIS 213 (2000); *Gold Line Refining, Ltd. v. United States*, 43 Fed. Cl. 291 (1999) (*Gold Line I*); *MAPCO Alaska Petroleum, Inc. v. United States*, 27 Fed. Cl. 405 (1992).

This court too finds in favor of plaintiff on the breach of contract claim. The court adopts the

rationale set forth by Judge Bruggink in both the seminal case *MAPCO* and also in the case of *Barrett I*, as well as the reasoning of Judge Hewitt, enunciated in *Gold Line II* and *La Gloria*.

Nonetheless, this case in large measure is also about the equitable doctrine of waiver. Wyoming waited fourteen years before suing on the contracts at issue, and ten years after the *MAPCO* decision was rendered, the initial case decided by this court which decided favorably a virtually identical claim to Wyoming's. Simply put, under such circumstances the ancient equitable doctrine of waiver would not permit a litigant to prosecute a claim. The claim may be stale. Witnesses memories grow faulty. Documentary evidence could be lost. And simple fairness and justice demands that a party should not be hauled into court to defend its behavior when its adversary refused to timely vindicate and protect its rights.

But the precedent of the Federal Circuit[1] appears to be of two minds in cases similar to the one *sub judice*. As will be explained at greater depth below, one line of cases would hold that where a contract was performed, but the government insisted on including in the contract a material provision which was unlawful, the doctrine of waiver does not apply despite plaintiff's dilatory behavior. Another series of cases seem to go the other way. Nevertheless, as also explained more fully below, it unclear whether and when Wyoming had the requisite knowledge for waiver to apply, or, knowledge aside, whether Wyoming's claims are barred by the doctrine of laches. As such, the court must deny the parties' cross-motions for summary judgment as premature.

## I. Background

Between 1988 and 1994, Wyoming entered into nine contracts with the DESC[2] to provide the government with jet fuel for military purposes. Each contract[3] contains an "Economic Price Adjustment" ("EPA") clause which tied the price of the contracts at issue to the fluctuating prices published in *Petroleum Marketing Monthly* ("PMM"). The PMM is a publication issued by the Department of Energy which contains averages of every fuel refiner's sales prices across the nation broken down by region. Under the EPA clauses, if the average price for fuel in a given region increased (as recorded in the PMM), Wyoming made more money per gallon of fuel sold, and vice-versa if the PMM average decreased.

These PMM-based EPA clauses, however, were found unlawful in 1992 when this court ruled

---

[1] Under the doctrine of *stare decisis*, decisions of the United States Court of Appeals for the Federal Circuit constitute binding precedent on this court. *See Compliance Corp. v. United States*, 22 Cl. Ct. 193, 204-05 n. 9 (1990), *aff'd*, 960 F.2d 157 (Fed. Cir. 1992).

[2] Until 1998 when it changed its name, the DESC was known as the Defense Fuel Supply Center ("DFSC"). DESC is part of the Defense Logistics Agency which is a component of the Department of Defense ("DOD"), and it purchases fuel for the military worldwide. 48 C.F.R. § 202.101 (2003).

[3] The contracts at issue are: DLA600-86-D-0877; DLA600-87-D-0589; DLA600-88-D-0577; DLA600-89-D-0568; DLA600-90-D-0552; DLA600-91-D-0578; DLA600-92-D-0549; DLA600-93-D-0560; and DLA600-94-D-0529.

in *MAPCO* that the clauses violated the Federal Acquisition Regulations ("FAR").[4] *MAPCO* is now the seminal case on the legality of PMM-based EPA clauses, and its reasoning has been followed in subsequent cases in this court. *See La Gloria*, 56 Fed. Cl. at 214-215; *Gold Line I*, 43 Fed. Cl. at 296; *Gold Line II*, 54 Fed. Cl. at 291-296. Because the arguments in this case concerning the EPA clauses are nearly identical to those in *MAPCO*, a brief description of *MAPCO* is helpful to provide background for the case at bar.

## A. *MAPCO*

The facts of *MAPCO* essentially mirror those of the case at bar: plaintiff, an oil refinery, entered a contract with DESC to provide jet fuel for military purposes; the contract contained a PMM-based EPA clause; and the oil refinery sued to have the clause invalidated. The primary argument in *MAPCO* centered on the meaning of FAR section 16.203-1, which reads:

> A fixed price contract with economic price adjustment provides for upward and downward revision of the stated contract price upon the occurrence of specified contingencies. Economic price adjustments are of three general types:
> (a) Adjustments based on established prices. These price adjustments are based on increases or decreases from an agreed upon level in published or otherwise established prices of specific items or the contract end items.
> (b) Adjustments based on actual costs of labor or material. These price adjustments are based on increases or decreases in specified costs of labor or material that the contractor actually experiences during contract performance.
> (c) Adjustments based on cost indexes of labor or material. These price adjustments are based on increases or decreases in labor or material cost standards or indexes that are specifically identified in the contract.

48 C.F.R § 16.203-1 (2003).[5]

The question in the case was whether the PMM-based price adjustments in the contract fell under subsection (a) as adjustments "based on increases or decreases from an agreed upon level in published or otherwise established prices." Specifically, the parties debated whether the language "established prices" in sub-section (a) meant "contractor's established prices" as plaintiff asserted, or whether it meant "established market or catalog prices" as the government contended. *MAPCO*, 27 Fed. Cl. at 408. Only under the government's interpretation, of course, would the PMM constitute a permissible basis upon which a contract price could be adjusted since the PMM was not specific to plaintiff's prices.

In holding for the plaintiff, the court examined the legislative history of section 16.203. The court noted that section 16.203 was largely a reproduction of its predecessor section, contained in the

---

[4] The FARs are implicitly incorporated into every federal government procurement contract. *See Chris Berg, Inc. v United States*, 192 Ct. Cl. 176, 182 426 F.2d 314, 317 (1970).

[5] Although the 2003 version of the regulation is cited here, the same language was contained in the regulation between 1988 and 1994, the period in issue in this case.

old Defense Acquisition Regulations ("DAR"), which were eventually superceded by the FARs in 1984. *Id*. at 409. In the old DAR provisions, section 3-404.3(b) was the provision that became FAR section 16.203-1, listing the three types of EPA clauses. DAR section 3-404.3(b) was prefaced by a section entitled "general" which spelled out the situations where EPA clauses could be used. One such situation was where an EPA clause was necessary to "provide for contract price adjustment in the event of changes in the *contractor's established prices*." 32 C.F.R. § 3-404.3(a) (1975) (emphasis added).

The *MAPCO* court found that since the "general" provision prefaced DAR section 3-404.3(b), listing the three general types of EPA clauses, the two sections should be read *in pare materia*, and thus, section 3-404.3(b)'s later reference to "established prices" implicitly meant "contractor's established prices." This reasoning held true, the court concluded, even though the superceding FARs rearranged where the above italicized language was positioned, so that it now appears after the section listing the three general types of EPA clauses. *Id*.

The *MAPCO* court also looked to neighboring provisions in the FARs for guidance on the meaning of "established prices." *Id*. at 410. The court noted that FAR sections 52.216-2(b), 52.216-2(c), 52.216-3(a), 52.216-3(b) and 52.216-3(c) all used the terms "established prices" and "contractor's established prices" interchangeably. *Id*. at 410. This again bolstered plaintiff's position that any EPA clause under section 16.203-1(a) had to be specific to the contractor's own established prices.

Important to the case at bar, the court rejected the government's argument that FAR section 15.804-3 was a guiding light in interpreting the phrase "established prices," since section 15.804-3 used the term "established catalog or market prices" when referring to EPA clauses used in contracts for semi-standard supplies. *Id*. The government argued that the phrase "established catalog or market prices" used in section 15.804-3 should be imported into section 16.203-1 as the definition of "established prices," and that the PMM index fit the definition of an established catalog or established market price. *Id*.

The *MAPCO* court, however, rejected the idea that "established prices" in 16.203-1 embraced "established catalog or market prices" as defined in section 15.804-3 since, according to the legislative history and the neighboring FAR sections, it was clear that "established prices" had to be the "contractor's established prices." *Id*. Morever, the court found, even assuming section 16.203-1 embraced "established catalog or market prices," the PMM did not fit the definition of either an established catalog price or an established market price. *Id*.

The definition of "catalog prices" given in section 15.804-3 was:

> prices regularly maintained by the manufacturer or vendor. This form may be a catalog, price list, schedule, or other verifiable and established record. The record must (i) be published or otherwise available for customer inspection and (ii) state current or last sales price to a significant number of buyers constituting the general public.

48 C.F.R. § 15.804-3(c)(1) (1986).[6] The court quickly rejected the idea that PMM was a catalog price because "it is not maintained by MAPCO, nor does it state MAPCO's prices to buyers in the general public." *Id*.

Alternatively, the court also found that the PMM did not fit the definition of an "established market price" under section 15.804-3, which defined "established market price[s]" as "current prices that (i) are established in the course of ordinary and usual trade between buyers and sellers free to bargain and (ii) can be substantiated by date from sources independent of the manufacturer or vendor." 48 C.F.R. § 15.804-3(c)(2) (1986). The PMM failed to fall under this definition, the court observed, because "the index is an amalgamation of the previous month's petroleum sales data. It is not, as § 15.804-3(c)(2) contemplates, determinative of any particular corporation's current prices." Moreover, the court determined that the prices reflected in the PMM could not be considered "current established prices" since the prices printed in the PMM were more than a month old. *Id*. 410-411.

Having exhausted section 16.203-1(a), the government next contended that the PMM-based EPA clauses fell under sub-section (c) of 16.203-1 as a cost index. *Id*. at 411. The court, however, cogently rejected the argument finding the cases cited by the defendant failed to support the notion that the definitions of cost indexes and price indexes were interchangeable. *See, e.g., Glopak Corp. v. United States*, 851 F.2d 334, 336 (Fed. Cir. 1988) (Producer's Price Index ("PPI") for polyethylene resin prepared by the United States Department of Labor (DOL)); *American Transparents Plastic Corp.*, 83-2 Comp. Gen. ¶ 539 at 2 (Nov. 8, 1983) (DOL's PPI for polyethylene resin). In addition, the court noted that the regulations specifically used the word "index" to refer to cost but not to price. In light of these two considerations, the court found the PMM-based EPA clauses were outside the purview of section 16.203-1(c). *Id*.

Although defendant was unsuccessful in showing that either section 16.203-1(a) or section 16.203-1(c) permitted the PMM-based EPA clauses, the court nevertheless addressed plaintiff's alternative argument that section 16.203-3 also prohibited the clauses. *Id*. at 411-412. Section 16.203-3 reads:

> Limitations
>
> A fixed-price contract with economic price adjustment shall not be used unless the contracting officer determines that it is necessary either to protect the contractor and the government against significant fluctuations in labor or material costs or to provide for contract price adjustment in the event of changes in the contractor's established prices.

48 C.F.R. § 16.203-3 (2003). Plaintiff's argument stemming from this section was simple: the EPA clauses in their contracts were not drafted "to protect the contractor and the government against significant fluctuations in labor or material costs or to provide for contract price adjustment in the event of changes in the contractor's established prices." *MAPCO*, 27 Fed. Cl. at 411.

---

[6] FAR section 15.804(c) was eliminated by the revisions made to the FARs in 1997.

The government's argument in response, attempting to belie Occam's Razor,[7] was far more complex. The government argued that section 16.203-3 required only that the government make a "threshold" determination that an EPA clause was necessary to protect the government and the contractor against significant price fluctuations or to provide for contract price adjustment if the contractor's established prices changed. Once the Contracting Officer made that determination, the government argued, the officer was free to select any type of EPA clause which could serve any purpose, including a purpose other than those delineated in section 16.203-3. *Id*. In other words, the government argued that section 16.203-3 only prevented Contracting Officers from using an EPA clause in the first place, unless they determined that one of the needs outlined in section 16.203-3 existed. Once that determination was made, however, the Contracting Officer could choose any EPA clause to serve any purpose, and that choice, the government argued, should be afforded significant deference as long as it was made in good faith. *Id*.

The court summarily rejected this argument as perhaps somewhat contrived:

> Section 16.203-3 does not merely call for a determination as to whether the parties will require protection from cost fluctuations or adjustment for changes in the contractor's established prices. It mandates that the officer may only enter a fixed-price contract with an EPA clause when such a contract "is necessary" to effectuate that protection or adjustment. It would be folly if an EPA clause could only be utilized if one of the two mischiefs described by the "Limitations" provision were present, but then the solution were not limited to addressing that mischief. Logically, therefore, the purpose of using an EPA clause is to make adjustments specifically to meet the two forms of instability set out in § 16.203-3. Otherwise, the word "Limitations" is emptied of meaning.

*Id*. at 412.

The government's final argument was one of waiver. Specifically, the government argued that MAPCO acquiesced to the EPA clauses in the contracts at issue, by performing the contracts and then waiting two years before suing. The court rejected this argument, opining that "when a contract clause drafted by the Government is inconsistent with law, whether the appellant inquired, protested, accepted or otherwise assumed any risks regarding the same is not controlling; the impropriety will not be allowed to stand." *Id*. at 426 (internal quotations omitted) (citing *Beta Systems v. United States*, 838 F.2d 1179 (Fed Cir. 1988); *Chris Berg, Inc. v. United Sates*, 192 Ct. Cl. 176, 183, 426 F.2d 314, 317 (1970); *Craft Machine Works, Inc.*, 90-3 B.C.A. (CCH) ¶ 23,095 at 115,969, 1990 WL 133158 (ASBCA June 29, 1990)).

## B. Wyoming's Complaint and the Government's Arguments for Summary Judgment

---

[7] William of Occam (1280? - 1447?) is said to have remarked that "entiata non sunt multiplicanda preater necessitatem," or "entities should not be multiplied more than necessary." As such, where there are two competing theories or explanations, all other things being equal, the simpler one is probably correct. *See generally* Michael Shermer, *Why People Believe Weird Things: Pseudoscience, Superstition, and other Confusions of Our Time* (1998), at 1-10. Although not a maxim of law, there is obviously much truth to this logic.

Plaintiff's complaint contains seven counts against the government. The first is a dual illegality count whereby plaintiff contends, not only that the government violated the FARs by incorporating the challenged PMM clauses, but that it violated the equal protection guarantee of the Fifth Amendment's Due Process Clause[8] by "extending to minority-owned businesses bidding preferences that were not narrowly tailored to further a compelling government interest." Compl. at. 4, 6. The second count is one of misrepresentation, whereby plaintiff maintains that the government failed to disclose that the PMM-based EPA clauses were violative of the FARs, and likely to produce price adjustments below fair market value. *Id*. at 6-7.

In the third count plaintiff alleges the government breached the contracts at issue by including the allegedly unlawful PMM clauses. *Id*. at 7-8. In the fourth count plaintiff contends that, assuming the PMM clauses were unlawful, that there is an implied-in-fact contract between Wyoming and the government to pay fair market value for the fuel delivered. Thus, it is maintained, Wyoming is entitled to recover $33,439,942.05 plus interest on the implied-in-fact contract in *quantum valebant*.[9] *Id*. at 8-9. Plaintiff's fifth count essentially mirrors the allegations made in count III (breach of contract), but inserts the words "failure of consideration and frustration of purpose" instead of breach of contract. *Id*. at 9-10.

Wyoming's sixth count alleges mistake – a mutual one assuming that the DESC did not know the PMM clauses were unlawful, and a unilateral one on Wyoming's part if the DESC did know the clauses were unlawful. *Id*. at 11-12. Finally, plaintiff alleges in the seventh count that the PMM clauses resulted in the DESC paying less than fair market value for the fuel, and that the government's resulting windfall amounted to an unconstitutional taking violating the Fifth Amendment.

In response to these allegations, the government filed the present motion for partial summary judgment under Court of Federal Claims Rule 56.[10] The government's arguments are four-fold. At the outset, the government argues that the Federal Circuit's ruling in *Barrett Refining Corp. v. United States*, 242 F.3d 1055 (Fed. Cir. 2001), contrary to plaintiff's contention, neither requires nor supports a finding by this court that the PMM clauses are illegal. Def.'s Mot. for Summ. J. at 9. Defendant further argues that neither FAR section 16.203-1, nor FAR section 16.203-3 prohibit the PMM clauses. *Id*. at 12, 18. The government's third and fourth arguments assume the illegality of the

---

[8] *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

[9] Black's Law Dictionary defines *quantum valebant* as follows:

> As much as they are worth. The common count in an action of *assumpsit* for goods sold and delivered, founded on an implied *assumpsit* or promise, on the part of the defendant, to pay the plaintiff as much as the goods are reasonably worth.

Black's Law Dictionary 1119 (5th ed. 1979).

[10] The motion is partial in that it does not take issue with Wyoming's equal protection or takings claims based on the Fifth Amendment (Counts I and VII) since, in the government's view, granting this motion on the other counts would "so dramatically change the scope and posture of the case that there is no reason to postpone this filing in order for us to investigate those more obscure theories of relief." Def.'s Mot. for Summ. J. at 1.

clauses but attempts to refute Wyoming's right to recover since Wyoming either: (1) waived its rights to recover by postponing this suit until several years after the contracts at issue were performed, or (2) received fair market value for the fuel anyway since the prices paid under the contract happened to reflect fair market value. *Id*. at 22, 27.

## II. Discussion

Summary judgment must meet the standards of Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). This rule allows for the court to render summary judgment in a case only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247- 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987).

An issue is genuine only if it might prompt a reasonable jury to resolve a factual matter in favor of the nonmoving party. *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed. Cir. 1987). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-248 (emphasis original). "If the evidence [of the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249-250 (citations omitted). Furthermore, when deciding a motion for summary judgment, the judge must determine whether the evidence presents a disagreement sufficient to require a submission to a fact finder, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Id*. at 250-252 (1986); *See also Dart Advantage Warehousing, Inc. v. United States*, 52 Fed. Cl. 694, 697 (2002). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

### A. The DESC's Arguments Based on FAR Section 16.203-1 and 16.203-3

As stated, defendant's primary argument is that the PMM-based EPA clauses contained in the contracts at issue do not violate FAR section 16.203-1.[11] The government's argument in this respect is nearly identical to the argument asserted in *MAPCO*. To wit, defendant argues that the phrase "established prices" in FAR section 16.203-1(a) actually means "established catalog or market prices," which, of course, to the government includes the prices contained in the PMM. As support

[11] Defendant's first argument in its brief supporting its motion for summary judgment preemptively attacked plaintiff's anticipated argument that the Federal Circuit's opinion in *Barrett Refining Corp. v. United States*, 242 F.2d 1055 at 1060, 1062 (Fed. Cir. 2001), implicitly adopted the reasoning set forth in *MAPCO*, and thus controls this court's determination. Defendant is correct on this point. Because the parties did not contest the illegality of the PMM clauses at the trial level (*Barrett*, 42 Fed. Cl. at 129 "the parties agree the clauses are unenforceable"), the Federal Circuit's opinion in *Barrett* deals solely with the quantum of damages owed to the plaintiff, and does not explicitly address whether the PMM clauses violated the FARS. This court, therefore, refuses to assume that the Federal Circuit decided an issue with which it was not, in fact, faced.

for this assertion, the government asks this court, as it asked the court in *MAPCO*, to look to neighboring FAR section 16.203-4 which employs the phrase "established catalog or market prices." Defendant then instructs the court – again, as it did in *MAPCO* – to import the definition of "established catalog or market prices" from section 15.804-3(c)(1) and (c)(2). This definition, the government concludes, embraces the PMM and thus renders the contracts enforceable.

Like the court in *MAPCO*, however, this court refuses to adopt such reasoning. The *MAPCO* court's opinion is thorough and well reasoned, leaving little room in this court's mind for debate on the issue. In other words, this court adopts the multiple rationales set forth in *MAPCO* and therefore rejects the government's arguments. As a result, FAR section 16.203-1(a) prohibits the PMM-based EPA clauses in the contracts at issue in this case.

Similarly, this court relies on *MAPCO*, as well as *Gold Line II*, to reject defendant's argument that FAR section 16.203-3 permits PMM-based EPA clauses. Defendant argues that this FAR provision permits the inclusion of an EPA clause upon a determination by the contracting officer under FAR section 16.203-3 that it is necessary either "to protect the contracting parties against significant fluctuations in labor or material costs or to provide for contract price adjustments based on changes in the contractor's established prices." Defendant's salvo here is that *MAPCO*, assuming it was decided correctly, placed a burden on plaintiff to show that PMM clauses in this case failed to protect the parties against the twin dangers outlined in section 16.203-3. Since Wyoming, the government argues, cannot demonstrate that the PMM clauses failed to protect against significant cost fluctuations, it cannot demonstrate that the government violated section 16.203-3.[12]

Alternatively, the government argues, as it did in *MAPCO*, that section 16.203-3 requires only that the Contracting Officer make a determination that an EPA clause is necessary to protect the government and the contractor from the dangers outlined in section 16.203-3, and once that determination is made, the Contracting Officer is free to select any type of EPA clause that is appropriate. Once a rational determination is made, it is implied, the inclusion of the EPA clause is lawful.

As for the first contention – that Wyoming has the burden to demonstrate that the PMM clauses failed to protect against significant labor and material cost fluctuations – this court finds the reasoning in *Gold Line II* instructive. Implicit in the government's argument – here and in *Gold Line II* – is the assertion that FAR section 16.203-1 must be broadly construed to allow for the inclusion of any sort of EPA clause in a contract, so long as it ameliorative of the harms contained in this FAR section. But the government takes the FAR too far. The crux of the *Gold Line II* court's rationale is that far from FAR section 16.203-1 being a sweeping grant of authority to include prophylactic EPA clauses, it is a *limitation* on the use of EPA-type clauses. *Gold Line II*, 54 Fed. C. at 291-292.

The court reasoned that it is in fact FAR subsection 16.2 (part of FAR section 16.201, denoted the "Description" provision) which authorizes EPA clauses "of three general types, specifically: (1)

---

[12] The government only argues that Wyoming must show the PMM clauses failed to protect against the first danger outlined in section 16.203-3 – significant labor and material cost fluctuations. It does not raise the argument that plaintiff must also demonstrate that the PMM clauses failed to protect against the second type of danger outlined in 16.203-3 – changes in the contractor's established prices. As such, this latter issue is not addressed by the court.

adjustments based on established prices, (2) adjustments based on actual costs of labor or material, and (3) adjustments based on cost indexes of labor or material." *Gold Line*, 54 Fed. Cl. at 290-291 (summarizing pertinent parts of FAR subsection 16.2). FAR section 16.203-3 (denoted the "Limitations" provision), on the other hand, "is a provision of limitation on the use of EPA clauses. FAR 16.203-3 states that a fixed price contract with economic price adjustment 'shall not be used unless the contracting officer determines that it is necessary,' and sets forth two circumstances in which EPA clauses may be used: 'either' to protect the contracting parties against significant fluctuations in labor or material costs 'or' to provide for contract price adjustments based on changes in the contractor's established prices." *Gold Line II*, 54 Fed. Cl. at 291-292 (quoting, FAR 16.203-3).

The court quoted *MAPCO* for the proposition that FAR section 16.203-3 "by limiting the circumstances in which an EPA clause may be used – also serves as a limitation on the types of clauses that may be used:

> Section 16.203-3 does not merely call for a determination as to whether the parties will require protection from cost fluctuations or adjustment for changes in the contractor's established prices. It mandates that the officer may only enter a fixed-price contract with an EPA clause when such a contract 'is necessary' to effectuate that protection or adjustment. It would be folly if an EPA clause could only be utilized if one of the two mischiefs described by the 'Limitations' provision were present, but then the solution were not limited to addressing that mischief. Logically, therefore, the purpose of using an EPA clause is to make adjustments specifically to meet the two forms of instability set out in § 16.203-3. Otherwise, the word 'Limitations' is emptied of meaning.
>
> The rules of statutory construction provide that, if a statute provides that a thing shall be done in a certain way, there is a rebuttable presumption under the rules of statutory construction that an implied prohibition against doing that thing in any other way exists. *See* 2A Singer, *Statutory Construction* § 46.23, at 314-315. Moreover, the case law is well established that specific provisions of limitation control over related, more general provisions.

*Gold Line II*, 54 Fed. Cl. at 292 (quoting *MAPCO*, 27 Fed. Cl. at 412) (citing *Pioneer Hi-Bred Int'l, Inc. v. J.E.M. AG Supply, Inc.*, 200 F.3d 1374, 1376-77 (Fed. Cir.), *aff'd*, 534 U.S. 124, 151 L. Ed. 2d 508, 122 S. Ct. 593 (2001) (holding that a general statute must give way to a specific one); *Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298, 1305 (1996) (holding that if general and specific provisions are inconsistent, then the specific provision governs)).

Consequently, the court concluded that:

> the phrase 'of three general types' in FAR 16.2031, limits the permissible categories of EPA clauses. Based on basic principles of statutory construction and the text of FAR 16.203-1, the 'Description' provision, and FAR 16.203-3, the 'Limitations' provision, it is the court's view that the use of agency- prescribed EPA clauses must be restricted to types of EPA clauses that are based either on fluctuations in labor or material costs or on changes in the contractor's established prices that are reflective of industry-wide contingencies. *See* FAR 16.203-2. Accordingly, the court construes

> the FAR provisions as restrictive rather than illustrative.

*Gold Line II*, 54 Fed. Cl. at 292.

Precisely like the EPA clause in *Gold Line II*, the EPA clauses in the case before this court are not one of the "three general types" of EPA clauses described in FAR section 16.203-1. They thus do not comply with the express terms of the FAR. Because the use of the clauses are inconsistent with the FAR, defendant's inclusion of the EPA clauses in the contracts, such as the clause used in *Gold Line II*, was an unauthorized deviation under the FAR. *See* § FAR 1.401(a).

As for the defendant's second and alternative argument, this court again finds *MAPCO* and *Gold Line II's* reasoning compelling. It would be odd, to say the least, if section 16.203-3 required only that the contracting officer make a simple determination that an EPA clauses was necessary to protect the government and the contractor, and then leave the contracting officer free to select any sort of EPA clause, regardless of whether it comported with section 16.203-1 or addressed the "mischiefs" outlined in section 16.203-3. Such a sweeping grant of power is inconsistent with the aforementioned structure of the applicable FARs and might very well transform the contracting officer into a martinet and any resulting contract an unenforceable illusory agreement.

For the reasons set forth above, this court reject defendant's arguments based on FAR sections 16.203-1 and 16.203-3, and turns now to the government's more compelling argument based on the doctrine of waiver.[13]

## B. Waiver

To the government, the issue of waiver in this case arises from two separate temporal events. The first is plaintiff's decision in 1993 and 1994 – after the decision in *MAPCO* – to enter contract numbers DLA600-94-D-0529 and DLA600-93-D-0560, which contained a PMM-based EPA clauses. The government asserts that Wyoming either knew or should have known that the PMM clause was defective after *MAPCO* and, by entering the contract anyway, Wyoming waived its right to sue on the clause. The second temporal event giving rise to the government's waiver claim is the simple passage of time: eight years passed between the time Wyoming entered the last PMM based contract (1994) and the time it filled suit (2002).

The government contends that Wyoming's failure to protest the PMM clauses during the time of performance or for nine years thereafter, shows Wyoming acquiesced to the clauses and thus waived any right to sue. The court also notes – adding fuel to the waiver fire – that the first contract containing the allegedly poisoned EPA clause (DLA600-86-D-0877) was consummated in 1988, fully

---

[13] Plaintiff asserts that, assuming the PMM clauses are illegal, the doctrine of judicial estoppel mandates that plaintiff should be able to calculate its damages using the same formula employed by this court in *Pride Co.'s, L.P. v. United States*, No. 95-597 C, 2000 Claims LEXIS 213 (Fed. Cl. May 10, 2000). Pl.'s Cross-Mot. for Summ. J. at 32. For the reasons given during oral argument, this court rejects plaintiff's assertion. *See* Tr. at 63-68. Moreover, as discussed below, the issues of waiver and laches may eventually bar plaintiff's claims entirely, thereby obviating the need to measure damages.

fourteen years before plaintiff commenced this action.

Plaintiff, on the other hand, cites various Federal Circuit cases for the proposition that where a contract clause drafted by the government is inconsistent with the law, the impropriety cannot be waived regardless of whether the plaintiff protested or accepted the clause, or how long the plaintiff sat on their rights. Plaintiff's reliance on these cases is in large measure correct, although hardly free from doubt. Adding to this doubt is that there also appears to be conflicting precedent from the Federal Circuit. But doubt often is productive. As Cicero once uttered, "by doubting we come at truth."[14] This matter is thus worthy of some scrutiny.

Plaintiff contends the leading case supporting its position is *Beta Systems, Inc. v. United States*, 838 F.2d 1179 (Fed. Cir. 1988). In *Beta Systems*, the contractor in part sought reformation of the price adjustment provision of a contract based upon a theory of mutual mistake and error of law. Beta and the Army Troop Support and Aviation Material Readiness Command entered into a contract for the procurement of several thousand tank/pump units over a period of four Program Years. Section H-8 of the contract, the section containing an EPA clause, provided for upward or downward adjustment of the contract price depending based upon several specified factors, including changes in material and labor costs as measured by the Bureau of Labor Statistics (BLS) index for "Machinery & Equipment, Code 11." The then-applicable Defense Acquisition Regulation required that the index must "bear a logical relationship to the type of contract costs being measured." DAR § 3-404.3(c)(3) c.5 (1981). Beta contended that its costs did not decrease, but instead dramatically increased because of increased market prices for aluminum, and that the "BLS index was a grossly inaccurate measure of the economic factors pertinent to the contract." 838 F.2d at 1180.

In reversing the lower court, which had ruled that the contractor beared the risk of the mutual mistake, the Federal Circuit held that the "risk of unintentional failure of a contract term to comply with a legal requirement does not fall solely on the contractor." *Id.* at 1185. This was because of "the government's insistence during negotiations on use of [the EPA clause] in its entirety." *Id.* The court further noted that it would simply be unfair to place the risk on the contractor when the "government does not challenge that Beta did not intend to use an index that would effectively eliminate its principal construction material from fair weight in the inflation adjustment." *Id.* at 1186. In recognizing that reformation is an appropriate remedy, the court concluded that "the contractor's acquiescence, does not immunize the government from the consequences of failure of the EPA clause to comply with the law stated as in the DAR." *Id.*

Although this case presents similarities to the one at bar (for instance, an apparent mutual mistake concerning the lawfulness of the EPA clause at the formation of the contract and continued performance by the plaintiff), there is at least one notable, perhaps crucial, distinction. In *Beta Systems*, unlike the case at bar, the plaintiff challenged the EPA when it learned it was unlawful, that is, when it suffered significant financial losses due to the increase in the price of aluminum. It is not clear to this court that Beta could even have known during contract formation that the BLS index, the basis for the EPA, did not bear a "logical relationship" (the DAR requirement – the predicate for the claim for illegality) to the dramatically increased price of aluminum. It appears from the opinion that the steeply rising price of aluminum was unforeseeable. This is very unlike the situation *sub judice*

---

[14] The venerable, yet prescient, philosopher-statesman Marcus Tullus Cicero (106 B.C. - 43 B.C.) is quoted in www.quotationspage.com, by permission of *Coles Quotables*.

where Wyoming waited eight years after *MAPCO* to litigate its claims. Indeed, as previously noted, two years after that decision was rendered, Wyoming entered into the very same type of contract with the DESC, one containing the very same type of EPA clause found unlawful in *MAPCO*. This is noticeably far more blatant behavior than was displayed by Beta.

Plaintiff also hangs its hat on *LaBarge Products, Inc. v. West*, 46 F.3d 1547 (Fed. Cir. 1995). In this case, LaBarge, the contractor, sought reformation of the contract on grounds that the bid process was a sham because the government had disclosed LeBarge's bid to another bidder in an attempt to lower bid offers. Therefore, the government's request for a second bid offer under the pseudonym "best and final offer" was a mockery of fairness and violated, among other things, FAR section 15.601(d). *Id*. at 1552.

It is important to note that LaBarge obtained information concerning the alleged conspiracy to drive down bid costs in a bid protest brought by an unsuccessful bidder that LeBarge joined and from an Army investigative report it obtained. The bid protest was in 1984, and the General Accounting Office ("GAO") denied the protest in May, 1985. Following contract completion, LaBarge submitted a claim to the Contracting Officer in which it sought to have the contract reformed to its original higher bid price, contending that reformation of the contract to the higher price was necessary in order to compensate it for the improper acts of certain Army personnel involved in the procurement. 46 F.3d at 1550. In September, 1986, after the Contracting Officer had issued a final decision denying the claim, LaBarge appealed to the Board of Contract Appeal under the Contracts Disputes Act. *Id*. The Board ultimately denied the claim and LaBarge appealed to the Federal Circuit.

The court held that even though LaBarge completed the contract, it could seek reformation of the price term. Thus, if "government officials make a contract they are not authorized to make, in violation of a law enacted for the contractor's protection, the contractor is not bound by estoppel, acquiescence or failure to protest." *Id.* at 1552 (citing *Chris Berg, Inc. v. United States*, 426 F.2d 314, 317, 192 Ct. Cl. 176, 183 (1970); *Rough Diamond Co. v. United States*, 351 F.2d 636, 639-643, 173 Ct. Cl. 15, 20-27 (1965), *cert. denied*, 383 U.S. 957, 86 S. Ct. 1221, 16 L. Ed.2d 300 (1966)). The court opined that in "cases in which a breach of law is inherent in the writing of the contract, reformation is available despite the contractor's initial adherence to the contract provision later shown to be illegal." *Id.* (citing *Chris Berg, Inc.*, 426 F.2d at 317-318). "LaBarge may seek reformation of its price term, even after performance, if that term was allegedly diminished by unlawful government acts." *Id.* at 1552-1553.

Once again, however, the behavior of plaintiff Wyoming in the case at bar was far more egregious than that of LaBarge's. Unlike the plaintiff at bar, LaBarge complained the bid protest, and did not significantly delay any legal challenge to the government's alleged collusion. Furthermore, it was only during the unsuccessful bid protest that it alleged to obtain information concerning the conspiracy. *Id*. at 5149-1550.

Similarly in another case cited by Wyoming, *Chris Berg*, the named plaintiff's behavior was not as blatant as the one at bar. In *Chris Berg, Inc.* plaintiff had sought but was denied administrative relief to correct a mistaken bid made in violation of applicable regulations. In such circumstances, the court held the contractor was entitled to reformation of the price provision even though the contractor had performed the uncorrected contract. *Chris Berg, Inc.*, 426 F.2d at 317-18. What was paramount to the court was that the applicable regulations were promulgated to protect the contractor

and that the government's failure to follow such regulations was unlawful. *Id*. at 317-318. Once again, the conduct of plaintiff Chris Berg did not rise to the level of Wyoming's audacious behavior. Nevertheless, implicit in Wyoming's argument is that its egregious behavior is irrelevant. As long as the pricing provision violated the law, that the regulations involved were for the protection of plaintiff (which the government here is not contesting), and that the breach was inherent in the writing of the contract, plaintiff contends that the *Beta/Chris Berg* line of cases requires that it is entitled to reformation of the contract.

In response, the government admits that the *Beta/Chris Berg* line of cases is contrary to its position, but contends that the Federal Circuit is of two minds on the waiver issue. The government primarily relies on *E. Walters & Co., Inc. v. United States*, 217 Ct. Cl. 254, 576 F.2d 362 (1978)(per curiam) and *Whittaker Electronic Systems v. Dalton*, 124 F.3d 1443 (Fed. Cir. 1997). In *E. Walters & Co., Inc*., the dispute centered around a clause in an Invitation For Bids ("IFB"), issued by the Department of the Army for procurement of fuses. The IFB contained a price schedule whereby unit prices increased with the size of an order. The IFB allowed for the Army to order fuses at a base amount, and then, at its option, purchase an additional 50 percent of the base amount at the very same base price. Section 1-1503(b) of the then Armed Services Procurement Regulations ("ASPR"), prohibited, however, those types of option clauses. *E. Walters*, 576 F.2d at 363-364.

Walters, the fuse supplier under the contract, apparently thought that the unlawful option provision would not be invoked. *Id*. at 365. When the option was indeed exercised, Walters questioned, but did not protest, the charged amount. In fact, it was only six months after delivery that Walters submitted a claim seeking a higher price. This protest was two years after the award of the contract. Both the contracting officer and the Armed Services Board of Contract Appeals deemed that Walters' behavior constituted a waiver of the claim. *Id*. at 366.

On appeal the court clearly recognized that the option provision was contrary to the ASPR, yet found compelling that Walters "chose to remain silent, to postpone any protest, and to fully perform the contract as if there were contemporaneous agreement of the parties on the proper interpretation of the terms of the IFB." *Id*. at 368. By that time, "the government had been prejudiced in consideration of other alternatives." *Id*. The court concluded:

> In these circumstances, the doctrine of estoppel is also for application. Had plaintiff protested the use of the option provision at the time of award, defendant would have been in a position to either reaffirm its use of the option provision, in apparent disregard of the ASPR prohibition . . . or it could have elected instead, to award the non set-aside quantity in the next least expensive manner . . . Plaintiff's silence deprived the government of that relatively painless alternative.

*Id.* Thus, silence was deadly to the plaintiff's cause here. It mattered not that the key pricing provision in the contract – here the option provision – was unlawful *ab initio*.

This deadly silence amounting to waiver by the litigant was also the gravamen of the government's second case, *Whittaker Electronic Systems*. Whittaker's predecessor-in-interest, REL, Inc., entered into a fixed-price contract with the Air Force to build a simulator of Soviet long-range radar. The contract contained an option provision which allowed the Air Force to acquire two additional simulators after the initial phase of the contract was complete. During the initial phase of

the contract, REL's subcontractor was late in delivering necessary parts which, in turn, caused REL to experience cost overruns due to the delays. Although Whittaker ("WES") acquired REL and assumed the contract, WES alleged that the option provision violated section 1-1502(b)(ii) of the DARs, and therefore, the contract was void *ab initio*. As a result, WES sought to reform the contract to reflect the price overruns incurred by REL, despite the fact that WES fully performed the contract, and also, never objected to the contract when it assumed it.

The court, relying in part on the reasoning in *E. Walters*, noted that "because REL failed to make a timely objection to the option clause, to any 'undue risk' it believed was thereby improperly allocated to it, or assert a violation of the regulation, REL waived the right to challenge the validity of the contract under DAR § 1-1502(b)(ii)." *Whittaker Electronic Systems*, 124 F.3d at 1446. Indeed, to the court, "[t]he doctrine of waiver precludes a contractor from challenging the validity of a contract, whether under a DAR or on any other basis, where it fails to raise the problem prior to execution, or even prior to litigation, on which it later bases its challenge." *Id.* (quoting, *United Int'l Investigative Servs. v. United States*, 109 F.3d 734, 738 (Fed. Cir. 1997); *E. Walters & Co., Inc. v. United States*, 217 Ct. Cl. 254, 576 F.2d 362, 367-68 (1978)). And the very fact "that REL failed to complain and WES agreed without objection to take over REL's contract, substantially completing it, constituted a waiver of the grounds for rescinding or voiding the contract because of a violation of the regulation, even assuming the option clause indeed violated the regulation." *Id.*

In rebuttal, Wyoming correctly points out that both *MAPCO* and *Gold Line II* refused to find waiver and followed the *Beta/Chris Berg* line of cases. *See MAPCO*, 27 Fed. Cl. at 416; *Gold Line II*, 54 Fed. Cl. at 296; *See also Barrett Refining Corp. v. United States*, 838 F.2d 1055, 1060 (Fed. Cir. 2001) (citing plaintiff's brief in holding "where a contractor has challenged the legality of a price adjustment clause on the ground that it violated the FAR, the contractor has been afforded the right to seek a remedy"). Wyoming also distinguishes *Whittaker Electronic Systems*, as did the court in *Gold Line II*, because "the alleged breach of [the] procurement regulations in *Whittaker* occurred after the contract award, while the breach in this case was 'inherent' in the award." *Gold Line II*, 54 Fed. Cl. at 296.

Yet in *Whittaker* the option provision included in the contract was unlawful when agreed to. *Whittaker*, 124 F.3d at 1446. Similarly, the breach of contract in *E. Walters* certainly was – like *Gold Line II* – "inherent in the very writing of the contract." *E Walters*, 576 F.2d at 368 (citing *Applied Devices Corp .v. United States*, 591 F.2d 635, 640-41 (Ct. Cl. 1979)). The fact that these were option provisions, and not pricing terms, as was the case in *Gold Line II* and in the case at bar, is a distinction without a difference. The point is that these provisions were unlawful *ab initio* and thus appear to contradict the *Beta/Chris Berg* line of cases.

Nevertheless, there is another line of cases that may very well be the sword that cuts the Gordian Knot – the Federal Circuit's more recent holdings in *American Telephone and Telegraph Co. v. United States*, 177 F.3d 1368 (Fed. Cir. 1999) (en banc) (*AT&T III*) and *American Telephone and Telegraph Co. v. United States*, 307 F.3d 1374 (Fed. Cir. 2002) (*AT&T IV*).[15] Both Wyoming

[15] The rounds of litigation preceding *AT&T III* and *AT&T V*, are largely irrelevant to this court's current analysis. *See American Telephone and Telegraph Co. v. United States*, 32 Fed. Cl. 672 (1995), *aff'd in-part, rev'd in-part*, 124 F.3d 1471 (Fed. Cir. 1997), *vacated and withdrawn*, 136

and the government rely in part on various aspects of these cases, as will be discussed below.

The facts of the *AT&T* cases are interesting. During the Cold War, the United States Navy entered into a contract with AT&T to construct an acoustic sonar surveillance system that would enable United States vessels to detect the new ultra-quiet Soviet submarines.[16] *AT&T III*, 177 F.3d at 1369, 1370. The system was known as SURTASS, an acronym for Surveillance Towed-Array Sensor System. Although SURTASS was comprised of numerous components ranging from electronics to towing winches, the heart of SURTASS was an 8,000 foot flexible hose containing hydrophones, sensors, and electronics which could detect the faint sonar signals originating from Soviet subs. *Id.*; *and see American Telephone and Telegraph Co. v. United States*, 32 Fed. Cl. 672, 674 (1995). The hose was towed behind a surface vessel known as the T-AGOS SURTASS ship, and data collected from the hose was transmitted to both shipboard and shore-based computers for processing. *Id*.

The contract to produce SURTASS was awarded to AT&T on December 31, 1987. The contract was a fixed-price incentive fee contract which obligated AT&T to design and construct SURTASS for under $19,221,630. *AT&T III*, 177 F.3d at 1370. The contract also included an option to the Navy to acquire a second engineering development model at a fixed ceiling price of $3,510,253, as well as three other production models for a ceiling price of $8,475,466. *Id*. All said and done, the final fixed price was actually about $34.5 million after the Navy and AT&T agreed to several price adjustments during the course of performance. AT&T, however, sued claiming that it actually incurred costs upwards of $91 million, and sought to have the contract restructured accordingly.

The legal issue in *AT&T III* was whether section 8118 of the Defense Appropriations Act applied to AT&T's contract, and if so, whether the contract was void *ab initio* if the government failed to abide by section 8118. Section 8118 read in relevant part:

> None of the funds provided for the Department of Defense in this Act may be obligated or expended for fixed price-type contracts in excess of $ 10,000,000 for the development of a major system or subsystem unless the Under Secretary of Defense for Acquisition determines, in writing, that program risk has been reduced to the extent that realistic pricing can occur, and that the contract type permits an equitable and sensible allocation of program risk between the contracting parties . . .

Pub. L. No. 100-202, 101 Stat. 1329, 1329-1384 (Dec. 22, 1987).

After holding that section 8118 did in fact apply to AT&T's contract, the court then held that,

---

F.3d 793 (Fed. Cir. 1998).

[16] American and Soviet nuclear submarines during the cold war played a deadly cat and mouse game whereby each trailed the other attempting to avoid detection by its adversary. Author Tom Clancey's novel "*Hunt for Red October*" (1984) raised this high stakes undersea naval poker to public notoriety. All the same, in real life submarine tracking had immense national security implications because the very survival of the free world and the Soviet bloc was at stake. Fearing that these new deadly hyper-quiet Soviet submarines would escape detection, the SURTASS program was established. One can readily see the desperate importance of SURTASS.

although the government failed to abide by section 8118, the contract was not void *ab initio*. *AT&T III*, 177 F.3d at 1376. Instead, the court held that AT&T, having fully performed on the illegal contract, could nevertheless recover under a theory of implied contract or reformation. *Id*.[17] It is this part of the opinion that Wyoming relies upon. The only question on remand, then, was whether AT&T was entitled to a remedy. *Id*. at 1377.

For the case *sub judice*, the importance of *AT&T III* also lies in Judge Plager's dissent, for it is there that the issue of waiver arose. Judge Plager disagreed with the *en banc* court's holding that the contract was not void *ab initio* due to the government's failure to abide by section 8118. *Id*. at 1379. Among several other reasons for this disagreement, Judge Plager noted that even assuming AT&T was entitled to a remedy, it should not be afforded one due to the doctrine of unclean hands. *Id*. at 1384-1385. More specifically, Judge Plager noted that AT&T was a sophisticated government contractor,[18] and as such, AT&T most likely knew during negotiation that the contract violated section 8118 which was passed only nine days before the contract was entered. As Judge Plager stated:

> If AT&T is to have any remedy entitling it to more than what it has been paid, its claims must be based on some sort of equitable claim for payment for goods sold and delivered, a *quantum valebant* claim. Even assuming for discussion purposes that the Court of Federal Claims could exercise the powers of a court of equity, AT&T has no equity on its side, and therefore is not entitled to the intervention of a court of equity.
>
> AT&T comes to the court with unclean hands. AT&T is not an innocent bystander being taken advantage of by a predator government. Both the Government and AT&T knew exactly what they were doing when they entered into this deal. It simply defies belief that AT&T was unaware of § 8118 when it purported to contract with the Government or was unaware that the Navy was proceeding with the contract

---

[17] "When a contract or a provision thereof is in violation of law but has been fully performed, the courts have variously sustained the contract, reformed it to correct the illegal term, or allowed recovery under an implied contract theory; the courts have not, however, simply declared the contract void *ab initio*." *AT&T III*, 177 F.3d at 1376 (citing *LaBarge Products v. United States*, 46 F.3d 1547, 1552-1553 (Fed. Cir. 1995); *Beta Systems, Inc. v. United States*, 838 F.2d 1179, 1185-1186 (Fed. Cir. 1988)). Wyoming would thus characterize *AT&T III* as progeny of the *Beta/Chris Berg* lineage. Pl.'s Cross-Mot. for Summ. J. and Opp'n to Def.'s Mot. for Summ. J. at 51-52.

[18] Judge Plager brought this point to light in a footnote which read:

> For the year 1987, AT&T was listed as 15th among the Top 100 Federal Contractors, with 1,438 procurement actions worth something over $ 2 billion. See Federal Procurement Data Center, Government-wide Information Systems Division, MVS, GSA, Central Office, Top 100 Federal Contractors 14 (Jan. 25, 1988). AT&T was 16th in 1988. See Federal Procurement Data Center, Government-wide Information Systems Division, MVS, GSA, Central Office, Top 100 Federal Contractors 14 (Feb. 2, 1989).

*AT&T III*, 177 F.3d at 1383, n.9.

> in the manner the Navy did.

*Id*. (footnote omitted).

The government in the case at bar characterizes Judge Plager's reasoning as tantamount to one of waiver[19] and relies upon it as a rationale to deny Wyoming relief in our case.[20]

Three years after Judge Plager's dissent in *AT&T III*, the Federal Circuit was again faced with AT&T's grievances when AT&T appealed this court's determination on remand that AT&T was not entitled to a remedy for the government's breach of section 8118. The Federal Circuit affirmed this court's holding and denied AT&T a remedy, holding that: "In sum, the language of section 8118 provides for legislative oversight and enforcement. The section does not create a cause of action inviting private parties to enforce the provision in courts." *AT&T V*, 307 F.3d at 1379.

Although the crux of the Federal Circuit's holding was to deny AT&T a remedy, the court discussed, as an alternative holding, the issue of waiver raised in Judge Plager's *AT&T III* dissent. It is worthwhile for disposition of the case at bar to quote the *AT&T V* court's language on this point at length:

> In view of the facts of this case, this court would be forced to conclude that AT&T waived its present arguments even were those arguments to state a valid claim. At the time it negotiated the RDA contract, AT&T was fifteenth among the Top 100 Federal Contractors, having 1,438 procurement actions worth over $ 2 billion. *AT&T III*, 177 F.3d at 1383 (PLAGER, J., dissenting). As a sophisticated player, AT&T bargained for and won a fixed-price contract – with all of its attendant benefits and risks. Despite AT&T's sophistication on these matters, the record simply provides no evidence that AT&T sought a cost reimbursement contract during contract negotiations.
>
> As this court previously noted, AT&T successfully underbid technically superior competitors to win the RDA contract, and retained the contract with a vigorous defense against a competitor's protest action. Nonetheless, AT&T now argues that the courts must relieve it of the risk that it so aggressively pursued. It is too late now to make that claim . . . .
>
> In short, the proper time for AT&T to have raised the issues that it now

---

[19] Of course, both the doctrines of "unclean hands" and waiver derive from the English common law of equity and are thus cousins, perhaps even fraternal twins. As John Norton Pomeroy explained in his timeless treatise on equity, "any willful act in regard to the matter in litigation, which would be condemned and pronounced wrongful by honest by fair minded men, will be sufficient to make the hands of the applicant unclean." JOHN NORTON POMEROY, POMEROY'S EQUITY JURISPRUDENCE § 404 at 142-143 (5th ed. 2002).

[20] The government mischaracterizes Judge Plager's dissent as a concurring opinion. Def's Mot. for Summ. J. at 25. By remanding the case on the issue of what nature of reformation is applicable, however, the majority in *AT&T III* never had to address the issue of either unclean hands or waiver. Consequently, Judge Plager's rationale is not binding here.

> presents was at the time of contract negotiation, when effective remedy was available. This, AT&T did not do. For reasons evident above, even were AT&T to have stated a valid claim for reformation, this court's case law would require a finding that AT&T waived that claim. *Whittaker Elec. Sys. v. Dalton*, 124 F.3d 1443, 1446 (Fed. Cir. 1997) ("The doctrine of waiver precludes a contractor from challenging the validity of a contract, whether under a DAR [defense acquisition regulation] or on any other basis, where it fails to raise the problem prior to execution, or even prior to litigation, on which it later bases its challenge.") (citing *United Int'l Investigative Servs. v. United States,* 109 F.3d 734, 738 (Fed. Cir. 1997); *E. Walters & Co.,* 576 F.2d at 367-68).

*Id*. at 1381 (brackets original).

The question after *AT&T V*, then, is whether Judge Plager's dissent in *AT&T III* was elevated to the status of binding law by the three-Judge panel's opinion in *AT&T V*. The government, of course, argues strenuously that Judge Plager's dissent and the *AT&T V* opinion control this case, noting that the majority in *AT&T V* cite with favor it's two lead cases, *Whittaker* and *E. Walters & Co.* Def.'s Mot. for Summ. J. at 25-26. Wyoming, on the other hand, predictably argues to the contrary, asserting: (1) that a three-Judge panel's opinion cannot supercede an *en banc* court's opinion; (2) that the *AT&T V* opinion should be limited to the very narrow circumstances of that case; and (3) The Federal Circuit's holdings in *Beta Systems*, *Chris Berg*, and *Barrett*, as well as this court's holdings in *MAPCO* and *Gold Line* all mandate a finding here that Wyoming did not waive its claim. Pl.'s cross-mot. for summ. J. and Opp'n to Def's Mot. for Summ. J. at 42-46; Tr. at 53-54.

Taking plaintiff Wyoming's argument in reverse order, the court has previously explained why plaintiff's cited cases are distinguishable from the situation at bar. Plaintiff, however, is undoubtedly correct as to its second contention. Indeed, the *AT&T V* majority noted that its waiver opinion was an alternative ground of decision. Thus, it is *dicta* because it is unnecessary for the disposition of the case, which was predicated upon a failure to state a claim. The alternative opinion must, consequently, be limited to the peculiar and specific facts of the case, and the court so notes: "*In view of the facts of this case*, this court would be forced to conclude that AT & T waived its present arguments *even were those arguments to state a valid claim.*" *AT&T IV*, 307 F.3d at 1380 (emphasis added).

As to its first argument, why the alternative holding is not applicable, Wyoming may very well be correct that the three-judge panel's opinion does not supercede the *en banc* holding. It is becoming accepted as the doctrine termed "the Law of the Circuit" that an *en banc* opinion by a court of appeals establishes the law of the case that binds a panel hearing a subsequent appeal. *See generally* Wright, Miller & Copper, Federal Practice and Procedure: Jurisdiction 2d. § 4478.2 (2002); *see also Biggins v. Hazen Paper Co.*, 111 F.3d 205, 208-209 (1st Cir. 1997), *cert. denied*, 522 U.S. 952 ("It is not open to the panel, in the normal case, to reconsider issues decided earlier in the same case by the *en banc* court."); *Van Ooteghem v. Gray*, 774 F.2d 1332, 1335 (5th Cir. 1985); *United States v. DeJesus*, 752 F.2d 640 (1st Cir. 1985); *United States v. Roberts*, 650 F.2d 933 (8th Cir. 1981), *cert. denied*, 454 U.S. 973. The issue would here thus becomes whether the majority opinion of the *en banc* panel in *AT&T III* is inconsistent with the alternative holding of the majority opinion in *AT&T IV*. But research indicates that the Federal Circuit has never opined as to the doctrine of the Law of the Circuit. Nevertheless, this court need not reach this issue.

This is because this court need not shoehorn this case under the holdings of the *Beta/Chris Berg* line of cases or under the explicit facts of *Whittaker* and *E. Walters & Co.* The core rationale of the *Beta/Chris Berg* line of cases is that government should not prosper because of its illegalities. But, this should not, and cannot, mean that a contractor has carte blanche to behave in any manor it wishes. These cases are not a court-made contractor's functional equivalent of 007's licence to kill. Simply put, the Federal Circuit in these cases has not altogether abolished the doctrine of waiver. To rule as such would allow the devious to take undue advantage of governmental error, no matter how innocent, and prey on the public fisc.

The key factual distinction between *Beta Systems, Inc*., *Chris Berg* and the case at bar, is that in the former cases the contractors either complained during contract formation or, at the very least, at an early stage in the history of the conflict. Here, on the other hand, Wyoming, who was and is a sophisticated government contractor, astonishingly waited fourteen years after entering the first PMM-based contract before suing in this court, and waited eight years after entering the last PMM-based contract before litigating. Wyoming never complained that it was not making a profit. And Wyoming never complained that the contract it was fulfilling was in part unlawful. Wyoming commenced this action, the court must add, a full ten years after the *MAPCO* decision was rendered. Clearly, it knew or should have known that the EPA clause was suspect. Again, this conduct is far more egregious than that which occurred in either *Beta Systems, Inc*. or *Chris Berg*.

The court emphasizes that this case is *sui generis*. This trial court ruling by necessity is, of course, limited to the facts of this singular case. But, the facts here surely fall under the ancient doctrine of waiver. As the predecessor to this court observed:

> There is, of course, venerable authority that, wherever a contract not already fully performed is continued in spite of a known breach, the wronged party cannot avail himself of that excuse . . . . As a general proposition, one side cannot continue after a material breach by the other . . . act as if the contract remains fully in force . . . run up damages, and then suddenly go to court.

*Ling-Temco-Vought, Inc. v. United States*, 201 Cl. Ct. 135, 146, 475 F.2d 630, 637 (1973)(quoting *Northern Helix Co. v. United States*, 197 Cl. Ct. 118, 125-26, 455 F.2d 546, 551 (1972). To rule otherwise here, would simply be unjust.

That said, waiver requires a "voluntary relinquishment of a known right or claim." *Seaboard Limber Co. v. United States*, 903 F.2d 1560, 1563 (Fed. Cir. 1990); *see also* 31 C.J.S. Estoppel & Waiver § 67. The question then becomes a paraphrase of the question posited by Senator Howard Baker during the Senate hearings on the infamous Watergate scandal: What did Wyoming know, and when did it know it? Or, cutting to the chase, when did Wyoming know about the *MAPCO* decision?

For purposes of analysis, Wyoming entered into two sets of contracts: those entered prior to the *MAPCO* decision in 1992, and those entered after *MAPCO*. If Wyoming knew of *MAPCO* in 1992 when the decision came down, waiver would clearly apply to the two PMM-based contracts Wyoming entered into in 1993 and 1994 (contract numbers DLA600-94-D-0529 and DLA600-93-D-0560). As for the contracts entered into before 1992, if Wyoming knew of *MAPCO* when it came down, Wyoming's knowledge of the case and its subsequent failure to bring suit until 2002 would also

indicate a voluntary choice not to sue on the pre-1992 contracts. In other words, Wyoming should have sued on all their contracts upon learning of *MAPCO*.

Even absent Wyoming's actual knowledge of *MAPCO*, parties are presumed to know the law, and ignorance of it is historically not an excuse. *Pomeroy v. United States*, 1998 U.S. App. LEXIS 24039 (Fed. Cir. 1998); *Lambert v. California*, 355 U.S. 225, 228, 78 S. Ct. 240, 243, 2 L. Ed. 2d 228 (1958); *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 92 L. Ed. 10, 68 S. Ct. 1 (1947). This axiom, however, typically applies to statutes or appellate court opinions, rather than to decisions from a trial court. Nevertheless, as a sophisticated government contractor, there is a strong argument to be made for imputing knowledge of *MAPCO* to Wyoming. Like AT&T discussed *supra*, Wyoming was one of the top 100 military fuel contractors in the nation – number eighty to be exact. Such a status would suggest Wyoming kept abreast of any legal developments in the area of government fuel contracts. Similarly, as a government contractor, the Court of Federal claims is the only Federal Court where governmental contract disputes valued above $10,000 are decided. This again suggests that Wyoming, who made more than $17 million on government contracts in 1998, knew of this court's decisions on such contracts. At minimum, counsel for a sophisticated contractor such as Wyoming should be charged with knowledge of the case law the counselor should have read before advising Wyoming to enter the contracts after *MAPCO*.

Furthermore, there is an issue the parties failed to raise – laches. Under the doctrine of laches, a plaintiff's claim will be dismissed if there is: (1) an unreasonable and inexcusable delay in bringing the claim, and (2) material prejudice to the defendant as a result of the delay. *Advanced Cardiovascular Sys. v. SciMed Life Sys.*, 988 F.2d 1157, 1161 (Fed. Cir. 1993); *A.C. Aukerman Co. v. R.L. Chaides Construction Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc); *see also* 30A C.J.S. Equity § 129 ("Laches in a general sense is the neglect, for an unreasonable and unexplained length of time, under circumstances permitting diligence, to do what in law should have been done, resulting in a disadvantage to the other party"); *Calcasieu Refining Co. v. United States*, No. 02-1219C, slip op. at 18-19 (Fed. Cl. July 31, 2003) (denying summary judgment in a PMM-based government contract case because, in part, "the spectre of laches could be present").[21]

Hypothetically, if the court was only faced with the pre-*MAPCO* contracts, the issue may very well be whether the failure to sue after more than ten years would create a triable issue under the doctrine of laches. But in this case, the two post-*MAPCO* contracts tilt the scale measuring plaintiff's conduct toward waiver rather than laches because, to the court, plaintiff's dilatory conduct appears willful. Simply put, under the circumstances of this case, the pre-MAPCO contracts "piggy-back" onto the post-MAPCO contracts for purposes of the doctrine of waiver. There appears to be no justification for plaintiff not to sue on *all* of its contracts once MAPCO was decided by this court.

Nevertheless, as discussed above, the Federal Circuit's law on waiver is not clear, especially as to whether the traditional presumption of knowing the law extends to trial court decisions such as

---

[21] The court is mindful of Court of Federal Claims Rule 8(c) which would require the government to plead laches as an affirmative defense, something it did not do. Nevertheless, it appears that the court may raise the issue on its own accord. *See generally* Dan B. Dobbs, The Law of Remedies § 2.4(2) ("The point, courts often say, is not that the plaintiff's unclean hands furnish a 'defense' to defendant, but rather that the court itself wishes to avoid participating in inequity. For this reason, the issue may be raised by the court *sua sponte* even if counsel does not raise it.").

*MAPCO*. Furthermore, the only evidence on the record as to Wyoming's actual knowledge comes from a declaration by Mr. David R. Miller, Wyoming's Vice President of Accounting and Administration. App. to Pl.'s Cross-Mot. for Partial Summ. J. and Opp'n to Def.'s Mot. for Partial Summ. J. at 1200. As Vice President of Accounting and Administration, Mr. Miller was the man responsible for negotiating the contracts at issue in this case. *Id*. His declaration states "in negotiating and entering into Wyoming's military fuel contracts with DESC, I was not aware that the price indexes in Wyoming's contracts were illegal." *Id*. Reading this statement in a light most favorable to plaintiff, the statement establishes that Wyoming did not know of *MAPCO* when entering either the pre or post-*MAPCO* contracts. The statement does not, however, negate the idea that if Wyoming was presumed to know the law of *MAPCO* once it came down, such knowledge would not only conclusively establish that Wyoming waived its right to sue on the post-*MAPCO* contracts, but also that such knowledge could be "piggy-backed" onto the pre-*MAPCO* contracts such that Wyoming's failure in 1992 to sue on all nine contracts would constitute waiver.

## III. Conclusion

Consequently, this court must at this time deny the parties' cross-motions for summary judgment as premature. As a result, this court requests supplemental briefing on the following questions:

1. In the context of this case, can knowledge of this court's decision in *MAPCO* be imputed to Wyoming such that waiver would apply?

2. Is a hearing or trial necessary in order to develop a factual record on the issue of?

3. Does the doctrine of laches apply in this case, and if so, whether the court may raise the issue *sua sponte*? Assuming laches applies, is a hearing or trial necessary to resolve the matter?

Defendant's supplemental brief in response to these questions shall be limited to fifteen pages and shall be filed in this court no later than Friday, August 15, 2003. Plaintiff's brief in response thereto shall also be limited to fifteen pages and shall be filed in this court no later than Friday, August 22, 2003. Defendant's final response to plaintiff's supplemental brief shall be limited to seven pages and shall be filed with this court no later than Wednesday, August 27, 2003.

For the reasons stated above, the parties' cross-motions for summary judgment are hereby DENIED.

IT IS SO ORDERED.

**No Costs**

s/Lawrence J. Block
Lawrence J. Block
Judge