IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 02-1460C
(Judge Block)

HERMES CONSOLIDATED, INC.,
Doing Business As Wyoming Refining,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MOTION TO DISMISS

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

STEVEN J. GILLINGHAM
Senior Trial Counsel
KYLE CHADWICK
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 616-2311
Facsimile: (202) 353-7988

Attorneys for Defendant

OF COUNSEL:

BERNARD A. DUVAL
Counsel
Defense Energy Support Center
Fort Belvoir, VA 22060
HOWARD M. KAUFER
Assistant Counsel
Office of General Counsel
Defense Energy Support Center
Fort Belvoir, VA 22060

November 21, 2005

## TABLE OF CONTENTS

**PAGE(S)**

DEFENDANT'S MOTION TO DISMISS THE COMPLAINT .................................................. 1

STATEMENT OF THE ISSUES ........................................................................................ 1

STATEMENT OF THE CASE .......................................................................................... 2

I. Nature Of The Case ........................................................................................ 2

SUMMARY OF MATERIAL FACTS .............................................................................. 3

I. Hermes and Its DESC Contracts ..................................................................... 3

SUMMARY OF THE ARGUMENT .................................................................................. 5

ARGUMENT ................................................................................................................... 7

I. Standard of Review ......................................................................................... 7

II. DESC's EPA Clauses Are Authorized by FAR 16.203-1 ............................................ 8

A. EPA Clauses Need Not Be Based Upon Plaintiff's Own Prices ............................. 9

B. Hermes' Fair Market Value Allegations Do Not State A Cause of Action ........... 13

C. Hermes' FAR 15.802(b) Allegation Does Not State A Cause of Action ............... 13

D. Conclusion .............................................................................................. 16

III. Hermes' Alternative Illegality Theories In Counts II-VI Must Be Dismissed ............ 17

A. Count II (Misrepresentation) ................................................................... 17

B. Count III ("Breach of Contract") ............................................................. 18

C. Count IV ("Implied-In-Fact Contract") ...................................................... 18

D. Count V ("Failure of Consideration and Frustration of Purpose") ........................ 19

E. Count VI ( Mistake) ................................................................................ 20

1. Mutual Mistake ............................................................................. 20

2. Unilateral Mistake .......... 22

IV. Waiver and Estoppel Bar Hermes' Claims .......... 24

CONCLUSION .......... 26

## SUPPLEMENTAL APPENDIX

DECLARATION OF JOHN R. WALKER ........................................................................ 1

Recommendation to Change Base Reference Date for EPA References Tied to Petroleum Marketing Monthly (PMM), dated 6 January 1986 .................................................... 5

Defense Logistics Agency Inter-Office Memorandum, dated 2 December 1987 ........................ 7

Excerpt from deposition of Lawrence Ervin, dated, December 1, 2003 .................................... 14

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

Am. Tel. & Tel. Co. v. United States,
177 F.3d 1368 (Fed. Cir.1999) .......... 15

Am. Tel. & Tel. Co. v. United States,
307 F.3d 1374 (Fed. Cir. 2002) .......... passim

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) .......... 7

Atlas Corp. v. United States,
895 F.2d 745 (Fed. Cir. 1990) .......... 20, 21

Barrett Refining v. United States,
242 F.3d. 1055 (2001) .......... 19

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) .......... 7

Conley v. Gibson,
355 U.S. 41 (1957) .......... 8

Dairyland Power Cooperative v. United States,
16 F.3d 1197 (Fed. Cir. 1994) .......... 20, 21

Dale Ingram, Inc. v. United States,
201 Ct. Cl. 56, 475 F.2d 1177 (1973) .......... 22

Durable Metals Prods., Inc. v. United States,
27 Fed. Cl. 472, aff'd, 11 F.3d 1071 (Fed. Cir. 1993) (table) .......... 17

E. Walters & Co., Inc. v. United States,
217 Ct. Cl. 254, 576 F.2d 362 (1978) .......... 24, 26

Everett Plywood Corp. v. United States,
227 Ct. Cl. 651 F.2d 723 (1981) .......... 19

Far West Fed. Bank v. OTS,
119 F.3d 1358 (9th Cir. 1997) .......... 19

Fraass Surgical Mfg. Co., Inc. v. United States,
215 Ct. Cl. 820, 571 F.2d 34 (1978) ........ 23

Freightliner Corp. v. Caldera,
225 F.3d 1361 (Fed. Cir. 2000) ........ 15

Glopak Corporation v. United States,
12 Cl.Ct. 96, 102 (1987), aff'd. 851 F.2d 334, 338 (1988) ........ 24

Gould, Inc. v. United States,
935 F.2d 1271 (Fed. Cir. 1991) ........ 8

Hermes v. United States,
58 Fed. Cl. 3 (2003) ........ passim

Hermes v. United States,
58 Fed. Cl. 409 (2003) ........ 2

Hume v. United States,
21 Ct. Cl. 328, 330 (1886), aff'd., 132 U.S. 406 (1889) ........ 23

J&E Salvage v. United States,
37 Fed. Cl. 256 (1997) ........ 22, 23

John Massman Contracting Co., v. United States,
23 Cl. Ct. 24, 32 (1991) ........ 18

Liebherr Crane Corp. v. United States,
810 F.2d 1153 (Fed. Cir. 1987) ........ 23

Ling-Temco-Vought, Inc. v. United States,
201 Ct. Cl. 135, 146 (1973) ........ 25

MAPCO Alaska Petroleum, Inc. v. United States,
27 Fed. Cl. 405 (1992) ........ 2, 5, 12

Montana v. United States,
124 F.3d 1269 (Fed. Cir. 1999) ........ 7

Morrison-Knudsen Co. v. United States,
170 Ct. Cl. 712 (1965) ........ 18

Perpetual Financial Corp. v. United States,
61 Fed. Cl. 126 (2004) ........ 20

Reservation Ranch v. United States,
39 Fed. Cl. 696 (1997), aff'd, 217 F.3d 850 (Fed. Cir. 1999) (table) .............................. 24

Rochman v. United States,
27 Fed. Cl. 162 (1992) .......................................................................................... 8

Seaboard Lumber v. United States,
308 F.3d 1283 (Fed. Cir. 2002) ............................................................................ 20

Seaboard Lumber Co. v. United States,
903 F.2d 1560 (Fed. Cir. 1980) ............................................................................ 24

Sherwood v. Walker,
66 Mich. 568, 33 N.W. 919 (1887) ...................................................................... 21

Short Bros., PLC v. United States,
65 Fed. Cl. 695 (2005) ..................................................................................... 14, 15

Spalding & Sons, Inc. v. United States,
28 Fed. Cl. 242 (1993) .......................................................................................... 20

Sweats Fashions, Inc. v. Pannill Knitting Co.,
833 F.2d 1560 (Fed. Cir. 1987) .............................................................................. 7

Tesoro et al. v. United States,
405 F. 3d 1339 (Fed. Cir. 2005) ................................................................... passim

Tony Downs Foods Co. v. United States,
209 Ct. Cl. 31, 530 F.2d 367 (1976) ..................................................................... 22

Trauma Service Group v. United States,
104 F.3d 1321 (Fed. Cir. 1997) ............................................................................ 19

United States v. Hamilton Enterprises,
711 F.2d 1038 (Fed. Cir. 1983) ............................................................................ 22

Whittaker Elec. Sys. v. Dalton,
124 F.3d 1443 (Fed. Cir. 1997) ............................................................................ 24

**STATUTES**

10 U.S.C. § 2306(a) ............................................................................................... 16

15 U.S.C. §772 ........................................................................................................ 4

## REGULATIONS

FAR 11.203-1 .......... passim

FAR 15.402(a) .......... passim

FAR 15.802(b) .......... passim

FAR 15.804-3 .......... 10, 13

FAR 16.103 .......... 16

FAR 16.104 .......... 16

FAR 16.203-3 .......... 11, 12

FAR 16.203-4 .......... 9, 16

## MISCELLANEOUS

Restatement (Second) of Contracts .......... 20, 21, 22

Nash and Cibinic, Formation of Government Contracts (3rd Ed. 1998) .......... 16

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HERMES CONSOLIDATED, INC.,<br>Doing Business As Wyoming Refining<br>Company,<br><br>Plaintiff,<br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 02-1460C<br>(Judge Block) |

DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

The United States respectfully requests that the Court dismiss the counts of the complaint, pursuant to RCFC 56(b) or, in the alternative, and as detailed further in our issue statement below, pursuant to RCFC 12(b)(6). In support of this motion, we rely upon the Second Amended Complaint, the following brief, the accompanying proposed findings of uncontroverted fact ("PFF"), the exhibits submitted in conjunction with our first motion for summary judgment ("Exh."), and the supplemental appendix ("SA") attached to this brief

**STATEMENT OF THE ISSUES**

1. Whether the contracts at issue were illegal because their Economic Price Adjustment ("EPA") clauses were based upon "indexes rather than on Plaintiff's own established fuel prices," "were not market-based, were not designed or intended to used to set or adjust prices, and did not reflect at least the fair market value of military fuel." See Compl. ¶ 33-34.

2. Whether the allegation contained in Count I that the EPA clauses violated FAR 15.802(b) (currently codified at FAR § 15.402(a)) states a claim upon which relief can be granted. See Comp. ¶ 35.

3. Whether if the answers to Issue 1 and 2 are in the negative, Counts II-VI, which state alternative theories of relief based upon the same allegations concerning the PMM and are labeled

as "Misrepresentation," "Breach of Contract," "Implied-In-Fact-Contract," "Failure of Consideration and Frustration of Purpose," and "Mistake," also should be dismissed for failing to state a claim upon which relief can be granted.

4. If the answers to any of the above are in the affirmative, whether plaintiff has waived any applicable benefit, or is estopped from litigating their applicability.

## STATEMENT OF THE CASE

### I. Nature Of The Case

This case arises from 11 fuel supply contracts between Hermes Consolidated, Inc. ("Hermes") and the Defense Energy Support Center ("DESC"). Compl. ¶ 5; 27-28.[1] Hermes complains that the EPA clauses contained in DESC fuel contracts were illegal and, thus, concludes that it is "entitled to recover based on the fair market value of the fuel it delivered to DESC." E.g., Compl. ¶ 38.

In an earlier phase of this litigation, we requested summary judgment upon Hermes' allegation that the clauses at issue violated the Federal Acquisition Regulation ("FAR") ("illegality issue") and, in the alternative, that: Hermes had waived any right it might have had to price its fuel pursuant to EPA clauses other than the ones contained in its contracts, and was estopped from litigating the point. In Hermes v. United States, 58 Fed. Cl. 3 (2003) ("Hermes I"), the Court held that, based upon the reasoning set forth in MAPCO Alaska Petroleum, Inc. v. United States, 27 Fed. Cl. 405 (1992), the clauses were illegal, but requested additional briefing concerning whether Hermes had waived any such claims. In Hermes II (Hermes v. United States, 58 Fed. Cl. 409 (2003)), the Court held that Hermes had waived its claims, dismissed the FAR-based illegality

[1] Until 1998, DESC was called the Defense Fuel Supply Center ("DFSC"). We use the current name.

claim, and certified the waiver and illegality issues for interlocutory appeal. The Federal Circuit accepted the interlocutory appeal and, in Tesoro et al. v. United States, 405 F. 3d 1339 (Fed. Cir. 2005), *petition for reh'g. en banc denied*, No. 04-5064 (Fed. Cir. Aug. 22, 2005) ("Tesoro"), held that DESC's PMM-based EPA clause was legal, and declined to reach the waiver issue.

Following a status conference concerning how to proceed in this case, the Court permitted Hermes to file an amended complaint and defendant to file this motion. Hermes has filed its amended complaint, styled as the "Second Amended Complaint," to include what we consider to be immaterial factual allegations concerning the PMM (Compl. ¶ 15-22) and to assert a cause of action pursuant to FAR 15.802(b) (currently codified at FAR § 15.402(a)). See Compl. at ¶ 35.

## SUMMARY OF MATERIAL FACTS

The evidence set forth in the accompanying proposed findings of uncontroverted fact is sufficient to establish the Government's right to a dismissal of the complaint. Generally, the proposed findings describe the market-based nature of the EPA clauses at issue, DESC's long, controversy-free use of those clauses, Hermes' failure to object to the use of, or application of, the clauses, until many years after performing the contracts, and Hermes' long history and familiarity with these clauses.

### I. Hermes and Its DESC Contracts

Hermes is a sophisticated Government contractor. It entered into at least 11 DESC contracts over a period of approximately 12 years, involving the sale of approximately $223 million of military fuel. PFF 4; see also Hermes II, 58 Fed. Cl. at 417.

From 1986 to 1997, Hermes performed approximately 10 DESC fuel supply contracts (Compl. ¶ 5; 27-28), involving the sale of approximately $223 million of military fuel. Compl. ¶ 5. The contracts contained DESC-drafted price adjustment clauses that provided for the repricing of

fuel on a monthly basis, according to changes in a designated report of fuel sales. Id. at ¶ 6; Exh. 1 ¶ 5-11. In essence, for each petroleum product to be supplied, offerors proposed a "base price" per gallon, which the agency used for evaluation purposes. PFF 11, 12. Offerors also acknowledged a "reference price," which, since the early 1980s, has been taken from one of two widely-available petroleum price publications. PFF 11-12; Exh. 4 at 5-7. After award, the base price per gallon was periodically adjusted up or down, by the exact number of fractions of a cent that the published reference price had risen or fallen since the last adjustment. PFF 11-12. Thus, changes in the contract prices were linked to changes in the prices of similar products. Exh. 1 ¶ 9-10; Exh. 2 ¶¶ 3-11.

DESC began using EPA clauses during the 1973 oil embargo. At that time, the agency allowed offerors to choose between basing price adjustments upon either published prices of refined products, or actual crude oil costs. DESC began using market-prices exclusively in the early 1980s, primarily because the prior practice made it difficult to compare offers for evaluation purposes. PFF 9.

The contracts awarded to Hermes contained EPA clauses required DESC to adjust the accepted offer price based upon changes in the average sale prices of refined petroleum products, for a specified region, as reported by the Department of Energy ("DOE"), Energy Information Administration, in its publication the Petroleum Marketing Monthly. PFF 12. The PMM is compiled from transaction price reports that refiners, including Hermes, are required by law to submit to DOE monthly. PFF 12; 15 U.S.C. § 772. Pursuant to that clause, these adjustments were made monthly. PFF 12. For example, for a 1989 contract, Hermes offered a base price of $.564500 per gallon for 41,000,000 gallons of JP-4 at destination (Exh. 4 at 2), tied to a PMM-based reference price, supplied by DESC, of $.548940 per gallon for February 1989. Id. at 7. Assuming

hypothetically that, for the first month in which Hermes delivered fuel, the reference price had risen .10 cents, the contract price for that first month would have been the base (offer) price plus the same .10 cents per gallon.

In 1995, DESC adopted as its EPA escalator a widely-used industry publication, Platts Oilgram Price Report ("Platts"). PFF 25. DESC did so because, despite substantial advantages offered by the PMM, including the fact that it was a report of actual sale prices, the report of those prices was not available until three months after the sales took place. The EPA clauses, however, required monthly payments and, therefore, price adjustments. To accommodate this gap between the payment date and the availability of the data necessary to calculate the economic price adjustment applicable to those payments, DESC made an estimated interim payment and then reconciled the payment with the amount properly due when the applicable PMM sales data became available. PFF 13; Exh. 4 at 5. Thus, Hermes' suggestion that the change from PMM demonstrates that a PMM-based clause was illegal or not market-based is sheer hyperbole. See, e.g., Compl. ¶¶ 15-22.

Hermes never objected to any version of the EPA clause, or to any of many price adjustments made pursuant to the clauses. PFF 26. Indeed, it was not until Hermes submitted its first certified claim in 2001 – approximately 15 years after the first contract was awarded, and nine years after MAPCO, 27 Fed. Cl. 405, was decided – that Hermes alleged that the EPA clauses were illegal. Compl. 27-28; Exh.1.

## SUMMARY OF THE ARGUMENT

In Tesoro, 405 F.3d 1339, the Federal Circuit explicitly rejected Hermes' stubborn contention that the clauses were illegal because they were based upon "indexes rather than on Plaintiff's own established fuel prices" or that DESC's PMM-based EPA clause is prohibited by the

FAR. Tesoro also effectively disposes of Hermes' miscellaneous complaints concerning the EPA clauses. In Tesoro, the court held that, in order to pass muster under FAR 16.203-1, EPA clauses need only be based upon "industry-based prices," which "may be established by references to either a catalog or market sources independent of the manufacturer or vendor." Id. at 1347. Yet, in the guise of various legal theories, Hermes contends that the EPA clauses are suspect because they were not "designed or intended" to set prices and did not "reflect at least the fair market value of military fuel." These allegations do not invoke any part of the legal test for EPA clauses and, therefore, fail to state a claim upon which relief can be granted. In fact, DESC's EPA clauses pass muster under Tesoro, because they are based upon "market sources."

Hermes' attempt to repackage its clause-illegality argument as various common law theories, "Breach of Contract," "Implied-In-Fact-Contract," "Failure of Consideration and Frustration of Purpose," and "Mistake" fare no better. All are based upon the legally-unfounded premise that DESC owed a duty to Hermes to utilize price references that were "designed or intended to be used to set or adjust prices," that the references "reflect at least the fair market value of military fuel," and that DESC pay "fair market value." None is grounded in the language of Hermes' actual contracts or the Federal Circuit's standard for assessing the legality of EPA clauses. All are thinly-disguised, back-door attempts to alter the legal standard for EPA clauses, established and applied in Tesoro. Accordingly, none of these states a cause of action upon which relief may be granted. To the extent they might, Hermes simply fails to demonstrate the elements of proof for those causes of action.

Finally, even if Hermes' various allegations are not subject to dismissal, we still are entitled to summary judgment, because, years ago, Hermes abandoned any rights the FAR might have conferred. Hermes also forfeited any right it might have had to test those rights in litigation when it

waited as many as 15 years to file the necessary claims. Although the Hermes Court did not explicitly address Hermes' other causes of action, there is no principled basis for treating them differently, because all are premised upon the very allegations that make Hermes illegality argument ineffective, i.e., that DESC failed to deliver that which it was not legally required to deliver, and only Hermes wishful reading of the contracts suggests the contrary.[2]

**ARGUMENT**

I. Standard of Review

Summary judgment is warranted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." RCFC 56(c); accord Montana v. United States, 124 F.3d 1269, 1273 (Fed. Cir. 1999). A factual issue is material if it could affect the outcome of the case in light of the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute exists only if a reasonable trier of fact could find for the nonmoving party. Id. The movant need not "produce evidence" of the absence of factual disputes; it need only "point[] out" that the record does not support the other party's case. Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1563 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

[2] In our earlier motion for summary judgment, we demonstrated that, in order to maintain a cause of action against the Government, Hermes must allege and prove that it was injured, damaged, or harmed by the Government's allegedly wrongful action and that Hermes had failed to do so. Def. MSJ at 27. We do not repeat that argument here, because the dismissal of the complaint we seek here would moot the argument. However, should the Court deny this motion, we respectfully request that the Court address that argument before permitting any further discovery. Our earlier motion for summary judgment also explained that, if Hermes could establish entitlement to recovery in quantum valebant, the Court should dismiss those portions of the complaint that rest upon the presumption that Hermes may disregard its original offer prices, as Hermes' certified claims did. See Def. MSJ at 29. We do not repeat that position either. However, should the Court deny this motion, we respectfully request that that argument be considered before any discover concerning remedy is permitted.

We have moved to dismiss some counts of the Second Amended Complaint pursuant to RCFC 12(b)(6), which permits the dismissal of an allegation that fails to state a claim upon which relief may be granted. Dismissal upon this ground is appropriate whenever "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

In making this determination, the Court must accept the factual allegations set forth in the complaint as true and "indulge in all reasonable inferences in favor of the nonmovant." Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991).[3]

II. DESC's EPA Clauses Are Authorized by FAR 16.203-1[4]

In Count I, Hermes presents several theories concerning the illegality of DESC's EPA clauses: (1) that the clauses were illegal because there were not based upon "Plaintiff's own established fuel prices" (Compl. ¶ 33); (2) that the clauses were illegal because they were "not market-based, were not designed or intended to be used to set or adjust prices, and did not reflect at least the fair market value of military fuel" (Compl. ¶ 34); and (3) that the contracts were awarded in violation of FAR § 15.802(b) (currently codified at FAR 15.402(a)) (contracting officer's duty to review offers for price reasonableness). (Compl. ¶ 35)

As explained below, Hermes waived whatever benefits it imagines these regulations

---

[3] However, "legal conclusions, deductions, or opinions couched as factual allegations are not given a presumption of truthfulness." Rochman v. United States, 27 Fed. Cl. 162, 168 (1992)(quoting 2A Jeremy C. Moore, Moore's Federal Practice, ¶ 12.07 [2.-5] (2d ed. 1992)).

[4] In our first motion for summary judgment, we explained that, although FAR 16.203-1 specifically authorized the clauses at issue, it was Hermes' burden to demonstrate that the clauses were prohibited, not our burden to demonstrate specific authority. See Def. MSJ at 11. We have not repeated the position here. However, should the Court determine that the clauses at issue are not specifically authorized, we respectfully request that it consider that position.

conferred and now, is estopped by its years of inaction from litigating those benefits. However, even if that is not so, Hermes is not entitled to relief, as these clauses are legal pursuant to Tesoro. Indeed, Hermes' allegations, which attempt to redefine the standard for EPA clauses, do not even state a claim upon which relief can be granted, because they invoke standards for illegality not found in the law.

A. EPA Clauses Need Not Be Based Upon Plaintiff's Own Prices

FAR 16.203-1 provides as follows:

> A fixed-price contract with economic price adjustment provides for upward and downward revision of the stated contract price upon the occurrence of specified contingencies. Economic price adjustments are of three general types:
>
> (a) Adjustments based on established prices. These price adjustments are based on increases or decreases from an agreed-upon level in published or otherwise established prices of specific items or the contract end items.
>
> (b) Adjustments based on actual costs of labor or material. These price adjustments are based on increases or decreases in specified costs of labor or material that the contractor actually experiences during contract performance.
>
> (c) Adjustments based on cost indexes of labor or material. These price adjustments are based on increases or decreases in labor or material cost standards or indexes that are specifically identified in the contract.

FAR Section 16.203-1(a) describes two sorts of "established prices" adjustments -- those based upon "published or otherwise established prices." Section 16.203-1 does not define those terms. However, FAR 16.203-4(a), and (b) ("Clauses"), which prescribe standardized clauses for "adjustments based on established prices," specifically refer to supplies having an "established "catalog or market price."

Since January 1997, FAR 16.203-4 has not explicitly defined the terms "catalog or market

price."[5] However, its predecessor made clear that the terms "established catalog or market price" referred to the definitions found in FAR 15.804-3. The predecessor stated that, before using a "published or otherwise established price" EPA clause, the contracting officer must determine that "the requirement is for . . . .supplies that have an established catalog or market price verified using the criteria in FAR 15.804-3" (emphasis added). Section 15.804-3 (c), in turn, defined "established catalog prices" as "prices (including discount prices) recorded in a catalog, price list, schedule, or other verifiable and established record that (A) are regularly maintained by the manufacturer or vendor; and (B) are published or otherwise available for customer inspection." FAR 15.804-3(c)(1) (1995). It defined "established market prices" as "current prices that (I) are established in the course of ordinary and usual trade between buyers and sellers free to bargain and (ii) can be substantiated by data from sources independent of the manufacturer or vendor." Id. § 15.804-3(c)(2) (emphasis added).

In Tesoro, the Federal Circuit, reviewing the PMM-based EPA clause at issue here, held that FAR 15.804-3 supplies the meaning for "established prices," which need not be, as Hermes asserts, the contractor's own prices:

> Although the term "established price" is not expressly defined in FAR § 16.203, the definition of the term in FAR § 15.804-3 is incorporated by reference. FAR § 15.804-3 defines "established prices" to include contractor-specific prices, namely "established catalog prices," and industry-based prices, namely "established market prices." As indicated by FAR § 16.203-2 and FAR § 15.804-3, the policy behind requiring use of "established prices" is to avoid contracts subject to the operational whims of individual contractors.

Tesoro, 405 F.3d at 1347.

Rejecting the contractor's theory (Hermes' here), the court held explicitly that the theory that

[5] This provision was deleted from the FAR effective January 2, 1997.

"FAR 16.203-3 requires that adjustments be based only on changes in the prices charged by individual contractors eviscerates the regulatory meaning of the term 'established prices' and the policy reasons for using it." Id. Summarizing, the court explained that: "According to the interplay of all four sections of FAR § 16.203, a 'contractor's established price' may be established by reference to either a catalog or market sources independent of the manufacturer or vendor." Id. at 1347.

The court did not stop there, however. Instead, it explicitly considered whether DESC's PMM-based EPA clause was an "established prices" clause contemplated by FAR § 16.203-1 and held that it was – foreclosing this Court from considering the question anew. Indicating that it was indeed considering the legality of the PMM-based EPA clause, the court recited the PMM's various features as well as the parties' contentions concerning the effect of those features upon the viability of the PMM-based EPA clause. The court's specific recitations concerning the PMM included the following.

- The certified question for interlocutory review was "Did DESC establish the price of fuel in violation of law by employing economic price adjustment clauses indexed to PMM?" Tesoro, 405 F.3d. at 1342 (emphasis added).

- "The reference prices to which the price adjustments were tied were drawn from market publications. Until June 23, 1994, DESC drew its EPA reference prices from the market publication known as the [PMM]." Id. at 1341.

- The PMM is published by DOE and reports "monthly average sales figures for specified fuels for five regions known as Petroleum Administration for Defense Districts ('PADDs')." Id.

- "All refiners, including Tesoro and Hermes, are required by law to submit monthly sales data to the DOE, which then compiles the data to report the monthly average sales prices per PADD for various products." Id.

- The complaints in both suits claimed that "DESC's actions were per se illegal because the PMM-based EPA clause was inconsistent with the applicable section of the FAR." Id. at 1342.

- The contractors argued that "DESC's use of an EPA clause tied particularly to the PMM does not comport with the express requirements of FAR § 16.203-3 . . . Relying upon the language of MAPCO, Appellants claim that a PMM-based EPA clause fails to address either of the "mischiefs" specified in FAR § 16.203-3, because the PMM is an "amalgamation" of petroleum sales that does not reflect the product, the market, or the price for the military fuel Tesoro and Hermes supplied." Id. at 1348 (emphasis added).

- A review of the MAPCO analysis of the PMM itself, which was distinct from MAPCO's analysis of whether, in general, EPA clauses must be based upon the contractor's prices. See MAPCO, 27 Fed. Cl. at 410-11. The appellate court's review included MAPCO's dissection of the PMM, including the fact that it was an "amalgamation of the previous month's sales data" and, as such, did not comport with the dictionary definition of "established." The review also recited MAPCO's conclusion ("In sum, the index at issue is neither the contractor's, nor does it reflect an established price"), which underscored the fact that the appellate court and the MAPCO court considered the general question of whether an "established prices" EPA clause could be market based as well as whether DESC's PMM clause was an "established prices" clause. Id. at 1347.

Following this recitation, the court concluded, in unmistakable language, that the PMM-based EPA clause was, indeed, a permissible EPA clause:

> Because we conclude that DESC's use of a market-based EPA clause tied to the PMM was authorized under the FAR, we do not reach the other issues raised in the certified questions . . . . Our holding that the use of the PMM-based EPA clause was authorized under the statute moots the issue of [waiver].
>
> * * *
>
> For the foregoing reasons, we hold that the Court of Federal Claims erred in holding that DESC's use of a PMM-based EPA clause was not authorized under the FAR.

Id. (emphasis added).

The appellate court's conclusion about the nature of the PMM is hardly surprising. The PMM is based upon sales data from a large number of refiners and sellers of petroleum products. It reports averages of the actual prices sellers have charged and buyers have paid for various petroleum products in different states and regions of the country. PFF 12. Because the prices are established

in actual sales between a number of sellers and buyers, they clearly are "market prices," and satisfy the FAR 15.804-3 requirement that market prices be established in the ordinary course of business between buyers and sellers free to bargain.

B. Hermes' Fair Market Value Allegations Do Not State A Cause of Action

The above analysis establishes that DESC's EPA clauses pass muster under Tesoro and, therefore, are legal. However, Hermes asserts that the clauses also may be considered illegal because they were "not market-based, were not designed or intended to be used to set or adjust prices, and did not reflect at least the fair market value of military fuel" (Compl. ¶ 34). But, we are aware of no legal basis for invalidating EPA clauses upon these grounds and the complaint identifies none. In short, Hermes' effort to levy yet further qualifications upon EPA clauses is rooted neither in Hermes' contract nor the applicable law concerning EPA clauses. Accordingly, we see no apparent ground upon which these allegations might state a claim.

C. Hermes' FAR 15.802(b) Allegation Does Not State A Cause of Action

In yet another effort to create an unfounded legal test for EPA clauses, Hermes asserts that the clauses were illegal because they somehow violated FAR § 15.802(b) (currently codified at FAR 15.402(a)). As this Court has already held, that regulation does not create rights for contractors. In other words, a complaint rooted in this regulation fails to state a claim upon which relief can be granted.

FAR 15.402(a) provides that:

> Contracting officers must-
>
> (a) Purchase supplies and services from responsible sources at fair and reasonable prices. In establishing the reasonableness of the offered prices, the contracting officer must not obtain more information than is necessary. To the extent that cost or pricing data are not required by 15.403-4, the contracting officer must generally

> use the following order of preference in determining the type of information required:
>
> (1) No additional information from the offeror, if the price is based on adequate price competition, except as provided by 15.403-3(b).
>
> (2) Information other than cost or pricing data:
>
> (I) Information related to prices (e.g., established catalog or market prices or previous contract prices), relying first on information available within the Government; second, on information obtained from sources other than the offeror; and, if necessary, on information obtained from the offeror. When obtaining information from the offeror is necessary, unless an exception under 15.403-1(b)(1) or (2) applies, such information submitted by the offeror shall include, at a minimum, appropriate information on the prices at which the same or similar items have been sold previously, adequate for evaluating the reasonableness of the price.
>
> (ii) Cost information, that does not meet the definition of cost or pricing data at 2.101.
>
> (3) Cost or pricing data. The contracting officer should use every means available to ascertain whether a fair and reasonable price can be determined before requesting cost or pricing data. Contracting officers must not require unnecessarily the submission of cost or pricing data, because it leads to increased proposal preparation costs, generally extends acquisition lead time, and consumes additional contractor and Government resources.

We start with the proposition that not every regulation provides the contractor with an "enforceable interest." Am. Tel. & Tel. Co. v. United States, 307 F.3d 1374, 1381 (Fed. Cir. 2002) (AT&T V). And that is precisely where this Court started in Short Bros., PLC v. United States, 65 Fed. Cl. 695, 764-65 (2005). In rejecting the very argument that Hermes advances here, the court explained:

> The FAR provisions cited by plaintiff purport to do no more than to provide internal government direction. For example, FAR § 15.802 (1993), entitled "Policy," only requires that the contracting officer "[p]urchase supplies and services from responsible sources at fair and reasonable prices [.]" FAR § 15.802(b) . . . It does not afford a

judicial remedy."

Short Bros. is consistent with AT&T V and other cases that hold that contractors lack standing to bring suit based upon regulations issued for the Government's benefit. E.g., Freightliner Corp. v. Caldera, 225 F.3d 1361(Fed. Cir. 2000).

The decision also is consistent with the AT&T V court's analysis concerning whether a regulation might be said to confer an enforceable interest. In AT&T V, the court considered a contractor's allegation that, in selecting a fixed-price contract, the Navy had "violated a variety of procurement regulations and directives that guide a contracting officer's selection of contract type." 307 F.3d at 1379. Specifically, the contractor alleged, and there was no dispute, that Navy contracting officials had failed to obtain a statutorily-mandated departmental-level certification that would have permitted it to enter into the fixed-price shipbuilding contract at issue. But, the court refused to entertain the contractor's claim, finding no intent in the legislation to "make any provision for judicial enforcement" (id.) -- and this was so, despite the fact that passage of the statute was prompted by shipbuilding claims of the sort at issue. See Am. Tel. & Tel. Co. v. United States, 177 F.3d 1368, 1370-71 (Fed. Cir.1999) (en banc).

If the court could not find an enforceable interest for contractors in a statute, whose passage was motivated by their having to bear costs overruns, Hermes will be hard pressed to find one here. Indeed, the purpose of this regulation is not to protect contractors (other than from needless demands for documents), but to protect the Government from prices that are "higher than warranted." All Phase Environmental, Inc., B-292-919.2, 2004 CPD ¶ 62, 2004 WL 437450 at 6. That purpose is evident, for example, in the regulation's warning against prices that include "contingency" amounts, i.e., amounts that would make a price "higher than warranted." Professors Nash and Cibinic agree, explaining that: "The primary focus of these requirements is to ensure that

the Government does not pay unreasonably high prices," although they caution that "prices that are unreasonably low must also be dealt with before an award is made, because they could be evidence of mistake, non-responsibility, lack of understanding of the work, or a buy-in." Formation of Government Contracts (3rd Ed. 1998) at 1279.[6]

Indeed, if, as Hermes argues, the contracting officer's obligation to assess price reasonableness were actionable, contract pricing never would be binding, because contractors who failed to realize the *post hoc* demands of their owners or investors could occasion this Court's intervention with no more substantial an allegation than "our price was unfair!" That is precisely what Hermes seeks to do here, insisting that it be paid what it calls "fair market value," a term apparently to be defined by an expert at trial.

D. Conclusion

At bottom, Hermes' complaint concerns the type of market-based clause selected. However, absent a prohibition, the agency had the discretion to select an appropriate clause. See AT&T V, 307 F.3d at 1378-80; accord 10 U.S.C. § 2306(a) (agency head generally "may enter into any kind of contract that he considers will promote the best interests of the United States"). Indeed, the FAR expressly affords the contracting officer latitude to use agency-prescribed EPA clauses when the standard FAR clauses are "inappropriate." FAR 16.203-4 (a)(2), (b)(2), (c)(2) (1995). See also FAR 16.103(a) ("Selecting the contract type is generally a matter for negotiation and requires the exercise of sound judgment."); FAR 16.104 (selection of contract type turns upon "many factors").

To borrow this Court's phrase: "An important consideration is the prevailing view among

[6] We are not aware of any allegation of pricing mistake, of the sort referred to in this treatise, here.

courts that determinations in procurement matters should ordinarily be left to the discretion of administrative officials exercising procurement authority." Durable Metals Prods., Inc. v. United States, 27 Fed. Cl. 472, 477 n.6, aff'd, 11 F.3d 1071 (Fed. Cir. 1993) (table). And, any doubt concerning the agency's exercise of discretion in this case should be erased by the uncontroverted facts of this case: during approximately 12 years of contract performance, Hermes did not complain once about its contracts' formation or operation. PFF 26. That silence is telling. There simply is nothing inherently suspicious or illegal about DESC's fuel contracts. And, Hermes, which, as claimant must prove otherwise, has not done so.

## III. Hermes' Alternative Illegality Theories In Counts II-VI Must Be Dismissed

In addition to its core complaint, that the EPA clauses violate the FAR, Hermes presents several common-law theories of relief in Counts II-VI. These trojan horse allegations merely repackage the premise discussed in Sections II.B. and C., above: that EPA clauses must be "designed and intended," and, in fact, provide for the payment of "fair market value." As explained, however, this premise arises neither from Hermes' contracts nor from the Federal Circuit's announced standard for EPA clauses. As explained below, the premise gains no traction under its common law guise and, therefor, Counts II-VI also fail to state a claim.

### A. Count II (Misrepresentation)

In sum, Count II alleges that DESC "misrepresented and otherwise failed to disclose that PMM and other indexes were not designed or intended to be used to set or adjust prices and did not reflect at least fair market value." Compl. ¶ 47. The apparent premise for this allegation is that "[i]n basing price adjustments on PMM, DESC represented and warranted that PMM accurately reflected at least the fair market value for fuel and that prices for military fuel were fair and reasonable." Compl. ¶ 12.

"Misrepresentation occurs when the government misleads a contractor by a negligently untrue representation of fact, or fails to disclose information it has a duty to disclose." John Massman Contracting Co., v. United States, 23 Cl. Ct. 24, 32 (1991) (citing Morrison-Knudsen Co. v. United States, 170 Ct. Cl. 712 (1965)). Hermes has not identified a fact that DESC had a duty to disclose or one that was material to its bargain. The essential terms of the DESC contracts are that Hermes would supply fuel at a given location and that DESC would pay Hermes according to a specified formula. Hermes has not alleged that any part of the contract was ambiguous, that DESC failed to honor the pricing clause, or that the clause failed to operate as described in the contract.

B. Count III ("Breach of Contract")

Count III is based upon the premise that "DESC's basing price adjustments and other indexes that were adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value was a material condition of the contracts upon which Plaintiffs reasonably relied in entering the contracts." Compl. ¶ 55. Hermes also asserts that it was material to the contracts that DESC base price adjustments "on standards that were designed or intended to be used to set of adjust prices," id. at ¶ 56, and DESC pay "at least fair market value." Id. at ¶ 57. The short answer is that there is nothing in the contract that recites any such conditions and, as the Tesoro decision clarifies, the law does not impose any such conditions. Accordingly, there is no basis for concluding that these were "material" conditions of the contracts and, therefore, that the contract was breached, even assuming that these conditions never materialized.

C. Count IV ("Implied-In-Fact Contract")

Count IV alleges that DESC committed a "violation of law and regulation" in awarding and administering Hermes contracts. Compl. at ¶ 68. As the Federal Circuit has confirmed, DESC's use

of the clause at issue does not comprise a violation of law or regulation. Nonetheless, an "implied-in-fact contract cannot exist if an express contract already covers the same subject matter." Trauma Service Group v. United States, 104 F.3d 1321, 1326 (Fed. Cir. 1997). Here, the alleged implied-in-fact contract concerns the same subject as that addressed directly by the contracts at issue, the price of fuel already bought and sold. Accordingly, if, according to the contracts, Hermes is entitled to additional compensation, contracts and contract principles will provide Hermes its remedy.[7]

D. Count V ("Failure of Consideration and Frustration of Purpose")

Count V also is based upon the triumvirate of premises discussed above, that DESC was required to: (1) base prices upon an index "adequate to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value;" (2) base prices upon an index "designed or intended to be used to set or adjust prices" and that "reflected at least the fair market value of fuel;" (3) and pay "fair and reasonable prices" and "at least fair market value." Compl. at ¶ 75-77.

As we have explained, these allegations are not the proper basis for a contractually-based claim and pleading them as a breach-type claim does not increase their heft. Moreover, these theories are bases for avoiding performance – and not applicable here, because performance already has occurred. See, e.g., Everett Plywood Corp. v. United States, 227 Ct. Cl. 415, 423-24, 651 F.2d 723, 728-29 (1981) (frustration excuses performance); Far West Fed. Bank v. OTS, 119 F.3d 1358, 1364 (9th Cir. 1997)([f]rustration of purpose is an excuse for non-performance, not a cause of action

[7] We understand that this allegation has not been plead as an independent ground for relief, but as an allegation of law concerning how a remedy might be obtained should the contract's express pricing clause be stricken as illegal. See Barrett Refining v. United States, 242 F.3d. 1055, 1060 (2001) (remedy for illegal pricing term is found in any implied contract concerning that term). However, as we have noted, these contracts are legal. Thus, this count adds no new allegations or necessary cause of action and should be dismissed.

(citing Restatement (Second) of Contracts sec. 265)); Perpetual Financial Corp. v. United States, 61 Fed. Cl. 126, 138 (2004) (frustration of purpose count must be dismissed); Spalding & Sons, Inc. v. United States, 28 Fed. Cl. 242, 248-49 (1993) (frustration is a "rule respecting discharge," based on frustration of purpose, citing section 265 of the Restatement (Second) of Contracts).

But, even if the Court were to recognize frustration as an affirmative cause of action, the frustration allegations would fail. The Federal Circuit has held that, to excuse performance based upon frustration of purpose, a party must establish that: (1) a supervening event occurred; (2) the moving party did not bear the risk of the supervening event; and (3) the event rendered the value of performance worthless. Seaboard Lumber v. United States, 308 F.3d 1283, 1295 (Fed. Cir. 2002). Hermes simply has failed to allege such factors.

E. Count VI (Mistake)

In Count VI, Hermes argues that the same "no fair prices, no fair market value, no intent to track fair market value" litany presented in the other alternative counts entitles Hermes to reprice its DESC contracts. Compl. at ¶¶ 93-95. In Count VI, the litany is further fractured into yet two more alternatives -- mutual mistake (Compl. ¶¶ 100-111) and unilateral mistake (Compl. ¶¶ 112-115). However because the litany (in addition to being untrue) has no legal significance, Count VI too must be dismissed.

1. Mutual Mistake

To establish mutual mistake so as to justify recision of a contract, a party must demonstrate that: (1) at the time of their agreement, both parties shared a mistaken belief "regarding a fact"; (2) that the mistaken belief "constituted a basic assumption underlying the contract"; (3) that the mistake "had a material effect on the bargain;" and (4) the claimant did not assume the risk of mistake. Dairyland Power Cooperative v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994); Atlas

Corp. v. United States, 895 F.2d 745, 750 (Fed. Cir. 1990).

The kind of "mistake" necessary to support reformation of a contract concerns a belief not in accord with the facts in existence at the time of contracting. Atlas Corp., 895 F.2d at 750 (rejecting claim of mutual mistake where fact had not come into existence at time of contracting).[8] Thus, the "mistake" alleged in a mistake of fact claim must concern an "existing fact," Dairyland Power Cooperative, 16 F.3d at 1202, and, therefore, "'[a] party's prediction or judgment as to events to occur in the future, even if erroneous, is not a 'mistake' as that word is defined [under the doctrine of mutual mistake of fact].'" Id. at 1203 (quoting Restatement (Second) of Contracts § 151 cmt. a (1981)). "Indeed, there is uniformity among the circuit courts of appeals and the commentators that mutual mistake of fact cannot lie against a future event." Id. (citing cases and treatises).

Here, Hermes' contention is that the PMM does not track fair market value. But, Hermes offers no evidence concerning the elements of a mistake claim, including that both parties believed anything to the contrary of what occurred or that was a material part of their bargain. The best evidence of what the parties believed concerning the basic nature of their agreement is the plain language of the contract itself. Yet, Hermes has identified no ambiguity that might lead the parties to believe that the PMM or Platts was anything other than what they were: publications of certain price data. Moreover, the gravaman of Hermes' complaint is not that the parties failed to understand what Platts or PMM were, but that the payments they yielded were assailable, as a matter of law. However, in light of the Federal Circuit's decision in Tesoro, that is not the case. As a result, if there was any mistake, it was Hermes' legal conclusion at the time it filed its claim -- and not one concerning a fact "existing" at contract formation.

---

[8] The archetypal example is Sherwood v. Walker, 66 Mich. 568, 576, 33 N.W. 919 (1887). There, a seller was permitted to void his contract to sell a cow that the parties had supposed was barren, when, in fact, she was fertile, and of good breeding stock.

2. Unilateral Mistake

To succeed on a claim of unilateral mistake, a party must demonstrate:

> (1) mistake by one party, not bearing the risk of such mistake, as to a basic assumption on which he made the contract;
>
> (2) that has a material effect on the agreed exchange of performance; and
>
> (a) the effect of the mistake is such that enforcement of the contract would be unconscionable; or
>
> (B) the other party to the contract has reason to know of the mistake.

J&E Salvage v. United States, 37 Fed. Cl. 256, 265 (1997) (citing Restatement (Second) of Contracts § 153 (1981)).

A contract will not be reformed because of a unilateral mistake in a bid unless the contractor establishes that the mistake resulted from a clear cut clerical or arithmetical error, or a misreading of the specifications. United States v. Hamilton Enterprises, 711 F.2d 1038, 1046 (Fed. Cir. 1983); Dale Ingram, Inc. v. United States, 201 Ct. Cl. 56, 74, 475 F.2d 1177, 1186 (1973). But, an agreement cannot be revised to reflect a plaintiff's subjective understanding of which the defendant is and should be unaware. Id. Accordingly the doctrine of mistake of fact does not apply when the error made by one of the parties was based upon an erroneous prediction or judgment. Restatement (Second) of Contracts § 151a.

An actionable "mistake" is a discrepancy between an offeror's state of mind and his offer. Tony Downs Foods Co. v. United States, 209 Ct. Cl. 31, 530 F.2d 367, 372 (1976) (holding that "difficulty of performance or losses in carrying out a contract will not be treated as a basis for relief by the courts in the absence of special clause in the contract stipulations providing for such relief"). In Hamilton Enterprises, 711 F.2d at 1046, the court found no mistake because the contractor could

not demonstrate that the price it bid was not "the price it intended to bid." Accord Liebherr Crane Corp. v. United States, 810 F.2d 1153, 1157 (Fed. Cir. 1987) ("there is no difference in this case between Liebherr's intended bid and the bid Liebherr actually submitted).

Hermes cannot make the necessary showing, because the vague allegations concerning the inappropriateness of the EPA clauses are, at best, legal characterizations of the clauses or of payment eventualities that postdated Hermes' offers (the payment, or not, of "fair market value) – and not true mistakes concerning what Hermes intended to bid. Indeed, if that were not true, we would expect to see allegations (supported by declarations) concerning the state of mind of Hermes' contract pricing teams. Instead, we see Hermes' thinly-disguised, and now debunked, allegations of law concerning the legal nature of the EPA clauses - none concerning the factual circumstances of Hermes' offers.

The final test (the alternative second prong) of a unilateral mistake claim is that the contract was unconscionable. J&E Salvage, 37 Fed. Cl. at 265. This jurisdiction has defined an unconscionable contract as one "which no man in his senses, not under delusion, would make on the one hand, and which no fair and honest man would accept on the other...." Hume v. United States, 21 Ct. Cl. 328, 330 (1886), aff'd., 132 U.S. 406 (1889); accord Fraass Surgical Mfg. Co., Inc. v. United States, 215 Ct. Cl. 820, 571 F.2d 34 (1978).

As this Court has explained:

> In analyzing the allegation of unconscionability the court should look for some type of oppression, unfair surprise and lack of consent at the time of entering into the contract. Gregory Lumber, 11 Cl.Ct. at 504 . . . . As pointed out in the Fraass decision . . . "discretion to deny enforcement to an unconscionable clause ... is not extended to permit courts to redistribute risks allocated by differences in bargaining power, but rather to prevent oppression and unfair surprise." Fraass, 215 Ct. Cl. at 830, 571 F.2d at 40.

Glopak Corporation v. United States, 12 Cl.Ct. 96, 102 (1987), aff'd. 851 F.2d 334, 338 (1988).

Here, nothing about the award was unconscionable. As many as 15 years of Hermes' silence tells us that.

IV. Waiver and Estoppel Bar Hermes' Claims

As explained above, FAR does not confer any unrealized right upon Hermes. However, even assuming that were not the case, we are entitled to summary judgment on all counts, because, long ago, Hermes waived whatever rights it imagines the FAR might have conferred upon it. Similarly, through its years of inaction, Hermes is estopped from pursuing any of these imagined rights in litigation.

As this Court has explained, waiver is an "intentional relinquishment or abandonment of a known right or privilege." Hermes II at 409 (quoting Johnson v. Zerbst, 304 U.S. 458 (1938)); see also Seaboard Lumber Co. v. United States, 903 F.2d 1560, 1563 (Fed. Cir. 1980) (citing Brookhard v. Janis, 384 U.S. 1, 4, 5 (1966)). Absent an affirmative congressional prohibition, a party may waive regulatory, statutory, and even constitutional rights. Reservation Ranch v. United States, 39 Fed. Cl. 696, 712 (1997), aff'd, 217 F.3d 850 (Fed. Cir. 1999) (table).

Here, Hermes performed 11 DESC contracts of the sort about which it now complains, over approximately 12 years, and waited 15 years from its first contract to bring a complaint. As this Court held in Hermes II, under those circumstance, Hermes had waived its right to complain that those contracts were illegal. Hermes II, 58 Fed. Cl. at 413.

In reaching its conclusion, the Court first considered whether the defense of waiver was available in this circuit, against a claim of illegality, observing that

> the Federal Circuit *seems* to be of two minds on this issue in that *Whittaker Elec. Sys. v. Dalton*, 124 F.3d 1443 (Fed. Cir. 1997); *E. Walters & Co., Inc. v. United States*, 217 Ct. Cl. 254, 576 F.2d 362

> (1978) (per curiam), as well as *American Telephone and Telegraph Co. v. United States,* 307 F.3d 1374 (Fed. Cir. 2002) (*AT&T V*) may be cited for the very opposite of the *Beta/Chris Berg* line of cases, that is: the doctrine of waiver precludes a contract from challenging the validity of a contract under an unlawful regulation or other illegality where the contractor fails to raise the problem prior to execution or litigation.

Id. at 412.

The Court reconciled the apparent division of authority through what it found to be the "key factual distinction" between the two lines of cases cited – the distinction being that, where waiver was found, "the contractors either complained during contract formation or, at the very least, at an early stage in the history of the conflict." Id. at 413 (quoting Hermes I, 58 Fed. Cl. at 19). In Hermes, the Court noted, the contractor "astonishingly waited 14 years after entering the first [contract at issue] and eight years after entering the last [contract at issue] before litigating." Hermes II, 58 Fed. Cl. at 413.

Reasoning that the defense of waiver was available under the right circumstances, the Court proceeded to find that Hermes had in fact waived its claims because knowledge of its right under the law could be presumed, as knowledge of the law generally is, and that "intelligent waiver" could be discerned from Hermes' general sophistication and lengthy failure to signal its dissatisfaction whatsoever. Id. at 416-18. As the Court observed:

> It is almost universally conceded that "'wherever a contract not already fully performed is continued in spite of a known breach, the wronged party cannot avail himself of that excuse . . . . As a general proposition, one side cannot continue after a material breach by the other . . ., act as if the contract remains fully in force (although stopping performance would be fair and convenient), run up damages, and then go suddenly to court.'"

Id. at 418 (citing Ling-Temco-Vought, Inc. v. United States, 201 Ct. Cl. 135, 146 (1973) (quoting

Northern Helex Co. v. United States, 197 Ct. Cl. 118, 125-26 (1972)).

The Court's conclusion applies with equal force to Hermes's other counts. As explained below, they are based upon the same faulty premise as Hermes' illegality argument, i.e., that the Government has a legal duty to use escalators based upon indexes that are "intended or designed" to be used as prices indexes, and to ensure that contracts result in payments that the contractor is satisfied amount to"fair market value." Per force, these allegations cannot carry more legal weight than the less oblique illegality argument that they mirror.

As explained in our original motion for summary judgment, estoppel also is applicable. Estoppel requires that the party asserting estoppel rely to its detriment upon its opponent's action or inaction. E.g., E. Walters & Co., Inc. v. United States, 217 Ct. Cl. 254, 576 F.2d 362 (1978). Here, because of its superior knowledge of its own costs, its market options, and because of its extensive experience with the clauses at issue, Hermes was in the best position to assess the efficacy of the EPA clauses regarding its own situation. By adopting the EPA clauses in its offers with the text of the FAR available to it for consultation, Hermes signaled its intent to forego any benefits contained in the FAR. That Hermes continued to offer these clauses, coupled with its failure to protest clearly prejudiced the Government, because, as subsequent events showed, the Government could have obtained a deviation. Either of these would have been a "relatively painless alternative" to the after-the-fact, competition-free, speculative recovery Hermes now seeks. Indeed, as did the contractor in Ling-Temco-Vought, Hermes has "in effect retained all options for itself . . . made its calculations entirely in its own favor, without proper consideration of the defendant's position," and violated the "basic principle calling for fair treatment of both parties." 201 Ct. Cl. at 148, 475 F.2d at 638.

## CONCLUSION

For these reasons, defendant respectfully requests that the Court dismiss the Second

Amended Complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Steven J. Gillingham
STEVEN J. GILLINGHAM
Senior Trial Counsel
KYLE CHADWICK
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tele: (202) 616-2311
Fax: (202) 353-7988

Attorneys for Defendant

OF COUNSEL:

BERNARD A. DUVAL
Counsel

HOWARD M. KAUFER
Assistant Counsel
Office of General Counsel
Defense Energy Support Center
Ft. Belvoir, VA

November 21, 2005

CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2005, a copy of the foregoing document was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Steven J. Gillingham