IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 02-1460C
(Judge Block)

HERMES CONSOLIDATED, INC.,
Doing Business As Wyoming Refining Company,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S SUPPLEMENTAL APPENDIX

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

STEVEN J. GILLINGHAM
Senior Trial Counsel
KYLE CHADWICK
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 616-2311
Facsimile: (202) 353-7988

Attorneys for Defendant

OF COUNSEL:

BERNARD A. DUVAL
Counsel
Defense Energy Support Center
Fort Belvoir, VA 22060
HOWARD M. KAUFER
Assistant Counsel
Office of General Counsel
Defense Energy Support Center
Fort Belvoir, VA 22060

November 21, 2005

## SUPPLEMENTAL APPENDIX

DECLARATION OF JOHN R. WALKER .......... 1

Recommendation to Change Base Reference Date for EPA References Tied to Petroleum Marketing Monthly (PMM), dated 6 January 1986 .......... 5

Defense Logistics Agency Inter-Office Memorandum, dated 2 December 1987 .......... 7

Excerpt from deposition of Lawrence Ervin, dated, December 1, 2003 .......... 14

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HERMES CONSOLIDATED, INC. Doing business as Wyoming Refining Company, Plaintiff, v. THE UNITED STATES, Defendant. | ) | No. 02-1460 C (Judge Block) |

DECLARATION OF JOHN R. WALKER

1. My name is John R. Walker and I am a contracting officer with the Defense Energy Support Center (DESC). I have been with DESC since 1983, except for a period from 1987-1989, when I worked for the Naval Sea Systems Command. I have been a DESC contracting officer since 1989.

2. In a declaration dated December 12, 2002, and filed with the Court in support of Defendant's December 23, 2002, Motion for Partial Summary Judgment, I addressed economic price adjustment (EPA) clause claims submitted by Wyoming Refining Company (Wyoming)[1], a longtime Government contractor, on a series of nine contracts awarded to Wyoming between 1986 and 1994 by

[1] The contracts were awarded to Wyoming Refining Company, Hermes Consolidated, Inc. doing business as Wyoming Refining Company, and Wyoming Refining Company, A Division of Hermes Consolidated, Inc. For purposes of this declaration, I refer to the firms as Wyoming.

DESC or its predecessor, the Defense Fuel Supply Center (DFSC). Since the date of my prior declaration, Wyoming has filed similar claims on three contracts that DESC awarded it between 1997 and 1999.

3. The three contracts that are the subjects of Wyoming's later claims are contract numbers SP0600-97-D-0510, SP0600-98-D-0509 and SP0600-99-D-0549. The contracts were indefinite quantity-type contracts for one year and called for the delivery of large volumes of fuel. According to our records, the Government paid Wyoming in excess of $40 million for nearly 59 million gallons of fuel under the contracts. The contracts were for the bulk supply of JP-8 jet fuel. JP-8 jet fuel is a kerosene based jet fuel compositionally similar to commercial airline jet fuel.

4. The EPA clauses in these three contracts were based on regional average market prices contained in leading industry publications, either Platts Oilgram Price Report (Platts) or Oil Price Information Service (OPIS). Platts is published weekdays. OPIS is published weekly. Contract prices under these contracts were adjusted weekly.

5. The contracts were awarded pursuant to competitive negotiated solicitations under Federal Acquisition Regulation (FAR) Part 15 and FAR Part 12 ("Acquisition of Commercial

Items"). DESC ensured that contracts were awarded at fair and reasonable prices as mandated by the Federal Acquisition Regulation (FAR). Prices were determined fair and reasonable based on adequate price competition under FAR Part 15.

6. Based on my review of the files, Wyoming made no objection to the legality of the EPA clauses, and made no complaints that it was not being paid a fair price for its product until it submitted the claims described below. For each contract, Wyoming specifically stated in its offer that it agreed to the EPA clause. Price change modifications were issued weekly for the product that is the subject of the claims under these contracts. Wyoming did not object to any of these price change notices. It submitted offers regularly during the period 1997-1999, and has continued to win contracts since then up to the present time.

7. Wyoming submitted certified claims under these three contracts on September 2, 2003, September 17, 2004, and September 6, 2005, for approximately $4.5 million. Its principal contention was that the EPA clauses in its contracts were illegal, citing the MAPCO court decision.

8. I denied the claims in final decisions dated November 3, 2003, November 12, 2004, and November 7, 2005. I concluded that the EPA clauses were legal and authorized and that the firm

had received fair market value for its fuel.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 18, 2005.

JOHN R. WALKER
Contracting Officer

DFSC-N (A. Harvey/46570/fk) 6 January 1986

SUBJECT: Recommendation to Change Base Reference Date for EPA References Tied to Petroleum Marketing Monthly (PMM)

TO: DFSC-PD

1. The current procedure of adjusting prices on the domestic bulk program has a major drawback. As currently worded, clause B19.33, Part A, (f) states:

> The term "base reference price" means the reference price that will be established when the Petroleum Marketing Monthly publication becomes available for the month prior to the month in which Best and Final offers are due. For example, if Best and Final offers are due in April, the base reference price would be based on the March data of the Petroleum Marketing Monthly's specified Sales Prices of Petroleum Products Tables which would generally be published in mid-June.

2. Since the Best and Final offers are submitted before the base reference is known, offerors must guess at the relationship between their offered price and the reference. In order to compensate for this unknown factor offerors must implicitly increase their price. Whether offerors would admit to this is an interesting question in light of the initial sentence in B19.33:

> The contractor represents that the unit prices set forth in this contract do not include any contingency allowance to cover the possibility of increases in the reference price(s) in the Contractor's bid or proposal.

3. Yet our analysis of the movement of the PMM as compared to other references as used for interim price adjustments indicates that the PMM may have moves as much as one or two cents per gallon out of step with such interim references. This situation is not only difficult for offerors, it provides potentially misleading indications for DFSC.

4. It is the recommendation of this office that the base reference date used on domestic bulk solicitations be changed so that offerors will know exactly the base reference price to which their best and final price is tied. Thus, the best and final offer price would be tied to a known final EPA reference and a known interim EPA reference. For example, if the best and final date were

November 15th, the final base EPA reference would be PMM for August and the interim base reference would be the publications(s) as stated in B19.33 Part C for the month of July.

CHRISTOPHER LEE
Director
Office of Market
Research & Analysis

DEFENSE LOGISTICS AGENCY

# Inter-Office Memorandum

IN REPLY REFER TO DFSC-N (L.Ervin/46570/me) 2 December 1987

SUBJECT: Economic Price Adjustment in the Domestic Bulk Program

TO: DFSC-D/DD

1. At the recent prenegotiation briefing for the current East/Gulf domestic bulk procurement, discussion among DFSC-D, -P, and -N concerned the means of price escalation used in the domestic programs. DFSC-N offered to provide DFSC-D with a copy of the decision package on this issue which was prepared last spring for General Griffith. The enclosed material includes the decision paper and related back-up material.

2. The decision problem concerns the use of an administratively cumbersome method of price adjustment which results in contractor complaints and problems in billing and payments by DFSC. The paper discussed four options, including keeping the then current interior/final adjustment system, modifying it to reduce offer price uncertainties, or moving to final-only escalators based on prices published in trade journals. The interested directorates, DFSC-C, -G, -N, and -P, unanimously recommended Option II, a modification of the then current system. General Griffith accepted Option II for use beginning with last summer's Inland/West procurement. At that time, he stated his desire that DFSC move eventually to trade journal-based escalation and asked that the interested directorates work together toward that end.

3. The original decison package included the decision paper and the back-up material at Tabs A through C. The research paper at Tab D was produced prior to the meeting with General Griffith and was discussed at that meeting.

Christopher Lee
CHRISTOPHER LEE
Director
Office of Market Research
and Analysis

cc: DFSC-C
DFSC-G
DFSC-P/PZ

2217

## Economic Price Adjustment in the Domestic Bulk Programs

**Issue** - Should the present two-step method of interim and final price adjustment (EPAs or escalators) for domestic bulk fuel contracts be changed to a one-step price adjustment based on current market price indications as published in trade journals? Or should the two-step method be modified to reduce bidder uncertainty with the present system?

**Background** The current system of price adjustment has been used since 1983. All offerors of product to DFSC are required to accept a method of price adjustment based on actual monthly sales price averages as published by the Department of Energy in the Petroleum Marketing Monthly (PMM). Because the PMM data is not published until the third month following the month for which the data is effective, interim billings are paid based on the movement of an interim escalator. The interim escalator is based on prices published in trade journals at the end of the month prior to delivery. Final adjustments in the billings are made according to differences between the interim and PMM (final) escalators. When the PMM is published. When market prices vary greatly from month to month, as they have over the last two years, the final billing adjustments can be substantial. The two-step billing process is administratively cumbersome, and has resulted in a number of contractor complaints over the past 3 years (see Tab A). In the words of one contractor, pricing uncertainty is such that, "we never know if we have made or lost money when you (DFSC) lift a cargo."

**Discussion** There are nine criteria by which proposed escalation systems can be judged, 1) product; 2) geography; 3) timing; 4) timeliness; 5) commonality; 6) independence from contractor influence; 7) basis in actual sales; 8) market risk; and 9) simplicity. The PMM-based system and the alternative trade journal-based systems are evaluated below, according to the criteria.

The current PMM-based system is preferable by three criteria: independence from contractor influence, sales basis, and market risk. Three other criteria, simplicity, timing, and timeliness, favor the switch to trade journals. By the criteria of product, geography, and commonality, there is no clear preference between the alternate systems.

Product - DFSC product prices should escalate with the prices of similar commercial fuels. Both the PMM and trade publications publish prices of the similar commercial products -mogas, jet kerosene, diesel fuels, residual fuels - which are used for bulk price escalation of JP-4, JP-5, and DFM prices. While neither the PMM nor the trade journals publish price data for naphtha-type jet fuel (Jet B or JP-4), escalators for this fuel are constructed by use of mogas and kerojet prices which represent the alternate use-value of the JP-4 blending components. A similar principle is used in the construction of prices and escalators for Navy Special Fuel Oil. Preference based on this criteria - none. [redacted]

Geography - DFSC product prices should escalate with prices of fuels in the geographical area where the requirements are located. PMM data is published on both a statewide and regional (multistate) basis. Trade publication prices are published for most large cities in the United States. Preference: none.

Timing - DFSC prices should escalate concurrently with commercial prices, not with a lead or lag. This reduces the possibility that contractors will build a contingency premium into their prices. PMM prices are available on a monthly basis, while trade journal prices are published on a daily or weekly basis for most fuels. Given that actual market prices change almost continuously, it is preferable for escalators to change more frequently than on a monthly basis. Preference: trade journals, with weekly or daily price adjustment.

Timeliness - Escalator prices should be available to DFSC and the contractors on or immediately following their respective effective dates. PMM prices are published during the third month following the month of effectiveness. Trade journal prices become available within a day to a week following their effective dates. The long lag on PMM availability is the reason why an interim billing system is used which employs trade journals. Preference: trade journals.

Commonality - Proposed escalators should be acceptable to both DFSC and the contractors for use as references. The PMM system has been used successfully in domestic bulk for three years. DFSC has been successful in obtaining commonality based on trade journals in ground fuels procurements and in overseas bulk programs. Preference: none.

Independent of Contractors - Both the PMM and trade journals are independent of control by DFSC contractors. Given their informal method of conducting market surveys, trade publication prices may be influenced by the moves of large market players who may be DFSC contractors. Although this has not been a general problem in ground fuels procurements where trade journals are routinely used for price escalation, there have been situations where questions have been raised regarding independence of the contractor's control. Since this may be a more serious problem in the bulk program, where DFSC contractors may be large market players, any proposed trade publication escalation system would require careful review of the system's susceptibility to manipulation by prospective contractors.

Basis in Actual Sales - The PMM is based on a mandatory DOE survey of actual sales by refiners and gas plant operators. This survey is subject to DOE audit, although actual audits are rarely performed. Trade journal prices are generally based on seller quotations rather than actual sales because the latter are not generally available to informal, private canvassers. These price series are not auditable. However trade journal prices are closely reflective of actual sales, as these price

How do Commercial Buyers & Sellers do Business? (what escalator?)

series are closely correlated with PMM prices over time, particularly if prices are adjusted on a weekly basis (see graphs at Tab B). Contractor complaints about the performance of trade journal escalators have been received in the ground fuels program. Although nearly all of these complaints are unfounded, several complaints have been justified and have required substitution of a replacement economic price adjustment reference. Because trade journal data is a less direct measure of actual market sales, complaints concerning trade journals are more difficult to analyze and defend. Preference: PMM.

Market Risk - DFSC contract prices are susceptible to market risk if they escalate on indices which do not correlate well with actual sales prices. PMM prices are actual sales price averages. Although they generally track sales data quite well, trade journals are more variable in quality, and occasionally are replaced in those programs in which they are used due to poor performance in reflecting market conditions. In ground fuel procurements, a poorly performing escalator can be readily replaced with a substitute from another publication for most fuels in most locations. This would be true for bulk mogas and diesel requirements as well. However, only one trade journal has published jet kerosene prices for the last several years (Platt's Oilgram). While these jet fuel series closely correlate with actual sales, there is, as yet, no substitute publication available should the Platt's data series be discontinued or should it fail to continue to track the market. This potential problem affects both JP-4 and JP-5 escalation in CONUS. Oil Price Information Service has recently begun to publish jet fuel prices, but the reliability of this source will not be established until 12 months of historical data have been accumulated. This will occur by April 1988 in several localities. Preference: PMM.

Another aspect of market risk with trade journals concerns the relative speed with which their prices reflect actual market price changes. Given that the journals generally survey seller quotations, or "postings", some asymmetrical behavior may be expected. Sellers tend to raise postings quickly when actual prices are rising, and to resist lowering postings when actual prices are falling. Sellers may also lower prices by granting hidden discounts off of stable postings. Thus, one would expect that the use of trade journal prices for escalation would cost DFSC money through relative "price stickiness" during periods of declining prices. An analysis of alternative bulk escalation systems by DFSC-N (see attached study at Tab C) found some evidence of this potential problem in the behavior of trade journal prices over the 1984-86 period (which included a major price drop). The analysis assumed that the choice of escalation system had no effect on the level of the initial offer prices. Overpayment due to lagged declines in postings were offset by underpayments due to lagged increases when prices were adjusted weekly. Some evidence of downside stickiness was found in the analysis of twice-monthly and monthly changes. In these cases, over payments would have exceeded under payments and would have resulted in greater expense to the government. Weekly price changes did not suffer from this problem, in general.

3220

Simplicity - Any escalation system should be simple to explain to contractors and simple for DFSC to administer. The trade journal-based system is clearly simpler than the PMM system.

The issue of simplicity is important when the problem of bid preparation is considered. Domestic bulk offerors must submit best-and-final prices which are effective for the month prior to receipt of best-and-final offers. This raises two problems: price timing and margin uncertainty. In the first case, some offerors may bid based on current prices rather than prior-month prices (See study at Tab D). If current prices are lower than prior-month prices (as in July 1986), the offeror's bid will be lower than if it were properly prepared. If market and bid prices are much lower, a mistake-in-bid may eventually be claimed by the offeror. On the other hand, if current prices are higher than the prior-month prices (as in January 1987) this offeror's bid price may be higher than it otherwise would be. It may be so high that it is not in line for award. In fact, price reasonableness of offers may become a serious issue if current prices are higher than prior-month prices, because bid prices will be compared to prior-month market ranges. If such offers are awarded, the government will be paying higher prices than if a simplified one-step escalation system is used. A switch to weekly escalation based on trade journals would enable current prices rather than prior-month prices to be bid and evaluated, and would greatly reduce this preparation problem.

The current method of escalation introduces another element of uncertainty into the bid preparation process. At the time of receipt of best-and-final offers, the offer price and the relationship (margin) between the interim escalator and the offer price is fixed. However, the margin between the offer price and the final escalator (PMM) is unknown and remains so for some two months following the receipt of best-and-finals. While the base value of the interim escalator is known, the relationship between the base values of the interim and final escalators is subject to statistical uncertainty. Because the margin between the offer price and the base final reference (PMM) determines the actual margin (and, thus, the actual price) for final billing purposes, offerors who are risk-averse may build a contingency premium into their offer price to protect themselves against uncertainty about the ultimate level of their margin. To the extent that offerors perceive this as a problem, the prices that the government pays for fuel will be higher than under a one-step escalation system based on trade journals. Recent experience and contractor comment suggest that both the margin problem and the bid preparation problem are real and significant.

Another way of reducing the problem of bid preparation would be to have offerors bid with prices effective with the most recent PMM available. Offerors on the recent East and Gulf procurement would have made their bids (in January 1987) effective in

October 1986 rather than December 1986 as was done during that procurement. This would have had the effect of eliminating margin uncertainty. The process would still have been susceptible to the generally upward market price movement over that period. In this case, however, at least one company was able to agree to a price reduction (when requested by DFSC-P), after the December PMM became available, in part as a result of margin certainty with December pricing. On the previous Inland and West procurement, one company reduced its offered volume when the June PMM became available prior to time of award, and actual June price levels were found to have been higher than this company assumed when it prepared its bid. In this case, the latest PMM at the time of receipt of best and final offers contained April prices. Under a modified bid process, offerors would have made their best and final prices effective in April rather than in June. Several individuals and contractors have suggested that DFSC modify its current system in this manner. The experience with the recent bulk procurements and with an analagous situation several years ago in an overseas procurement suggest that this is a feasible improvement on the current escalation system.

Decision Options

Option I - Maintain current two-step method of domestic bulk price escalation.

Pro - This system is already in use and contractors are familiar with it. There is no market risk to continuation of its use. DFSC prices are adjusted according to the movement of actual monthly sales price averages.

Con - This system is complex and administratively cumbersome. There are 12 monthly escalations plus 12 monthly corrections. The problems associated with bid preparation probably result in additional expense to the U.S. Government. There will continue to be contractor complaints about the size of final payment adjustments. This system, by escalating on monthly averages, fails to reflect intramonthly price movements.

How much

Option II - Modify the current two-step escalation method so that offerors can establish their bid prices as effective with the month of the most recent PMM.

Pro - This system has the same advantages as Option I, and removes margin uncertainty from the offerors' bid preparation problem.

Con - This system has the same disadvantages as Option I, and forces the offeror to focus on a point two months further into the past when formulating the bid prices, thus possibly making the process even more susceptible to market price movement over the intervening period between the most recent PMM and the date of best and final offers.

Option III - Change to twice-monthly escalation using trade journals escalating with prices effective on the 1st and 15th of the month.

Pro - This system is administratively simpler than the current system (with 24 "final-only" escalations). There is no need for final billing adjustments. There is less need for contractors to build contingency premiums into their offer prices due to margin uncertainty.

Con - There is market risk associated with the move away from escalation on actual sales, particularly with respect to jet kerosene. Twice-monthly price changes do not track actual sales as well as weekly changes, so offerors may still add contingency premiums to their prices. There will likely be several contractor complaints each year about the short-term performance of these escalators.

Option IV - Change to weekly escalation using trade journals.

Pro - This system can be administered as easily as the identical system currently used in ground fuels. There is no need for final billing adjustments. The bid preparation problems would be virtually eliminated. Weekly price changes track actual sales better than monthly or twice-monthly price changes, because they better reflect the continuous nature of price movements in the marketplace. Thus there is even less need for contractors to build in contingency premiums as offer prices can be updated to the time of receipt of best-and-final offers.

Con - There is market risk associated with the move away from escalation on actual sales, particularly with respect to jet kerosene. There would be 52 price escalations per year, more than twice the number in Options I, II, and III. There will likely be several contractor complaints each year concerning the short term performance of these escalators.

Staff Recommendations:

Option II is favored by all of the interested directorates (DFSC-C, -G, -P, and -N). Should the implementation of Option II fail to alleviate the bidding difficulties, the issue can be revisited. In any event, the trade journal options do not appear to be truly viable before mid-1988 at the earliest.

UNITED STATES COURT OF FEDERAL CLAIMS

LA GLORIA OIL AND GAS COMPANY, :

Plaintiff, :

v. : No. 02-465C

THE UNITED STATES, : (Judge Hewitt)

Defendant. :

: Pages 1 - 59

- - - - -

Deposition of Lawrence Ervin

Ft. Belvoir, Virginia

Monday, December 1, 2003

Reported by: Marian E. Cummings, Notary Public

Job No.: 156783

December 1, 2003

12:01 p.m.

Deposition of Lawrence Ervin, held the offices of:

Defense Energy Support Center
8725 John J. Kingman Road
Ft. Belvoir, Virginia 22060-6217

Pursuant to notice, before Marian E. Cummings, a Notary Public of the Commonwealth of Virginia.

APPEARANCES:

Mayer, Brown, Rowe & Maw
For the Plaintiff
1909 K Street, Northwest
Washington, D.C. 20006-1101
(202) 263-3208
BY: J. Keith Burt, Esq.
William L. Olsen, Esq.

United States Department of Justice
For the Defendant
Room 4050
1100 L Street, Northwest
Washington, D.C. 20530
(202) 616-2311
BY: Steve Gillingham, Esq.

Defense Energy Support Center
For the Defendant
Suite 1565
8725 John J. Kingman Road
Ft. Belvoir, Virginia 22060
(703) 767-5009
BY: Howard Kaufer, Esq.

Defense Supply Center
Richmond, Virginia
(804) 279-1423
BY: Donald Tracy, Esq.

# C O N T E N T S

EXAMINATION OF LAWRENCE ERVIN PAGE
MR. BURT 6
-0-

# E X H I B I T S

ERVIN DEPOSITION EXHIBITS: PAGE:
(None)
-0-

PROCEEDINGS

Thereupon,

LAWRENCE ERVIN

the Witness, called for examination by counsel for the Plaintiff, and, after having been sworn by the notary, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. BURT:

Q Would you state your name for the record.

A Lawrence Calvin Ervin.

Q Mr. Ervin, what is your current position?

A I'm the chief of the market research office at the DECS.

Q And how long approximately have you held that position?

A Eight plus years.

Q And generally what are the responsibilities of that position?

A Well, overseeing an effort to -- we do interscreen, analyses of support of the procurement operations center, do support for price negotiation work in the pricing work done in contracting divisions.

There's a certain amount of affiliate work we do for contingency folks.

We actually manage the strategic petroleum program to the extent we're involved with the -- help the budget folks who work for the comptroller with their out year budget projections, price of oil in the future, forecasting, that sort of stuff. I think that I -- probably everything we do falls within that general description.

A The responses is often oral. And the document, it gets generated, provided to the person who asked it. We kind of rely heavily on the contract files to be the repository of that since it's, you know, sort of proprietary information.

Q The contract files meaning an office other than yours or is that a contract file in your office?

A No, we don't maintain contract files.

Q So when you provide some market analysis to the bulk fuels group in connection with their procurement and when that analysis is in writing do you keep a copy of what you give to the bulk fuels group?

A Well, I think the short answer to that is no and maybe something momentarily. Again, it would rely heavily on the contract file.

Q All right. Let's turn to page 6 of Plaintiff's Exhibit 2, request number 15 reads, "All documents relating to DESC's decision to use the PMM indexes, Platts, or OPIS as a basis for adjusting prices in its price adjustment clauses."

A Recollection was that '87 study which I believe you've been provided and a prior '84 study.

Q Can you generally describe those studies for me?

A '84, '87 I was involved in producing and we looked at comparing PMM versus Platts and OPIS and the issue of SC escalating on a different time frame and the documents looked at various things which are nice to have in an escalator. They track -- the '87 study wound up recommending making an adjustment to the PMM based status quo at the time.

The '84 study which I did not prepare, my understanding and recollection is that it's mainly, it deals mostly with the move from the ELS to PMM which was prior to 1985.

Q Where did you find those studies?

A Well, I didn't, I don't think I found the first one.

Q Okay.

A The '84 one, and '87 I had basically on my shelf.

Q Mr. Ervin, I believe that in approximately 1995 DESC switched from using Platts to using PMM as an escalator to using Platts; is that correct?

A Sometime back in there, yeah.

Q Do you know whether there was any sort of any studies or analysis of reports prepared by your office in connection with that change from using the PMM to using Platts?

A Well, there wasn't because I was sitting in a room when the decision happened and it was made in response to some pressure from headquarters to do things differently. So the analysis is based on, basically is the analysis in the '87 study. Some people who have read the '87 studies that they would draw different conclusions than what was presented at the end of the study, certainly a close call. Analysis would have supported that as well so it's really the '87 study which is the basis for that move. That and some pressure from headquarters to, you know, be doing things differently and doing things different in a visible fashion to hopefully over the course of time produce substantial cost savings to the taxpayer.

CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2005, a copy of the foregoing document was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Steven J. Gillingham