**EXHIBIT A**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

HERMES CONSOLIDATED, INC., Doing Business as Wyoming Refining Company

Plaintiff,

v.

THE UNITED STATES,

Defendant.

No. 02-1460C
(Judge Block)

**DECLARATION OF J. KEITH BURT**

I, J. Keith Burt, declare the following:

1. I am counsel of record for Plaintiff, Hermes Consolidated, Inc., doing business as Wyoming Refining Company ("Hermes").

2. Because there has been no discovery in this case, DESC is in control of substantial evidence necessary for Hermes to respond to DESC's motion for summary judgment. In addition, Hermes is required to depose any number of former employees that are now third-party witnesses. Without access to this evidence, Hermes is unable to present by affidavit or other sworn testimony facts essential to its Opposition.

3. Specifically, with respect to the following of Defendant's proposed findings of fact, Hermes requires discovery:

> A. Defendant's PFF No. 6: Hermes' contracts were competitively awarded through negotiated solicitations, pursuant to 48 C.F.R. ("FAR") part 15 ("Contracting by Negotiation"), and FAR part 12 ("Acquisition of Commercial Items"). Walker Decl. ¶ 6; SA ¶ 2-3. The contracting officer determined that the base prices of Hermes' contracts were reasonable, based on the existence of adequate price competition or, in the case of the commercial item sales, upon established catalog or market prices of commercial items sold in substantial quantities to the general public. Walker Decl. ¶ 8; SA 3 ¶ 5.

> B. Defendant's PFF No. 9: DESC began using EPA clauses in 1973, in response to increases in crude oil costs experienced by suppliers as a result of the Arab oil embargo. At that time, the Government had imposed controls upon the price of crude oil. After the price restraints were lifted, DESC gave suppliers the option of selecting an EPA clause based either upon actual crude oil costs, or upon market prices for similar products. In 1981, having concluded that allowing that choice presented too many administrative problems, including difficulties in evaluating and comparing bids that used different EPA references, DESC began using market-based prices exclusively. DESC chose refined product market prices

because those prices were believed to closely mirror changes in refiners' costs, over time, although a given price publication might not track costs over shorter periods. Exh. 3, 5.

C. Defendant's PFF No. 11: All of the DESC solicitations at issue instructed offerors to propose a "base price" for each product offered. Walker Decl. ¶ 5. As Clause B19.33 explained, the successful offeror would be paid its base price plus a periodic adjustment, based upon changes experienced by the reference price during the term of the contract. Specifically, B.19.33 provided that "[t]he prices payable under this contract for listed items shall be the base [proposal] price for the listed item increased or decreased by the same number of cents, or fraction thereof, that the reference price increases or decreases per like unit of measure from the base reference price." Exh. 4 at 6; Pl. App. 99 (part D ¶(c)). In short, the reference price was not the price the contractor received for fuel. Rather, the contractor received its offer price, adjusted monthly by the same penny for penny change (if any) experienced by the reference price.

D. Defendant's PFF No. 13: A significant feature of the PMM is the three-month lag time DOE requires to obtain the sales data for any particular month. Thus, for example, sales data for January are published in April, and data for February are published in May. Walker Decl. ¶ 9. This was significant in DESC's administration of the PMM-based EPA clauses, because B19.33 provided for monthly adjustments. *Id.* To accommodate DOE's three-month lag, DESC made monthly adjustments on an interim basis, and then reconciled them when PMM data for that month were published. *Id.*

E. Defendant's PFF No. 14: In January, 1986, DESC's Office of Market Research prepared a recommendation to change the procedure by which offers were submitted in DESC's solicitations for bulk fuels. SA 5. Due to the three- month lag time for prices to be published in PMM, offerors were required to submit offers tied to a reference price that had not yet been published. SA 5 ¶ 1. That is, the clause provided that the base reference price was the PMM price published for the month before the submission of best and final offers. *Id.* As the recommendation noted, "[s]ince the Best and Final offers are submitted before the base reference is known, offerors must guess at the relationship between the offered price and the reference." *Id.* at ¶ 2. The recommendation noted that "the movement of the PMM compared to other references as used for interim price adjustments may have moves as much as one or two cents per gallon out of step with such interim references." *Id.* at ¶ 3. The recommendation noted that offerors might increase their price to compensate for the unknown factor of what the PMM reference price would be when it was eventually published and, therefore, recommended that the best and final price be tied to an already published final and interim reference price. "For example, if the best and final date were November 15th, the final base EPA reference price would be PMM for August and the interim base reference would be the publication(s) . . . for the month of July." SA 5-6.

F. Defendant's PFF No. 15: In 1987, DESC's Office of Market Research and Analysis prepared a decision paper concerning the " . . .means of price escalation used in the domestic programs." SA 20 ¶ 1. The purpose of the decision paper was to decide whether the economic price adjustment clauses DESC was then using to adjust contract prices in long term contracts for the supply of domestic bulk fuels should be modified to change the use of the unpublished PMM reference price, or to use market prices published in a commercial publication, such as Platts or other "trade journals" rather than prices in PMM. SA 21 ¶ 1 (Issue). The

paper considered four options for adjusting long term contract prices in domestic bulk fuel contracts. SA 7 ¶ 2. The four options were: 1) to keep the price adjustment system then in use by DESC, 2) to modify the system then in use to " . . . reduce offer price uncertainties," 3) to adjust prices twice monthly using "trade journal" prices, and 4) to adjust prices weekly using "trade journal" prices. *Id.,* at par 2; SA 12-13, Decision Options.

G. Defendant's PFF No. 16: The decision paper included a detailed discussion of the options available to DESC to adjust contract prices. SA 8-12. In a paragraph entitled "Background," the paper described the economic price adjustment system that DESC had been using since 1983. SA 8 at Background. The paper set forth nine criteria by which to judge proposed escalation systems, " . . . 1) product; 2) geography; 3) timing; 4) timeliness; 5) commonality; 6) independence from contractor influence; 7) basis in actual sales; 8) market risk; and 9) simplicity." *Id.* at Discussion. The paper then compared PMM prices to "trade journal" prices for using those nine criteria. SA 8-11.

H. Defendant's PFF No. 17: The paper concluded that:

> [t]he current PMM based system is preferable by three criteria: independence from contractor influence, sales basis, and market risk. Three other criteria, simplicity, timing, and timeliness, favor the switch to trade journals. By the criteria of product, geography, and commonality there is no clear preference between the alternate systems.

SA 8 at Discussion.

I. Defendant's PFF No. 18: The paper included a detailed analysis of each of the nine criteria and whether each favored the PMM, the trade journal prices, or neither. The paper found that the product criterion favored neither, because "[b]oth the PMM and trade publications publish prices of the similar commercial products . . . ." SA 8. Regarding geography, the paper found that both PMM and trade publications prices were published in " . . . the geographical area where the requirements are located." SA 9. Regarding commonality, the paper found that either PMM or trade publications were acceptable to both DESC and contractors, based upon the fact that DESC had used PMM prices successfully in bulk fuels for three years and had used trade publication prices successfully in contracts for ground fuels and overseas bulk programs. *Id.*

J. Defendant's PFF No. 19: The paper concluded that the contractor influence, contractor sales, and market risk factors favored PMM. The paper observed that, although both PMM and trade publications were independent of DESC contractors, trade publications might be influenced by the moves of large "market players" "given their informal method of conducting market surveys," whereas the PMM was a survey of actual sale prices. *Id.* Regarding market risk, the paper found that DESC ". . . contract prices are susceptible to market risk if they escalate on indices which do not correlate well with actual sales prices. PMM prices *are* actual sales price averages." SA 10. Trade publication prices were considered more " . . . variable in quality . . . ." *Id.* The study also found that trade publication prices were more susceptible to "price stickiness," and increased the market risk of higher prices during time periods of declining prices because sellers might be slow to lower posted prices. *Id.*

K. Defendant's PFF No. 20: The paper concluded that the timing and timeliness criteria favored trade publication prices. As the paper explained, because trade publication prices were published on a daily or weekly basis rather than monthly, the timing of those prices would reduce the " . . . possibility that contractors will build a contingency premium into their price." SA 9. On the other hand, because PMM was published with a three month lag-time, it necessitated the use of interim pricing and reconciliations, *i.e.*, more adjustments. *Id.*

L. Defendant's PFF No. 21: Finally, the paper set forth a summary of the "pros and cons" of the four alternatives. The paper concluded that the preferred option was to modify the existing use of PMM prices by using the latest *published* PMM price as the base reference price. That, the study reasoned, would eliminate "margin uncertainty" and allow bidders to base their offered prices on a known reference price. SA 12. The paper pointed out that "[s]everal individuals and contractors have suggested that [DESC] modify its current system in this manner." SA 12. Starting in 1987, DESC began using this modified PMM-based adjustment, and continued to do so until 1995, when the use of trade publication prices began. *See* PFF 23.

M. Defendant's PFF No. 22: In September, 1994, DESC requested a one-time FAR deviation to authorize the use of price adjustment based on market prices published in Platts and OPIS for that year's annual bulk fuels contract, in lieu of PMM prices. Exh. 10. In the request for a FAR deviation, DESC stated that, although the PMM had been reliable (Exh. 10), using Platts would eliminate the need for two price adjustments, was "widely accepted by industry" and would be simpler to use. Exh. 10. *See, also*, Exh. 16, at 3. DESC further noted that its Office of Market Research and Analysis had studied the proposed Platts-based clauses and found them to provide reliable bases for price adjustments. Exh. 10; Pl. App. 302; *see also* Walker Decl. ¶ 15.

O. Defendant's PFF No. 23: In May, 1995, DESC sought a Class Deviation and change to the Defense Logistics Agency Acquisition Regulation that would explicitly authorize DESC to base its EPA clauses upon "industry publications" (including Platts and OPIS). Exh. 16. The bases for DESC's request were the same as those set forth in its request for an individual deviation the previous Fall. Id. DESC noted that "industry publications" were published more often and would eliminate the "need for double calculations or price adjustments, a significant savings to the government." *Id.* The deviation request noted that, due to the lag time between interim and final billing under PMM, "contractors likely build in a price cushion." The deviation also noted that the use of an "industry publication" was similar to the "way adjustments are done commercially in that commercial publications are widely accepted by industry." *Id.*

P. Defendant's PFF No. 24: The DESC request also noted that "industry publications" had been used for DESC programs other than bulk fuels for years. *Id.* As it did in its earlier request, DESC stated that its "Office of Market Research and Analysis has studied the proposed EPA provisions and found them to be reliable for price adjustments." *Id.* The Office of Market Research and Analysis study to which both deviation requests referred was the 1987 study described in PFF 16-22. SA 22, l.20 - 23, l.19.

Q. Defendant's PFF No. 25: Because Platts was published daily, DESC was able to adjust prices weekly, and, therefore, was able to discontinue the

burdensome interim payment and reconciliation process required by the PMM-based EPA clause. *Id.*

R. Defendant's PFF No. 26: During performance of the contracts at issue, Hermes never raised any question regarding the legality of the EPA clauses, and it never complained that it was not being paid fairly. Walker Decl. ¶ 11; SA 3 ¶ 6. Hermes also did not object to any of the monthly or weekly price adjustments made under the contracts' PMM-based and industry publication-based EPA clauses. *Id.*

4. To the extent that DESC's motion seeks to challenge any of the well-pleaded allegations in Hermes' Second Amended Complaint, Hermes requires discovery to establish the following allegations at paragraphs 7 to 25 of its Second Amended Complaint that apply generally to all of the counts in the Complaint:

A. DESC has acknowledged at least two authorized purposes for its price adjustment clause: First, to protect DESC and Plaintiff against market fluctuations, and, second, to ensure that the prices DESC paid Plaintiff for military fuel under the long-term contracts reflected at least fair market value.

B. A January 5, 1993 memorandum from DLA's Deputy Director, Directorate Contracting and Production, states that DESC's standard price adjustment clause was intended both to "ensure[] that the contract price will be awarded and remain at the market price," and to "ensure[] that the sale will be at the market price, which is fair and reasonable."

C. DESC's price adjustment clause permitted DESC to adjust the prices it paid Plaintiff for fuel based on changes in indexes published by the Department of Energy ("DOE") in the *Petroleum Marketing Monthly* (hereafter "PMM").

D. DESC was one of the principal users of PMM and worked with DOE in determining how PMM was published. A March 23, 1989 internal memorandum from DESC's Director, Office of Market Research and Analysis, states: "DOE normally will work with us to see that our needs are satisfied as we are one of the primary users of PMM." DESC never disclosed to its suppliers such as Plaintiff its role in publication of PMM.

E. In basing price adjustments on PMM, DESC represented and warranted that PMM was adequate to accomplish its purposes of protecting against market fluctuations and ensuring that the prices DESC paid for military fuel reflected at least fair market value.

F. In basing price adjustments on PMM, DESC represented and warranted that PMM accurately reflected at least the fair market value for fuel and that prices for military fuel were fair and reasonable.

G. DESC's Pre-Negotiation Briefing Memoranda, which established pricing policies for DESC's military fuel contracts, expressly provided that DESC's price adjustment clause was "non-negotiable." Accordingly, suppliers of military fuel such as Plaintiff were required to accept DESC's use of PMM to set military fuel prices or exit the market for military fuel.

H. Contrary to the acknowledged purposes of DESC's price adjustment clause, DOE did not design or intend for PMM to be used to set or adjust prices in response to market fluctuations, and PMM did not reflect at least the fair market value for military fuel.

I. Among the many inadequacies of PMM for use in setting military fuel prices, PMM suffered from a statistical flaw known as an "index number problem," whereby different categories or classes of fuel were used to calculate the value of the index in different months. Such an index number problem renders use of PMM essentially meaningless for measuring changes in price levels from month to month as DESC did. After this case was filed, DOE publicly conceded that PMM suffered from an index number problem.

J. As early as January 1986, DESC concluded in an internal assessment that "the movement of PMM as compared to other [market] references . . . indicates that PMM may have moves as much as one or two cents per gallon out of step with such . . . references." In contrast, DESC typically required suppliers such as Plaintiff to submit bids to sell military fuel to the one-ten-thousandth of a cent ($.000001).

K. DESC did not disclose to its suppliers such as Plaintiff its 1986 assessment and, notwithstanding the assessment, continued to use PMM in its price adjustment clause.

L. In 1987, DESC conducted a second study of PMM which found that PMM did not protect against market fluctuations and did not ensure that the prices DESC paid for military fuel under the long-term contracts reflected at least fair market value.

M. DESC did not disclose this 1987 study to its suppliers such as Plaintiff and, despite the study, continued to use PMM in its price adjustment clause.

N. Seven years later, in 1994, senior officials at DLA learned of DESC's 1987 study, and, upon review of the study, directed DESC to stop using PMM to set military fuel prices.

O. In implementing DLA's directive, DESC admitted that its use of PMM had distorted military fuel prices materially, stating in internal documents that "direct contract price comparisons are not possible" between DESC's military fuel prices and fair market value.

P. Consistent with DESC's internal admissions, a DOE report admits that PMM differed by as much as nineteen percent from comparable prices published by the Bureau of Labor Statistics.

Q. Thus, DESC, as the sole purchaser and user of military fuel, used PMM on a "non-negotiable" basis to set military fuel prices despite knowing that PMM was not designed to be used to set or adjust prices, and despite knowing that PMM did not reflect at least fair market value and did not result in fair and reasonable prices.

R. As a result of DESC's use of PMM in its price adjustment clause, DESC paid Plaintiff prices for military fuel that were materially below fair market value and were not fair and reasonable.

S. DESC also used other indexes in its price adjustment clause to make price adjustments. On information and belief, DESC also knew that some of the other indexes it used to set or adjust prices were not appropriate for these purposes.

5. To the extent that DESC's motion seeks to challenge any of the well-pleaded allegations in Count I of Hermes' Second Amended Complaint, Hermes requires discovery to establish the following allegations at paragraphs 33 to 37 of its Complaint:

A. DESC knowingly awarded and administered Plaintiff's contracts in violation, *inter alia*, of FAR § 16.203 by basing price adjustments on indexes rather than on Plaintiff's own established fuel prices.

B. Even if FAR § 16.203 permitted DESC to base price adjustments on indexes rather than on Plaintiff's own established fuel prices, DESC knowingly awarded and administered Plaintiff's contracts in violation, *inter alia*, of FAR § 16.203 by basing price adjustments on indexes that were not market-based, were not designed or intended to be used to set or adjust prices, and did not reflect at least the fair market value of military fuel.

C. DESC knowingly awarded and administered Plaintiff's contracts in violation, *inter alia*, of FAR § 15.802(b) [currently codified at FAR § 15.402(a)] by using PMM and other indexes to establish prices for military fuel that were not fair and reasonable.

D. DESC thus combined its substantial market power and substantial ability to affect the price of military fuel with a knowing violation of law and regulation to reduce the price it paid for military fuel below fair market value.

E. DESC's violation of law and regulation in awarding and administering Plaintiff's contracts damaged Plaintiff.

6. To the extent that DESC's motion seeks to challenge any of the well-pleaded allegations in Count II of Hermes' Second Amended Complaint, Hermes requires discovery to establish the following allegations at paragraphs 40 to 51 of its Complaint:

A. DESC knowingly awarded and administered Plaintiff's contracts in violation of law and regulation.

B. In awarding and administering Plaintiff's contracts, DESC knowingly based price adjustments on PMM and other indexes that were not adequate to accomplish the stated purposes of DESC's price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value.

C. In awarding and administering Plaintiff's contracts, DESC knowingly based price adjustments on PMM and other indexes that were not

designed or intended to be used to set or adjust prices and which did not reflect at least the fair market value of military fuel.

D. In awarding and administering Plaintiff's contracts, DESC knew that the contracts did not provide for payment of at least the fair market value of military fuel and knew that the contracts did not provide for fair and reasonable prices.

E. In awarding and administering Plaintiff's contracts, DESC worked with DOE to determine how PMM was published and to "see that our needs are satisfied as . . . one of the primary users of PMM."

F. In awarding and administering the contracts, DESC, through the contracting officer and others, misrepresented and otherwise failed to disclose its violation of law and regulation.

G. In awarding and administering the contracts, DESC, through the contracting officer and others, misrepresented and otherwise failed to disclose that it based price adjustments on PMM and other indexes that were not adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value.

H. In awarding and administering the contracts, DESC, through the contracting officer and others, misrepresented and otherwise failed to disclose that PMM and other indexes were not designed or intended to be used to set or adjust prices and did not reflect at least fair market value.

I. In awarding and administering the contracts, DESC, through the contracting officer and others, misrepresented and otherwise failed to disclose that the contracts did not provide for payment of at least fair market value for military fuel and did not provide for fair and reasonable prices.

J. In awarding and administering the contracts, DESC, through the contracting officer and others, misrepresented and otherwise failed to disclose that DESC worked with DOE to determine how PMM was published and to "see that our needs are satisfied as . . . one of the primary users of PMM."

K. Plaintiff reasonably relied upon DESC's material and/or fraudulent misrepresentations as an inducement to enter the contracts.

L. DESC's material and/or fraudulent misrepresentations damaged Plaintiff.

7. To the extent that DESC's motion seeks to challenge any of the well-pleaded allegations in Count III of Hermes' Second Amended Complaint, Hermes requires discovery to establish the following allegations at paragraphs 54 to 65 of its Complaint:

A. DESC's compliance with law and regulation in awarding and administering the contracts was a material condition of the contracts upon which Plaintiff reasonably relied in entering the contracts.

B. DESC's basing price adjustments on PMM and other indexes that were adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value was a material condition of the contracts upon which Plaintiff reasonably relied in entering the contracts.

C. DESC's basing price adjustments on standards that were designed or intended to be used to set or adjust prices and which reflected at least the fair market value of fuel was a material condition of the contracts upon which Plaintiff reasonably relied in entering the contracts.

D. DESC's paying at least fair market value for military fuel and DESC's paying fair and reasonable prices were material conditions of the contracts upon which Plaintiff reasonably relied in entering the contracts.

E. DESC's negotiating and administering the contracts in good faith was a material condition of the contracts upon which Plaintiff reasonably relied in entering the contracts.

F. In contravention of DESC's contractual obligations, DESC violated law and regulation in awarding and administering the contracts.

G. In contravention of DESC's contractual obligations, DESC based price adjustments on PMM and other indexes that were not adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value.

H. In contravention of DESC's contractual obligations, DESC based price adjustments on standards such as PMM and other indexes that were not designed or intended to be used to set or adjust prices and which did not reflect at least the fair market value of fuel.

I. In contravention of DESC's contractual obligations, DESC did not pay at least fair market value for military fuel and did not pay fair and reasonable prices for fuel.

J. In contravention of DESC's contractual obligations, DESC did not negotiate and administer the contracts in good faith. Instead, DESC used a non-negotiable illegal price adjustment clause that based price adjustments on PMM and other indexes, and worked with DOE to determine how PMM was published and to "see that our needs are satisfied as . . . one of the primary users of PMM."

K. DESC's contravention of its contractual obligation constituted breach of contract.

L. DESC's breach of contract damaged Plaintiff.

8. To the extent that DESC's motion seeks to challenge any of the well-pleaded allegations in Count IV of Hermes' Second Amended Complaint, Hermes requires discovery to establish the following allegations at paragraphs 68 to 71 of its Complaint:

A. DESC knowingly awarded and administered Plaintiff's contracts in violation of law and regulation.

B. DESC's violation of law and regulation in awarding and administering Plaintiff's contracts rendered at least the price terms of Plaintiff's contracts invalid and unenforceable.

C. DESC's violation of law and regulation in awarding and administering Plaintiff's contracts damaged Plaintiff.

D. At least the pricing terms of Plaintiff's contracts are replaced by an implied-in-fact contract to pay the fair market value of the fuel Plaintiff delivered to DESC.

9. To the extent that DESC's motion seeks to challenge any of the well-pleaded allegations in Count V of Hermes' Second Amended Complaint, Hermes requires discovery to establish the following allegations at paragraphs 74 to 89 of its Complaint:

A. DESC's compliance with law and regulation in awarding and administering the contracts was a material part of the consideration upon which Plaintiff reasonably relied in entering the contracts and a material purpose of the contracts.

B. DESC's basing price adjustments on PMM and other indexes that were adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value was a material part of the consideration upon which Plaintiff reasonably relied in entering the contracts and a material purpose of the contracts.

C. DESC's basing price adjustments on standards that were designed or intended to be used to set or adjust prices and that reflected at least the fair market value of fuel was a material part of the consideration upon which Plaintiff reasonably relied in entering the contracts and a material purpose of the contracts.

D. DESC's paying at least fair market value for the military fuel it purchased and DESC's paying fair and reasonable prices were a material part of the consideration upon which Plaintiff reasonably relied in entering the contracts and a material purpose of the contracts.

E. DESC's negotiating the contracts in good faith was a material part of the consideration upon which Plaintiff reasonably relied in entering the contracts and a material purpose of the contracts.

F. DESC violated law and regulation in awarding and administering the contracts.

G. DESC based price adjustments on PMM and other indexes that were not adequate to accomplish the stated purposes of its price adjustment clause to protecting against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value.

H. DESC based price adjustments on PMM and other indexes that were not designed or intended to be used to set or adjust prices and that did not reflect at least fair market value.

I. DESC did not pay at least fair market value for military fuel or pay fair and reasonable prices.

J. DESC did not negotiate the contracts in good faith.

K. DESC's violation of law and regulation in awarding and administering the contracts constituted a failure of consideration and frustrated the purpose of the contracts.

L. DESC's failure to base price adjustments on PMM and other indexes that were not adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value constituted a failure of consideration and frustrated the purpose of the contracts.

M. DESC's use of PMM and other indexes that were not designed or intended to be used to set or adjust prices and that did not reflect at least fair market value constituted a failure of consideration and frustrated the purpose of the contracts.

N. DESC's failure to pay at least fair market value for military fuel and its failure to pay fair and reasonable prices constituted a failure of consideration and frustrated the purpose of the contracts.

O. DESC's failure to negotiate the contracts in good faith constituted a failure of consideration and frustrated the purpose of the contracts.

P. This failure of consideration and frustration of the purpose of the contracts damaged Plaintiff.

10. To the extent that DESC's motion seeks to challenge any of the well-pleaded allegations in Count VI of Hermes' Second Amended Complaint, Hermes requires discovery to establish the following allegations at paragraphs 92 to 116 of its Complaint:

A. Plaintiff entered and performed the contracts with the intent that they comply with law and regulation. This was a material condition upon which Plaintiff reasonably relied in entering the contracts.

B. Plaintiff entered and performed the contracts with the intent that PMM and other indexes were adequate to accomplish the stated purposes of DESC's price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value. This was a material condition upon which Plaintiff reasonably relied in entering the contracts.

C. Plaintiff entered and performed the contracts with the intent that the standards used to make price adjustments were designed or intended to be used to set or adjust prices and reflected at least fair market value. This was a material condition upon which Plaintiff reasonably relied in entering the contracts.

D. Plaintiff entered and performed the contracts with the intent that DESC pay at least fair market value for military fuel and pay fair and reasonable prices. This was a material condition upon which Plaintiff reasonably relied in entering the contracts.

E. DESC did not comply with law and regulation in awarding and administering the contracts.

F. DESC did not use PMM and other indexes that were adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value.

G. DESC based price adjustments on PMM and other indexes that were not designed or intended to be used to set or adjust prices and that did not reflect at least fair market value.

H. DESC did not pay fair market value for military fuel or pay fair and reasonable prices.

I. If DESC did not knowingly award and administer the contracts in violation of law and regulation, as alleged above, then DESC must be presumed to have intended to award and administer the contracts in accordance with law and regulation.

J. If DESC did not know that the PMM and other indexes were not adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value, as alleged above, then DESC must be presumed to have used the PMM and other indexes with the intent that they were adequate to accomplish the stated purposes of its price adjustment clause.

K. If DESC did not know that PMM and other indexes were not designed or intended to be used to set or adjust prices and did not reflect at least fair market value, as alleged above, then DESC must be presumed to have used PMM and other indexes with the intent that they were designed or intended to be used to set or adjust prices and reflected at least fair market value.

L. If DESC did not knowingly fail to pay at least fair market value for military fuel and did not knowingly fail to pay prices that were fair and reasonable, as alleged above, then DESC must be presumed to have intended to pay at least fair market value for military fuel and to have intended to pay fair and reasonable prices.

M. As a result of a mistake, DESC and Plaintiff entered and performed the contracts in violation of law and regulation.

N. As a result of a mistake, DESC and Plaintiff entered and performed the contracts using the PMM and other indexes that were not adequate to accomplish the stated purposes of DESC's price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value.

O. As a result of a mistake, DESC and Plaintiff entered and performed the contracts using PMM and other indexes that were not designed or intended to be used to set or adjust prices and did not reflect at least fair market value.

P. As a result of a mistake, DESC and Plaintiff entered and performed the contracts that did not provide for the payment of at least fair market value for military fuel and did not provide for payment of fair and reasonable prices.

Q. If DESC and Plaintiff had not been mistaken, DESC and Plaintiff would not have entered and performed the contracts in violation of law and regulation.

R. If DESC and Plaintiff had not been mistaken, DESC and Plaintiff would not have entered and performed the contracts using the PMM and other indexes that were not adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value.

S. If DESC and Plaintiff had not been mistaken, DESC and Plaintiff would not have entered and performed the contracts using PMM and other indexes to set or adjust prices.

T. If DESC and Plaintiff had not been mistaken, DESC and Plaintiff would not have entered and performed the contracts that did not provide for the payment of at least fair market value for military fuel and did not provide for payment of fair and reasonable prices.

U. Alternatively, if DESC was not mistaken in awarding and administering contracts in violation of law and regulation, then DESC knew or should have known of Plaintiff's mistake and failed to meet its duty timely to disclose this mistake to Plaintiff.

V. Alternatively, if DESC was not mistaken in awarding and performing the contracts using the PMM and other indexes that were not adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value, then DESC knew or should have known of Plaintiff's mistake and failed to meet its duty timely to disclose this mistake to Plaintiff.

W. Alternatively, if DESC was not mistaken in awarding and performing contracts using PMM and other indexes to set or adjust prices, then DESC knew or should have known of Plaintiff's mistake and failed to meet its duty timely to disclose this mistake to Plaintiff.

X. Alternatively, if DESC was not mistaken in entering and performing contracts that did not provide for payment of at least fair market value for military fuel and that did not provide for payment of fair and reasonable prices, then DESC knew or should have known of Plaintiff's mistake and failed to meet its duty timely to disclose this mistake to Plaintiff.

Y. The parties' mutual mistake and/or DESC's failure to disclose Plaintiff's unilateral mistake damaged Plaintiff.

12. With respect to DESC's affirmative defense of waiver, Hermes requires full discovery concerning negotiation, award and performance of the fuel contracts, and concerning DESC's prices and indexes in the fuel contracts.

I declare under penalty of perjury that the forgoing is true and correct.

Executed January 11, 2006.

J. Keith Burt