IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 02-1460C
(Judge Block)

HERMES CONSOLIDATED, INC.,
Doing Business as Wyoming Refining Company,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

J. Keith Burt
Mayer, Brown, Rowe & Maw, LLP
1909 K Street, N.W.
Washington, D.C. 20006
(202) 263-3208

Attorneys for Plaintiff
Hermes Consolidated, Inc.,
Doing Business as Wyoming Refining Company

Of Counsel:

Adrian L. Steel, Jr.
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, DC 20006

January 11, 2006

# TABLE OF CONTENTS

**Page**


STATEMENT OF FACTS ............ 2

I. THE PARTIES ............ 2

II. DESC'S MILITARY FUEL PRICES ............ 3

III. DESC'S CONFLICTING ASSESSMENTS OF ITS MILITARY FUEL PRICES ............ 5

IV. THE NON-NEGOTIABILITY OF DESC'S MILITARY FUEL PRICES ............ 8

V. THE FAILURE OF DESC'S MILITARY FUEL PRICES TO REFLECT FAIR MARKET VALUE ............ 9

VI. HERMES' SECOND AMENDED COMPLAINT ............ 15

ARGUMENT ............ 16

I. DESC'S MOTION FAILS TO SATISFY THE STANDARDS FOR JUDGMENT AS A MATTER OF LAW ............ 16

II. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON HERMES' CLAIMS THAT DESC'S MILITARY FUEL PRICES VIOLATE FAR § 16.203 ............ 19

A. Only The Issue Of *Per Se* Illegality Was Before The Court In *Tesoro* ............ 20

B. DESC's Construction Of *Tesoro* Ignores Its Plain Language ............ 23

III. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON HERMES' CLAIMS THAT DESC'S MILITARY FUEL PRICES VIOLATE FAR § 15.802(b)(1) ............ 26

IV. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON HERMES' CLAIMS OF MISREPRESENTATION ............ 33

V. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON HERMES' CLAIMS OF BREACH OF CONTRACT ............ 36

VI. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON HERMES' CLAIMS OF BREACH OF AN IMPLIED-IN-FACT CONTRACT ............ 40

VII. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON HERMES' CLAIMS OF FAILURE OF CONSIDERATION AND FRUSTRATION OF PURPOSE ............ 41

VIII. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON HERMES' CLAIMS OF MISTAKE ............ 45

IX. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ITS AFFIRMATIVE DEFENSE THAT HERMES WAIVED ALL OF ITS CLAIMS ............ 47

**TABLE OF CONTENTS**
(continued)

**Page**


A. As A Matter Of Fact, DESC Fails To Establish That Hermes Waived All Of Its Claims ........ 48

B. As A Matter Of Law, Hermes' Claims Of Illegality Cannot Be Waived ........ 57

1. Hermes Is Entitled To Recover A Lawful Price For Fuel ........ 57

2. Because The Law At Issue Protects Contractors, DESC's Violations Of Law Cannot Be Waived ........ 61

3. DESC May Not Use A Defense Of Waiver To Seek A Judicially-Imposed Statute Of Limitations Congress Did Not Enact ........ 64

4. *Federal Crop Insurance v. Merrill* Does Not Support A Finding Of Waiver ........ 66

5. *E. Walters & Co. v. United States* And *Whittaker Electronic Systems v. Dalton* Do Not Support A Finding Of Waiver ........ 67

6. *AT&T v. United States* Does Not Support A Finding Of Waiver ........ 70

CONCLUSION ........ 74

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A Olympic Forwarder, Inc. v. United States*, 33 Fed. Cl. 514 (1995) ....................................48, 56

*AT&T v. United States*, 177 F.3d 1368 (Fed. Cir. 1999) .................................................... *passim*

*AT&T v. United States*, 32 Fed. Cl. 672 (1995).......................................................................70

*AT&T v. United States*, 48 Fed. Cl. 156 (2000)........................................................................71

*AT&T v. United States*, 124 F.3d 1471 (Fed. Cir. 1997) ......................................................70, 72

*AT&T v. United States*, 307 F.3d 1374 (Fed. Cir. 2002) .....................................31, 66, 68, 71, 72

*Accardi v. Shaughnessy*, 374 U.S. 260 (1954).........................................................................33

*Adams v. United States*, 391 F.3d 1212 (Fed. Cir. 2004) ............................................................17

*Aerojet-General Corp. v. Askew*, 453 F.2d 819 (5th Cir. 1971)..................................................41

*Ahrenholz v. Bd. of Trustees*, 219 F.3d 674 (7th Cir. 2000) ..........................................................22

*Alaska Pulp Corp. v. United States*, 48 Fed. Cl. 655 (2001) .......................................................52

*Aluminum Co. of Am. v. Essex Group, Inc.*, 499 F. Supp. 53 (W.D. Pa. 1980)............................46

*American Capital Corp. v. United States*, 58 Fed. Cl. 398 (2003) ..............................................38

*American Sav. Bank, F.A. v. United States*, 62 Fed. Cl. 6 (2004) ................................................39

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..........................................................17, 18

*Applied Devices Corp. v. United States*, 591 F.2d 635 (1979) ........................................59, 62, 69

*Ashford v. United States*, 43 Fed. Cl. 1 (1997) .............................................................................35

*Barrett*, 242 F.3d 1055...................................................................................................... *passim*

*Barrett Ref. Corp. v. United States*, , 42 Fed. Cl. 128 (1998)..........................................3, 4, 9, 46

*Barrett Ref. Corp. v. United States*, 45 Fed. Cl. 166 (1999)............................................... *passim*

*Beta Systems, Inc. v. United States*, 838 F.2d 1179 (Fed. Cir. 1988) .................................. *passim*

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Burness v. Bruce*, 776 P.2d 32 (Or. Ct. App. 1989)....................50

*C & H Comm. Contractors, Inc. v. United States*, 35 Fed. Cl. 246 (1996) ....................35, 38, 47

*Cain v. Burns*, 280 P.2d 888 (Cal. Dist. Ct. App. 1955)....................58

*Carter v. Seaboard Fin. Co.*, 203 P.2d 758 (Cal. 1949) ....................58

*Celotex Corp. v Catrett*, 477 U.S. 317 (1986) ....................1, 2, 17, 18, 19

*Centel Communications Co.*, 89-1 B.C.A. (CCH) ¶ 21,225 (Sept. 8, 1988) ....................59

*Centex Corp. v. United States*, 395 F.3d 1283 (Fed. Cir. 2005) ....................40

*Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442 (Fed. Cir. 1997)....................30, 61, 63, 68

*Cherokee Nation v. United States*, 174 Ct. Cl. 131, 140 (1966) ....................48

*Chris Berg, Inc. v. United States*, 426 F.2d 314 (Ct. Cl. 1970) ....................59

*Clark v. United States*, 95 U.S. 539 (1877) ....................66

*Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986)....................62

*Conley v. Gibson*, 255 U.S. 42 (1957) ....................1, 17

*Cont'l Bus. Enter., Inc. v. United States*, 452 F.2d 1016 (Ct. Cl. 1971) ....................33

*Cornetta v. United States*, 851 F.2d 1372 (Fed. Cir. 1988) ....................65

*Costanzo Coal Mining Co. v. Weirton Steel Co.*, 150 F.2d 929 (4th Cir. 1945) ....................57, 58

*D.F.K. Enter., Inc. v. United States*, 45 Fed. Cl. 280 (1999)....................39, 40

*Desert Apartments, Inc. v. United States*, 250 F.2d 457 (10th Cir. 1957)....................56

*District of Columbia v. Thompson*, 281 U.S. 25 (1930) ....................41

*Dow Chem. Co. v. United States*, 226 F.3d 1334 (Fed. Cir. 2000)....................51

*E. Walters & Co. v. United States*, 576 F.2d 362 (Ct. Cl. 1978) ....................67, 68

*Edwards v. Aguillard*, 482 U.S. 578 (1987) ....................30

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Everett Plywood Corp. v. United States*, 227 Ct. Cl. 415, 423 (1981) ........................................43

*Far West Fed. Bank, S.B. v. Director, OTS*, 930 F.2d 883 (Fed. Cir. 1991) ..........................42, 43

*Far West Fed. Bank, S.B. v. OTS*, 119 F.3d 1358 (9th Cir. 1997)................................................43

*Fed. Crop Ins. v. Merrill*, 332 U.S. 380 (1947) .........................................................37, 50, 66, 67

*Freightliner Corp. v. Caldera*, 225 F.3d 1361 (Fed. Cir. 2000)...........................................27, 30

*G.L. Christian & Assocs. v. United States*, 320 F.2d 345 (Ct. Cl. 1963).....................................59

*Gen. Eng'g & Machine Works v. O'Keefe*, 991 F.2d 775 (Fed. Cir. 1993)..................................49

*George Solitt Constr. Co. v. United States*, 64 Fed. Cl. 229 (2005) ............................................33

*Gold Line Ref., Ltd. v. United States*, 54 Fed. Cl. 285 (2002) ...................................61, 69, 71, 72

*Gold Line Ref., Ltd. v. United States*, 43 Fed. Cl. 291 (1999) .....................................................59

*Hamilton v. Williams*, 573 N.E.2d 1276 (Ill. Ct. App. 1991) ......................................................49

*Hercules, Inc. v. United States*, 292 F.2d 1378 (Fed. Cir. 2002).................................................36

*Hermes Consol., Inc. v. United States*, 58 Fed. Cl. 3 (2003) ...........................................23, 50, 72

*Hermes Consol., Inc. v. United States*, 58 Fed. Cl. 409 (2003) ............................23, 50, 61, 66, 73

*INS v. Hibi*, 414 U.S. 5 (1973)..............................................................................................52, 64

*Interstate Plywood Sales Co. v. Interstate Container Corp.*, 331 F.2d 449 (9th Cir. 1964) .........34

*J&E Salvage v. United States*, 37 Fed. Cl. 256 (1997).................................................................47

*John C. Grimberg Co. v. United States*, 185 F.3d 1297 (Fed. Cir. 1999) ...................................33

*John Deere Ind. Equip. v. Triple Cities Equip., Inc.*, 646 F. Supp. 114 (N.D.N.Y. 1986)...........49

*John Reiner & Co. v. United States*, 325 F.2d 438 (Ct. Cl. 1963)..............................................68

*Johnson v. Zerbst*, 304 U.S. 458 (1938) ................................................................47, 48, 63, 65

*Kaiser Aluminum & Chem. Sales, Inc. v. Avandole Shipyards, Inc.*, 677 F.2d 1045 (5th Cir. 1982) ............................................................................................................................58

**TABLE OF AUTHORITIES**
**(continued)**

**Page**


*Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982) .......... 57, 60, 62

*Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240 (1933) .......... 24

*L.W. Matteson, Inc. v. United States*, 61 Fed. Cl. 296 (2004) .......... 36

*LaBarge Products, Inc. v. West*, 46 F.3d. 1547 (Fed. Cir. 1995) .......... *passim*

*La Gloria Oil & Gas Co. v. United States*, No. 02-456C (Fed. Cl.) .......... 7

*Leiter v. United States*, 271 U.S. 204 (1926) .......... 62

*Lone Mtn. Prod. Co. v. Nat. Gas Pipeline Co. of Am.*, 710 F. Supp. 305 (D. Utah 1989) .......... 48

*Louisville & Nashville R.R. Co. v. Cent. Iron & Coal Co.*, 265 U.S. 59 (1924) .......... 64

*M.A. Mortenson Co. v. Brownlee*, 363 F.3d 1203 (Fed. Cir. 2003) .......... 36, 37

*MAPCO Alaska Petroleum, Inc. v. United States*, 27 Fed. Cl. 205 (1992) .......... *passim*

*M.G. Constr., Inc. v. United States*, 67 Fed. Cl. 176 (2005) .......... 38

*Maislin Ind., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116 (1990) .......... 51, 64

*Majernick v. Hartford Cas. Ins. Co.*, 688 A.2d 1330 (Conn. 1997) .......... 49

*John Massman Contracting Co. v. United States*, 23 Cl. Ct. 24, 31 (1991) .......... 35

*McDonnell Douglas Corp. v. United States*, 182 F.3d 1319 (Fed. Cir. 1999) .......... 33

*Motorola Inc. v. West*, 125 F.3d 1470 (Fed. Cir. 1997) .......... 64

*Navajo Ref. Co., L.P. v. United States*, 58 Fed. Cl. 200 (2003) .......... 9, 31, 55, 57

*Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757 (Fed. Cir. 1988) .......... 20

*Nortel Networks, Inc. v. Gold & Appel Transfer, S.A.*, 298 F. Supp. 2d 81 (D.D.C. 2004) .......... 48

*Northern Helex Co. v. United States*, 455 F.2d 546 (Ct. Cl. 1980) .......... 54

*OPM v. Richmond*, 496 U.S. 414 (1990) .......... 60

*Pauley Petroleum, Inc. v. United States*, 219 Ct. Cl. 24, 41 n.13 (1979) .......... 44

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Payne v. Block*, 714 F.2d 1510 (11th Cir. 1983)....................33

*Perpetual Fin. Corp. v. United States*, 61 Fed. Cl. 126 (2004) ....................44

*U.S. Philips Corp. v. Sears Roebuck & Co.*, 55 F.3d 592 (Fed. Cir. 1995)....................22, 23

*Phoenix Petroleum Co. v. United States*, No. 98-5124, 1999 U.S. App. LEXIS 16939 (Fed. Cir. July 23, 1999) ....................24, 61, 69

*Pittsburgh Ry. Co. v. United States*, 250 U.S. 577 (1919)....................57, 58, 66, 67

*Pleasant Country, Ltd. v. United States*, 37 Fed. Cl. 321 (1997) ....................17

*Princess Cruises, Inc. v. United States*, 397 F.3d 1358 (Fed. Cir. 2005) ....................56

*Puerto Rico Dep't. of Labor & Human Res. v. United States*, 49 Fed. Cl. 24 (2001) ....................37

*RCS Enters., Inc. v. United States*, 53 Fed. Cl. 303 (2002) ....................33

*Randy v. Columbia/HCA Healthcare Corp.*, 2003 U.S. Dist. LEXIS 17270 (N.D. Tex. Sept. 30, 2003) ....................50

*Reliance Ins. Co. v. United States*, 20 Cl. Ct. 715, 723 (1990)....................48

*Rose v. Mitsubishi Int'l Corp.*, 423 F. Supp. 1162 (E.D. Pa. 1976) ....................50

*Roseburg Lumber Co. v. Madigan*, 978 F.2d 660 (Fed. Cir. 1992)....................34

*Rough Diamond Co. v. United States*, 351 F.2d 636 (1965) ....................59

*Roxco, Ltd. v. United States*, 60 Fed. Cl. 39 (2004)....................48

*S.E.R., Jobs for Progress, Inc. v. United States*, 759 F.2d 1 (Fed. Cir. 1985)....................65

*S.J. Amoroso Constr. Co. v. United States*, 12 F.3d 1072 (Fed. Cir. 1993)....................59

*Saunders v. Hilpertshauser*, 1988 U.S. Dist. LEXIS 3646 (S.D.N.Y. 1988) ....................42

*In re Schenck Tours, Inc.*, 69 B.R. 906 (E.D.N.Y. 1987) ....................42

*Seaboard Lumber v. United States*, 308 F.3d 1283 (Fed. Cir. 2002)....................44, 45

*Shimrak v. Garcia-Mendoza*, 912 P.2d 822 (Nev. 1996)....................58

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Short Bros. PLC v. United States*, 65 Fed. Cl. 695 (2005) ....................32

*Sola Elec. Co. v. Jefferson Co.*, 317 U.S. 173 (1942)....................48, 54, 57

*Southern Pacific Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336 (1982)....................58

*Spalding & Sons, Inc. v. United States*, 28 Fed. Cl. 242 (1993)....................43

*Sprague Steamship Co. v. United States*, 172 F. Supp. 674 (Ct. Cl. 1959) ....................59

*State Oil Co. v. Khan*, 522 U.S. 3 (1997)....................20

*Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548 (Fed. Cir. 1992)....................38, 42

*Sunoco, Inc. v. United States*, 59 Fed. Cl. 390 (2004)....................38, 48

*Sweat Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560 (Fed. Cir. 1987)...........1, 17, 18

*T. Brown Constructors, Inc. v. Sec'y. of Transp.*, 132 F.3d 724 (Fed. Cir. 1997) ....................34

*T.L. Roof & Assoc. Constr. Co. v. United States*, 28 Fed. Cl. 572 (1993)....................35

*Tesoro Hawaii Corp., et al. v. United States*, 58 Fed Cl. 65 (2003).................... *passim*

*Tesoro Hawaii Corp., et al. v. United States*, No. 02-704C, 2003 U.S. Claims LEXIS 410 (Fed. Cl. Oct. 30, 2003) ....................23

*Tesoro Hawaii Corp. v. United States*, 405 F.3d 1339 (Fed. Cir. 2005) .................... *passim*

*Thomas v. United States*, 125 Ct. Cl. 76, 80 (1953) ....................64

*Toxgon Corp. v. BNFL, Inc.*, 312 F.3d 1379 (Fed. Cir. 2002)....................47

*Tylor Bank v. Truck Ins. Exch.*, 51 F.3d 736 (7th Cir. 1995)....................49

*USA Petroleum Corp. v. United States*, 821 F.2d 622 (Fed. Cir. 1987) ....................39

*United Counties Trust Co. v. Maclum, Inc.*, 643 F.2d 1140 (5th Cir. 1981) ....................50

*United States Fid. & Guar. Co. v. Bimco Iron & Metal Corp.*, 464 S.W.2d 353 (Tex. 1971) ....................50

*United States v. Amdahl*, 786 F.2d 387 (Fed. Cir. 1986)....................59, 73

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200 (2001)........................................29

*United States v. Spearin*, 248 U.S. 132 (1918) ..................................................................39

*Urban Data Sys., Inc. v. United States*, 699 F.2d 1147 (Fed. Cir. 1983) ........................60, 64, 67

*Utah Power & Light Co. v. United States*, 243 U.S. 389 (1917)...........................................52, 64

*Walker v. Cont. Life & Accident Co.*, 445 F.2d 1072 (9th Cir. 1971) ....................................42, 43

*Washington State Hop Producers, Inc. v. Goschie Farms, Inc.*, 773 P.2d 70 (Wash. 1989) ........43

*Whittaker Elec. Sys. v. Dalton*, 124 F.3d 1443 (Fed. Cir. 1997) ...............................67, 68, 69, 70

*Williams Alaska Petroleum, Inc. v. United States*, No. 02-705C (Fed. Cl.) ...........................15, 24

*Yerxa v. United States*, 11 Cl. Ct. 110, 119 (1986), *aff'd*, 824 F.2d 978 (Fed. Cir. 1987).............66

*Yosemite Park & Curry Co. v. United States*, 582 F.2d 552 (Ct. Cl. 1978) .................................67

**Constitutional Provisions and Statutes**

41 U.S.C. § 253(b) ..........................................................................................................33

28 U.S.C. § 1292(d)(2) ......................................................................................................22

FAR § 15.402(a) ...........................................................................................15, 27, 32

FAR § 15.610, (d)(3) ........................................................................................................61

FAR § 15.803(c) ..............................................................................................................27

FAR § 15.802(a), (b)(1)................................................................................... *passim*

FAR § 15.804-1, 1(a), 3(c)(2)......................................................................3, 26, 27

FAR § 16.203.................................................................................................. *passim*

FAR § 33.206(a) ..............................................................................................................64

**Miscellaneous**

2 DCAM, § 9-201(b) at 924 (July 1, 1989) .........................................................................29

**TABLE OF AUTHORITIES**
**(continued)**

**Page**


ASPM § 1.3 (Dep't of Def. 1986) ....................28

Allan Farnsworth, *Farnsworth on Contracts* § 8.6 at 452 (3d ed. 2004) ....................49

Black's Law Dictionary (8th ed. 1999)....................20

Chevron Products Company, *Aviation Fuels Technical Review* 13 (2000)....................2

Contracting Pricing Reference Guide § I.2.1 (available at http://www.acq.osd.mil/dpap/contractpricing/vol1intro.htm#I.2.1) (last updated Aug. 26, 2005) ....................29

Arthur L. Corbin, 6A *Corbin on Contracts* § 1540, at 833-34 (1962) ....................41, 49, 58

Joseph Perillo, *Calamari And Perillo On Contracts* at 458 (5th ed. 2003)....................49

*Preaward Failure to Object Waives Contractor's Right to Challenge Contract's Validity*, Cases & Decisions, 39 No. 41 *Gov't Contractor* ¶ 519 (Oct. 1997)....................69

*Restatement (Second) of Contracts* § 84....................49

*Restatement (Second) of Contracts* § 93....................49

*Restatement (Second) of Contracts*, § 161(b) (1981)....................35

*Restatement (Second) of Contracts* § 162 (1979) ....................35

*Restatement (Second) of Contracts* § 237....................41

*Restatement (Second) of Contracts* § 241....................38

*Restatement (Second) Contracts* § 266....................42, 43, 44, 45

*Webster's II New Riverside University Dictionary* 161 (1988) ....................30

*Webster's New World Dictionary of the American Language* 502 (2d ed. 1984)....................30

*Williston on Contracts* § 814 (3d ed. 1962)....................41

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HERMES CONSOLIDATED, INC.,<br>Doing Business as Wyoming Refining<br>Company,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 02-1460C<br>(Judge Block) |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Plaintiff, Hermes Consolidated, Inc., doing business as Wyoming Refining Company ("Hermes"), respectfully submits its Reply to Defendant's Motion to Dismiss. In its motion, Defendant seeks dismissal of Hermes' Second Amended Complaint pursuant to RCFC 12(b)(1) and 12(b)(6), and, alternatively, seeks summary judgment pursuant to RCFC 56(b) on all of Hermes' claims. DESC's Motion at 1. As set forth below, Defendant's RCFC 12(b) Motion to Dismiss, which must assume the truth of the well-pleaded allegations in the Complaint, should be denied because Defendant fails to establish that it is entitled to judgment as a matter of law. *Conley v. Gibson*, 255 U.S. 42, 45-46 (1957). Furthermore, Defendant's alternative request for summary judgment must be denied because Defendant fails to provide evidence which "would establish its right to judgment," *Sweat Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1562 (Fed. Cir. 1987), and its motion amounts to little more than "a conclusory assertion that the plaintiff has no evidence to prove his case." *Celotex Corp. v Catrett*, 477 U.S. 317, 328 (1986) (White, J., concurring). (*See* discussion pp. 16-19, *infra*.) Moreover, to the extent that DESC could be deemed to satisfy its burden with respect to any material fact, and, to the extent that Hermes is deemed not to provide sufficient countering evidence to establish a genuine issue with respect to that fact, this Court should, pursuant to Hermes' accompanying motion under

RCFC 56(f), refuse DESC's application for summary judgment or, in the alternative, grant a continuance to permit Hermes the discovery it requires to establish these facts. *Celotex*, 477 U.S. at 326. For these reasons and as further set forth below, Defendant's motion should be denied.

## STATEMENT OF FACTS

### I. THE PARTIES

DESC[1] is the principal purchaser of military fuel for the Department of Defense ("DOD"). It is the single largest purchaser of fuel in the world.[2] As relevant here, DESC principally purchased unique types of military jet fuel and a unique military distillate. Second Amended Complaint ¶ 4.[3]

Hermes was a supplier of military fuel to DESC. From 1986 to 1998, it owned and operated a 10,500 barrel per day refinery in Newcastle, Wyoming. App. 638. The refinery was and remains one of the smallest operating refineries in the United States. *Ibid.* Hermes maintained long-term supply relationships with DESC and committed substantial, long-term capacity to refining military fuel. Second Amended Complaint ¶ 5. DESC purchased military fuel from Hermes, as it did from essentially all military fuel suppliers, under long-term contracts typically lasting one year. Second Amended Complaint ¶ 5. Because of its limited size, Hermes

---

[1] DESC previously was known as the Defense Fuel Supply Center ("DFSC"). For simplicity, "DESC" is used throughout.

[2] *Dimensions*, *Defense Logistics Agency News Magazine* (1999 Almanac ed.), *available at* http//www.dla.mil/dimensions/almanac/desc.htm.

[3] Chevron Products Company, *Aviation Fuels Technical Review* 13 (2000) (military "maintain[s] separate specifications for jet fuel [because of] operational and logistical differences between the military and civilian systems and the additional demands high-performance jet fighter engines place on the fuel").

participated in DESC's small business set-aside program. App. 638. During the period relevant here, Hermes and DESC entered 11 contracts providing for the delivery of military jet fuel, principally in South Dakota.[4] Second Amended Complaint ¶¶ 27-28.

## II. DESC'S MILITARY FUEL PRICES

DESC's military fuel contracts contained adjustable prices that permitted DESC to set military fuel prices monthly or weekly during the contract term. App. 667. FAR § 16.203 permits use of adjustable prices where, *inter alia*, prices are set based on changes in "established prices." "Established prices" are "established market prices." *Tesoro Hawaii Corp. v. United States*, 405 F.3d 1339, 1345 (Fed. Cir. 2005) (quoting the prior provisions of FAR § 15.804-3(c)(2)). Established market prices may include price references such as indexes, but, where used, indexes must be "market-based references." *Id*. at 1347-48.[5]

As relevant to DESC's motion, DESC set fuel prices under its military fuel contracts using a compilation of petroleum sales data published by the Department of Energy ("DOE") known as the Petroleum Marketing Monthly ("PMM").[6] App. 669. The PMM reports a monthly average sales figure for specified fuels, such as jet fuel or diesel fuel, for five regions known as Petroleum Administration for Defense Districts ("PADDs"). *Barrett Ref. Corp. v. United States*,

---

[4] Hermes submitted a certified claim to DESC's contracting officer with respect to a 12th military jet fuel contract, but the contracting officer's final decision denying that claim was not issued until after Hermes' Second Amended Complaint was filed on October 3, 2005.

[5] *See infra* fn. 22.

[6] DESC also used other compilations of sales data to set fuel prices. However, in its motion, DESC offers no evidence concerning these other compilations. Because DESC fails to meet its burden to offer any evidence concerning these other compilations, or otherwise move with respect to them, Hermes does not address them specifically in its response and limits its discussion to the PMM.

42 Fed. Cl. 128, 130 n.6, 131 (1998), *aff'd in part and rev'd in part*, 242 F.3d 1055 (Fed. Cir. 2001). As the PMM moved upward or downward each month, DESC's fuel prices also moved upward or downward. App. 669.[7]

DESC's Deputy Director of Contracting, Edward Biddle, stated in a 1993 memorandum that the purpose of DESC's adjustable prices was to "ensure[] that the sale will be at the market price, which is a fair and reasonable price. Not only is the government protected, but *the contractor is protected by knowing that its price will always be related to the price it could obtain in the commercial marketplace.*" App. 4 (emphasis added). DESC's Director of the Office of Market Research and Analysis, Lawrence Ervin, testified similarly before this Court in 1998 that DESC used adjustable prices because: "[W]e wanted our prices to reflect, as closely as possible, market levels for the same or similar commercial fuels in the marketplace. . . . We wanted the price to go up and also down when the market prices of similar fuel went [up or] down." App. 14; *see also* App. 62 ("the EPA [economic price adjustment] reference selected is [intended to be] reflective of changes in commercial market prices"); App. 67 ("the EPA reference is designed to adjust the award price in concert with changes in going market price levels;" "the D[E]SC Office of Market Research and Analysis endeavors to select the reference that most accurately reflects movements of going market prices").

Consistent with this purpose, DESC's pricing clause is titled "Economic Price Adjustment – Published Market Price." App. 9. Among its various iterations over time, the clause states that "[t]he market price [used to set military fuel prices] is derived from quotes, assessments, or sales prices in the market place" and further provides that military fuel prices are

[7] The PMM is designed for Congressional use in developing broad energy policy. *Barrett*, 42 Fed. Cl. at 131.

"*to reflect market conditions*." App. 9 (emphasis added).[8] It is therefore unsurprising that in *Barrett* the United States Court of Appeals for the Federal Circuit expressly found that DESC's adjustable pricing clause embodied a promise to "pay at least fair market value" for fuel. 242 F.3d at 1060.

## III. DESC'S CONFLICTING ASSESSMENTS OF ITS MILITARY FUEL PRICES

Outwardly, DESC maintained that the PMM was the "gold standard" for measuring fair market value. DESC wrote to its parent organization, the Defense Logistics Agency ("DLA"), that its PMM "references are virtually unimpeachable from an accuracy standpoint, since *they don't just 'track' the market – they are the market.*" App. 98 (emphasis added).[9] In response to a supplier's objection to the PMM, DESC similarly wrote that the PMM "consistently reflects actual market prices," App. 96, and to another objecting supplier DESC wrote that the PMM is "a reliable indicator of price movements in the petroleum products market." App. 91. As late as 1998, DESC's Mr. Ervin testified before this Court that the PMM is "the benchmark against which we . . . compare everything domestically." App. 29.

DESC's statements to DLA, its suppliers and this Court stand in stark contrast to DESC's expert economists' assessment of the PMM. In 1986, DESC's then-Director of the Office of Market Research and Analysis, Mr. Christopher Lee, undertook an assessment of the PMM to compare its performance with commonly used commercial price references for fuel, such as

---

[8] *See also* App. 87 (Mr. Ervin stating that, pursuant to DESC's pricing clause, "replacement of the escalation reference is called for if the reference 'consistently fails to reflect market value'"); App. 85 (Mr. Ervin stating that through its pricing clause "DESC assumes the risk of higher product prices").

[9] DESC's public espousal of the PMM is unsurprising, given DESC's acknowledgment that "DOE normally will work with us to see that our needs are satisfied as we are one of the primary users of PMM." App. 100.

Platts and OPIS (which DLA subsequently directed DESC to use in place of the PMM). Referring to Platts and OPIS as "other references,"[10] Mr. Lee, who holds a Doctorate in Economics,[11] stated: "Yet our analysis of the movement of the PMM as compared to other references as used for interim price adjustments indicates that the PMM may have moves as much as *one or two cents per gallon out of step* with such interim references." App. 103 (emphasis added). In contrast, DESC required its suppliers to submit bids to the one ten-thousandth of a cent ($0.000001). App. 665.

In 1987, DESC's Office of Market Research and Analysis undertook another study "comparing PMM versus Platts and OPIS." App. 134. That study supported using the commercial price references Platts and OPIS to make price adjustments – not the PMM. App. 134. When DLA ultimately learned of DESC's 1987 study – albeit seven years later – DLA directed DESC to stop using the PMM to set prices and to use Platts and OPIS instead.

Mr. Ervin explains how DESC's 1987 study led to DLA's directive to stop using the PMM in 1994:

> I was sitting in a room when the decision happened and it was made in response to some pressure from headquarters to do things differently. So the analysis is based on, basically is the analysis in the '87 study. Some people who have read the '87 studies [stated] that they would draw different conclusions than what was

[10] In the 1986 assessment, Mr. Lee uses the phrase "other references as used for interim price adjustments." App. 103. DESC used its interim price adjustments to set prices on an interim basis at the time fuel was delivered. App. 120. DESC set final prices when the PMM was published three months after the fact – *i.e.*, three months after the fuel was delivered. App. 121. DESC's interim references, as identified in its adjustable pricing clause, were Platts and OPIS. App. 120.

[11] App. 111.

> presented at the end of the study, certainly a close call. Analysis would have supported that as well so it's really the '87 study which is the basis for that move [in 1994 from PMM to Platts and OPIS].

App. 134.[12]

The 1987 study was written by the Office of Market Research and Analysis with the objective of justifying continued use of its "gold standard," the PMM. App. 595-602.[13] While the all-important statistical analysis behind the study has not yet been produced, the admissions against interest in the narrative of the study are compelling. DESC's expert economists admit that using Platts and OPIS to set prices instead of the PMM "would cost DESC money" and concede that "[t]here is market risk associated with the move away from escalation on actual sales [PMM] particularly with respect to jet kerosene [military jet fuel]." App. 599; App. 602. DESC's economists additionally recount in the 1987 study how its suppliers had complained that, as a result of DESC's use of the PMM to set prices after fuel is delivered, "'*we never know if we have made or lost money when you (D[E]SC) lift a cargo.*'" App. 597 (emphasis added); *see also* App. 595 (cover memorandum to the 1987 study stating with respect to the proposed change in using the PMM, "The issue has been raised several times in recent years, formally and informally, by contractors").

---

[12] DESC proffered Mr. Ervin as a witness in response to a Notice of Deposition served under Rule 30(b)(6) in *La Gloria Oil & Gas Co. v. United States*, No. 02-456C (Fed. Cl.). App. 141. The notice directed DESC to designate a witness to address the existence of documents requested in the plaintiff's requests for production of documents. App. 141. Because, pursuant to the terms of the notice, the deposition was limited to the existence of responsive documents, the plaintiff's ability to inquire into the substance of the conclusions of the documents was limited. App. 141. That inquiry must await further discovery.

[13] While this document is attached to DESC's motion, DESC does not specifically identify the document as the 1987 study referred to by Mr. Ervin in his deposition. Final confirmation of this fact awaits further discovery.

Once DLA directed DESC to stop using the PMM in 1994 and to set prices using Platts and OPIS instead, DESC made the extraordinary admission that prices it previously had set using the PMM so departed from market value that they could not be compared to prices set based on Platts and OPIS. DESC stated: "Direct contract price comparisons *are not possible* due to the switch from the monthly interim-final (PMM) escalation method to a weekly market price escalation basis [using Platts and OPIS]." App. 144 (emphasis added).[14] DESC's admission is unsurprising, given that DESC had concluded elsewhere that changing from the PMM to commercial references, such as Platts and OPIS, "could significantly influence contract prices," App. 98, and further found, in response to a proposal from one of its largest suppliers to stop using the PMM, that its "PMM JP-5" jet fuel prices were ten cents a gallon higher, then ten cents lower, and yet again ten cents higher than Platts – all within the same year. App. 182.[15]

## IV. <u>THE NON-NEGOTIABILITY OF DESC'S MILITARY FUEL PRICES</u>

Despite DESC's admission that "comparisons are not possible" between the prices it set using the PMM and those set using commercial market references such as Platts and OPIS, DESC had mandated that "[a]ll offerors are required to accept a method of price adjustment

---

[14] For each procurement, DESC prepares a "Price Analysis Memorandum" to determine its price objectives during contract negotiations. *See, e.g.,* App. 144, 150, 154, 157, 163. In determining its price objectives for the procurement, DESC typically considers, under the heading "Price History," the price it is paying under its current, existing contracts. *See, e.g.,* App. 144, 151, 155, 157, 163, 167-68. However, as noted above, when DESC stopped using the PMM and switched to using Platts and OPIS instead, it stated that its usual practice of making price comparisons with its existing contracts was "not possible." App. 144.

[15] The assessments of the PMM by DESC's expert economists, discussed above, together with DLA's direction to stop using the PMM based on DESC's 1987 study, draw into serious question the credibility of Mr. Ervin's subsequent cross-examination testimony in this Court in 1998 that he never identified any "problem with using the PMM" to set military fuel prices other than "billing" issues. App. 36-37.

based on . . . the Petroleum Marketing Monthly (PMM)." App. 195; *see also* App. 199 (stating that DESC "would not consider" an offer unless objection to the PMM was withdrawn). As Mr. Ervin testified before this Court, DESC used its "leverage as a buyer" as the sole purchaser of military fuel to "improve the competition" for DESC's business by requiring use of the PMM. App. 17.

Accordingly, even though suppliers objected to DESC's use of the PMM as "coerced," App. 201; App. 204, the use of the PMM to set prices was "not negotiable as a matter of policy." App. 205. DESC's procurement authorizations expressly stated under the heading "POTENTIAL PROBLEMS" that "common escalation [using the PMM] is non-negotiable." App. 206-278; *Navajo Ref. Co., L.P. v. United States*, 58 Fed. Cl. 200, 214 (2003) ("DESC explicitly stated in its pre-negotiation briefing memoranda that it deemed its price adjustment clause to be non-negotiable"); *see also Barrett Ref. Corp. v. United States*, 45 Fed. Cl. 166, 171 (1999) (supplier "had no control over use of PMM EPA clause, and indeed attempted, unsuccessfully, to persuade the agency not to use it"), *aff'd in part and rev'd in part*, 242 F.3d 1055 (Fed. Cir. 2001). Evidencing the futility of objecting to DESC's pricing clause, even after a supplier filed a claim in 1988 challenging DESC's use of the PMM, DESC continued to use the PMM for six more years, until it was directed to use Platts and OPIS instead. *MAPCO Alaska Petroleum, Inc. v. United States*, 27 Fed. Cl. 205, 407 (1992).

## V. THE FAILURE OF DESC'S MILITARY FUEL PRICES TO REFLECT FAIR MARKET VALUE

While Hermes knew that DESC's use of its adjustable pricing clause and the PMM were non-negotiable, what Hermes did not know was that DOE had not designed the PMM to be used to set fuel prices or to reflect market value. As Dr. John Cook, Director of the Petroleum Marketing Division of the Department of Energy's Energy Information Administration (which

publishes the PMM), has since testified and as this Court found: "[T]he PMM is not intended to be an index that is used for setting prices." *Barrett*, 42 Fed. Cl. at 131. Thus, while "Hermes entered into the fuel contracts with the intent that DESC's pricing would reflect fair market value[,]" Hermes could not have been more wrong. App. 662-63.

An assessment of the PMM as an established market price is set forth in the Expert Report of Joseph Kalt[16] and Peter Killen.[17] In their report, Kalt and Killen conclude that DESC's "PMM-based adjustment clauses failed to provide an effective measure of established market prices or the fair market value of military fuels." App. 611.

The following chart, drawn from Kalt and Killen's report, dramatically illustrates the PMM's departure from the marketplace:




---

[16] Joseph Kalt is the Ford Foundation Professor of International Political Economy at the John F. Kennedy School of Government, Harvard University. App. 609-610.

[17] Peter Killen is a Senior Advisor in the Houston offices of the firm of Muse Stancil & Company, a global consulting firm specializing in the energy industry. He holds a B.S. in Chemical Engineering and is a Registered Professional Engineer. App. 610.

The chart illustrates how many cents per gallon the marketplace changed more or less than the PMM during the years DESC used the PMM. App. 634; App. 625.[18] If the change in the PMM was equal to the change in the marketplace, the bars in the chart would be zero or nonexistent. Thus, as the chart shows, in July of 1990 the marketplace increased by 13 cents a gallon more than the PMM. As Kalt and Killen state, "[t]he fact that we see significant bars indicates that the relationship between the movements of the two series [the PMM and the marketplace] is notably unstable." App. 625. Thus, as Kalt and Killen explain, the chart shows the PMM's relationship with the marketplace to be "extremely volatile," with the change in the PMM varying from the change in the market place from approximately +13 cents to approximately -13 cents during the relevant period. App. 625; App. 634.[19]

Equally compelling, Kalt and Killen explain that the PMM and the marketplace "frequently actually move in different directions [*e.g.*, the market goes up and the PMM goes down] in starkly erratic fashion." App. 625. Kalt and Killen demonstrate that the PMM moved in the opposite direction of the marketplace on average "38% of the time," while, in each of the years 1986, 1991 and 1992, the PMM moved in the opposite direction of the marketplace 42% of the time. App. 626; App. 635.

---

[18] As Kalt and Killen explain, it is the change in price levels of the PMM and the marketplace, rather than the absolute prices levels themselves, that are relevant here because "the PMM is used by the DESC to index *changes* in price levels, rather than the price levels themselves." App. 624 (emphasis original).

[19] As Kalt and Killen further explain, the fact the PMM overstated the change in market does not mean that Hermes was overpaid. Given the PMM's random relationship with the market, a "winning bidder could readily [and erroneously] forecast that the Defendant's PMM index in any particular contract period would turn out to yield payments in the next contract period in excess of fair market value – pushing the optimistic bidder's base price bid downward." App. 613-14; *see also* App. 630-31.

The next chart, again drawn from Kalt and Killen's report, illustrates on an annual basis how much the change in the PMM departed from the change in the marketplace:

Figure 6

THE MONTHLY AVERAGE DIFFERENCE BETWEEN CHANGES IN MARKET-BASED AND PMM-BASED ESCALATORS OVER THE COURSE OF A CONTRACT IS HIGHLY UNSTABLE




Note: 1984-1987 contracts assumed to have the same reference date (February) as the 1988-1994 contracts.
Sources: Platts; EIA Petroleum Marketing Monthly.

The height of the bars shows for each year how many cents per gallon, on average, the change in the PMM departed from the change in the marketplace. App. 637; App. 626-27. Once again, not only is the amount of the error significant (in 1986 the PMM *understated* the marketplace on average 15 cents a gallon), but both the amount and the direction of the error are erratic (in 1985 the PMM *overstated* the market on average 7 cents a gallon). App. 627; App. 637.

This volatile nature of the PMM is significant, because it made it essentially impossible for a bidder to predict correctly how the PMM would relate to the marketplace and, therefore, to

bid in a way that would provide some meaningful protection from the PMM. As Kalt and Killen explain: "The deviations between changes in the Market-based escalator and the PMM-based escalator are quite volatile . . . This volatility confounds rational prediction by which a rational bidder might reliably adjust bid prices so as to ensure receipt of no less than market value under a given period's fuel contract." App. 627.

Kalt and Killen state that there are a number of reasons why the PMM does not reflect the marketplace. Among them, Kalt and Killen explain, "the PMM data were not designed or intended to be used as an index." App. 611. They also show that the PMM suffers from a statistical flaw known as an "index number problem." App. 616-19. This statistical flaw, Kalt and Killen state, results in the PMM erroneously reporting changing in the volume of fuel sold as changes in the price of fuel. Because of the PMM's index number problem, Kalt and Killen conclude:

> PMM data do not contain accurate information needed to understand how the prices of specific products, such as a particular grade of military jet fuel, may have changed over time. An index that relies on these data, such as the DESC's PMM-based escalator, is readily susceptible to situations in which the index reports a price increase (or decrease) even though the actual market value of the fuel has declined (or risen) in the marketplace.

App. 618.

Significantly, Kalt and Killen point out that, unlike DOE here, other federal agencies that publish indexes intended to be used as price indexes go to great lengths to ensure that the indexes do not suffer an index number problem. Kalt and Killen state:

> It is important to note here that statisticians at government agencies and in other organizations often go to great lengths to address the "index numbers" problem when constructing indices such as the Producer Price Index ("PPI") and the Consumer Price Index ("CPI"), which are used to reflect the underlying changes in price levels for specific products used by producers and consumers. Each of these indices is constructed using fixed weights from period to period such that short-term variation in the mix of products sold is not mistaken for actual changes in the levels of prices.

App. 618 (footnote omitted).

Beyond the PMM's index number problem, Kalt and Killen further conclude that DESC's PMM-based pricing clause failed to reflect the marketplace because "the formulas used by the government to create the index did not track changes in the value of the military jet fuel." App. 611. As they explain, DESC simply used the wrong fuels, and thus the wrong PMM data, in its pricing clause. App. 619-22.

Thus, for the military jet fuel known as JP-4, DESC based price adjustments on the PMM data for unleaded gasoline and commercial jet fuel, weighted 70 percent and 30 percent, respectively. App. 620. However, this combination of unleaded gasoline and commercial jet fuel does not reflect the physical characteristics or market value of JP-4. Kalt and Killen state: "The DESC's simplistic use of a 70:30 ratio of gasoline and kerosene-type jet fuel prices to proxy for JP-4 market prices is inappropriate for economic price adjustment purposes given the technical and economic considerations of how JP-4 and other refined products are actually produced." App. 621.

Kalt and Killen explain that a proper measure of the physical characteristics and market value of JP-4 should not be based on unleaded gasoline and commercial jet fuel but rather on a combination of naphtha, commercial jet fuel, and diesel fuel. App. 621-22. Notably, both this Court and the Federal Circuit in *Barrett* also concluded, over DESC's objection, that naphtha and not unleaded gasoline was the proper fuel to use for measuring the value of JP-4. *Barrett*, 242 F.3d at 1061 ("However, the government does not dispute the Court of Federal Claims' finding that the naphtha-based index 'provides data that more closely reflect the product [JP-4] Barrett was actually selling.'").

For these and other reasons, Kalt and Killen observe that commercial buyers and sellers do not use the PMM as a price index. They conclude that the PMM's failure to pass "[t]his

'market test' reinforces the conclusion that a PMM-based escalator of the type used by the DESC is simply not suited to represent actual movement of established market price for any fuel, much less military jet fuel." App. 619.

## VI. HERMES' SECOND AMENDED COMPLAINT

In its Second Amended Complaint, Hermes seeks relief from DESC's military fuel prices in seven counts. Count I challenges DESC's fuel prices on several grounds of illegality. Hermes alleges that DESC violated FAR § 16.203, because DESC did not set military fuel prices using "established fuel prices" that are "market-based" references. Second Amended Complaint ¶ 34; *see generally Tesoro*, 405 F.3d at 1347-48.

In *Williams Alaska Petroleum, Inc. v. United States*, No. 02-705C (Fed. Cl.), the Court articulated this claim as follows:

> I thought the situation is one in which the question was may the government use[] a market-based-index, and I said of course it can. . . . But that says nothing about . . . whether the index provides an accurate measure of the market it's attempting to draw data from.
>
> If, for example, it was an index of apples and oranges and bananas, no one could conceivably argue, well, it's there in the contract and therefore it's law. No. You may have a right to use a market-based index, *but the index itself must be representative of the market it's purporting to represent.* That's the issue that I see is still there to be decided.

Transcript of Nov. 18, 2003 Proceedings at 24-25 (emphasis added), App. 292-93.

In addition to its claim that DESC's fuel prices violated FAR § 16.203, Hermes alleges in Count I that DESC's prices violate FAR § 15.802(b)(1) (currently FAR § 15.402(a)) because DESC used the PMM to set prices that were not "fair and reasonable." Second Amended Complaint ¶ 35.

In Count II, Hermes challenges DESC's military fuel prices on the ground of misrepresentation. Hermes alleges, *inter alia*, that DESC misrepresented that the PMM was

designed to measure fair market value, misrepresented that the PMM was intended to be used to set prices, and misrepresented that the PMM and the prices set using it reflected fair market value. Second Amended Complaint ¶¶ 9-24, 39-52. In Count III, Hermes challenges DESC's military fuel prices on the ground of breach of contract. Hermes alleges, *inter alia*, that DESC's adjustable pricing clause requires DESC to set and pay prices for fuel that reflect fair market value and that DESC failed to do so when it set prices using the PMM. Second Amended Complaint ¶¶ 53-66.

In Count IV, Hermes challenges DESC's military fuel prices on the ground that DESC's violation of law in setting fuel prices gave rise to an implied-in-fact contract to pay fair market value, which Hermes alleges DESC breached. Second Amended Complaint ¶¶ 67-72. In Count V, Hermes alleges that DESC's failure to pay fair market value for military fuel caused a failure of consideration and frustrated the purpose of the fuel contracts. Second Amended Complaint ¶¶ 73-90.

Finally, in Count VI, Hermes alleges that the fuel contracts were entered, *inter alia*, as the product of the parties' mistaken belief that (1) the PMM was designed to and did measure the fair market value of fuel and (2) the PMM was intended to be used to set prices. Second Amended Complaint ¶¶ 91-117.

## ARGUMENT

### I. DESC'S MOTION FAILS TO SATISFY THE STANDARDS FOR JUDGMENT AS A MATTER OF LAW

DESC styles its motion as a "Motion to Dismiss," although DESC variously seeks dismissal of Hermes' claims under RCFC 12(b)(1) and RCFC 12(b)(6) and summary judgment under RCFC 56(b). DESC's Motion at 1. With regard to RCFC 12(b)(1) and 12(b)(6), DESC faces a substantial burden in seeking dismissal. It must demonstrate that, accepting the truth of

all well-pleaded allegations in the Second Amended Complaint, Hermes fails to state a claim as a matter of law. *Adams v. United States*, 391 F.3d 1212, 1218 (Fed. Cir. 2004). Evidence is irrelevant on such a motion; rather, for the movant to prevail, it must show that, even if the plaintiff could prove all the facts alleged in the complaint, the law does not recognize the claim. *Conley*, 255 U.S. at 45-46. As established below, DESC's motion fails to meet these standards.

With regard to DESC's alternative approach of seeking summary judgment under RCFC 56(b), DESC must demonstrate – with respect to each claim on which it seeks judgment – that there is no genuine issue as to any material fact and it is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Material facts are those "that might significantly affect the outcome of a suit," *Pleasant Country, Ltd. v. United States*, 37 Fed. Cl. 321, 325 (1997), and, with respect to those facts, DESC must provide "affidavits or other evidence which, unopposed, would establish its right to judgment." *Sweat Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1562 (Fed. Cir. 1987). "It is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case." *Celotex Corp.*, 477 U.S. at 328 (White, J., concurring). Only after the movant has provided evidence that, unopposed, would establish a right to judgment with respect to the material facts does the non-movant have an obligation to "proffer countering evidence sufficient to create a genuine factual dispute." *Sweat Fashions*, 833 F.2d at 1562.[20] Moreover, when such countering evidence is proffered, a court cannot weigh the evidence or determine the truth of any matter on a motion for summary judgment. Instead, the

---

[20] Nor, prior to "an opportunity to make full discovery," may DESC seek to meet its burden by alleging that "the record does not support the other party's case." *Celotex*, 477 U.S. at 325-26.

question is simply whether the evidence creates a genuine issue for trial. *Anderson*, 477 U.S. at 249.

As set forth below, DESC offers essentially no evidence addressing the material facts in this case. For example, DESC offers no evidence addressing whether the PMM is a "market-based reference" as required by FAR § 16.203, no evidence concerning whether its military fuel prices were "fair and reasonable" as required by FAR § 15.802(b)(1), and, outside the contracts themselves, no evidence addressing the substance of Hermes' allegations of misrepresentation, breach of contract, failure of consideration or mistake. With regard to its affirmative defense of waiver, DESC relies only upon the existence of the contracts and a declaration of John Walker that fails to meet even basic standards of evidentiary competence.

Accordingly, DESC's motion for summary judgment amounts to little more than "a conclusory assertion that the plaintiff has no evidence to prove his case," *Celotex*, 477 U.S. at 328, and DESC's request for judgment must be denied for failure to "support[] its motion." *Sweat Fashions*, 833 F.2d at 1562. Moreover, because DESC fails to meet its moving burden, DESC may not prevail on its motion, and Hermes is under no obligation here to proffer "countering evidence." *Id*. Thus, for example, because DESC points to no evidence concerning Hermes' allegations of misrepresentation or mistake, and because DESC offers essentially no evidence concerning its affirmative defense of waiver, Hermes has no obligation here to present evidence concerning these issues. Further, to the extent that DESC somehow could be deemed to satisfy its burden with respect to any material fact, and, to the extent that Hermes is deemed not to provide sufficient countering evidence to establish a genuine issue with respect to that fact, Hermes invokes its discovery rights pursuant to RCFC 56(f). (*See* Hermes' RCFC 56(f) Motion accompanying this Opposition.) As the Supreme Court has made clear, summary judgment

should not be granted until the non-movant has "had an opportunity to make full discovery." *Celotex*, 477 U.S. at 326.[21]

## II. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON HERMES' CLAIMS THAT DESC'S MILITARY FUEL PRICES VIOLATE FAR § 16.203

DESC seeks to dismiss Hermes' claims that DESC's military fuel prices violate FAR § 16.203 relying on *Tesoro*, 405 F.3d at 1339. DESC asserts that in *Tesoro* the Federal Circuit held that DESC's use of the PMM to set military fuel prices was legal for all purposes. DESC therefore concludes that *Tesoro* requires denial of Hermes' claims that the PMM is not an "established price" which is "a market-based reference" within the meaning of FAR § 16.203. DESC's Motion at 8-14. Contrary to DESC's assertion, the issue of whether the PMM is a market-based reference within the meaning of FAR § 16.203 was not before the Federal Circuit in *Tesoro*, and, accordingly, the court could not and did not decide the issue.

---

[21] In support of its current Motion to Dismiss, DESC cites to portions of the record submitted in support of its earlier motion for summary judgment in this case and otherwise states that it is relying on the entirety of that earlier record to support its current motion, even if not cited here. DESC's Motion at 1. DESC's attempt to create a "rolling record" is inappropriate. Evidence submitted as part of the record for DESC's earlier motion may not have been deemed material and, therefore, may not have been disputed for purposes of that earlier motion; however, it may be material here, but lurk undisputed in the earlier record. Hermes, and ultimately this Court, have no idea what portions of that substantial and uncited record DESC may later seek to rely upon for purposes of appeal or otherwise. Hermes, and ultimately this Court, are entitled to a clearly defined record. Accordingly, to the extent that DESC's Motion to Dismiss relies upon the record submitted for a different motion, those portions of DESC's motion should be stricken. (In the event they are not, Hermes hereby incorporates the entirety of the record it submitted with respect to that prior motion.)

In a similar vein, DESC seeks to incorporate in its present Motion to Dismiss arguments advanced in its prior motion, but upon which it did not previously prevail. DESC's Motion at 7 n.2., 8 n.4. Once again, these portions of DESC's motion that are "incorporated by reference" should be stricken. Neither Hermes nor this Court should be subject to a *seriatim* motion for summary judgment. (In the event these arguments are not stricken, Hermes hereby incorporates the entirety of its response to those previously submitted arguments.)

### A. Only The Issue Of *Per Se* Illegality Was Before The Court In *Tesoro*

In *Tesoro*, the Appellants challenged DESC's military fuel prices on the sole ground that they were "*per se* illegal." Brief of Plaintiffs-Appellants at 8 n.5, App. 377. A claim of *per se* illegality, of course, is one where the illegality is "of, in or by itself," where it is "standing alone, without reference to additional facts." *Black's Law Dictionary* (8th ed. 1999); *see LaBarge Products, Inc. v. West*, 46 F.3d. 1547, 1556 (Fed. Cir. 1995) ("Disclosure of one offeror's bid does not make later negotiations per se illegal."); *cf*. *State Oil Co. v. Khan*, 522 U.S. 3, 12 (1997) (explaining in the antitrust context, when a party challenges the lawfulness *per se* of a particular practice, "the proper inquiry [i]s 'not whether [that practice] is *ever* illegal, but whether it is *always* illegal'" (emphasis in original)). The Appellants in *Tesoro* asserted that DESC's military fuel prices were *per se* illegal because the prices were based on an index and not on changes in the contractor's own prices. As the Appellants stated in their principal brief: "[O]nly the portion of Count I alleging *per se* illegality was the subject of the parties' cross motions [for summary judgment below] and therefore within the scope of this certified appeal." Brief of Plaintiffs-Appellants at 8 n.5, App. 377.[22]

DESC similarly characterized the Appellants' claim was one of *per se* illegality and expressly told the Federal Circuit that the issue of whether the PMM was a market-based

[22] Hermes continues to maintain that DESC's use of the PMM and other indexes to set military fuel prices is *per se* illegal, *inter alia*, for the reasons set forth in *MAPCO*, 27 Fed. Cl. at 405. Hermes maintains that the Federal Circuit's holding in *Barrett*, 242 F.3d at 1060, 1064, that DESC's price adjustment clause was illegal controls over the Federal Circuit's later, conflicting decision in *Tesoro*. *See generally Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed. Cir. 1988) ("This court has adopted the rule that prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned in banc . . . Where there is direct conflict, the precedential decision is the first."). Hermes further maintains that *Tesoro* was wrongly decided. However, given the mandate in *Tesoro*, Hermes recognizes that final resolution of these questions may have to await further appellate consideration.

reference within the meaning of FAR § 16.203 was not before the court. DESC stated during oral argument:

> This is not a beauty contest about one economist's view of the best marketplace indicator versus another. Both parties have affidavits either championing or damning the PMM, but the question in this case is whether the government may rely on a market value indicator
>
> . . . The *challenge here is a per se challenge to the government's use of market-based indicators.*

App. 326-27 (emphasis added; paragraphing omitted). DESC's comments during oral argument mirror those in its principal brief, where, in responding to criticisms of the *amicus curiae* from The American Petroleum Institute about the "'suitability' and 'appropriateness'" of PMM as a measure of market prices, Brief of The American Petroleum Institute at 16, App. 449, DESC told the Federal Circuit: "We do not regard this appeal as a referendum upon the appropriateness or suitability of particular price references." Brief of Defendant-Appellee at 25, App. 499-500.

The Federal Circuit concurred with both DESC and the Appellants that the claim before it was, in fact, only one of *per se* illegality and not one challenging the PMM on the ground that it was not a market-based reference. The court stated: "The complaints in both suits included among their claims the charge that DESC's actions were per se illegal because the PMM-based EPA clause was inconsistent with the applicable section of the FAR." *Tesoro*, 405 F.3d at 1342; *Id.* ("The parties in both suits filed cross-motions for summary judgment on the claim of per se illegality.") The court went on to articulate the Appellants' *per se* illegality claim in the same manner as the Appellants had:

> Appellants assert that the term "established prices" in FAR § 16.203-1 should be read as "contractor's established prices" in order to be consistent with the term found in FAR § 16.203-3. Under this reading of the two sections, prices could only be adjusted based on changes in the individual contractor's prices and not based on changes in overall market prices.

*Id*. at 1343-44.

Importantly, DESC opposed the Appellants' *per se* illegality claim on the sole ground that it was "inconsistent with the plain meaning of the regulatory language," and the Federal Circuit agreed, holding that "the plain meaning of the regulatory language contradicts Appellants' arguments" without ever discussing whether the PMM was or was not a market-based reference. *Id*. at 1344, 1346.

Thus, fully respecting DESC's admonition that the PMM's relationship to the marketplace for fuel was not before the court, the Federal Circuit held:

> The regulations permit use of contracts that include adjustments based on established prices, but do not limit those adjustments to changes only in specific prices offered by an individual contractor. Thus, DESC's use of market-based references to determine adjustments to established price was authorized under the law.

*Id*. at 1348; *see also id*. ("[C]ontrary to the conclusion of the Court of Federal Claims, market-based EPA clauses are permitted under the FAR").

The Federal Circuit's narrow holding that DESC's use of the PMM was not *per se* illegal comports with the limitations on the court's jurisdiction to entertain the appeal. Jurisdiction in *Tesoro* was based on 28 U.S.C. § 1292(d)(2) which by its express terms permits appeal only of "controlling questions of law" certified by the Court of Federal Claims. *Tesoro*, 405 F.3d at 1342-43; *see Ahrenholz v. Bd. of Trustees*, 219 F.3d 674, 677 (7th Cir. 2000) (certified appeal under the analogous provisions of 28 U.S.C. § 1292(b) extends only to "abstract issue[s] of law"). The issue of the PMM's relationship to the marketplace (and, therefore, the determination of whether it is a market-based reference) is solely a question of fact – not a question of law reviewable under section 1292(d)(2). *Id.* Furthermore, the Federal Circuit's jurisdiction was circumscribed by the scope of the orders certified, *U.S. Philips Corp. v. Sears Roebuck & Co*., 55 F.3d 592, 597 (Fed. Cir. 1995), and neither of the certified orders before the court made factual findings concerning whether the PMM reflected the marketplace for the military fuel DESC

purchased from the Appellants. *Tesoro Hawaii Corp., et al. v. United States*, 58 Fed Cl. 65 (2003); *Tesoro Hawaii Corp., et al. v. United States*, No. 02-704C, 2003 U.S. Claims LEXIS 410 (Fed. Cl. Oct. 30, 2003); *Hermes Consol., Inc. v. United States*, 58 Fed. Cl. 3 (2003) (hereafter *"Hermes I")*; *Hermes Consol., Inc. v. United States*, 58 Fed. Cl. 409 (2003) (hereafter *"Hermes II")*. Accordingly, the Federal Circuit in *Tesoro* would have exceeded its jurisdiction in contravention of the express language of section 1292(d)(2) by entertaining, to say nothing of deciding, the issue of whether the PMM is a market-based reference. *U.S. Philips Corp.*, 55 F. 3d at 597. As established above, it did not do so.

### B. DESC's Construction Of *Tesoro* Ignores Its Plain Language

DESC is unable to point to a holding in *Tesoro* that the PMM is a market-based reference. DESC is similarly unable to point to any discussion by the court regarding the relationship between the PMM and marketplace for fuel. Instead, DESC makes the sweeping assertion that the court held that use of the PMM was legal for all purposes. DESC's Motion at 11-13. This assertion cannot be reconciled with the plain language of *Tesoro*.

DESC cites to the court's statement: "we conclude that DESC's use of a *market-based EPA clause* tied to the PMM was authorized under the FAR." DESC's Motion at 12 (citing *Tesoro*, 405 F.3d at 1348) (emphasis added). The court here, however, merely characterizes DESC's standard pricing clause as the type of price adjustment clause that provides for "market-based" price adjustments. It conspicuously does not characterize the PMM itself as a "market-based reference." Rather, the court merely notes that the PMM is the particular reference used in the iteration of the price adjustment clause before it (which now, for example, uses Platts and OPIS). The court made a similar distinction elsewhere in its decision when it stated without reference to the PMM, "[c]ontrary to the conclusion of the Court of Federal Claims, *market-based EPA clauses* are permitted under the FAR." *Id*. at 1348 (emphasis added); *see also*

*Williams Alaska Petroleum, Inc. v. United States,* No. 02-705C (Fed. Cl.) (drawing the same distinction between "the government use [of] *a market-based-index* . . . [and] whether the index provides an *accurate measure of the market* it's attempting to draw data from") (Transcript of Nov. 18, 2003 Proceedings at 24-25) (emphasis added), App. 292-93. DESC, however, would read the words "authorized under the FAR" in the language it quotes to mean authorized for all purposes under all 52 subparts of the FAR, regardless of whether the issue was raised before or considered by the court. To make such an assertion is to refute it.

Moreover, DESC defies credulity, to say nothing of the fundamental demands of due process, in asserting that the Federal Circuit placed its imprimatur on the PMM as a market-based reference. DESC may not impart to the Federal Circuit an intent to sanction the PMM in the face of the facts that the PMM, *inter alia*, varied randomly with respect to the marketplace, reported changes of volume as changes in price, and moved in the opposite direction of the marketplace 38% percent of the time. App. 623. Nor may DESC claim that the Federal Circuit sanctioned DESC's use of the wrong fuels to measure the fair market value of military fuel, particularly when the court previously found DESC's pricing clause to be wanting in this respect in *Barrett*. App. 618-20; *Barrett*, 242 F.3d at 1061. Moreover, it is undisputed here that DESC knew that the PMM did not reflect the marketplace, misrepresented that fact to its suppliers, and, nonetheless, used the PMM to set prices for its own benefit. Second Amended Complaint ¶¶ 9-24, 39-52. DESC may not make the Federal Circuit an "abettor of iniquity" by claiming that the court absolved DESC even of responsibility for its own misrepresentations. *Phoenix Petroleum Co. v. United States*, No. 98-5124, 1999 U.S. App. LEXIS 16939 at *10 (Fed. Cir. July 23, 1999) (quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933)).

DESC's further reliance on the Federal Circuit's discussion of *MAPCO* is unavailing. DESC's Motion at 11-12. While the Federal Circuit rejected *MAPCO*'s holding that the PMM was not an established price, the court did so on the grounds that *MAPCO* "was premised on a misinterpretation of the meaning of the term 'contractor's established prices.'" *Tesoro*, 405 F.3d at 1348. The lower court in *MAPCO* erred, the Federal Circuit stated, when it reasoned that, because the PMM was an index that did "not reflect any specific vendor's current price," the PMM was not an "established price." *Id*. Nothing in the Federal Circuit's discussion of *MAPCO* even remotely suggests that the Federal Circuit considered *MAPCO* to have found that the PMM was not a market-based reference or, *a fortiori*, that the Federal Circuit took exception to such a finding.

DESC similarly misses the mark in pointing to *Tesoro*'s discussion of the Appellants' contention that, as held in *MAPCO*, the PMM did not address one of the "mischiefs" set forth in FAR § 16.203-3. DESC's Motion at 11-12 (quoting *Tesoro*, 405 F.3d at 1348). The Appellants simply asserted that the PMM, as an "amalgamation of petroleum sales," did not comply with FAR § 16.203-3's requirement that DESC "provide for price adjustment in the event of changes in the contractor's established prices." Because of this failing, the Appellants argued that the PMM did not reflect their own product, market or price in the same way their own established prices would. *Tesoro*, 405 F.3d at 1348. *Tesoro*'s holding that an index can be an "established price" for purposes of FAR § 16.203, and that use of the contractor's own prices is not required, rendered this argument a *non sequitur*. *Ibid.*

Recognizing the indefensibility of its proffered reading of *Tesoro*, DESC alternatively retreats to an attempt to rewrite FAR § 16.203. DESC asserts that, under FAR § 16.203, an index used to set prices need be drawn from only "market sources" and that its actual

relationship to the marketplace is irrelevant. DESC's Motion at 12-13 (quoting *Tesoro*, 405 F.3d at 1347). DESC's assertion ignores FAR § 16.203's requirement that price adjustments based on "'established market prices'" must be prices "'established in the course of ordinary and usual trade between buyers and sellers free to bargain.'" *Tesoro*, 405 F.3d 1343 (quoting FAR § 15.804-3(c)(2)). DESC's reckless assertion that "market sources" need not reflect the marketplace for the product that the government is purchasing would effectively write the word "market" out of the requirement for an "established market price."

The Federal Circuit rejected an analogous assertion in *Beta Systems, Inc. v. United States*, 838 F.2d 1179 (Fed. Cir. 1988). There, the court struck down as illegal the use of a BLS index to set prices for aluminum mill shapes that did not "fair[ly] measure the economic situation actually confronting the contractor." *Id.* at 1184-85. Consistent with the principles of *Beta Systems*, the Federal Circuit made clear in *Tesoro* that price adjustments based on indexes must be "market-based references" and thereby reflect the marketplace for what the government purchases. *Tesoro*, 405 F.3d at 1347-48.[23]

## III. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON HERMES' CLAIMS THAT DESC'S MILITARY FUEL PRICES VIOLATE FAR § 15.802(B)(1)

In seeking to dismiss Hermes' claims that DESC violated the requirements of FAR § 15.802(b)(1) for "fair and reasonable prices," DESC makes no effort to support the fairness or

---

[23] DESC has suggested elsewhere that the other price references it used to set prices in addition to the PMM satisfy DESC's flawed "market sources" standard. Here, however, DESC offers no evidence that these other price references reflected the marketplace where DESC purchased fuel or that the fuels it used accurately reflected the physical characteristics of the military fuel DESC purchased. App. 618-20. As DESC does not even attempt to meet its burden of coming forward with evidence in support of its motion on this ground, these issues will have to await determination on a proper record following discovery.

reasonableness of its military fuel prices. Instead, DESC seeks to dismiss Hermes' claims on the sole ground that it is not bound by FAR § 15.802(b)(1), because FAR § 15.802(b)(1) does not protect contractors. DESC's Motion at 13-16. DESC's assertions ignore the weight of overwhelming authority establishing that FAR § 15.802(b)(1) protects contractors. Accordingly, Hermes is entitled to seek judicial relief for DESC's violations of that provision. *Freightliner Corp. v. Caldera*, 225 F.3d 1361, 1365 (Fed. Cir. 2000).

FAR § 15.802(b)(1) provides: "Contracting officers shall – (1) Purchase supplies and services from responsible sources at fair and reasonable prices."[24] FAR § 15.802(b)(1) is in FAR Part 15, "Contracting by Negotiation," and should be considered within the context of other provisions in that Part. Significantly, FAR § 15.803(c) states that "[p]rice *negotiation* is intended to permit the contracting officer *and the offeror to agree* on a fair and reasonable price." (Emphasis added). Similarly, FAR § 15.804-1(a) states that "[c]ost or pricing data submitted by an offeror or contractor enable the Government to perform cost or price analysis and ultimately enable the Government *and the contractor to negotiate fair and reasonable prices*." (Emphasis added). Indeed, FAR § 15.803(d) stresses that the "total result" should be "fair and reasonable to both the Government *and the contractor*." (Emphasis added).[25] Thus, the plain language of the FAR – which DESC ignores – establishes beyond any question that the requirement to purchase products at "fair and reasonable prices" is intended to protect

---

[24] During the period relevant here, this provision also was denominated as FAR § 15.802(a) and is currently denominated as FAR § 15.402(a).

[25] The FAR contained each of these provisions in identical form from 1984 through 1997 (1994 for § 15.804-1); subsequent versions are substantially similar.

contractors. *See Tesoro*, 405 F.3d at 1346 ("We construe a regulation in the same manner as we construe a statute, by ascertaining its plain meaning.").

In addition to ignoring this dispositive language, DESC fails to mention critical portions of its *own guidance* demonstrating that the term "fair and reasonable prices" in FAR § 15.802(b)(1) is meant to protect contractors. DOD issued an "Armed Services Pricing Manual" ("ASPM") in 1986 (Volume 1) and 1987 (Volume 2, "Price Analysis"), and the foreword to each volume states that DOD based the ASPM "on policies and procedures of the [FAR] and the [DFARS]." App. 548-A; App. 604. The ASPM states unequivocally that "[a] fair and reasonable price is one that is fair to *both parties to the contract* . . . ." ASPM § 1.3 (Dep't of Def. 1986) at 1-3 (emphasis added), App. 549; *see also id*. at B-5 (Appendix B) ("Fair and reasonable price: A price that is *fair to both parties*.") (emphasis modified), App. 552; App. 605. Also, like the FAR provisions discussed above, the ASPM expressly links the "fair and reasonable" concept to negotiations: "[T]o be *fair to both parties*, the price must represent a *reasonable compromise between the seller's and the buyer's view of a fair price*. . . . [Y]ou should consider 'fair and reasonable' in three dimensions: fair under current market conditions; *reasonable to the seller; and reasonable to the buyer*." ASPM § 2.5, at 2-6 (emphasis added), App. 550; *see also id*. at § 9.2, 9-12 ("Fair and reasonable describes the conclusion that the price is *acceptable and fair to both parties*.") (emphasis added), App. 551; App. 606.[26] Thus,

[26] DOD promulgated an earlier version of the ASPM in 1975 that contains similar instructions. *See, e.g.*, ASPM No. 1 (Dep't of Defense 1975) at 2B10 ("[W]e defined a fair and reasonable price to be one that is *fair to both parties* . . . . Thus, to be fair to both parties, the price must represent a *reasonable compromise* between the seller's *and the buyer's view* of what is fair.") (emphasis added), App. 546; *id*. at 2B11 ("Fair and reasonable describes a conclusion that the price is *acceptable to both the Government and the seller*.") (emphasis added), App. 547. Furthermore, the Defense Contract Audit Agency's ("DCAA's") Contract Audit Manual

(footnote continued)

consistent with the ASPM, DOD's "Defense Procurement and Acquisition Policy, Contracting Pricing Reference Guide," *currently* states – in a section titled "Pay A Fair and Reasonable Price" – that "[t]o be *fair to the seller* a price must be realistic in terms of the seller's ability to satisfy the terms and conditions of the contract." Defense Procurement and Acquisition Policy, Contracting Pricing Reference Guide § I.2.1 (available at http://www.acq.osd.mil/dpap/contractpricing/vol1intro.htm#I.2.1) (last updated Aug. 26, 2005) (last visited Dec. 6, 2005) (emphasis added), App. 542. Such long-standing interpretations of the FAR are entitled to judicial deference. *See generally United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 222 (2001).

Moreover, the preeminent authorities on federal procurement law, Professors Nash and Cibinic, agree that the requirement of arriving at a "fair and reasonable price" requires taking account of contractors' interests, as well as ensuring that the government does not pay more than is fair to it. In describing the obligations of contracting officers under FAR Parts 14 and 15, they wrote: "Fair and Reasonable Price – A price that is *fair to both parties* . . . ." CCH Nash & Cibinic eSeries, Government Contracts Reference Book, F Guidebook (2005) (available on Lexis) (emphasis added). Even DESC's Deputy Director of Contracting, Edward Biddle, acknowledged this obligation in a 1993 memorandum stating that the purpose of DESC's adjustable prices was to "ensure[] that the sale will be at the market price, which is a *fair and reasonable price*. Not only is the government protected, *but the contractor is protected* by

---

("DCAM") states: "The objective in requiring cost or pricing data or information other than cost or pricing data is to enable the Government to perform cost or price analysis and ultimately enable *the Government and the contractor to negotiate fair and reasonable contract prices*." 2 DCAM, § 9-201(b) at 924 (July 1, 1989) (emphasis added), App. 555.

knowing that its price will always be related to the price it could obtain in the commercial marketplace." App. 4 (emphasis added); *see also* App. 67 ("the ultimate goal [of DESC's adjustable prices] is to assure that fuel contract prices are fair and reasonable"); App. 69 ("[t]he contract price should then remain fair and reasonable (within current market range)").

Finally, DESC's insistence that "fair and reasonable" benefits *only one party* cannot be squared with the ordinary and accepted meaning of the word "fair." Webster's defines "fair" as "[j]ust to *all parties*." *Webster's II New Riverside University Dictionary* 161 (1988) (emphasis added); *see also Webster's New World Dictionary of the American Language* 502 (2[d] ed. 1984) ("[T]he treating of *both or all sides alike*") (emphasis added). Courts usually interpret legal provisions according to their plain meaning (*see Edwards v. Aguillard*, 482 U.S. 578, 594 (1987)), yet DESC urges just the opposite, arguing that "the purpose of this regulation is *not* to protect contractors." DESC's Motion at 15 (emphasis added).

The Federal Circuit has made clear that contractors have the right to seek relief when the government violates a provision of law meant to benefit them. In *Freightliner Corp.*, the court articulated the controlling standard as follows: "In order for a private contractor to bring suit against the Government for violation of a regulation, that regulation must exist for the benefit of the private contractor." 225 F.3d at 1365 (*citing Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442, 1451 (Fed. Cir. 1997). Thus, in *LaBarge Prods., Inc.*, the Federal Circuit held that the contractor could seek relief for the government's alleged violation of a regulation that was for the contractor's benefit (the FAR prohibition of auction techniques) and further noted that the Court of Claims had granted contractors relief "when a contract has been written in violation of a law or regulation enacted for the benefit of prospective contractors." 46 F.3d at 1552; s*ee also*

*Navajo Ref. Co. L.P.*, 58 Fed. Cl. at 213 (noting that, "[i]f a regulation appears intended to define and state the rights of a class of persons, it is presumptively intended to benefit those persons").

None of the cases DESC cites refutes this conclusion. DESC leans on *AT&T v. United States*, 307 F.3d 1374 (Fed. Cir. 2002) (hereafter "*AT&T V*"), claiming hopefully that, "[i]f the court could not find an enforceable interest for contractors in a *statute*, . . . Hermes will be hard pressed to find one here." DESC's Motion at 15 (emphasis added). Yet the portion of *AT&T V* dealing with a statute – section 8118 of the Department of Defense Act (101 Stat. 1329) – has nothing to do with FAR § 15.802(b)(1). There, the Federal Circuit held that, because the restrictions on the use of appropriated funds in section 8118 included legislative enforcement (compliance reports to Congress), there was no basis for judicial enforcement. *AT&T V*, 307 F.3d at 1378. The court underscored this conclusion by discussing separation of powers principles, noting that "it is not 'the judicial role to discipline the agency's noncompliance with the supervisory and reporting instructions of congressional oversight.'" *Id*. at 1379 (quoting *AT&T v. United States*, 177 F.3d 1368, 1375 (Fed. Cir. 1999) (*en banc*) (hereafter "*AT&T III"*)). By contrast, FAR § 15.802(b)(1) contains no legislative enforcement provision. The Federal Circuit in *AT&T V* also discussed certain regulations dealing with the selection of contract type and determined that those regulations were meant to benefit only the government.[27] *AT&T V*, at

[27] DESC blurs the distinction between the holding in *AT&T V* concerning section 8118 and the separate holding concerning certain regulations. *See* DESC's Motion at 15 (referring in one sentence to AT&T's allegation that the Navy had violated a variety of procurement *regulations*, but claiming in the next sentence that, "[s]pecifically, the contractor alleged . . . that Navy contracting officials had failed to obtain a *statutorily-mandated* department-level certification . . . .") (emphasis added). As discussed herein, neither holding in *AT&T* supports the government's arguments.

1379-80. However, as discussed above, FAR § 15.802(b)(1) is intended to benefit contractors. As such, *AT&T V* is simply irrelevant.

DESC's reliance on *Short Bros. PLC v. United States*, 65 Fed. Cl. 695 (2005), is similarly misplaced. The lengthy opinion in that case includes a single statement that FAR § 15.802(b)(1) "does not afford a judicial remedy." *Id.* at 765. The court's limited focus on the FAR provision is understandable, as apparently neither the plaintiff nor, conspicuously, the government provided the court with any of the substantial evidence discussed above (including DOD's long-standing position) demonstrating that the FAR requirement to arrive at fair and reasonable prices is intended to benefit contractors. Moreover, in *Short Bros.*, the contractor ultimately sought to use FAR § 15.802(b)(1) to challenge the selection of contract type, a choice *AT&T* makes clear is uniquely within the province of the government.[28]

Finally, DESC makes the extraordinary assertion that, were FAR § 15.802(b)(1) to be enforced, "contract pricing never would be binding." DESC's Motion at 16. This Court, however, reviews innumerable determinations by contracting officers both before and after contract award, including the requirements of the Competition in Contracting Act that the government award contracts that are "most advantageous to the United States, considering only

[28] DESC also relies on *All Phase Environ., Inc.*, B-292919.2, 2004 U.S. Comp. Gen. LEXIS 19 (Feb. 4, 2004). There, the GAO observed that, before awarding a fixed-price contract, agencies are required to determine that the price offered is fair and reasonable, citing as support FAR § 15.402(a) (the successor provision to FAR § 15.802(b)). The GAO then noted that "an agency's concern in making a *price reasonableness* determination focuses primarily on whether the offered prices are higher than warranted." *Id*. at *16 (emphasis added). The GAO did not discuss whether the FAR provision benefits contractors, did not discuss the purpose of the provision, did not discuss the term "fair", and certainly did not state that the provision benefits *only* the government. Yet DESC recklessly cites *All Phase* to support its claim that "the purpose of this regulation is not to protect contractors (other than from needless demands for documents), but to protect the Government from prices that are 'higher than warranted.'" DESC's Motion at 15-16. *All Phase* provides no such support.

cost or price and the other factors included." 41 U.S.C. § 253(b). There is simply nothing unique about reviewing whether the contracting officer had a basis in fact to determine that prices were "fair and reasonable." Indeed, Hermes alleges here that DESC's determination of price reasonableness was, in essence, a sham: that DESC knew that the PMM did not reflect the marketplace, misrepresented that fact, and then "determined" that its prices were fair and reasonable while knowing they were not. Second Amended Complaint ¶¶ 9-24, 35. DESC may not seek to shield such conduct from judicial review under the guise that the government will too often be sued for violating the law. *See generally Cont'l Bus. Enter., Inc. v. United States*, 452 F.2d 1016, 1022 (Ct. Cl. 1971) ("the standard of proof which we require in cases such as this will undoubtedly discourage frivolous lawsuits.").[29]

## IV. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON HERMES' CLAIMS OF MISREPRESENTATION

DESC seeks to dismiss Hermes' claims of misrepresentation without disputing that it misrepresented the facts about its military fuel prices. Instead, DESC alleges that its

[29] At a minimum, DESC's sham determination of price reasonableness is reviewable for an abuse of discretion. *See, e.g.*, *McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1326 (Fed. Cir. 1999) (the rule that a termination for default is reviewable for an abuse of discretion "is but a part of the well established law governing abuse of discretion by a contracting official"); *John C. Grimberg Co. v. United States*, 185 F.3d 1297, 1303 (Fed. Cir. 1999) ("Of course, courts may review such decisions [concerning contractor's responsibility] by the contracting officer for abuse of discretion . . . ."); *George Solitt Constr. Co. v. United States*, 64 Fed. Cl. 229, 247 (2005) (relying on *RCS Enters., Inc. v. United States*, 53 Fed. Cl. 303, 309 (2002), where the court held it could review for abuse of discretion contracting officer's decision not to pay for a value engineering change proposal, in holding that court could review agency performance award determinations). Equally relevant to DESC's sham determination here, the courts have held that "acts tantamount to refusal to exercise discretion are subject to judicial review" quite apart from the review available if that discretion had, in fact, been exercised. *Payne v. Block*, 714 F.2d 1510, 1520 n.33 (11th Cir. 1983) (citing *Accardi v. Shaughnessy*, 374 U.S. 260, 266 (1954)).

misrepresentations were not material and that it had no duty to disclose the truth about its prices. DESC's assertions are simply wrong.

Misrepresentation occurs when "the Government ma[kes] an erroneous representation of a material fact." *T. Brown Constructors, Inc. v. Sec'y. of Transp.*, 132 F.3d 724, 729 (Fed. Cir. 1997). Hermes alleges that DESC misrepresented that the PMM was designed to measure fair market value, misrepresented that the PMM was intended to be used to set prices, and misrepresented that the PMM and the prices set using it reflected fair market value. Second Amended Complaint ¶¶ 9-24, 46-48.[30] While these allegations must be deemed true for purposes of DESC's Motion to Dismiss, it is compelling that DESC does not deign even to deny them, likely because its own documents establish that it made similar misrepresentations to its parent organization, DLA, and others that the PMM was "virtually unimpeachable." App. 98; *see also* App. 96; App. 91.

Unable to deny Hermes' allegations of misrepresentation, DESC asserts that its misrepresentations about its fuel prices were not material. Price, however, is always material. *See, e.g.*, *Roseburg Lumber Co. v. Madigan*, 978 F.2d 660, 666 (Fed. Cir. 1992) (holding that the minimum acceptable bid rates, calculated by the Forest Service, were essential to the claimant's bid and were, therefore, material underlying premises of the contract); *Interstate Plywood Sales Co. v. Interstate Container Corp.*, 331 F.2d 449, 452 (9th Cir. 1964) ("Price is an essential contract element"). Indeed, a representation that a party will pay fair market value, when it knows it will not, could not be more material. *See T. Brown Constructors, Inc*, 132 F.3d at 729

[30] Hermes also alleges that DESC misrepresented the legality of its fuel prices; however, these are separate and distinct allegations from the misrepresentations discuss above. *Compare* Second Amended Complaint ¶ 40 *with* ¶¶ 46-49. DESC does not specifically address these allegations of misrepresentation in its motion.

("A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent") (quoting *Restatement (Second) of Contracts* § 162 (1979)).[31]

DESC's further assertion that it had no duty to disclose the truth about its military fuel prices profits is naught in the face of its undisputed, affirmative misrepresentations. *John Massman Contracting Co. v. United States*, 23 Cl. Ct. 24, 31 (1991). In any event, DESC had a duty to disclose material facts known to it. *Id*.; *Ashford v. United States*, 43 Fed. Cl. 1, 4 (1997) ("a contracting party is never free to disregard, or to fail to call attention to, mistakes of fact that can be seen to shape or influence the other party's understanding of the expected contract's essential terms and conditions. *Restatement (Second) of Contracts*, § 161(b) (1981) [addressing misrepresentation]"). DESC does not deny that it failed to meet this duty, nor does DESC offer any evidence even suggesting that Hermes was aware of the facts that DESC failed to disclose.

DESC's final assertion that the terms of the fuel contracts somehow absolve it of responsibility for its misrepresentations ignores the well-established rule that "[e]xtrinsic evidence is admissible to prove that a plaintiff entered a contract based on a misrepresentation by defendant." *C & H Comm. Contractors, Inc. v. United States*, 35 Fed. Cl. 246, 256 (1996) (citing *T.L. Roof & Assoc. Constr. Co. v. United States*, 28 Fed. Cl. 572 (1993)). Once again, DESC does not deny Hermes' allegations of what the extrinsic evidence establishes – that DESC knew that the PMM did not reflect fair market value and misrepresented what it knew for its own benefit. Second Amended Complaint ¶¶ 9-24, 46-48.

---

[31] At a minimum, the determination whether DESC's misrepresentations are material raises factual issues about which DESC offers no evidence. On this ground as well, DESC's motion must be denied.

## V. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON HERMES' CLAIMS OF BREACH OF CONTRACT

DESC seeks to dismiss Hermes' claims that DESC breached the military fuel contracts when, *inter alia*, it failed to pay fair market value for the fuel Hermes delivered. DESC does not claim that it paid fair market value but, instead, asserts that it was not required to do so. DESC contends that it set fuel prices according to changes in the PMM and that that is all the contracts required. DESC's Motion at 18. DESC's assertions ignore the purpose of its adjustable pricing clause, its own admissions of what its pricing clause requires, and the clause's express language – all of which mandate the payment of fair market value.[32]

"A court must construe a 'contract to effectuate its spirit and purpose.'" *M.A. Mortenson Co. v. Brownlee*, 363 F.3d 1203, 1206 (Fed. Cir. 2003) (quoting *Hercules, Inc. v. United States*, 292 F.2d 1378, 1381 (Fed. Cir. 2002)); *see also L.W. Matteson, Inc. v. United States*, 61 Fed. Cl. 296, 307 (2004). Here, the purpose of an adjustable pricing clause as authorized by the FAR is to ensure that the contract price reflects changes in the marketplace during the term of contract. *Beta Systems, Inc.*, 838 F.2d at 1185 ("The government concedes, as it must, that the purpose of the EPA clause was to accommodate inflationary/deflationary changes in the costs of labor and materials."). With respect to DESC's pricing clause, the Federal Circuit expressly found in *Barrett* that DESC's clause embodied "a promise by the government to pay at least fair market value" for fuel, and, as cited above, DESC's documents expressly confirm this purpose. *Barrett*, 242 F.3d at 1060; App. 4; App. 14; App. 62; App. 67. The only construction of DESC's pricing

[32] Hermes also alleges that DESC breached the contracts when it awarded them in violation of law; however, these are separate and distinct allegations from the breaches of contract discussed above. *Compare* Second Amended Complaint ¶ 59 *with* Second Amended Complaint ¶¶ 60-63. DESC does not address specifically these allegations of breach in its motion.

clause that gives effect to its purpose, as required by the FAR, found by the Federal Circuit, and as admitted by DESC itself, is one that provides for DESC to pay the fair market value for its purchases. *M.A. Mortenson*, 363 F.3d at 1206.

Moreover, the mandate of the Deputy Director of Contracting that DESC's pricing clause "ensure[] that the sale will be at the market price" establishes a restriction on the contracting officer's authority. App. 4.[33] Once again, the only interpretation of DESC's pricing clause that is consistent with this limitation on the contracting officer's authority, and that would not render the clause void for lack of authority, is one that provides for DESC to pay the fair market value for what it purchases. *Puerto Rico Dep't. of Labor & Human Res. v. United States*, 49 Fed. Cl. 24, 31 (2001) (because "parties are presumed to have intended to create a valid, binding contract . . . the court must dismiss an interpretation which would find that the parties intended to create a contract with even a portion of the contract void"); *see generally Fed. Crop Ins. v. Merrill*, 332 U.S. 380 (1947) (unauthorized governmental actions without effect).

Unsurprisingly, the language of DESC's pricing clause makes clear that DESC's contractual obligation was to pay fair market value. The very title of the clause, "Economic Price Adjustment – Published Market Price," indicates that DESC was to pay the "market price." App. 9. In some iterations of the clause, the "market price" that is used to set fuel prices is defined as "derived from quotes, assessments, or sales prices in the market place." App. 9.[34] A

---

[33] DESC cannot credibly allege that its contracting officers have authority to contract in derogation of policies established by its own Office of the Director of Contracting. Were DESC to make such an allegation, Hermes, of course, would be entitled to discovery to challenge it.

[34] While the language of DESC's pricing clause has changed over time, the structure and the purpose of the different iterations of the clause are the same, and DESC has not alleged that a different intent and obligation underlie different iterations of the clause.

more express recognition that the "*market price*" is to reflect the "*market place*" is difficult to imagine. Removing any possible ambiguity, however, DESC's pricing clause further provides that the index used to set prices shall be changed if "the Contracting Officer determines that the *market price* indicator consistently and substantially fails to reflect *market conditions*." App. 9 (emphasis added). The totality of this contractual language clearly demonstrates a contractual obligation, to say nothing of the parties' intent, that DESC pay fair market value for the fuel it purchases. *Sunoco, Inc. v. United States*, 59 Fed. Cl. 390, 392-93 (2004) ("The intention of the parties to a contract controls its interpretation.") (citing *Beta Systems, Inc.*, 838 F.2d at 1185).[35]

DESC's assertion that its pricing clause should be read not to impose an obligation to pay fair market value assumes that the indexes selected for the clause were chosen essentially randomly, and thus without a purpose, and could as easily have been an index of apples, oranges

[35] If any credence could be given to DESC's construction of its pricing clause as not providing for payment of fair market value, that construction, at a bare minimum, raises an ambiguity with respect to the language quoted above, and extrinsic evidence would be admissible to resolve that ambiguity. *M.G. Constr., Inc. v. United States*, 67 Fed. Cl. 176, 182-83 (2005) ("But, if an ambiguous or uncertain writing can only be understood upon consideration of the surrounding circumstances, extrinsic evidence will be allowed to interpret the language."). However, DESC's own documents and testimony before this Court, to say nothing of the Federal Circuit's finding in *Barrett*, make clear that DESC's pricing clause required payment of fair market value. App. 4; App. 14; *Barrett*, 242 F.3d at 1060.

Moreover, even in the absence of ambiguity, this evidence may be considered. "The Federal Circuit requires the court to review the totality of events and circumstances in determining whether there has been a material breach of contract." *Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548, 1552 (Fed. Cir. 1992) (citing *Restatement (Second) of Contracts* § 241). Among the factors to be considered include the nature and effect of the breach in light of how the contract was viewed, bargained for, entered into, and performed. *Id*. at 1551." *American Capital Corp. v. United States*, 58 Fed. Cl. 398, 408-09 (2003). In addition, "[t]here are exceptions to the parole evidence rule applicable when a written agreement is based upon mutual mistake or is procured by one of the parties through fraud or material misrepresentation on which the other party relies." *C & H Comm. Contractors, Inc. v. United States*, 35 Fed. Cl. 246, 254 (1996). Here, Hermes has alleged both mutual mistake and misrepresentation. Second Amended Complaint ¶¶ 91-117; 39-52.

and bananas (continuing with an earlier analogy) as the PMM. This "head-in-the-sand" construction of DESC's pricing clause is absurd. The PMM was chosen for a reason, and that reason was to provide for the payment of fair market value. App. 4; App. 14; App. 62; App. 67; *see generally American Sav. Bank, F.A. v. United States*, 62 Fed. Cl. 6, 13 (2004) (regarding plaintiff's allegations that it accepted a lower interest rate based on government's promise of a note of forbearance: "Certainly there was some reason why this particular rate was chosen, and Defendant offers no explanation that counters Plaintiff's characterization of the negotiations").

Moreover, under the *Spearin* doctrine, DESC warranted that the indexes it picked to set prices would be adequate to accomplish the purpose for which they were used – namely, to reflect changes in economic conditions during the term of the contracts. *United States v. Spearin*, 248 U.S. 132, 136 (1918) (the government impliedly warrants the accuracy of matters set forth in contract documents); *D.F.K. Enter., Inc. v. United States*, 45 Fed. Cl. 280 (1999) (same). Thus, in *USA Petroleum Corp. v. United States*, 821 F.2d 622 (Fed. Cir. 1987), where the quantity of fuel delivered was measured based on defective strapping tables selected by the government, the court held: "We conclude, applying the *Spearin* doctrine, that the government breached its implied warranty to provide accurate strapping tables and is responsible for the consequences of its breach." *Id*. at 624. Similarly, in *D.F.K. Enterprises,* this Court relied on the *Spearin* doctrine to hold that a chart entitled "Anticipated Adverse Weather Delays" constituted an "affirmative representation" that the "government had undertaken some analysis to determine the usual weather at the job site." 45 Fed. Cl. at 286. In language equally applicable to DESC's construction of its pricing clause here, the Court held: "Under the government's reading, the numbers in the chart could have been completely arbitrary. This is not a fair reading of a chart entitled 'Anticipated Adverse Weather Delays,' and we do not think

that offerors can be faulted for having viewed the chart as something more than an entirely arbitrary set of numbers chosen by the government." *Id*. at 287. Clearly, the use of the words "market prices" in the title of DESC's pricing clause, like the title of the chart in *D.F.K. Enterprises*, alone conveyed "something more than an arbitrary set of numbers," as DESC attempts to argue. *Id*.[36]

## VI. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON HERMES' CLAIMS OF BREACH OF AN IMPLIED-IN-FACT CONTRACT

DESC seeks to dismiss Hermes' allegations that DESC's violations of law gave rise to an implied-in-fact contract to pay fair market value – a contract Hermes, in turn, alleges that DESC breached. DESC asserts that there cannot be an implied-in-fact contract to pay for fuel if an express contract addresses the same subject. DESC's Motion at 18-19. DESC's argument ignores *Barrett*. *Barrett* holds that, when the price of a contract is found to be illegal, it is "unenforceable." 242 F. 3d at 1060 n.2. Arising in place of the unenforceable price, *Barrett* further holds, is an "implied-in-fact" contract and that contract is one to "pay at least fair market value." *Id*. (citing *Urban Data Sys. v. United States*, 699 F.2d 1147, 1148, 1154 (Fed. Cir. 1983)); *see also AT&T III*, 177 F.3d at 1376 (upholding the availability of implied-in-fact contract relief in the presence of illegality). This is exactly what Hermes alleges in its Second Amended Complaint. Second Amended Complaint ¶¶ 67-72. DESC has not established that its

---

[36] Finally, Hermes alleges that DESC breached its obligation of good faith and fair dealing. *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005) ("The covenant of good faith and fair dealing is an implied duty that each party to a contract owes to its contracting partner. . . . The duty applies to the government just as it does to private parties.") (internal citations omitted). Hermes alleges that DESC imposed a non-negotiable price clause that it knew would not reflect the fair market value of fuel and, without disclosure to Hermes, worked with DOE "to see that our needs were met" in the way the PMM was published. Second Amended Complaint ¶ 63; App. 100. DESC does not dispute that it acted in bad faith or deny these allegations of breach.

fuel prices were legal, nor does DESC deny Hermes' allegation that DESC breached the resulting implied-in-fact contract by failing to pay fair market value for the fuel it received.

## VII. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON HERMES' CLAIMS OF FAILURE OF CONSIDERATION AND FRUSTRATION OF PURPOSE

In seeking to dismiss Hermes' claims of failure of consideration and frustration of purpose, DESC does not contest that the illegality of its prices and its failure to pay fair market value for fuel caused consideration to fail and frustrated the purpose of the contracts. Rather, DESC principally asserts that failure of consideration and frustration of purpose provide a basis only for avoiding further performance and do not provide a basis for affirmative relief by way of restitution of the value of the benefit Hermes conferred on DESC when it delivered fuel. DESC's Motion at 19-20. This assertion is contrary to recognized precedent.

A claim of "failure of consideration exists wherever one who has promised to give some performance fails, without his fault, to receive in some material respect the agreed exchange for that performance." *Williston on Contracts* § 814 (3d ed. 1962); *see also Restatement (Second) of Contracts* § 237 cmt. a. The doctrine of failure of consideration supports contractual relief even in the absence of a breach of contract and without regard to the fault of the non-performing party. As the United States Court of Appeals for the Fifth Circuit explained in *Aerojet-General Corp. v. Askew*, 453 F.2d 819, 831 (5th Cir. 1971): "The failure to render a promised performance may not be a breach of contract for the reason that performance has become impossible without fault; but it is nonetheless a failure of consideration discharging the other party from his duty to make the agreed return and *giving him a right to restitution of payments already made or other benefits already conferred*." (emphasis added) (quoting *Corbin on Contracts* §1255). In addition to *Aerojet*, ample authority establishes that failure of consideration provides a basis for affirmative relief. *District of Columbia v. Thompson*, 281 U.S. 25, 31 (1930) (holding that the D.C.

government, that had assessed a landowner costs for road improvements that were never completed, "was under an obligation imposed by law to return, as for a failure of consideration, the assessment of benefits that had been paid by the plaintiff"); *Stone Forest Indus., Inc.*, 973 F.2d at 1553 (granting restitution to a contractor who was unable to extract the timber for which it had provided a deposit because of intervening environmental legislation); *see generally Far West Fed. Bank, S.B. v. Director, OTS*, 930 F.2d 883, 887 (Fed. Cir. 1991) (alleging that a statute abrogating a regulatory agreement had "effected a complete frustration of the Conversion Agreement, and a failure of the consideration for which the investment group bargained"). DESC cites no authority to the contrary.

Similarly, the doctrine of frustration of purpose supports affirmative relief. As the *Restatement (Second) of Contracts* explains: "Where a party has partly performed before discovery of the impracticability or frustration, he may claim relief including restitution under the rules stated in §§ 240 and 370-77." *Restatement (Second) Contracts* § 266 cmt. a. Restitution, by way of recovery of the value of the benefit it conferred, is exactly the relief Hermes seeks from DESC. Second Amended Complaint ¶ 90. Once again, ample authority supports such recovery, recognizing that there is no reason to assign randomly a forfeiture to one of the parties when the purpose of a contract is frustrated. *Walker v. Cont. Life & Accident Co.*, 445 F.2d 1072, 1074-75 (9th Cir. 1971) (upholding claim of frustration and granting restitution to investors in tax-based transactions later held impermissible); *Saunders v. Hilpertshauser*, 1988 U.S. Dist. LEXIS 3646, at *28 (S.D.N.Y. 1988) (rejecting a statute of limitations argument, because, "[i]n an action to reform a contract on the grounds of frustration, the cause of action accrues only when unforeseen circumstances nearly or quite completely destroy the purpose of the bargain"); *In re Schenck Tours, Inc.*, 69 B.R. 906, 911 (Bankr. E.D.N.Y.) (denying a

frustration claim on the merits, but noting that the claimant would have been entitled to rescission had it prevailed), *aff'd*, 75 B.R. 249 (E.D.N.Y. 1987); *Washington State Hop Producers, Inc. v. Goschie Farms, Inc.*, 773 P.2d 70 (Wash. 1989) (granting rescission and restitution based on frustration of purpose).

Furthermore, the cases which DESC cites do not support its position. In *Everett Plywood Corp. v. United States*, 227 Ct. Cl. 415, 423 (1981), and *Spalding & Sons, Inc. v. United States*, 28 Fed. Cl. 242, 249 (1993), frustration was offered only as a defense, and the court did not consider whether the doctrine could be applied to support affirmative relief. In *Far West Fed. Bank, S.B. v. OTS*, 119 F.3d 1358 (9th Cir. 1997), the court denied a frustration of purpose claim finding in essence that "the Investors seek damages" couched as restitution, which is not the remedy recognized by the *Restatement* or sought by Hermes here. *Id*. at 1364. Instead, the court found that the "best framework" for addressing the claims was breach of contract (thereby rendering its comments on frustration of purpose dicta). *Id*. Furthermore, *Far West* relies solely on the *Restatement (Second) of Contracts* to support its statement that frustration of purpose does not support affirmative recovery; *id*., however, as quoted above, the *Restatement* expressly *does* provide that frustration of purpose supports a "claim for relief including restitution." *Restatement (Second) Contracts* § 266 cmt. a. In any event, the Ninth Circuit's decision in *Far West* is inconsistent with that same court's earlier decision in *Walker*, 445 F.2d at 1074-75, cited above, and the Federal Circuit appears to have held a more sympathetic view when the plaintiffs in *Far West* sought restitution before it earlier in the same case based, *inter alia*, on "complete frustration of the conversion agreement." *Far West Fed. Bank, S.B.*, 930 F.2d at 889 ("We

conclude that Far West's claim for rescission and restitution may be brought in the district court under the 'sue and be sued' clause.")[37]

So, too, DESC's reliance on *Seaboard Lumber v. United States*, 308 F.3d 1283 (Fed. Cir. 2002), is misplaced. Initially, *Seaboard* involved claims of supervening frustration caused by an unanticipated spike in interest rates, whereas Hermes also alleges what the *Restatement* recognizes as frustration at the time the contract is made. *Restatement (Second) Contracts* § 266(2). Such frustration exists "where, at the time a contract is made, a party's principal purpose is substantially frustrated without his fault by a fact of which he has no reason to know and the non-existence of which is a basic assumption on which the contract is made." *Id*. Thus, Hermes alleges that DESC's violations of law in awarding the contracts, its use of the PMM, and its failure to pay fair market value frustrated the principal purpose of the contracts both at their inception and based on intervening events. Second Amended Complaint ¶¶ 73-90.

As applicable here, *Seaboard* provides that the party seeking relief not bear the risk of frustration of purpose. *Seaboard*, 308 F.3d at 1295. DESC, of course, cannot foist the risk of its own violation of law on Hermes, and DESC's use of the PMM and failure to pay fair market value is similarly alleged to be the product of DESC's own misrepresentation, the risk of which Hermes cannot be deemed to have assumed.

Moreover, the extent of frustration required to maintain a claim for frustration of purpose, also addressed in *Seaboard*, is properly viewed as one of "commercial impracticability," as *Pauley Petroleum, Inc. v. United States*, 219 Ct. Cl. 24, 41 n.13 (1979), holds. *Pauley Petroleum*, in turn, provides the support for *Everett Plywood Corp.*, 227 Ct. Cl. at 424, upon

[37] *Perpetual Fin. Corp. v. United States*, 61 Fed. Cl. 126, 138 (2004), also relied upon by DESC, cites *Everett* and *Far West* but provides no analysis.

which *Seaboard* ultimately relies. *Seaboard*, 308 F.3d at 1295. This "commercial impracticability" standard is in line with the *Restatement*'s "substantially frustrated" standard. *Restatement (Second) Contracts* § 266(2). Here, the voiding of DESC's pricing clause on the grounds of illegality, *Barrett*, 242 F.3d at 1060 n.2, *per se* renders the fuel contracts commercially impractical, if not commercially "worthless" as articulated in *Seaboard*, as does DESC's use of the PMM and failure to pay fair market value. *Seaboard*, 308 F.3d at 1295. In any event, the extent of frustration is a factual issue upon which DESC offers no evidence and which is, therefore, not ripe for decision.

## VIII. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON HERMES' CLAIMS OF MISTAKE

In seeking dismissal of Hermes' allegations of mistake, DESC does not dispute that DESC's military fuel prices are the product of a mistake of the parties or seek dismissal on the grounds of the absence of a mistake. Instead, DESC asserts that the parties' mistake was not one about an existing fact at the time the contracts were entered but, rather, was a mistaken prediction about the future. DESC's Motion at 20-21. DESC's assertion simply ignores the allegations in Hermes' Second Amended Complaint.

Hermes alleges that, if DESC did not misrepresent the facts about its military fuel prices as discussed above, then DESC's fuel prices are the product of a mistake of the parties. Hermes alleges that, at the time the contracts were awarded, the parties were mistaken in their then-existing belief about what the PMM was, how it was designed, and for what it was intended to be used. Second Amended Complaint ¶¶ 91-117. Specifically, Hermes alleges, and it is not disputed here, that, at the time the contracts were awarded, the parties were mistaken in their then-existing belief that the PMM was designed to and did measure the fair market value of fuel

and that the PMM was intended to be used to set prices. Second Amended Complaint ¶¶ 91-117.[38]

It is now clear, however, that the PMM was not designed to measure fair market value and did not do so. App. 610. Indeed, the record establishes that, among other failings alleged to be unknown to the parties, the PMM suffered an "index number problem," whereby mere changes in the volume of fuel sold were reported as changes in price. App. 615-17. Given the PMM's index number problem, the PMM may as well have measured the price of apples, oranges and bananas for all it was designed to reflect the market for fuel. In fact, DOE has testified and this Court has found that, as alleged to be unknown to the parties here, "the PMM is not intended to be an index that is used for setting prices." *Barrett*, 42 Fed. Cl. at 131.

Similar allegations were held to support a claim of mistake in *Beta Systems.* There, an index did not "fair[ly] measure the economic situation actually confronting the contractor," because the index effectively eliminated the contractor's "principal construction material from fair weight in the inflation adjustment." 838 F.2d at 1184-85. Accordingly, the court held in language equally applicable here: The "inclusion of an 'inappropriate and inadequate . . . price index in the escalation clause' constitute[s] mutual mistake of material fact." *Id.* at 1186 (citing *Polarad Elect., Inc.*, ACAB No. 1116, 2 ECR para. 134 (1971)).[39]

---

[38] Hermes also alleges that the parties were mistaken concerning the legality of DESC's fuel prices; however, these are separate and distinct allegations from the mistakes discussed above. *Compare* Second Amended Complaint ¶ 104 *with* Second Amended Complaint ¶¶ 105-07.

[39] At the very least, whether the mistake regarding the PMM was one of present fact or future prediction is itself a question of fact, not suitable for resolution on summary judgment. *See, e.g., Aluminum Co. of Am. v. Essex Group, Inc.*, 499 F. Supp. 53, 62 (W.D. Pa. 1980) ("ALCOA calls the mistaken assumption that the index was suitable a factual assumption. Essex calls it a prediction. This is a dispute of fact[], not law.")

DESC further errs in asserting that the parties' specific mistake must be expressly stated in the contract itself to support a claim. DESC's Motion at 21. In *Beta Systems*, the applicable index, like that at issue here, was identified in the contract; however, it was the parties' erroneous assumptions about the index, erroneous assumptions that are undisputed here, that supported a mistake claim. *Id*. Thus, contrary to DESC's assertion, it is well-recognized that extrinsic evidence is admissible to prove mistake. *Id*.; *C & H Comm. Contractors, Inc. v. United States*, 35 Fed. Cl. 246, 254 (1996).[40]

## IX. DESC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ITS AFFIRMATIVE DEFENSE THAT HERMES WAIVED ALL OF ITS CLAIMS

DESC seeks to dismiss all of Hermes' claims on the grounds of waiver. Because waiver is an affirmative defense, DESC has the burden to establish the absence of any material issue of fact with regard to each element of its defense and to establish that it is entitled to judgment as a matter of law. *Toxgon Corp. v. BNFL, Inc.*, 312 F.3d 1379, 1383 (Fed. Cir. 2002) ("[T]he Defendants, rather than [plaintiff] bear the burden of proof on a properly pled affirmative defense"). As set forth below, DESC fails to meet its burden either as a matter of fact or law. DESC fails to establish the absence of any material issue of fact concerning whether Hermes intentionally relinquished a known right. *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). Indeed,

---

[40] DESC's challenge to Hermes' allegations of unilateral mistake similarly fails. A party may maintain a claim of unilateral mistake if "the other party to the contract ha[d] reason to know of the mistake." *J&E Salvage v. United States*, 37 Fed. Cl. 256, 265 (1997). Here, Hermes expressly alleges that DESC knew or had reason to know of its mistake about the PMM – indeed, that DESC misrepresented the underlying facts – and DESC does not dispute these assertions. Second Amended Complaint ¶¶ 112-17. A claim of unilateral mistake also will lie if it would be unconscionable not to correct the mistake. *J&E Salvage*, 37 Fed. Cl. at 265. Here, permitting DESC to retain the benefits of its prices in the face of Hermes' mistake, when DESC knew the PMM did not reflect market value and nonetheless used it to set prices, would be unconscionable.

DESC offers no evidence of Hermes' intent at all. Moreover, as a matter of law, Hermes' claims of illegality could not be waived. *Sola Elec. Co. v. Jefferson Co.*, 317 U.S. 173, 176 (1942).

### A. As A Matter Of Fact, DESC Fails To Establish That Hermes Waived All Of Its Claims

In its most general form, waiver is an "'intentional relinquishment of a known right.'" *Zerbst*, 304 U.S. at 464; *Roxco, Ltd. v. United States*, 60 Fed. Cl. 39, 42 (2004) (quoting *Cherokee Nation v. United States*, 174 Ct. Cl. 131, 140 (1966)). Because the doctrine of waiver is an equitable one, "'[i]t is a well established rule of law that 'waivers of rights must be voluntary, knowing and intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.'" *A Olympic Forwarder, Inc. v. United States*, 33 Fed. Cl. 514, 521 (1995) (quoting *Reliance Ins. Co. v. United States*, 20 Cl. Ct. 715, 723 (1990)). "The determination of whether there has been an intelligent waiver . . . must depend, in each case, upon the particular facts and circumstances surrounding the case." *Zerbst*, 304 U.S. at 458. "[M]ost Circuit Courts of Appeal [have] concluded that waiver is a question of fact." *Sunoco, Inc. v. United States*, 59 Fed. Cl. 390, 398 (2004); *accord Nortel Networks, Inc. v. Gold & Appel Transfer, S.A.*, 298 F. Supp. 2d 81, 88 (D.D.C. 2004) (collecting cases). Because "[t]he applicability of waiver depends upon the intent of the non-breaching party," it is a particularly fact-based inquiry. *Lone Mtn. Prod. Co. v. Nat. Gas Pipeline Co. of Am.*, 710 F. Supp. 305, 311 (D. Utah 1989); *accord A Olympic*, 33 Fed. Cl. at 521 (waiver requires that the non-breaching party "had an intention to relinquish" their claims).

Incredibly, DESC seeks summary judgment on its waiver defense without offering any evidence of Hermes' knowledge or intent. Thus, DESC fails to offer any evidence establishing either the existence of a "known" right or an "intentional relinquishment" of it. *Zerbst*, 304 U.S. at 464. DESC's failure to offer evidence of Hermes' knowledge or intent stands in stark contrast

to the Declaration of David R. Miller, Hermes' Vice President of Accounting and Administration, who has had responsibility since 1981 for administering Hermes' military fuel contracts. In his Declaration, Mr. Miller states that Hermes entered the contracts believing that DESC's prices were legal and with the intent that the prices DESC set would reflect fair market value. App. 639. Thus, Mr. Miller expressly states that: Hermes "was not aware at the time it entered into the fuel contracts that . . . DESC awarded the contracts in violation of law," and that Hermes "entered into the fuel contracts with the intent that DESC's pricing would reflect fair market value." App. 639. Accordingly, in the absence of knowledge of the essential facts – here, that DESC's prices were illegal and that DESC would not set prices that reflected fair market value – it is well established that waiver may not be found.[41]

---

[41] *See, e.g.*, *Gen. Eng'g & Machine Works v. O'Keefe*, 991 F.2d 775, 781 (Fed. Cir. 1993) ("[t]here can be no waiver or estoppel without evidence of knowledge"); *Tylor Bank v. Truck Ins. Exch.*, 51 F.3d 736, 740 (7th Cir. 1995) (finding no waiver because "there is no evidence that [the bank] knew that the checks had not been properly made payable to the bank") (Posner, J.); *John Deere Ind. Equip. v. Triple Cities Equip., Inc.*, 646 F. Supp. 114, 116-17 (N.D.N.Y. 1986) ("In the absence of [] knowledge [of the breach], there can be no waiver of [the] breach."); *Majernick v. Hartford Cas. Ins. Co.*, 688 A.2d 1330, 1335 (Conn. 1997) ("Where one lacks knowledge of a right there is no basis upon which a waiver of it can rest . . . .") (citation omitted); *Hamilton v. Williams*, 573 N.E.2d 1276, 1284 (Ill. Ct. App. 1991) ("Ignorance of a material fact negatives waiver, however, and waiver is not established where the consent was given under a mistake or misapprehension of fact."); Joseph Perillo, *Calamari And Perillo On Contracts* at 458 (5th ed. 2003) ("The party waiving must know or have reason to know the fact giving rise to the failure of condition."); *Restatement (Second) of Contracts* § 93 ("A promise within the terms of §§ 82-85 [including a promise of waiver under section 84] is not binding unless the promisor knew or had reason to know the essential facts of the previous transaction to which the promise relates. . . .").

Waiver is similarly inapplicable to Hermes' breach of contract claims, because a material part of the consideration for a contract cannot be unilaterally waived. *See Corbin on Contracts* § 40.1 at 522; *see also id.* ("*A condition of a promisor's duty can be eliminated by a mere voluntary expression of willingness to waive it, if its performance does not constitute a material part of the agreed equivalent of the promise and its nonperformance does not materially affect the value the promisor received.*") (italics original); *Restatement (Second) of Contracts* § 84 and cmt. d ("promise to perform . . . a conditional duty . . . in spite of the non-occurrence of the condition is

(footnote continued)

Indeed, the government's motion provides a counterpoint to this Court's decisions in *Hermes I*, 58 Fed. Cl. 3, and *Hermes II,* 58 Fed. Cl. 409. In those decisions, waiver was found based on presumed knowledge of a *per se* violation of the law. 58 Fed. Cl. at 416-18 (relying on *Fed. Crop Ins.*, 332 U.S. 380, to impute knowledge of the law and further finding that "[w]hat is important is that the unauthorized use of the PMM clause is clear"). Here, by contrast, the absence of knowledge of the essential facts giving rising to Hermes' claims must, on the present record, be presumed, including knowledge that the PMM was not a market-based reference, that the PMM was not designed to adjust prices, and that the PMM in fact did not measure the fair market value of fuel. App. 638-39; App. 627-31.

The only "fact" supported in the record to which DESC points to buttress its waiver defense is that Hermes entered into a series of contracts with DESC that contained DESC's

---

binding . . . unless . . . occurrence of the condition was a material part of the agreed exchange"); Allan Farnsworth, *Farnsworth on Contracts* § 8.6 at 452 (3d ed. 2004) ("The concept of waiver is restricted to conditions that are relatively minor."); *Tylor Bank*, 51 F.3d at 739 ("Unless the right waived is a minor one (this is the logic of Farnsworth's suggestion), why would someone give it up in exchange for nothing.") (Posner, J.); *Rose v. Mitsubishi Int'l Corp.*, 423 F. Supp. 1162, 1167 (E.D. Pa. 1976) ("If performance of the condition is a material part of the agreed exchange, an agreement to be liable in spite of the non-performance of the condition involves to so great a degree a new undertaking that the requisites for the creation of a new contract must exist."); *United States Fid. & Guar. Co. v. Bimco Iron & Metal Corp.*, 464 S.W.2d 353, 357 (Tex. 1971) ("waiver may be effective after expiration of the time for performance of a condition has expired, if the condition which is asserted to have been waived is not a material part of the agreed equivalent of the obligor's promise and its non-performance does not materially affect the value received by the obligor"); *Burness v. Bruce*, 776 P.2d 32, 34 (Or. Ct. App. 1989) ("Although, as a general rule, a party to a contract may waive performance of a provision included for his benefit, . . . material conditions of the contract cannot be waived.") (citing *Restatement (Second) Contracts*, § 84(1)(a), cmt. c at 218 (1979)). Similarly, waiver cannot bar Hermes' failure of consideration claims, because, if a contract fails for lack of consideration, there are no underlying obligations left to be waived. *United Counties Trust Co. v. Maclum, Inc.*, 643 F.2d 1140, 1144 (5th Cir. 1981); *Randy v. Columbia/HCA Healthcare Corp.*, 2003 U.S. Dist. LEXIS 17270 (N.D. Tex. Sept. 30, 2003).

adjustable price clauses. Contrary to DESC's assertion, Hermes' entering into those agreements with DESC does not lead ineluctably to the conclusion that Hermes knew of its rights, their abridgement, and that it intentionally and voluntarily relinquished them. *See generally Maislin Ind., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 122-23, 136 (1990) (even where parties entered "1,081" agreements below the established market price for trucking services, the parties' course of dealing did not bar recovery of the market price); *Dow Chem. Co. v. United States*, 226 F.3d 1334, 1346 (Fed. Cir. 2000) (delay of six years after discovery of a breach held *not* to constitute waiver by the non-breaching party.)

As Mr. Miller makes clear in his declaration, Hermes entered into the contracts with DESC containing DESC's pricing clause, because the pricing clause was non-negotiable and because Hermes had no other choice if it wanted to remain a military fuel supplier. App. 639. As Mr. Miller states:

> DESC maintained that the method by which it set fuel prices was non-negotiable and that its fuel prices reflected fair market value throughout the duration of its contracts. In entering the fuel contracts, Wyoming understood that it could not be a fuel supplier to DESC unless it accepted DESC's pricing provisions. Notwithstanding, Wyoming continued to enter into fuel contracts with DESC of practical necessity as it owned and operated a terminal solely dedicated to the delivery of military jet fuel to Ellsworth Air Force Base, the principal destination point for the contracted fuel and there was no other feasible outlet for the military jet fuel.
>
> By continuing to enter fuel contracts with DESC, Wyoming did not, as I understand DESC alleges, intend that it would be paid less than the fair market value of fuel or at any time intend to relinquish its right to payment of fair market value.

App. 639 (internal paragraph numbers omitted). Given the Hobson's choice between exiting the military fuel business or accepting DESC's non-negotiable pricing clause, it does not follow that by remaining in the military fuel business Hermes intended to relinquish fair market value for its fuel or waive its right to seek redress for injuries caused by DESC's pricing clause, particularly

when DESC misrepresented its fuel prices. *Alaska Pulp Corp. v. United States*, 48 Fed. Cl. 655, 671 (2001) (concluding that such a Hobson's choice would "reward the breaching party and add further injury to [the non-breaching party.]").[42]

Moreover, as Kalt and Killen explain in their Expert Report, while Hermes entered a number of contracts with DESC, "it still only had a maximum of 11 annual observations (1983 through 1993, the reference year for the last DESC contracts that used PMM-based escalators) from which to draw its inferences." App. 630. Eleven observations, Kalt and Killen explain, are not enough to determine a consistent bias in the PMM or assess how the PMM will perform during any specific contract period, particularly since the PMM's relationship to the marketplace was "neither stable nor predictable." App. 630-31; App. 628.

Kalt and Killen provide the following example:

> For example, over a shorter period of time, a bidder might observe a number of periods in which the PMM-based escalator is biased in such a way that it tends to under-represent upward movements in prices. However, this pattern does not permit the conclusion that the bias will always be in this same direction or even in the same direction in the next round of contracting. In fact, it would not be unusual to observe repeated runs of results that do not fairly approximate the result expected over the long run even in any otherwise unbiased game.
>
> Consider, for example, a repeated coin flip. Assuming a fair coin, the expectation is that a flip would result in a heads result 50% of the time. And in fact, over a large number of samples, this is undoubtedly true. However, as is the case here, over a much smaller set of flips, it is quite possible to find repeated runs of heads in apparent defiance with statistical expectations. In fact, as we contemplated illustrating our point here, we performed this experiment and ended up with a repeated run of 8 heads in a row and 15 heads out of 20 coin flips. Although we

---

[42] Were the parties' roles here reversed, DESC certainly would not concede that the parties' course of dealing or the passage of time established as a matter of law waiver of its rights, for the mere passage of time "is no defense to a suit . . . to enforce a public right or protect a public interest." *Utah Power & Light Co. v. United States*, 243 U.S. 389, 409 (1917); *see also INS v. Hibi*, 414 U.S. 5, 8 (1973) (quoting *Utah Power*). If a mere course of dealing or the passage of time, without more, does not give rise to waiver by the government, it should not support a finding of waiver against Hermes either, and certainly not on a motion to dismiss.

> did not expect the process of coin flipping to be biased, and there is no basis for presuming the coin we used was biased, we certainly found ourselves in a situation in the short run where, had we predicted 50% tails, we would have lost our "bet."

App. 629-30 (internal paragraph numbers omitted). Thus, Kalt and Killen conclude with respect to the eleven bidding cycles Hermes confronted: "As described in the coin flip example above, over such a small data sample, it would be impossible to predict that the observed variation or bias reflects the true bias." App. 630. If Hermes could not predict "true bias," then it cannot be presumed here that Hermes intended to relinquish the right to payment of fair market value. App. 612.

Furthermore, given the PMM's random variation with respect to the marketplace, a supplier might well be expected to "alternatively over- or under-predict the bias," thereby further complicating a supplier's assessment of the PMM's true bias. App. 630-31. As Kalt and Killen explain:

> The typical response of a bidder to the uncertainty around the bias introduced by the DESC's use of a PMM-based escalator would be to try to forecast this bias by reference to some set of historical prices. Assuming that the deviation of PMM-based escalators from actual market price escalators was a random walk, bidders might, for example, assume that the bias observed in past periods would be present in future periods. In the absence of any better information, this may be a reasonable assumption; however, this forecasting approach does not necessarily lead to consistent after-the-fact results due to the unstable nature of the bias introduced by the DESC's use of a PMM-based escalator. Using the past relationship between the PMM-based escalator and a market-based escalator to forecast the future relationship will alternatively over- or under-predict the bias. For example, when the bias is high in one year, the forecast bias for the next year is likely to be too high given the limited availability of data as to the "true" relationship.

*Ibid.*

Accordingly, Kalt and Killen reject DESC's assertion that, through entering a series of contracts with DESC, Hermes must be deemed to have intended to relinquish payment of fair market value. They state: "Such assertions ignore that a company such as Hermes, based on the information available at the time that it bid, could not have understood that its bids would consistently receive less than fair market value." App. 628.

Beyond Kalt and Killen's empirical assessment, the course of dealing between Hermes and DESC is analogous to the situation where a company buys products from a monopolist that sets prices illegally over a number of years. Even though the company is able to continue in business, it could not be suggested that the company, by continuing to deal with the monopolist, thereby intended to waive its right to receive a legal price. *See Sola Elec. Co.*, 317 U.S. at 176. Nor could it be suggested that the price the company paid the monopolist was fair market value merely because the company continued to do business with the monopolist or was not otherwise driven out of the business. *Ibid*.; *see generally Northern Helex Co. v. United States*, 455 F.2d 546, 549 (Ct. Cl. 1980) (where a commodity's production is so interrelated to other commodities produced that the first commodity must be produced or wasted, it is commercially reasonable to continue performance in a contract even in the event of a material breach by the other party).

In support of its waiver defense, DESC proffers the declaration of John Walker, who asserts that Hermes never objected to DESC's prices. Decl. of John Walker at ¶ 16, Ex. 1 to DESC's December 23, 2002 Mot. for Partial Summary Judgment in this matter. Startlingly, Mr. Walker does not even allege that he was involved in a *single one* of Hermes' contracts, nor does he even allege that he ever spoke with a *single person* at Hermes about its military fuel contracts. *Ibid*. In fact, Mr. Walker fails to disclose that he was not even employed by DESC during part of the period purportedly covered by his overly broad declaration. App. 560. [43] DESC's proffer of Mr. Walker's declaration in support of its motion simply mocks the rules of evidence.

---

[43] Significantly, the record establishes the inaccuracy of Mr. Walker's sworn statements in other similarly situated cases that the suppliers in those cases did not object to DESC's military fuel prices. *Compare* App. 96 (DESC's response to Calcasieu Refining Company's objection to DESC' s military fuel prices) *with* App. 645 (Decl. of John Walker at ¶ 11, Ex. 1 to DESC's Jan. 17, 2003 Mot. for Partial Summary Judgment in *Calcasieu Refining Co. v. United States*, No. 02-

(footnote continued)

While the full delineation of the course of dealing between Hermes and DESC will have to await discovery (*see* Hermes' RCFC 56(f) motion accompanying this Opposition), the record here makes clear that every known objection DESC received to its "non-negotiable" pricing clause was rejected out of hand. App. 205; App. 206-78. Beginning as early as 1984, suppliers objected to DESC's pricing clause as "coerced," and, in turn, were met by misrepresentations that the PMM "consistently reflects actual market prices." App. 201; App. 96. DESC's own 1987 study of the PMM recounts that suppliers complained that "'we never know if we have made or lost money when you (D[E]SC) lift a cargo,'" App. 597, and, even though MAPCO filed a claim against DESC challenging its pricing clause in 1988, DESC continued to use the PMM for six more years. *MAPCO*, 27 Fed. Cl. at 407. Clearly, objection was futile. *See Navajo Ref. Co., L.P.*, 58 Fed. Cl. at 214.

Moreover, the record establishes that Hermes filed its Complaint soon after the Federal Circuit in *Barrett* put a final end to DESC's public assertions that there were no remedies for its military fuel prices, and, as Mr. Miller further explains, Hermes "submitted claims under the fuel contracts beginning in 2001 after it first learned that remedies were available to permit payment of fair market value in accordance with Hermes' intent upon entering the contracts." App. 639; *Barrett*, 242 F.3d 1055. *Barrett* effectively ended DESC's misrepresentations, wherein DESC's chief economist had testified before this Court to what DESC's own documents show he knew or should have known not to be true – that the PMM was an appropriate "benchmark" to measure fair market value. App. 29. Despite being unmasked in its misrepresentations in *Barrett*, DESC

---

1219C (Fed. Cl.) (stating inaccurately that Calcasieu Refining never objected to DESC's military fuel prices)).

then proceeded to threaten essentially the entire U.S. refining industry *in writing* with claims of *fraud* should refiners pursue the same claims the Federal Circuit upheld in *Barrett*. App. 563-94.

Thus, the record establishes that, by at least 1986, DESC knew that the PMM did not reflect the marketplace, but continued to tell its suppliers and its parent organization, DLA, that it did. App. 103; App. 98. DESC admits it used its "market leverage" as the sole purchaser of military fuel to "improve the competition" by establishing its pricing clause as "nonnegotiable as a matter of policy" and by further refusing to do business with suppliers that objected. App. 17; App. 205; App. 199. Not until 1994, when DLA ultimately learned of DESC's misrepresentations, did DLA stop DESC's use of the PMM. App. 134. Even then, DESC misled this Court about the PMM and abused the government trust by threatening fraud claims against any refiner that pursued the very claims the Federal Circuit upheld in *Barrett*. If ever the government's unclean hands barred a waiver defense, it is hard to image a more compelling case than that presented here. *Desert Apartments, Inc. v. United States*, 250 F.2d 457, 458 (10th Cir. 1957) (the government may not ask for equitable relief when "for any reason its conduct is such that it must be said that it comes into court with unclean hands") (citing *Pan-American Petroleum & Transp. Co. v. United States*, 273 U.S. 456, 506 (1927)); *Princess Cruises, Inc. v. United States*, 397 F.3d 1358, 1369 (Fed. Cir. 2005) (The doctrine of unclean hands "is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.").[44]

---

[44] DESC's estoppel defense similarly fails. Estoppel requires, in the first instance, that DESC "must be ignorant of the true facts." *A Olympic Forwarder*, 33 Fed. Cl. at 522 (citing *Pacific Gas & Elec. v. United States*, 3 Cl. Ct. 329, 340 (1983)). The record establishes not only that

(footnote continued)

### B. <u>As A Matter Of Law, Hermes' Claims Of Illegality Cannot Be Waived</u>

Through its defense of waiver, DESC seeks to retain the benefit of setting its military fuel prices in violation of the law. DESC thereby seeks to give effect to the very illegal prices that the law prohibited. DESC may not invoke rules of estoppel to thwart the laws of the United States, *Sola Elec. Co.*, 317 U.S. at 176, and courts hold that either party to a contract with an illegal price may recover a lawful price. *Pittsburgh Ry. Co. v. United States*, 250 U.S. 577 (1919). This rule is reflected in a long line of decisions holding that the government's violation of provisions of law protecting contractors cannot be waived. *See, e.g., Beta Systems, Inc.*, 838 F.2d at 1186.

#### 1. <u>Hermes Is Entitled To Recover A Lawful Price For Fuel</u>

The Supreme Court has long held that "rules of estoppel will not be permitted to thwart the purposes of the statutes of the United States." *Sola Elec.*, 317 U.S. at 176 (contract violating antitrust law not enforceable, despite parties' agreement); *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 81 n.6 (1982) (quoting *Sola Elec.*). To preserve the law from encroachment, courts permit either party to a contract with an illegal price to recover a lawful price even after payment and performance are rendered. *Pittsburgh Ry.*, 250 U.S. 577; *Costanzo Coal Mining Co. v. Weirton Steel Co.*, 150 F.2d 929 (4th Cir. 1945).

---

DESC was aware of the facts, but also that it misrepresented them. Second Amended Complaint ¶¶ 9-24, 45-49. DESC's further assertion that it could have sought a deviation if Hermes had brought the illegality of DESC's prices to its attention is specious. MAPCO filed a claim challenging the legality of DESC's prices in 1988, and DESC continued using the PMM for six more years, and, when DESC ultimately did seek a deviation for its pricing clause, it did so illegally. *Navajo Ref. Co., L.P.*, 58 Fed. Cl. at 205-12.

In *Pittsburgh Railway*, the Supreme Court held that a railroad could sue for the legal shipping rate despite agreeing to ship at a lower rate. 250 U.S. at 583. While noting that the shipper "paid all that was demanded when the freight was delivered," the Court nonetheless held that payment of the agreed price "cannot change the policy which Congress has embodied in the statute in order to secure uniformity in charges for transportation." *Id.* at 582; *see also Southern Pacific Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 344 (1982) (following *Pittsburgh Railway*).

Relying on *Pittsburgh Railway*, the court in *Costanzo Coal Mining Co.* held that a seller of coal could sue to recover the statutory price for coal, despite agreeing to sell at a lower price. The court stated: "It is our view that a buyer who received deliveries of coal at prices specified in a contract below the legal minimum was not protected by the contract but was subjected to the liabilities imposed by his acceptance of goods whose price was fixed by the statute." 150 F.2d at 936. The court reasoned that "the right to recovery is permissible because it will promote the higher right of the public to effectuate the purposes of the statute." *Id.*; *cf. Kaiser Aluminum & Chem. Sales, Inc. v. Avandole Shipyards, Inc.*, 677 F.2d 1045 (5th Cir. 1982) (purchaser permitted to counterclaim to challenge contract as illegal tying arrangement, though counterclaim ultimately found barred by statute of limitations).[45]

---

[45] Corbin states the governing principle as follows: "In these cases the refusal of all remedy against a party to the illegal bargain would penalize the very persons for whose benefit the making of such a bargain is prohibited or declared illegal. In such cases, in order to attain the purposes of the law, the courts have frequently enforced the bargain by one or more of the usual remedies, in favor of a party for whose benefit the law was intended and against a party toward whom the prohibition or penalty was directed." Arthur L. Corbin, 6A *Corbin on Contracts* § 1540, at 833-34 (1962). Innumerable cases apply this rule. *See, e.g.*, *Carter v. Seaboard Fin. Co.*, 203 P.2d 758 (Cal. 1949); *Shimrak v. Garcia-Mendoza*, 912 P.2d 822 (Nev. 1996); *Cain v. Burns*, 280 P.2d 888 (Cal. Dist. Ct. App. 1955).

Similarly, in *Sprague Steamship Co. v. United States*, 172 F. Supp. 674 (Ct. Cl. 1959), the Court of Claims held that a purchaser of surplus ships from the United States Maritime Commission could recover the portion of the price it paid above that mandated by the Ship Sales Act because of "a Congressional purpose that the Government's surplus ships should be sold at prices, uniform to all purchasers." *Id*. at 676. The Court of Claims, in construing the doctrine of waiver, commented on *Sprague* in *Rough Diamond Co.*, stating: "Congress' establishment of the sale price-formula was evidently for the benefit of the purchasers themselves – the very persons who brought suit to regain the excess payments they had made or agreed to make." *Rough Diamond Co. v. United States*, 351 F.2d 636, 640 (1965).

The principle that a party to a contract is entitled to recover a lawful price is frequently given effect under the *Christian* doctrine, which reads FAR requirements into contracts where "intentionally or inadvertently omitted" in order to preclude the government from "deliberately or negligently" evading procurement policy. *S.J. Amoroso Constr. Co. v. United States*, 12 F.3d 1072, 1075 (Fed. Cir. 1993) (quoting *G.L. Christian & Assocs. v. United States*, 320 F.2d 345, 351 (Ct. Cl. 1963)). In *Applied Devices Corp. v. United States*, 591 F.2d 635, 640-41 (1979), the court relied upon the *Christian* doctrine to reform an illegal price ceiling on the contractor's termination costs, and, in *Chris Berg, Inc. v. United States*, 426 F.2d 314, 317 (Ct. Cl. 1970), the court relied upon the *Christian* doctrine to reform a mistaken and illegally accepted bid price.[46]

Any rule that would preclude a party to a federal procurement contract from recovering a legal price would impermissibly give effect to unauthorized governmental actions. *See Amdahl*,

[46] *See also Gold Line Ref., Ltd. v. United States*, 43 Fed. Cl. 291, 296 n.8 (1999) (relying on the *Christian* doctrine to provide a remedy for DESC's illegal military fuel prices); *Centel Communications Co.*, 89-1 B.C.A. (CCH) ¶ 21,225 (Sept. 8, 1988) (invoking the *Christian* doctrine to order price adjustments pursuant to a wage rate price adjustment clause).

786 F.2d at 392-93 ("[a]dministrative actions taken in violation of statutory authorization or requirement are of no effect"). Thus, in *Urban Data Sys., Inc.*, the court struck down a price violating statutory proscriptions on cost-plus-percentage-of-cost contracts and ordered *quantum meruit* recovery, because the government "had no power to enter into the challenged price terms." 699 F.2d at 1153 (relying on *Fed. Crop Ins.*, 332 U.S. at 382). In *Barrett*, the Federal Circuit relied upon its holding in *Urban Data Sys., Inc.* to hold that DESC's illegal fuel prices were "unauthorized and unenforceable" and to award the contractor *quantum valebant* relief. *Barrett*, 242 F.3d at 1060 & n.2; *see generally OPM v. Richmond*, 496 U.S. 414, 427-29 (1990) (giving effect to unauthorized governmental actions would impermissibly give those actions "the practical force of law," give rise to "improper collusions," and "vest authority in these [government] agents that Congress would be powerless to constrain").

Here, in order to preserve the purposes of the law, Hermes is entitled to recover a lawful price for the military fuel it delivered to DESC. FAR § 16.203 expressly precluded DESC from setting military fuel prices for its own benefit, and the other provisions of law DESC violated were similarly intended to benefit contractors. DESC may not assert a defense of waiver to preserve the benefit of the very illegal prices the law prohibited or to give effect to "unauthorized and unenforceable" prices DESC "had no power to enter." *Barrett*, 242 F.3d at 1060 & n.2; *Urban Data Sys., Inc.*, 699 F.2d at 1153. DESC's proffered defense of waiver must be denied, lest the rules "of illegality would obviously be ephemeral." *Kaiser Steel*, 455 U.S. at 81 n.6; *see also Tesoro*, 58 Fed. Cl. at 73 ("If we were to adopt DESC's argument that contracting parties are free to waive mandatory FAR requirements, the parties to fuel contracts such as those at issue here would be free to rewrite federal procurement policy through negligence or collusion.").

**2. Because The Law At Issue Protects Contractors, DESC's Violations Of Law Cannot Be Waived**

The rule that waiver and estoppel may not thwart the law is reflected in a long line of decisions holding that the government's violation of provisions of law protecting contractors cannot be waived. The court stated the governing rule in *Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442 (Fed. Cir. 1997): "'[I]f government officials make a contract they are not authorized to make, in violation of a law enacted for the contractor's protection, the contractor is not bound by estoppel, acquiescence, or failure to protest.'" *Id*. at 1451 (quoting *LaBarge Prods., Inc.*, 46 F.3d at 1552). This well-established rule requires denial of DESC's waiver defense. *Tesoro,* 58 Fed. Cl. at 72-75; *Gold Line Ref., Ltd. v. United States*, 54 Fed. Cl. 285, 296-97 (2002); *Phoenix Petroleum*, No. 97-315C (May 11, 1998), slip op. at 5-7; *but see Hermes II*, 58 Fed. Cl. 409.

In *Beta Systems,* the contractor sought relief from a price adjustment clause on the ground that it failed to track the price of a major construction material as the DAR required. 838 F.2d at 1185. The government argued that the contractor had waived its claim by proceeding with the contract after objecting to the price adjustment clause during contract negotiation. *Id.* at 1184. The Federal Circuit denied the government's waiver defense, holding that "[i]f the BLS index violated the DAR, the government can not, by law, benefit from it." *Id.* at 1185. The court concluded, "[i]f the BLS index that was selected does not comply with [the] DAR . . ., even approximately, it is not controlling whether or not [the contractor] or the government foresaw, or accepted the risk of failing to foresee, this defect in the index." *Id.* at 1186.

The Federal Circuit reiterated its holding in *Beta Systems* in *LaBarge Products, Inc.*, 46 F.3d 1547. In *LaBarge*, the contractor sought reformation of its contract on the ground that the government had awarded the contract using auction techniques prohibited by FAR § 15.610(d). 46 F.3d at 1552. In rejecting the conclusion of the court below that the contractor's "allegations

of government misconduct [were] the kind of allegations that are ordinarily made in pre-award bid protests," *id*., the Federal Circuit reiterated the principles underlying *Beta Systems*, explaining that the contractor could "seek reformation of its price term, even after performance, if that term was allegedly diminished by unlawful government acts." *Id.* at 1552-53. The court held that, where "a breach of law is inherent in the writing of the contract, reformation is available *despite the contractor's initial adherence to the contract provision later shown to be illegal*." *Id.* at 1552 (emphasis added); *see also Applied Devices,* 591 F.2d at 640 (where contract entered in violation of law made for the contractor's protection, the contractor "is not bound by his estoppel, acquiescence, and even failure to protest").

*Beta Systems* and *LaBarge* are consistent with *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986). There, the Supreme Court, in addressing waiver of constitutional protections, articulated the more general distinction between structural, institutional interests that cannot be waived and personal interests that can, noting: "[t]o the extent that this structural principle is implicated in a given case . . . notions of consent and waiver cannot be dispositive because the limitations serve institutional interests." *Id*. at 850-51. In illustration of this distinction, the rule is well established that statutory limitations on the amount of funds available to pay for a government contract cannot be waived. *Leiter v. United States*, 271 U.S. 204 (1926).

The interests at stake here – whether a government agency acting without authority may benefit from violating the law – implicate similarly important institutional interests precluding waiver. In *Tesoro*, the court cited *Schor* for this very proposition:

> [T]o extend the [waiver] defense to cases falling within the *Beta Systems* line of case may impinge upon the institutional concerns of the United States in application of the law. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986); *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982). The *Beta Systems* rule acts not only to protect the parties but also to ensure that Federal

> procurement regulations do not become the private property of parties to a government contract.

*Tesoro*, 58 Fed. Cl. at 75.

The *Beta Systems* rule may not be distinguished on the ground that Hermes allegedly did not protest before it agreed to enter the contracts. The *Beta Systems* rule expressly provides that "the contractor is not bound by . . . failure to protest." *Cessna*, 126 F.3d at 1451 (quoting *LaBarge*, 46 F.3d at 1552). In fact, raising an objection but nonetheless entering a contract gives rise to a greater, not a lesser, inference of the "intentional relinquishment of a known right" necessary to support waiver. *Zerbst*, 304 U.S. at 464. In any event, the undisputed record evidence establishes that Hermes was not aware of DESC's illegal fuel prices when it entered the contracts and could not have objected to the illegality. App. 663.

*Beta Systems* and *LaBarge*, implementing the principles of *Schor*, are materially indistinguishable from the present case. FAR § 16.203 and the other provisions of law at issue here, like the procurement regulations at issue in *Beta Systems* and *LaBarge*, were clearly intended to protect contractors. Indeed, with regard to DESC's violation of FAR § 16.203, the law could not be more emphatic, stating that "economic price adjustment shall not be used unless . . . necessary . . . to protect the contractor . . ." FAR § 16.203-3; *see Tesoro*, 58 Fed. Cl. 72 (citing *Phoenix Petroleum*, No. 97-315C, slip op. at 5). Because the law protected Hermes, DESC may not seek to retain the benefits of its violation of FAR § 16.203 by asserting a waiver defense. *Beta Systems*, 838 F.2d at 1186; *LaBarge*, 46 F.3d at 1552. The language of the Federal Circuit's proscription in *Beta Systems* is equally applicable here: "If the BLS *[PMM]* index violated the DAR*[FAR]*, the government can not, by law, benefit from it." *Beta Systems*, 838 F.2d at 1185; *see also MAPCO*, 27 Fed. Cl. at 408 (quoting *Beta Systems*).

**3. DESC May Not Use A Defense Of Waiver To Seek A Judicially-Imposed Statute Of Limitations Congress Did Not Enact**

Unable to overcome the rule of *Beta Systems* and *LaBarge*, DESC in essence seeks to bar Hermes' claims on the ground that too much time has elapsed since DESC began setting prices illegally for Hermes to seek a remedy. Such prudential limitations based on the passage of time, without more, are the province of statutes of limitation. *Thomas v. United States*, 125 Ct. Cl. 76, 80 (1953). Through its waiver defense, DESC may not seek a judicially-imposed statute of limitations Congress did not enact.

DESC's waiver defense runs squarely into the rule set forth in *Louisville & Nashville R.R. Co. v. Cent. Iron & Coal Co.*, 265 U.S. 59, 65 (1924). *Louisville & Nashville R.R.*, like *Pittsburgh Railway* discussed above, involved a railroad's claim to recover the lawful shipping rate despite agreeing to a lower price. In upholding the railroad's claim, the Supreme Court found: "Nor could any act or omission of the carrier *(except the running of the statute of limitations)* estop or preclude it from enforcing payment of the full amount" of the legal tariff. 265 U.S. at 65 (emphasis added); *see also Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 127 n.9 (1990) (quoting *Louisville & Nashville R.R.* (citation omitted)). Congress, of course, did not enact a statute of limitations applicable to Hermes' claims. *Motorola Inc. v. West*, 125 F.3d 1470, 1472-73 (Fed. Cir. 1997); FAR § 33-206(a).

With respect to the government itself, it has long been the rule that the mere passage of time "is no defense to a suit . . . to enforce a public right or protect a public interest." *Utah Power & Light Co. v. United States*, 243 U.S. 389, 409 (1917); *see also INS v. Hibi*, 414 U.S. 5, 8 (1973) (quoting *Utah Power*). Application of this same principle *against* DESC is even more compelling here where DESC unlawfully holds its contractors' funds based on prices it "had no power to enter." *Urban Data Sys., Inc.*, 699 F.2d at 1153. Indeed, the government commonly

pursues pricing disputes against refiners that cover decades. *See, e.g.*, Michael J. Sniffen, *Refiner to pay $110 million in underpaid-royalties suit*, *Corpus Christi Caller-Times* (Jan. 24, 2001) (settlement with Department of Interior for underpayment in royalties on oil spanning 1980 to 1999). It may not complain so loudly when the same rule is applied against it.

Nor may DESC seek to overcome the absence of a statute of limitations by cloaking its waiver defense within the rubric of laches. The Federal Circuit has long held that laches requires a showing of actual prejudice by the government. *S.E.R., Jobs for Progress, Inc. v. United States*, 759 F.2d 1, 8 (Fed. Cir. 1985); *Cornetta v. United States*, 851 F.2d 1372, 1378 (Fed. Cir. 1988) (*en banc*). DESC has alleged no such prejudice, nor has it asserted a laches defense.

DESC may not claim surprise that Hermes filed its claims after the Federal Circuit established the existence of a remedy for DESC's illegal prices in *Barrett*. The undisputed record evidence establishes that Hermes did not know that DESC's fuel prices were illegal. App. 663. Hermes could not challenge, or for that matter waive, an illegality of which it was unaware. *Zerbst*, 304 U.S. at 464 (waiver requires the "intentional relinquishment or abandonment of a known right"). Moreover, as Mr. Miller states in his declaration, Hermes timely filed its claims beginning in 2001 after it first learned that there were remedies available to require payment of fair market value in accordance with Hermes' intent upon entering the fuel contracts. App. 639.[47]

[47] A different result should not apply even assuming, arguendo, that Hermes knew of the Court of Federal Claims' first ruling in *MAPCO* that DESC's prices were illegal, albeit not on all of the grounds Hermes alleges here. In *MAPCO*, the court expressly reserved ruling on "the ultimate effect of th[e] illegality" in DESC military fuel prices. 27 Fed. Cl. at 406; *see also id.* at 417. It was not until this Court ruled in *Barrett*, over DESC's challenge to subject matter jurisdiction, that a supplier could recover *quantum valebant* relief that the question the court raised in *MAPCO* was resolved. *Barrett*, 242 F.3d at 1059-60. Moreover, *MAPCO* afforded suppliers time for resolution of the question it posed concerning the existence of a remedy, inasmuch as *MAPCO* (to say nothing of this Court's decision in *Beta Systems* upon which *MAPCO* relied)

(footnote continued)

### 4. *Federal Crop Insurance v. Merrill* Does Not Support A Finding Of Waiver

In support of its waiver defense, DESC relies on this Court's holding in *Hermes II* that a supplier waived its claims for DESC's illegal prices. *Hermes*, in turn, relied on *Fed. Crop Ins.*, 332 U.S. 380, to reason that, because the supplier was deemed to know the law, it is deemed to have waived its claims for DESC's illegal prices when it entered the fuel contracts. *Hermes II*, 58 Fed. Cl. at 416. The holding in *Hermes*, however, proves too much: Under *Hermes II*, a contractor could never seek a remedy under an illegal contract, because it would always be deemed to know the law and thus to have waived its claim upon entering the contract. *Id.* Such a rule cannot be reconciled with the Federal Circuit's *en banc* decision in *AT&T V* which expressly holds that remedies are available under illegal contracts. 307 F.3d at 1376 (relying, *inter alia*, on *Clark v. United States*, 95 U.S. 539, 542 (1877) (over a hundred years ago upholding *quantum meruit* relief under an illegal government contract)).

As the Supreme Court explained in *Pittsburgh Railway*, the parties' deemed knowledge of the law supports implementing the law, not arbitrarily invoking waiver against one party. 250 U.S. at 581-82. In upholding the railroad's claim to recover the statutory tariff notwithstanding the parties' contrary agreement, the Court found that "Fink [the shipper], as well as the carrier, must be presumed to know the law, and to have understood

---

unambiguously held that "[t]he contractor cannot, by waiver, permit the government to enter an illegal contract." 27 Fed. Cl. at 416. It would be inequitable to charge Hermes with knowledge of *MAPCO's* ruling of illegality while at the same time depriving them of reliance on *MAPCO's* ruling on waiver. *Yerxa v. United States*, 11 Cl. Ct. 110, 119 (1986) (if knowledge of a decision is imputed, portions to both the party's "disadvantage" and "advantage" must be imputed), *aff'd*, 824 F.2d 978 (Fed. Cir. 1987); *see also Sprague*, 172 F. Supp. at 676 (contractor's lack of knowledge of court's prior holding of illegality did not provide the government a defense for the same conduct).

that the rate charged could lawfully be only the one fixed by the tariff." *Id*. at 581. Noting a "mistaken understanding of the rate legally chargeable," the Court held, "[t]he transaction, in light of the [Tariff] Act, amounted to an assumption on the part of Fink to pay the only legal rate the carrier had the right to charge." *Id*. at 582. So, too, here, if DESC and Hermes are deemed to know the law, then they are deemed to have assumed an obligation to pay a legal price, not somehow to have caused Hermes to waive the law. *Id*.; *see generally Beta Systems*, 838 F.2d at 1186 (because government presumed to violate the law by mistake, reformation available).

That *Fed. Crop Insurance v. Merrill* is consonant with the existence of remedies for illegal contracts is established by *Urban Data Sys., Inc.* and *Yosemite Park & Curry Co. v. United States*, 582 F.2d 552 (Ct. Cl. 1978). In both of those cases, the court relied on *Merrill* to strike down an illegal contract but also ordered *quantum meruit* or *quantum valebant* relief for the contractor. *Urban Data*, 699 F.2d at 1153-54; *Yosemite Park*, 582 F.2d at 558. *Hermes II's* reliance on *Merrill* to deny a remedy for DESC's illegal prices cannot be reconciled with the contrary treatment of *Merrill* in *Urban Data Sys., Inc.* and *Yosemite Park.*

### 5. *E. Walters & Co. v. United States* And *Whittaker Electronic Systems v. Dalton* Do Not Support A Finding Of Waiver

DESC, as indeed did the Court in its prior decisions, relies for support upon *E. Walters & Co. v. United States*, 576 F.2d 362 (Ct. Cl. 1978), and *Whittaker Elec. Sys. v. Dalton*, 124 F.3d 1443 (Fed. Cir. 1997). At issue in *Walters* was a provision of the ASPR that restricted the use of contract options for "quantities [that] represent known firm requirements for which procurement funds are available." 576 F.2d. at 365-66 (construing ASPR § 1-1503(b)). The court's unexceptional holding that the contractor could not challenge funding restrictions promulgated to benefit the government is fully consistent with the rule set forth in *Beta Systems* and *LaBarge*

and provides no support for holding that violation of FAR provisions protecting contractors cannot be waived. *See Cessna*, 126 F.3d at 1451-52 (violation of funding restrictions set forth in DOD accounting manual not actionable).[48]

*Whittaker,* like *Walters*, similarly involved a contractor's attempt to restructure a contract by removing an option. *Whittaker*, 124 F.3d at 1446. The regulation at issue in *Whittaker*, DAR § 1-1502, expressly provided in its prefatory section that "[o]ption clauses may be included . . . if continuing performance beyond the original period of contract performance may be in the best interest of the Government." DAR § 1-1502(a). Consistent with the regulation's principal focus on the interests of the government, the ASBCA below found that the contractor lacked standing to challenge the option. *Whittaker*, 124 F.3d at 1446. Thus, the Federal Circuit's denial of the contractor's challenge to the option on the grounds of waiver was once again consistent with *Beta Systems* and *LaBarge*.

Moreover, in *Whittaker,* the contractor sought to declare its contract void *ab initio* because of the alleged violation of the DAR. 124 F.3d at 1446. The Federal Circuit responded in carefully chosen language, holding only that Whittaker waived "the grounds for *rescinding* or *voiding* the contract." *Id.* at 1446 (emphasis added). This distinction is fundamental. The Court has repeatedly admonished that "[t]he invalidation of a contract after it has been fully performed is not favored." *AT&T III*, 177 F.3d at 1375; *see also John Reiner & Co. v. United States*, 325

[48] Moreover, like the contractor in *AT&T*, the contractor in *Walters* sought, through removing the option, to change the form of its contract. The choice to use an option, like the challenged use of a fixed-price contract in *AT&T*, is a choice about contract form that fundamentally inures to the government's benefit, and, "unlike money, these bargained for rights are not reallocable after performance." *AT&T V*, 307 F.3d at 1381. Here, by contrast, Hermes seeks only the fair market value of the fuel it delivered in accordance with the Federal Circuit's decision in *Barrett*, 242 F.3d at 1060-61.

F.2d 438, 440 (Ct. Cl. 1963) (stating that a court should "ordinarily impose the binding stamp of nullity only when the illegality is plain"). Thus, a contractor may lose the right to have its contract declared void *ab initio*, but not lose the right to a remedy. *Whittaker* is entirely consistent with this important distinction.

*Whittaker* is distinguishable on another ground as well. In *Whittaker*, the exercise of the option giving rise to the alleged breach of the regulations occurred after the contract award. 124 F.3d at 1445. *Whittaker* thus represents the rare case where a breach of the law "subsequent to contract award" may be waived, whereas a breach of law "inherent in the very writing of the contract" may not. *Applied Devices*, 591 F.2d at 640-41; *see Tesoro*, 58 Fed. Cl. at 72; *Phoenix Petroleum*, No. 97-315C, slip op. at 6-7; *Gold Line*, 54 Fed. Cl. at 296; *see generally LaBarge*, 46 F.3d at 1552.[49]

That the disposition of this case is controlled by *LaBarge*, with its adoption of the principles of *Beta Systems*, and not *Whittaker*, is further confirmed by the chronology and context of the two decisions. Judge Michel authored both *LaBarge* and *Whittaker*, the former in 1995 and the latter in 1997. It is simply implausible that *Whittaker* intended to overrule *sub silentio* a decision written by the same hand only two years before. The more reasonable interpretation of *Whittaker*, therefore, is that its intended reach is more modest. It is limited to cases in which the contractor seeks to void an entire contract based on an alleged breach, after award, of regulations benefiting the government. *See also Preaward Failure to Object Waives Contractor's Right to Challenge Contract's Validity*, Cases & Decisions, 39 No. 41 *Gov't*

[49] While the option in *Whittaker* was part of the contract at the time of award, the illegality was fundamentally inchoate until the option was exercised during contract performance. *But see Hermes I*, 58 Fed. Cl. at 15.

*Contractor* ¶ 519 (Oct. 1997) (noting that *Whittaker*'s statement regarding scope of waiver doctrine arguably "is not as unqualified as it may first appear").

### 6. ***AT&T v. United States* Does Not Support A Finding Of Waiver**

DESC has relied upon *AT&T V* for support of its waiver defense. DESC's reliance on *AT&T V* is, however, misplaced. As the Court of Federal Claims observed in rejecting DESC's waiver defense in *Tesoro*: "We find it difficult to believe that the court in *AT&T* would *sub silentio* overrule, in dicta, the well-established rule that waiver is inappropriate where government officials execute a contract in violation of a mandatory regulation enacted for the contractor's protection." *Tesoro*, 58 Fed. Cl. at 74.

*AT&T V* is properly construed within the context of the five decisions in that case. In *AT&T v. United States*, 32 Fed. Cl. 672 (1995) ("*AT&T I*"), *aff'd in part, rev'd in part*, 124 F.3d 1471 (Fed. Cir. 1997), the Court of Federal Claims held that an anti-submarine warfare contract was illegal and that the contractor was entitled to *quantum meruit* relief because DOD did not make statutorily required determinations before it "obligated or expended funds" on a fixed price-type contract. *Id*. at 674. On appeal in *AT&T v. United States*, 124 F.3d 1471 ("*AT&T II*"), *vacated and withdrawn*, 136 F.3d 793 (Fed. Cir. 1998), a divided panel of the Federal Circuit held that *no remedy* was available in the Court of Federal Claims for an illegal contract, opining that relief might lie in replevin before the District Court. *Id*. at 1480.

The Federal Circuit, sitting *en banc*, vacated the panel decision and, thereafter, in *AT&T III,* expressly rejected the panel's earlier holding that no remedy was available for an illegal contract, stating: "When a contract or a provision thereof is in violation of law but has been fully performed, the courts have variously sustained the contract, reformed it to correct the illegal term, or allowed recovery under an implied contract theory." *AT&T III*, 177 F.3d at 1376. Importantly, in establishing the availability of remedies for illegal contracts, the *en banc* Court

cited and endorsed *Beta Systems* and *LaBarge*, both of which set forth a rule against waiver of mandatory legal requirements protecting contractors. *Ibid*. A lone dissent to the *en banc* decision would have denied AT&T a remedy because it knowingly agreed to the contract price, a ruling that, in effect, would have achieved the same result as the vacated panel decision. *Id*. at 1383.

On remand to address remedy, the Court of Federal Claims in *AT&T v. United States,* 48 Fed. Cl. 156 (2000) ("*AT&T IV*"), *aff'd*, 307 F.3d. 1374 (Fed. Cir. 2002), *cert. denied*, 124 S. Ct. 56 (2003), sustained the contract and dismissed the complaint on the ground that the statutory restrictions on funding fixed-price contracts did not establish mandatory requirements for the protection of contractors. *Id*. at 159-60. On appeal again in *AT&T V,* a divided panel of the Federal Circuit affirmed the Court of Federal Claims, holding that the contract should be sustained, because the underlying statute was "cautionary and informative" and designed to "provide only internal governmental direction." *AT&T V*, 307 F.3d at 1376, 1380. The divided panel decision added, *in dictum*, that AT&T waived any claim for violation of the non-mandatory provisions when it entered the contract. *Id*. at 1380-81.

Far from supporting DESC's waiver defense or somehow repudiating established law, this dictum in *AT&T V* is fully consistent with the holding in *Beta Systems* and *LaBarge* that the government may not invoke a waiver defense to thwart mandatory legal requirements protecting contractors. *Beta Systems*, 838 F.2d at 1185-86; *LaBarge*, 46 F.3d at 1552-53. In *AT&T V*, the panel expressly found that the underlying funding statute was neither mandatory nor intended to protect contractors. 307 F.3d at 1376, 1380; *see also Gold Line*, 54 Fed. Cl. at 296.

Accordingly, the discussion of waiver in *AT&T V* is properly read to apply only where, among the three options articulated by the *en banc* court, an illegal contract is sustained, because

the law was not mandatory and did not protect contractors. Otherwise, *AT&T V* could not be read consistently with the *en banc* court's holding that reformation and implied-in-fact recovery are available remedies for illegal contracts or the *en banc* court's endorsement of *Beta Systems* and *LaBarge*. *AT&T III*, 177 F.3d at 1376; *see also Gold Line*, 54 Fed. Cl. at 297 (*AT&T* "permitting reformation of a fully performed contract containing an illegal term or provision is permission for the contractor to challenge that illegal term").

Moreover, the panel narrowly limited its holding to the facts before it. The panel specifically noted that the reformation AT&T sought did not involve mere "money," but rather would "strike[] to the core of the contract bargain," because it would change the contract type, and the broader allocation of performance risks, from a fixed-price to a cost-reimbursable contract. *AT&T V,* 307 F.3d at 1380-81. This distinction was critical to the court's decision, because "unlike money, these bargained for rights are not reallocable after performance." *Id.* at 1381. In contrast to the contractor in *AT&T,* here Hermes merely seek to replace an illegal price and be paid the fair market value of the military fuel it delivered, a result the Federal Circuit previously endorsed in *Barrett*, 242 F.3d at 1060 n.2.

DESC's assertion that *AT&T V* provides it a waiver defense is simply an attempt to rewrite the Federal Circuit's *en banc* decision in *AT&T III*. In asserting that *AT&T V* provides it a waiver defense, DESC, in effect, would elevate the lone dissent in *AT&T III*, which would have denied AT&T a remedy for agreeing to the illegal price, to the rule in this Circuit and, as a practical matter, reinstitute the vacated panel decision in *AT&T II* that would deny all relief to contractors under illegal contracts. *Compare AT&T III*, 177 F.3d at 1383 (dissent), *with AT&T III*, 177 F.3d at 1376 (majority opinion); *AT&T II*, 124 F.3d at 1479-80; *see generally Hermes I*, 58 Fed. Cl. at 18 ("The government, of course, argues strenuously that Judge Plager's dissent [in

*AT&T III*] and the *AT&T V* opinion control this case"). DESC may not seek to overturn the Federal Circuit's *en banc* decision here.[50]

[50] In its prior decisions, the Court relied on what it found to be Hermes' sophistication as a government contractor as a further basis for finding waiver. *Hermes II*, 58 Fed. Cl. at 417-18. Hermes, however, is a small business with only one operating refinery, which is one of the smallest refineries in the country. The refinery has limited production capacity, and Hermes maintains a modest headquarters staff, most of which are clerical employees. It has never had a general counsel or other legal staff. App. 638-39. Moreover, as applicable here, the practical effect of the Court's finding that waiver of the law turns on a contractor's alleged sophistication is that sophisticated contractors are paid illegal prices but unsophisticated contractors are not. It would not appear that Congress, when it mandated promulgation of the FAR, or the FAR's drafters themselves contemplated such a result. *See Sprague*, 172 F. Supp. at 676 ("We do not think that Congress was willing that that purpose [of the law] should be frustrated, and different prices should be charged to different purchasers, because of different degrees of knowledge, in the purchasers, of facts or law.") Similarly, it would not appear that when *Amdahl* announced the rule that "[a]dministrative actions taken in violation of statutory authorization or requirement are of no effect," the court intended that the rule apply only in the presence of unsophisticated parties. *Amdahl*, 786 F.2d at 392-93. It is perhaps because the issue of sophistication would often weigh against the government in defending an assertion of waiver that, upon express inquiry during oral argument in *Tesoro*, DESC chose not to defend this portion of the decision in *Hermes*. App. 343.

## CONCLUSION

For the foregoing reasons, Hermes respectfully requests that Defendant's Motion to Dismiss be denied.

Respectfully submitted,

s/J. Keith Burt

J. Keith Burt
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, DC 20006
(202) 263-3208 (phone)
(202) 263-5208 (fax)

Attorneys for Plaintiff,
Hermes Consolidated, Inc., Doing Business As
Wyoming Refining Company

*Of Counsel:*

Adrian L. Steel, Jr.
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, DC 20006

January 11, 2005