IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 02-1460C
(Judge Block)

HERMES CONSOLIDATED, INC.,
Doing Business As Wyoming Refining,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S RESPONSE TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS and SECOND SUPPLEMENTAL APPENDIX

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

STEVEN J. GILLINGHAM
Assistant Director
Commercial Litigation Branch
Civil Division
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Department of Justice
Washington, D.C. 20530
Tele: (202) 616-2311
Fax: (202) 353-7988

OF COUNSEL:

DONALD S. TRACY
Trial Attorney
Defense Supply Center Richmond
Richmond, VA 23297

HOWARD M. KAUFER
Assistant Counsel
Office of Counsel
Defense Energy Support Center
Ft. Belvoir, VA

Attorneys for Defendant

February 22, 2006

## TABLE OF CONTENTS

**PAGE(S)**

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I. DESC's EPA Clauses Are Authorized by FAR 16.203-1 . . . . . . . . . . . . . . . . . . 11

A. EPA Clauses Need Not Be Based Upon Plaintiff's Own Prices . . . . . . . 11

B. DESC's PMM-Based EPA Clause Is Legal . . . . . . . . . . . . . . . . . . . . . . 12

C. Hermes' FAR 15.802(b) Allegation Does Not State A Cause of Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

II. Hermes' Alternative Illegality Theories In Counts II-VI Must Be Dismissed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

A. Count II (Misrepresentation) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

B. Count III ("Breach of Contract") and Count IV ("Implied-In-Fact Contract") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

C. Count V ("Failure of Consideration and Frustration of Purpose") . . . . . 20

D. Count VI (Mistake) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

III. Waiver and Estoppel Bar Hermes' Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

A. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

B. Plaintiff has Waived As A Matter Of Fact . . . . . . . . . . . . . . . . . . . . . . . . 13

C. Plaintiff has Waived Its Claims As A Matter Of Law . . . . . . . . . . . . . . . 26

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## SUPPLEMENTAL APPENDIX

Excerpt from deposition of John Cook, dated July 29, 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Excerpt from deposition of Jacob Bournazian, dated December 3, 2003 . . . . . . . . . . . . . . . . . . . 7

Form EIA-782A ("Refiners'/Gas Plant Operators'
Monthly Petroleum Product Sales Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

A Comparison of Selected EIA-782 Data with Data From Other Sources, by
Jacob Bournazian . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

American Telephone and Telegraph Co. v. United States,
307 F.3d 1374 (Fed. Cir. 2002) . . . . . . . . . . passim

American Telephone & Telegraph Co. v. United States,
177 F.3d 1368 (Fed. Cir. 1999) . . . . . . . . . . passim

Barrett Refining v. United States,
242 F.3d. 1055 (2001) . . . . . . . . . . 12, 19

Barrett v. United States,
50 Fed. Cl. 567 (2001) . . . . . . . . . . passim

Beta Systems, Inc. v. United States,
838 F. 2d 1179 (Fed. Cir. 1988) . . . . . . . . . . passim

Brooklyn Sav. Bank v. O'Neill,
324 U.S. 697 (1945) . . . . . . . . . . 27

Cessna Aircraft v. Dalton,
126 F.3d 1442 (Fed. Cir. 1997) . . . . . . . . . . passim

Chris Berg, Inc. v. United States,
426 F. 2d 314 (Ct. Cl. 1970) . . . . . . . . . . passim

Clark v. United States,
95 U.S. 539 (1877) . . . . . . . . . . 27, 28

Costanza Coal Min. Co. v. Weirton Steel Co.,
150 F.2d 929 (4th Cir. 1945) . . . . . . . . . . 36, 7

Dairyland Power Cooperative v. United States,
16 F.3d 1197 (Fed. Cir. 1994) . . . . . . . . . . 20

E. Walters & Co., Inc. v. United States,
217 Ct. Cl. 576 F.2d 362 (1978) . . . . . . . . . . passim

E. Walters & Co., Inc. v. United States,
576 F.2d 362 (Ct. Cl. 1978) . . . . . . . . . . passim

Federal Crop Ins. v. Merrill,
332 U.S. 380 (1947) . . . . . . . . . . 36, 37

Federal Elec. Corp. v. United States,
486 F.2d 1377 (Ct. Cl. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

General Eng'g. & Mach. Works v. O'Keefe,
991 F. 2d 775 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Hartford Accident & Indem. Co. v. United States,
127 F. Supp. 565 (Ct. Cl. 1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Hermes v. United States,
58 Fed. Cl. 409 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

LaBarge Prods., Inc. v. West,
46 F.3d 1547 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Ling-Temco-Vought, Inc. v. United States,
201 Ct. Cl. 135, 475 F.2d 630 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Louisville and Nashville R.R. Co. v. Cent. Iron and Coal Co.,
265 U.S. 59 (1924) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 36

MAPCO Alaska Petroleum, Inc. v. United States,
27 Fed. Cl. 405 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Millmaster Intl. Inc. v. United States,
427 F. 2d 811 (Cust. Ct. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Mitsubishi Motors Corporation v. Soler Chrysler-Plymouth, Inc.,
473 U.S. 614 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Nautilus Shipping Corp. v. United States,
141 Ct. Cl. 391 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Northern Helex Co. v. United States,
197 Ct. Cl. 118, 125-26 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

PCL Construction Services, Inc. v. United States,
41 Fed. Cl. 242, 252 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Pittsburgh C.C. & St. L. Ry. Co. v. Fink,
250 U.S. 577 (1919) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 36

Rough Diamond Co. v. United States,
351 F.2d 636 (Ct. Cl. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Safeco Credit v. United States,
44 Fed. Cl. 406 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Shearson/American Express, Inc. v. McMahon,
482 U.S. 220 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Short Bros., PLC v. United States,
65 Fed. Cl. 695 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

Shutte v. Thompson,
82 U.S. 151 (1872) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Sola Electric Co. v. Jefferson Electric Co.,
317 U.S. 173 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Sprague Steamship Co. v. United States,
172 F. Supp 674 (Ct. Cl. 1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Tesoro et al. v. United States,
405 F. 3d 1339 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Thomas v. United States,
125 Ct .Cl. 76, 80 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Trauma Service Group v. United States,
104 F.3d 1321 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Union Pacific Railroad Co. v. United States,
847 F.2d 1567 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

United States v. Mezzanatto,
513 U.S. 196 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Urban Data Sys., Inc. v. United States,
699 F.2d 1147 (Fed. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

Whittaker Electronic Systems v. Dalton,
124 F.3d 1443 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

**STATUTES AND REGULATIONS**

15 U.S.C. § 772 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

DAR § 1-1502(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

FAR § 15.402(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

FAR § 15.802(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

FAR § 15.804-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14

FAR § 16.203-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11

FAR § 16.203-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

FAR § 16.203-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**MISCELLANEOUS**

Restatement (Second) of Contracts § 178 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Nash and Cibinic, Formation of Government Contracts (3rd Ed. 1998) . . . . . . . . . . . . . . . . . . . 13

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HERMES CONSOLIDATED, INC., Doing Business As Wyoming Refining Company, | ) | |
| Plaintiff, | ) | No. 02-1460C (Judge Block) |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

The United States respectfully submits its reply to Plaintiff's opposition to our motion to dismiss the complaint. For our reply, we rely upon our: "Response to Plaintiff's Proposed Findings of Uncontroverted Fact" (filed today), in which we respond to many of the factual premises of plaintiff's opposition to our motion; the appendix to our motion to dismiss ("Def. App."); our Supplemental Appendix ("SA"), which is attached to our moving brief; and our Supplemental Appendix II ("SA 2"), which is attached to this brief.

**SUMMARY OF THE ARGUMENT**

In our moving brief, we demonstrated that Plaintiff's complaint is an "everything but the kitchen sink" pleading designed to take advantage of MAPCO Alaska Petroleum, Inc. v. United States, 27 Fed. Cl. 405 (1992), which held that that DESC's jet-fuel contract price escalation Clause B19.33 was inconsistent with the Federal Acquisition Regulation ("FAR"). Subsequent to MAPCO, the FAR's promulgation authority and DESC's parent issued regulations explicitly legalizing the clauses, which are in use to this day.

The absurdity of the entire litigation, based upon contracts repeatedly formed, and long-ago performed, with no contemporaneous question about their legality or their interpretation -

was thrown into dramatic relief when, in Tesoro et al. v. United States, 405 F. 3d 1339 (Fed. Cir. 2005), *petition for reh'g. en banc denied*, No. 04-5064 (Fed. Cir. Aug. 22, 2005) ("Tesoro"), the court of appeals abrogated MAPCO, holding that B19.33 had been legal all along. The court explicitly rejected the contractors' contention, repeated here, that B19.33 was illegal because it was based upon "indexes rather than on Plaintiff's own established fuel prices;" and because it used the Department of Energy's Petroleum Marketing Monthly ("PMM") as a price reference. As our moving brief explains, the standard Tesoro established for economic price adjustment ("EPA") clauses also effectively disposes of Hermes' miscellaneous complaints concerning the legality of its contracts' EPA clauses, because it makes clear that the various tests Hermes would have these clauses pass simply do not exist. In fact, the court held, in order to pass muster under FAR 16.203-1, EPA clauses need only rely upon "industry-based prices," which "may be established by reference to either a catalog or market sources independent of the manufacturer or vendor." Id. at 1347.

In response, Hermes filed a second amended complaint designed to bolster the alternative counts with further factual allegations and an assertion that the contracting officer had the obligation to assure Hermes was paid "fair market value, pursuant to FAR 15.802(b) (currently codified at FAR § 15.402(a))" (see Compl. ¶ 35). Hermes also stubbornly clung to allegations found in its original complaint that either were squarely rejected by Tesoro, or were disguised as "common law" allegations, such as mistake, misrepresentation, and breach. The former allegations assert that DESC improperly based its escalation clause upon a reference other than Hermes' prices, and should not have used the PMM in any case (Tesoro's explicit holding rejected that argument); or invoke requirements found nowhere in the law (asserting that EPA clauses must be "designed or intended" to set prices and "reflect at least the fair market value of

military fuel"). As our motion explains, these allegations do not invoke a proper legal test for EPA clauses and, therefore, fail to state a claim upon which relief can be granted. In short, we have argued that, *as a matter of law* (regardless of whatever facts it may or may not find), Hermes cannot prevail.

Hermes' common-law allegations echo its "illegality" allegations, found in Count I. Although allegedly grounded in the parties' understandings and commitments, they lack a factual basis -- one that might establish the essential unrequited promise or understanding that typically undergirds such allegations. Their deficiency is unsurprising, because, as our motion explains, they are but thinly-disguised restatements of the Count I complaints, which, in turn depend upon MAPCO for their vitality. Accordingly, with regard to these allegations too, our motion argued that, *as a matter of law*, there simply was no relevant fact that plaintiff possessed or envisioned that could transform these counts into authentic common law claims.

We also explained that, regardless of the above, Hermes abandoned any rights the FAR might have conferred upon it, and Hermes forfeited any right it might have had to test those rights in litigation when it waited as many years as it did to file the necessary claims. In doing so, we relied upon this Court's decision in Hermes v. United States, 58 Fed. Cl. 409 (2003) ("Hermes II"), which held that Hermes may no longer pursue its illegality-based claims. As we demonstrated, Hermes' rights with respect to its derivative claims are indistinguishable and also should be dismissed.

Hermes responds, for the most part, as we expected, with a broadside attack upon the PMM itself, based upon incomplete quotations, innuendo, and a report from its consultants quibbling with the use of the escalation clause that the parties agreed to use. Lost in the report is that the court of appeals has determined that the clause is *legal*, even if not to the liking of

plaintiff's pricing advisors. Hermes' efforts to resuscitate the complaint via common law complaints of mistake, misrepresentation, breach, frustration of purpose and the lack – premised on the very same lack of "fair market" element to their contracts, and absent traditional allegations of real, discussed, unrequited expectations – fare no better. That is so, because a cause of action that has, at its root, the existence of a right that does not exist (the right to an EPA clause based upon its own prices, or one based upon "fair market value") does not get stronger by adding further elements of proof.

The other basis of Hermes' response is that it "requires discovery." As we explain in our separate response to Plaintiff's RCFC 56(f) motion, Hermes' motion demonstrates that it "requires discovery" principally to discover its own case and other matters that are untethered to legal causes of action. Accordingly, Hermes is not *entitled* to discovery and cannot plead lack of discovery to prevent the termination of this litigation.

## FACTS

To add a gloss to its otherwise legally-untethered case, Hermes continues to rely upon the same partial quotations and quaint charges of Government scheming pedaled in its opposition to our motion for partial summary judgment. To this, Plaintiff adds an opinion by its consultants concerning the performance of the PMM, also built-upon unfounded premises, and a conclusory statement from one of plaintiff's officials declaring that plaintiff intended to receive legal prices and fair market value. See, Compl. ¶¶ 16-21; Opp., at pp. 5-8. We addressed many of these fallacies in our earlier briefing and see no reason to repeat them in detail here. In general, Plaintiff's logic-bending story is that: DESC knew there was something corrupt about its use of the PMM; apparently had concluded that the price of fuel would, in the future, move in one direction; the PMM and all of the references DESC used would report movement in the opposite

direction; somehow that movement always would favor DESC's customers; somehow the fuel industry never would detect this or, upon learning it, would bid eagerly nonetheless.

In fact, none of the documents upon which plaintiff's case rests can remotely be read to suggest that the Government believed there was a problem with the accuracy of the PMM or any other reference – or that there is one. Indeed, review of the complete documents cited by Plaintiff makes clear that the Government considered the PMM the benchmark for all other references, yet was keenly interested in studying any reference that was suitable for purposes of contract price adjustment.

Plaintiff's story begins with the Energy Information Administration ("EIA"), the author of the PMM. Among Plaintiff's favorite allegations and a pillar of its complaint is that the EIA has acknowledged that the PMM was not "intended to be an index that is used for setting prices." Pl. PFF 15. The implication, of course, is that the PMM is *unsuitable* or *illegal* for use as a price reference. What plaintiff avoids quoting is the testimony of the EIA's Dr. Cook on *that* point, which was:

> We're not opposed to [the PMM] being used for that purpose. We don't, per se, collect the data and justify its collection with OMB for that specific use. We justify its collection on the basis of its general value in measuring actual average prices, wholesale and retail, for everything from crude oil from the wellhead to the pump for state energy offices or various federal agencies, and most especially for Congressional committees for analysis purposes, forecasting, market tracking, all those uses. It's, it's, it happens to be useful, according to oil companies and DFSC for indexing, as well, but we didn't specifically design it for that.

SA 2 at 5 at 632, l. 14.

Plaintiff also asserts that the PMM is illegal because it suffers from an "index number problem." An index number problem refers to an "index" that contains two or more products

whose relative prices or quantities are changing. However, as Jacob Bournazian, of the EIA, explained to plaintiff's counsel, during Mr. Bournazian's deposition in La Gloria v. United States, No. 02-465 (Fed. Cl.), the price data at issue is not an index, which is "a ratio of two numbers." SA2 2. Surprisingly, Plaintiff's consultants cite Mr. Bournazian's article concerning the PMM as the basis of its assertion that there is an index number problem, asserting that the PMM "uses current-period volume weights; that is, the reported sales prices are weighted by the actual sales volumes of different products and in different locations in each period." Pl. App. 616. The report repeats this characterization of the PMM further below, on page 616, asserting that "the price data reported in the PMM often represents an aggregate of multiple different fuels sold across many locations." However, this is not at all apparent from the article cited. In fact, Mr. Bournazian's article compares prices of different fuels to each other, including "U.S. Kerosene-Type Jet Fuel." As the contracting officer has explained "PMM price averages are based on petroleum product sales information reported to DOE and grouped by product, type of sale, states, and by geographic region." Def. Exh. 1 (Walker Decl. ¶ 9). The EIA Form 782A, which collects that information, confirms as much. SA2 9-20. It provides strict requirements that require the segregation of product sales reports. Thus, kerosene-based jet fuel is reported on one line of the form, while different types of gasoline and diesel fuels have their own individual lines.[1]

---

[1] Thus, this reporting is different than that that might be encountered with a true "index," such as the Consumer Price Index, which consists of a mix of items. See, generally, http://www.bls.gov/lpc/lprdho95.pdf (Bureau of Labor Statistics paper on the index number problem); http://www.imf.org/external/np/sta/tegppi/ch15.pdf (International Monetary Fund paper addressing the question of "How exactly should the microeconomic information involving possibly millions of prices and quantities be aggregated into a smaller number of price and quantity variables? This is the basic index number problem").

Another pillar of Plaintiff's argument is that somehow DESC breached an obligation to the contractors by failing to disclose that it worked with DOE "to see that our needs were met." Pl. Br. At 40, n.36; see also Pl. Br. at 5, n.9. However, the document upon which the assertion relies, Pl. App. 100, is taken out of context. As plaintiff's next document explains, DESC asked that EIA employ a "phased-in" approach to a new PMM format EIA was developing. DESC suggested that this could take the form of a dual reporting scheme in which EIA proceeded with its new method, but also included the old method until existing DESC contracts relying on the old method expired. Pl. App. 101-02. This hardly affected the contracts at issue or implicated a legal duty owing the Government's fuel suppliers.

Lacking any proof of the PMM's inherent illegality, plaintiff asserts that DESC concluded as early as January, 1986 that PMM prices moved as much as one or two cents per gallon out of step with other market references, did not disclose this to its suppliers, and continued to use PMM prices despite this knowledge. Amend. Compl. at ¶¶ 16-17; Opp., at p. 5-6. But, what plaintiff refers to was well known by both parties, i.e., that various *interim* references (those used to provide a price adjustment while final PMM numbers for the month were being compiled by EIA), yielded *different* figures than the PMM and could over or under-predict the final price adjustment due. For that very reason, the contracts with PMM EPA clauses provided for final price adjustments, to be made when the applicable PMM prices were published. Such a two-step payment procedure would have been unnecessary if the prices in both references were identical. Thus, plaintiff knew from the many interim and final payments it received under its contracts that the reference prices differed.[2] Compl. ¶¶ 9, 27; See, PFF 13.[3]

[2] Plaintiff's attempts to infuse some significance to the difference between the PMM and other price references by asserting that, in contrast with the "one or two cent per gallon"

Another pillar of Plaintiff's complaint is its characterization of reviews conducted by DESC concerning the use of the PMM as a price reference.[4] For example, the second amended complaint alleges that a study DESC conducted in 1987 concluded that " . . . PMM did not protect against market fluctuations and did not ensure that the prices DESC paid for military fuel under the long term contracts reflected at least fair market value" and that "DESC did not disclose this 1987 study to its suppliers . . . ." Compl. ¶¶ 18, 19. Plaintiff also asserts that the " . . . study supported using the commercial price references Platts and OPIS to make price adjustments-not the PMM." Pl. Br. 6. In fact, the study found that PMM prices were adequate for price adjustment purposes and, judged by some criteria, superior to commercial trade publication prices. PFF 15-23. The study concluded that DESC should continue using PMM prices, but modify the system to use a published PMM reference price instead of an unpublished price. PFF 23. It did not conclude that PMM prices were inadequate for EPA purposes, or unfair to suppliers, or failed to reflect the market.[5]

---

differential between interim prices and PMM prices, DESC required its suppliers to submit bids to the one ten-thousandth of a cent, is equally misleading. DESC did not "require" that offerors ". . . submit bids to sell military fuel to the one-ten-thousandth of a cent ($.000001)." Compl. ¶16; Opp. p. 6. DESC only evaluated offers to that decimal place. Bidders were free to, and often did, submit bids to two decimal places, such as $.35, or .60, or .70 per gallon of fuel.

[3] Plaintiff's "Statement of Genuine Issues" denies PFF 13, stating "[d]enies the allegations pursuant to Rule 56(f)." But plaintiff cannot seriously claim that it needs discovery regarding whether some of its DESC contracts contained interim and final price adjustments. In fact, plaintiff's own Appendix contains a contract with a PMM clause providing for interim and final price adjustments precisely as set forth in PFF 13. Pl. App. 665-666.

[4] We have described these reviews in our PFFs 14-21.

[5] Plaintiff's allegation that "DESC did not disclose this study to its suppliers" is undercut by the very evidence it proffers in its Opposition. The cover memorandum on the "proposed final draft" study that plaintiff includes in its appendix clearly shows, in a handwritten note, that at least some suppliers were canvassed on the proposal to continue using PMM prices with an

Plaintiff relies upon selective quotation of the 1987 study, rather than reporting the report's actual conclusions. For example, plaintiff repeats the report's quotation of a supplier that "we never know if we have made or lost money when you (D[E]SC) lift a cargo." However, Plaintiff neglects to mention that the comment concerned the interim-final price adjustment issue, not the use of PMM *per se*. See, SA 8, Background. Plaintiff's reliance upon quotations from DESC economists that use of trade journals "would cost DESC money" and that there would be "market risk" if adjustments were based on trade journal prices for "jet kerosene" are, likewise, taken out of their context. In fact, the quotations concerned perceived weaknesses with trade journal prices, not defects in PMM prices. Thus, the "market risk" alluded to in the study of using trade journal prices was based upon the analysis that trade journals suffered from "price stickiness" during periods of declining prices and would "cost DESC money" during those times. PFF 19; SA 10. Likewise, the "market risk" noted with using trade journal prices for "jet kerosene" was not due to any PMM defect or failure, but to the availability of only a single trade journal reporting "jet kerosene" prices, and the risk that it might discontinue publication. PFF 19; SA 10.

To attempt to add weight to its innuendo, Plaintiff alleges that "seven years later, in 1994, senior officials at DLA learned of DESC's 1987 study, and, upon review of the study, directed DESC to stop using PMM to set military fuel prices." Compl., ¶ 20. However, it was DESC, not senior DLA officials, which, in 1994, first sought a FAR deviation to begin using trade publication prices for price adjustments. PFF 22, 23. DESC did so, not because it had

---

earlier base reference price. ("Option II industry survey-Barrett, Pride, Chevron, Dia. Sh.-great idea! Calcasieu-indifferent Sun, West. Pet, Gladieux, Peerless, AIRI-won't hurt-might help) Pl. App. 596.

concluded that refiners were not receiving "fair market value" with PMM price adjustment clauses. Rather, the decision was based upon some of the same criteria that had been set out in the 1987 study, including the elimination of the need for interim price adjustments, the wide acceptance of trade publication prices by industry, and the relative simplicity of the use of trade publication prices. PFF 22. The apparent basis for plaintiff's theory is the deposition testimony of Lawrence Ervin that the change from PMM prices to trade journal prices "was made in response to some pressure from headquarters to do things differently." SA 23. However, as he explained, the basis was DLA's hope that changing from PMM prices to Platts would "produce substantial savings to the taxpayer." Id. It would make no sense for DLA to have hoped to produce "substantial savings to the taxpayer" by eliminating the use of PMM prices that were allegedly underpaying suppliers.

Plaintiff's argument also is based upon a mischaracterization of a 1994 price analysis memorandum. As plaintiff explains it, DESC admitted that its use of PMM prices had " . . . distorted military fuel prices materially . . . " and that " . . . prices it had previously set using the PMM so departed from market value that they could not be compared to prices set based on Platts and OPIS." Compl., ¶ 21; Pl. Br. 8. In fact, as the memorandum makes clear, the quotation was not an admission regarding the validity of PMM prices, but the unremarkable observation that it was not possible to directly compare prices between contracts where the price adjustment references differed, with one contract adjusted using monthly PMM prices and interim adjustments, and the other using weekly adjustments. App. 144.

In addition to being untrue, the allegations added to this lawsuit through the second amended complaint add no legal weight to plaintiff's case. At best, they concern the relative merits of various price references - a discussion left to the realm of economists and fuel-industry

analysts -- not the parties to a contract years after their contracts have been fully performed.[6]

## ARGUMENT

I. DESC's EPA Clauses Are Authorized by FAR 16.203-1

In Count I, Hermes asserts: (1) that the clauses were illegal because there were not based upon "Plaintiff's own established fuel prices" (Compl. ¶ 33); (2) that the clauses were illegal because they were "not market-based, were not designed or intended to be used to set or adjust prices, and did not reflect at least the fair market value of military fuel" (Compl. ¶ 34); and (3) that the contracts were awarded in violation of FAR § 15.802(b) (currently codified at FAR 15.402(a)) (contracting officer's duty to review offers for price reasonableness). (Compl. ¶ 35)

A. EPA Clauses Need Not Be Based Upon Plaintiff's Own Prices

In our moving brief, we demonstrated that the explicit holding of Tesoro was that a FAR 16.203-1 EPA clause need not be based upon the contractor's own prices. As the court put it:

> Although the term "established price" is not expressly defined in FAR § 16.203, the definition of the term in FAR § 15.804-3 is incorporated by reference. FAR § 15.804-3 defines "established prices" to include contractor-specific prices, namely "established catalog prices," and industry-based prices, namely "established market prices." As indicated by FAR § 16.203-2 and FAR § 15.804-3, the policy behind requiring use of "established prices" is to avoid contracts subject to the operational whims of individual contractors.

Tesoro, 405 F.3d at 1347.

Rejecting the contractor's argument (Hermes' here), the court held explicitly that the theory that "FAR 16.203-3 requires that adjustments be based only on changes in the prices

---

[6] Notably, none of the additional evidence found in the second amended complaint or addressed to plaintiff's opposition concerns the contracts that contained price references other than the PMM. Accordingly, there is no basis for further proceedings concerning those contracts.

charged by individual contractors eviscerates the regulatory meaning of the term 'established prices' and the policy reasons for using it." Id. Summarizing, the court explained that: "According to the interplay of all four sections of FAR § 16.203, a 'contractor's established price' may be established by reference to either a catalog or market sources independent of the manufacturer or vendor." Id. at 1347.

Plaintiff offers no rebuttal to this point other than to assert that Tesoro was wrongfully decided, and that Barrett Refining v. United States, 242 F.3d. 1055, 1060 (2001), provides the proper rule of decision. However, that argument was presented to the court in Tesoro and rejected. Tesoro, 405 F. 3d 1345 (noting that, in Barrett, the court was not presented with the issue of legality). Accordingly, that argument appears to have reached an end – at least in this Court.

B. DESC's PMM-Based EPA Clause Is Legal

In Tesoro, the court did not stop with the question of whether, in general, an EPA clause not based upon the contractor's own price could be illegal, because the argument presented to it (especially given reliance upon MAPCO) invoked the nature of the PMM. Accordingly, the court of appeals explicitly considered whether DESC's PMM-based EPA clause was an "established prices" clause and held that it was. Our moving brief quoted at length from Tesoro. It demonstrated that the court stated that it was considering the legality *of the PMM* (e.g., the certified question for interlocutory review was "Did DESC establish the price of fuel in violation of law by employing economic price adjustment clauses indexed to PMM?"[7] ), and considered various of the factors cited by MAPCO, as the basis for its holding the PMM was not an

---

[7] Tesoro, 405 F.3d. at 1342 (emphasis added).

"established prices" clause (e.g., that the PMM was an "amalgamation of the previous month's sales data" and, as such, did not comport with the dictionary definition of "established").

Summarizing the sweep of its review, the court of appeals concluded:

> Because we conclude that DESC's use of a market-based EPA clause tied to the PMM was authorized under the FAR, we do not reach the other issues raised in the certified questions . . . . Our holding that the use of the PMM-based EPA clause was authorized under the statute moots the issue of [waiver].
>
> * * *
>
> For the foregoing reasons, we hold that the Court of Federal Claims erred in holding that DESC's use of a PMM-based EPA clause was not authorized under the FAR.

Id. at 1347 (emphasis added).[8]

Notwithstanding Tesoro's finding that the PMM-based clauses are legal, the complaint asserts that they could not be, because they were "not market-based, were not designed or intended to be used to set or adjust prices, and did not reflect at least the fair market value of military fuel" (Compl. ¶ 34). As we noted in our moving brief, these standards cannot be found in the regulation or in Tesoro. Rather than defend the sufficiency of these proferred legal tests posited by the complaint, Plaintiff's brief turns straight to the opinion offered by Plaintiff's trial consultants. (Plaintiff offers no criticism of the other EPA references included in the various contracts at issue, such as Platts). In general, without regard to the competition under which the prices at issue were offered or the terms provided in the parties' contract, the consultants' report

---

[8] Plaintiff's oft-quoted argument from our appellate brief that we did not consider the appellate court's review to be a "beauty contest" does not affect how the court itself viewed the scope of its argument. But, Plaintiff reads too much into our comment, which we repeat here: it is not for the courts to determine whether one EPA clause is better than another from a business, pricing or economic standpoint. That choice is the agency's and can be voided only upon a finding that it is illegal.

is a comparison between PMM and Platts, and how their report of "the market" may have moved in relation to each other.

The difficulty with relying upon opinions, even if taken as fact, is that, absent a legally-cognizable cause of action, the facts are immaterial to a court of law. Here, the materiality of the report rests upon plaintiff plumbing some depth in the simple regulatory requirement that an EPA clause be "market-based." Plaintiff's effort in that regard comes up empty, because Tesoro levied no greater standard than was sufficient to find that the PMM was market-based -- a finding it was able to make, based upon the simple facts before it. In our moving brief, we established that the PMM was "market-based." Among other things, we included (as we have here) the statute that requires refiners and sellers of petroleum products to report actual sales data to DOE. 15 U.S.C. § 772. It is this data upon which the PMM is based. See Def. PFF 12. Because the prices are established in actual sales between a number of sellers and buyers, it surely can be said that the EPA clause was based upon market prices, and satisfy the FAR 15.804-3 requirement that market prices be established in the ordinary course of business between buyers and sellers free to bargain.[9]

In the trial-level decisions that led to Tesoro, the plaintiffs disagreed concerning whether the PMM could be considered an "established prices" clause, arguing that the PMM was only an amalgamation of prices, was not based upon actual sales of jet fuel, and so forth. See, e.g., MAPCO Alaska Petroleum, Inc. v. United States, 27 Fed. Cl. 405 (1992). Neither the various

[9] To the extent that there was a "fair market value" test for the PMM, that was performed by the agency's examination of the various claims, which established, if anything, that contractors were overpaid. See also Barrett v. United States, 50 Fed. Cl. 567, 569-70 (2001) (finding that the use of PMM resulted in the contractor being overpaid in three of the four contract at issue when compared to Platts, the reference upon which the claims were based).

trial courts nor the court of appeals found a genuine issue that might have precluded a judgment in our favor.

Nor did these courts posit that there was a further test of what it means to be "market-based." The plaintiffs in Tesoro certainly never suggested that the PMM or any of the various references were not market-based. Nor does the purpose of the EPA clauses themselves. As we have explained in earlier briefings, the FAR's bias is for competition. Nothing provides a less-assailable ground for competition than firm-fixed prices. To permit an exception – one that allows the winning bidder of a single, price-based competition to escape that price for subsequent sales, yet be the sole supplier for those subsequent lots – potentially eviscerates a competition-based system. Accordingly, to assure that prices remain tethered to the competition, the FAR requires that escalators be independent of the contractor's prices and be permitted only when the nature of the sale requires it (such as the sale of as volatile a commodity as fuel). As the court of appeals explained it, "the policy behind requiring use of 'established prices' is to avoid contracts subject to the operational whims of individual contractors." Tesoro, 405 F.3d at 1347.

And, even if the court intended to effect a *sub silentio* remand on the question of whether the PMM was a market-based test, the FAR itself requires nothing more than the clause be "market-based" – not that it move with Platts or that it meet any particular standard of precision. Indeed, Plaintiff offers no new legal standard. Rather, it simply seeks to remove the unambiguous standard the parties agreed upon many years ago.[10] And, rooted as it is in the *post*

---

[10] Plaintiff's reference to Beta Systems, Inc. v. United States, 838 F.3d 1198 (Fed. Cir. 1988) does not supply that standard either. At issue there was a Defense Department FAR supplement not applicable here, which supplied specific criteria for cost index-type clauses. Indeed, the existence of such a detailed provision suggests that, if the agencies had wished to

*hoc* arguments of economists and industry-watchers, Plaintiff's approach relegates the parties to observers, not makers, of their own agreements – and infuses less certainty, not more, into their dealings.

C. Hermes' FAR 15.802(b) Allegation Does Not State A Cause of Action

In our moving brief, we demonstrated that Plaintiff's effort to root its core complaint in a violation of FAR § 15.802(b) (currently codified at FAR 15.402(a)), does not state a claim upon which relief can be granted, because it does not create an enforceable right for contractors.[11] See Short Bros., PLC v. United States, 65 Fed. Cl. 695, 764-65 (2005) ("The FAR provisions cited by plaintiff purport to do no more than to provide internal government direction. For example, FAR § 15.802 (1993), entitled "Policy," only requires that the contracting officer "[p]urchase supplies and services from responsible sources at fair and reasonable prices [.]" FAR § 15.802(b) . . . It does not afford a judicial remedy").[12] We further explained that that provision was found in that part of the regulation that was concerned with obtaining adequate price competition, so that the Government was assured of paying a reasonable price.

To overcome our analysis, Plaintiff relies upon the regulation, the dictionary (definition

---

further regulate EPA clauses to the degree plaintiff suggests, they would have done so. Where the regulating authorities having stayed their hand, the Courts should not be tempted to regulate.

[11] FAR 15.402(a) provides that the contracting officer "must- (a) Purchase supplies and services from responsible sources at fair and reasonable prices."

[12] Plaintiff's effort to distinguish Short Bros. is limited to noting that it was very long (and not devoted to the proposition for which we cite it) and that plaintiff sought a different contract type does not affect the case's logic. Nonetheless, the holding we cited is correct, and the plaintiff in Short Brothers also sought more money, as Plaintiff here. Plaintiff seeks to distinguish All Phase Environmental, on the ground that the GAO did not, among other things, discuss the purpose of FAR 15.402. To the contrary, the GAO noted that the agency's concern was in not paying more than warranted.

of "fair"), and guidance to contracting officers and auditors found in the Armed Services Pricing Manual ("ASPM"), which suggests that a price should be fair to both sides. However, even if plaintiff were entitled to bring a FAR 15.402-based claim to this Court, the complaint still fails to state a claim, because FAR 15.402 concerns *bid and award* prices – not *adjusted* prices, which are calculated during contract performance, based upon the movement of the EPA clause. Accordingly, the ASPM refers to "price" in the singular and to "current market conditions," not subsequent adjusted prices. As we have explained, the contractors set their offer prices and no contractor has suggested that their offer prices were unreasonable.

In any event, the ASPM guidance, the dictionary's definition of fairness, and Plaintiff's other secondary references amount to nothing more than good advice for contracting officers interested in working with contented, motivated contractors, not seeking opportunities to present claims.[13] However, they do not establish the existence of an enforceable interest.

Moreover, to suggest that the FAR, which was issued against a backdrop of long-established principles of commercial law (including the principle of unilateral mistake, which the FAR addresses), intended to add a cause of action not rooted in mistake is as preposterous as it is illogical.[14] Indeed, if, as Hermes argues, the contracting officer's obligation to assess price

---

[13] Indeed, the declarations in the record submitted by the contracting officer, John Walker (Def. Exh. 1) and the DESC Price Analysis and Pre-negotiation Briefing Memoranda (Pl. App. 144-70, 206-78) explain how prices were determined fair and reasonable. The undisputed facts show that prices were determined fair and reasonable based upon competition. See FAR 15.404-1(b)(2)(I) (normally, adequate price competition establishes price reasonableness").

[14] See Nash and Cibinic, Formation of Government Contracts (3rd Ed. 1998) at 1279 ("The primary focus of these requirements is to ensure that the Government does not pay unreasonably high prices," although they caution that "prices that are unreasonably low must also be dealt with before an award is made, because they could be evidence of mistake, non-responsibility, lack of understanding of the work, or a buy-in"). The plaintiff's own argument makes this connection, asserting that it is grounded in a misrepresentation. Pl. Br. 32-33.

reasonableness were actionable, contract pricing never would be binding, because contractors who failed to realize the *post hoc* demands of their owners or investors could occasion this Court's intervention with no more substantial an allegation than "our price was unfair!" Plaintiff suggests that is not true, because courts adjust contract prices all the time. But, they do so upon discernible standards – not generalized claims of "unfairness," unrooted in long-recognized causes of action.

Indeed, Plaintiff acknowledges that this is its true bottom-line, arguing that there is nothing unique to its FAR 15.402 claim, because Plaintiff "alleges that the determination of price reasonableness was, in essence: that DESC knew that the PMM did not reflect the marketplace, [and] misrepresented that fact. . . ." Pl. Br. 33. In other words, as Plaintiff's allegations of misrepresentation go, so goes its FAR 15.402 allegation. As we have explained, Plaintiff has yet to put a fact in evidence that amounts to a misrepresentation or establish its fanciful conspiracy theory.

III. <u>Hermes' Alternative Illegality Theories In Counts II-VI Must Be Dismissed</u>

A. <u>Count II (Misrepresentation)</u>

In our moving brief, we established that Plaintiff's misrepresentation count (DESC "misrepresented and otherwise failed to disclose that PMM and other indexes were not designed or intended to be used to set or adjust prices and did not reflect at least fair market value." Compl. ¶ 47) should be dismissed, because there is no such applicable rule for EPA clauses. Plaintiff's brief does not suggest one or that the Government actually misrepresented anything. Instead, Plaintiff asserts that, because the complaint *alleged* a "misrepresentation," for the purposes of our motion, it is an established fact. Pl. Br. 34. However, misrepresentation is an allegation of law, which we need not accept. In fact, the entire point of our motion is to

challenge it. Accordingly, absent any material fact pertaining to an actual misrepresentation, that count now must be dismissed.

B. Count III ("Breach of Contract") and Count IV ("Implied-In-Fact Contract")

In our moving brief, we established that Plaintiff's breach of contract count and implied-in-fact contract counts should be dismissed, because there is no ground for striking the parties' own unambiguous agreement. We also established that an "implied-in-fact contract cannot exist if an express contract already covers the same subject matter." Trauma Service Group v. United States, 104 F.3d 1321, 1326 (Fed. Cir. 1997).

Other than asserting that the contract "expressly" requires the payment of "fair market value" (apparently, an amount other than the price adjustment provided by the contract), Plaintiff cites no language to contradict the unambiguous language of the contract's pricing clause. Instead, Plaintiff attempts to oust that clause obliquely, reasoning that the *Spearin* doctrine (Government warrants that design specifications will yield satisfactory result) and principles of contract reformation somehow trump a contract's unambiguous language.[15] But, the plain language of the contract's pricing clause do not permit such machinations. We do not disagree that if, as a matter of law, the pricing clause were stricken, that reformation could be available. Nor do we disagree that any such remedy would include an examination of the parties' dealings

---

[15] Plaintiff alludes to the "implied" promise to pay fair market value found in Barrett, 242 F.3d 1060. Pl. Br. 36. However, in that case, the contract was assumed to be invalid, and the court was looking for evidence of an implied in fact contract. Here, should we reach such a remedy phase, we would expect the parties to adduce evidence concerning the fact of any such implied agreement. Absent agreement upon what "fair market value" means, it is unlikely the parties are in any position to agree upon what, specifically, that might be. Notably, the denouement of Barrett was the trial court's finding that, based upon the presumed implied-in-fact agreement, the Government overpaid for three of the four contracts at issue. Barrett, 50 Fed. Cl. At 569-70. We understand that plaintiff would dispute that an agreement that would yield any such result exists.

to search for an alternative, implied, arrangement; but, until plaintiff can void this contract through some other cause of action, these counts simply amount to an unnecessary bloating of the complaint.

C. Count V ("Failure of Consideration and Frustration of Purpose")

Count V presents a further unnecessary multiplication of Plaintiff's charges. Plaintiff seeks to avoid the dismissal of Count V, by asserting that the matter is not "ripe for decision," because "DESC offers no evidence" concerning the degree of frustration. Pl. Br. 45. However, it is Plaintiff that bears the burden of proof in advancing evidence of its purported frustration. Moreover, Plaintiff's reply acknowledges that the count is grounded "on the voiding of DESC's pricing clause on the grounds of illegality." Pl. Br. 45. Accordingly, the dismissal of Plaintiff's remaining illegality counts would result in the dismissal of this count (conversely, were it not to be dismissed, the frustration count would be superfluous) and, therefore, serves no purpose.

D. Count VI (Mistake)

In our moving brief, we demonstrated that Count VI must be dismissed for the same reason as the other alternative causes of action, and that Plaintiff failed to meet the basic elements of proof of a mistake claim, including that, at the time of their agreement, the parties shared a mistaken belief "regarding a fact" concerning a "basic assumption underlying the contract." See Dairyland Power Cooperative v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994).

The reply asserts that the complaint's focus in this Count is the purpose of the PMM and what it is intended to measure. Pl. Br. 45. But, Plaintiff's reply fails to identify any belief that it held concerning the PMM – let alone one held by DESC. As we have explained, the PMM reports on actual sales data required to be reported by statute. Plaintiff itself was required to

supply the information that was the basic ingredient of the PMM. Plaintiff has failed to show why the purpose of the PMM or why EIA collects PMM data is material to an unambiguous contract provision that was never alleged to operate or be administered or interpreted improperly.[16] In sum, Plaintiff's mistake pleading lacks a factual premise.

IV. Waiver and Estoppel Bar Hermes' Claims

A. Introduction

Our moving brief established that, even if the FAR were to confer some unrealized right, Plaintiff elected to accept the pricing clause it did and, through years of inaction, now is estopped from pursuing any such imagined right in litigation. Our moving brief also demonstrated that Plaintiff's alternate illegality arguments and the common law causes of action are based upon the same faulty premise, i.e., that the Government has a legal duty to use escalators based upon price references that are "intended or designed" to be used as prices references, and to ensure that contracts result in payments that the contractor is satisfied amount to"fair market value" rise or fall with Plaintiff's illegality allegation.

In Hermes II, 58 Fed. Cl. 409, this Court held that Plaintiff's allegation that the PMM violated the FAR was waivable, and that Hermes' illegality claim was waived in this case. In reaching its decision, the Court found that the requisite "intelligent waiver" could be discerned from Hermes' general sophistication and lengthy failure to signal its dissatisfaction whatsoever. Id. at 416-18.

As the Court observed:

---

[16] Plaintiff's reliance upon Beta Systems does not supply its missing factual ingredient. Not only are the facts of that case not suggested here by any evidence, that case involved a DFAR supplement and specific EPA clause criteria not applicable here.

> It is almost universally conceded that "'wherever a contract not already fully performed is continued in spite of a known breach, the wronged party cannot avail himself of that excuse . . . . As a general proposition, one side cannot continue after a material breach by the other . . ., act as if the contract remains fully in force (although stopping performance would be fair and convenient), run up damages, and then go suddenly to court.'"

Id. at 418 (citing Ling-Temco-Vought, Inc. v. United States, 201 Ct. Cl. 135, 146 (1973) (quoting Northern Helex Co. v. United States, 197 Ct. Cl. 118, 125-26 (1972)); see also Hermes II, 58 Fed. Cl. at 413 (a "key factual distinction" to be that Hermes "astonishingly waited 14 years after entering the first [contract at issue] and eight years after entering the last [contract at issue] before litigating").

As explained in our original motion for summary judgment, estoppel also is applicable. Estoppel requires that the party asserting estoppel rely to its detriment upon its opponent's action or inaction. E.g., E. Walters & Co., Inc. v. United States, 217 Ct. Cl. 254, 576 F.2d 362 (1978). Here, because of its superior knowledge of its circumstances, and its extensive experience with the clauses at issue, Hermes was in the best position to assess the efficacy of the EPA clauses regarding its own situation. By adopting the EPA clauses in its offers with the text of the FAR available to it for consultation, Hermes signaled its intent to forego any benefits contained in the FAR. That Hermes continued to offer these clauses, coupled with its failure to protest clearly prejudiced the Government, because, as subsequent events showed, the Government could have obtained a deviation. Either of these would have been a "relatively painless alternative" to the after-the-fact, competition-free, speculative recovery Hermes now seeks. Indeed, as did the contractor in Ling-Temco-Vought, Hermes has "in effect retained all options for itself . . . made its calculations entirely in its own favor, without proper consideration of the defendant's position," and violated the "basic principle calling for fair treatment of both parties." 201 Ct. Cl.

at 148, 475 F.2d at 638.

Hermes seeks to avoid the weight of this authority by asserting it may not be held to have waived as a matter of fact and may not be held to have waived as a matter of law.

B. Plaintiff has Waived As A Matter Of Fact

Plaintiff asserts that it cannot be considered to have waived its claims as a matter of fact upon various bases: (1) there is no factual basis for presuming an intentional relinquishment and the declaration of Plaintiff's officer that it believed "DESC prices were legal," that "the prices set would reflect fair market value, and did not "relinquish its right to payment of fair market value" (citing App . 639); (2) that the waiver found in Hermes II was based upon a presumed knowledge of law; (3) Plaintiff had only 11 observations of the performance of the PMM clause; (4) the purchase is analogous to the purchase from a "monopolist;" (5) that "suppliers" objected to the PMM clause; and (6) that DESC knowingly concealed secret knowledge concerning the operation of the PMM and, therefore, has "unclean hands."

We have addressed these various allegations, above, and in our response to plaintiff's proposed findings of fact. The essence of every element of Plaintiff's case is a statement by one of its current officers that Plaintiff intended the contracts at issue to be "legal," and that it intended to receive "fair market value" and not to "relinquish its right to payment of fair market value." Essentially, plaintiff has defined the problem away, by assuming that the contract is "illegal," that it has a "right" to receive "fair market value," that it did not receive "fair market value," and that, somehow DESC knew all this.[17] However, its declarations and appended

[17] Thus, for example, after citing examples of DESC stating that PMM states the fair market value, Plaintiff asserts that such statements are "misrepresentations" that have been "unmasked." In fact, assertions concerning PMM and its relationship to the market place are established by the statute that requires fuel refiners to report their actual sales prices to the EIA

documents fail to establish that. Moreover, the best evidence of plaintiff's intent is its conduct in signing contracts without objection over many years. As the court stated in Safeco Credit v. United States, 44 Fed. Cl. 406, 420 (1999): "Plaintiff's allegation of its intent not to waive a claim when it signed the modifications is insufficient to raise a genuine issue of material fact so as to preclude summary judgment for the government."

Plaintiff attempts to put a further gloss on this, by asserting that it could not have known how the PMM would operate, because it had nine "annual observations" of the PMM, and that this was not enough to determine a consistent bias; thus, there is no evidence plaintiff intended to forego fair market value. Actually, plaintiff had at least 108 relevant observations of the operation of the PMM, because prices were adjusted monthly or weekly for nine years (three of plaintiff's contracts used Platts as a base reference). Moreover, if plaintiff's knowledge concerning its current allegations were material, presumably, it would either have gathered that knowledge or determined that it was not material. But, what mystery there might be is confounded by the fact that Plaintiff itself was required to make detailed reports to EIA for the preparation of the PMM.

Plaintiff also asserts that the contracting officer, John Walker, whose declaration establishes that Plaintiff did not object to the legality of the PMM did not explain his involvement with plaintiff and failed to disclose that he was not employed by DESC for a portion of the time covered by his declaration. Pl. Br. 54. In fact, the declaration states that from 1987-89, Mr. Walker was employed by the Navy. SA 1. The declaration also explains the basis for Mr. Walker's knowledge, i.e., that he reviewed the contract files and saw no evidence

---

(PFF 12), DESC's study of the PMM (PFF 14-21), and DESC's consistent statement of its position through its vindication in Tesoro, 405 F. 3d 1339.

that plaintiff had objected to the EPA clause. And, in 1989, 1990, and 1998, he was the awarding contracting officer. Pl. App. 648, 718, 735.[18] Incredibly, Plaintiff offers no evidence that it did object. Accordingly, it is undisputed that Plaintiff did not object.[19]

Plaintiff's most dramatic gloss is its "clean hands" conspiracy theory. As is the case throughout Plaintiff's brief, Plaintiff's recitation of the tale is marred by its failure to fully quote the evidence cited. Typical is its assertion that DESC "admits" using its "market leverage" as "the sole purchaser of military fuel" to "improve the competition" by making the EPA clause non-negotiable, citing among other documents, Pl. App. 17. Pl. Br. 56. Pl. App. 17 is an excerpt of the testimony of Lawrence Ervin, a DESC pricing official, from the Barrett trial. There, Mr. Ervin stated that, in the mid-1980s, as the market became a buyer's market, DESC used its

---

[18] In a footnote, Plaintiff declares it has established the "inaccuracy" of Mr. Walker's statement in a similar case, Calcasieu v. United States. Pl. Br. 54, n. 43. In fact, there is no apparent conflict in the document Plaintiff offers in opposition to Mr. Walker's statement. The document is a letter from DESC to Calcasieu, not a letter of complaint from Calcasieu. From the response, it appears that Calcasieu was not complaining about the accuracy of the PMM, but its ability to determine its offer price when the PMM was not yet available for the reference month. Pl. App. 96. DESC resolved this problem in 1987 when it changed the reference month. SA 7.

[19] Instead, Plaintiff relies upon the allegation that DESC had received objections to PMM from "suppliers." "as early as 1984. Pl. Br. 55. Plaintiff also asserts that "every known objection was rejected out of hand." Id. In fact, what Plaintiff is referring to is the complaint of the plaintiff in MAPCO, which asserted that the PMM was "non-indicative of our marketplace," and noted its unique situation, i.e., its location in Alaska and non-access to continental markets. Pl. App. 205. However, neither this plaintiff (nor any other it has identified) has made any such objection or explained the relevance of MAPCO's situation to its own. The "rejection" to which plaintiff refers is a DESC internal memorandum, explaining that its policy was to have common "EPA references." Pl. App. 205. The memorandum explained that the "[u]se of different escalation references in a competitive procurement renders meaningful price evaluation in a competitive procurement difficult, if not impossible," but that, "in the case of Alaska, the proposed common escalation reference may not be obtainable . . . [Thus,] [i]f the proposed EPA reference is rejected by all Alaska based offerors, a common EPA reference based on Alaska product postings will be appropriate." Pl. App. 205. In short, the problem was with the Alaskan market, a common reference was required for competition purposes, but that if that was not obtainable, DESC was prepared to accept something else. None of this pertains to plaintiff.

leverage as a buyer to get contractors on a common escalator. As Mr. Ervin also explained, DESC wanted to be sure that it used a publication that reflected actual sales. Pl. App. 18. This is hardly a statement that DESC's use of the PMM was corrupt.

Plaintiffs' monopolist argument is similarly inapt - the Government is neither a monopolistic buyer or seller – and most assuredly did not set prices.

C. Plaintiff has Waived Its Claims As A Matter Of Law

Plaintiff argues that it may not be prevented from asserting its entitlement to a legal price, relying upon: (1) the principle that an illegality concerning the effectuation of a national purpose may not be waived (citing cases such as Pittsburgh C.C. & St. L. Ry. Co. v. Fink, 250 U.S. 577 (1919); Sprague Steamship Co. v. United States, 172 F.Supp 674 (Ct. Cl. 1959); Urban Data Sys., Inc. v. United States, 699 F.2d 1147 (Fed. Cir. 1983)); (2) cases holding that, where a rule is made for the protection of contractors, it may not be waived (Beta Sys., 838 F.3d 1185 and its progeny, including Cessna Aircraft v. Dalton, 126 F.3d 1442 (Fed. Cir. 1997)); (3) that waiver not be invoked absent a statute limitations (citing Thomas v. United States, 125 Ct .Cl. 76, 80 (1953) and Louisville and Nashville R.R. Co. v. Cent. Iron and Coal Co.,265 U.S. 59, 65 (1924).

These are the same arguments that plaintiff raised and were rejected in Hermes II. Plaintiff's central premise is that contractors may not waive clauses such as this one. But, it is well-established that public contractors may waive rights and benefits, and may be estopped from belatedly seeking to reassert them. E.g., Shutte v. Thompson, 82 U.S. 151 (1872). Even statutory benefits can be waived. United States v. Mezzanatto, 513 U.S. 196, 201 (1995) ("Rather than deeming waiver presumptively unavailable absent some sort of enabling clause, we instead have adhered to the opposite presumption."). Overcoming that presumption requires

a showing, deducible from the text of a statute or legislative history, that Congress itself intended to preclude waiver. Mitsubishi Motors Corporation v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985); accord Rough Diamond Co. v. United States, 351 F.2d 636, 639 (Ct. Cl. 1965) ("the basic test in deciding whether a purchaser could recover would always be the particular Congressional will reflected in the particular piece of legislation under scrutiny"). The burden is on the party opposing waiver to show that Congress intended to preclude it. Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 226 (1987).

To be sure, where Congress has clearly expressed broad public policy, courts are reluctant to permit the evisceration of that policy by the parties' consent. See Clark v. United States, 95 U.S. 539 (1877) (statute designed to "prevent and punish fraud"); Urban Data Sys., Inc. v. United States, 699 F.2d 1147 (Fed. Cir. 1983) (statutory prohibition against cost-plus-percentage-of-cost contracts).

But, a party does not thwart public policy by declining a benefit contained in a regulation or other law. Brooklyn Sav. Bank v. O'Neill, 324 U.S. 697, 705 (1945); Millmaster Intl. Inc. v. United States, 427 F. 2d 811, 814 (Cust. Ct. 1970) (importers may waive benefits of Tariff Act, because waiver will not interfere with any "manifest statutory purpose"). In fact, the jurisprudence of this circuit is replete with references to contractor waivers, including Hermes II. E.g., American Telephone and Telegraph Co. v. United States, 307 F.3d 1374 (Fed. Cir. 2002) (AT&T V); Whittaker Electronic Systems v. Dalton, 124 F.3d 1443 (Fed. Cir. 1997); E. Walters & Co., Inc. v. United States, 217 Ct. Cl. 254, 576 F.2d 362 (1978) (per curiam); Ling-Temco-Vought, Inc. v. United States, 201 Ct. Cl. 135, 148, 149, 475 F.2d 630, 638 (1973).

As the Court observed in Hermes II, 58 Fed. Cl. at 413:

> the Federal Circuit *seems* to be of two minds on this issue in that

> *Whittaker Elec. Sys. v. Dalton*, 124 F.3d 1443 (Fed. Cir. 1997); *E. Walters & Co., Inc. v. United States*, 217 Ct. Cl. 254, 576 F.2d 362 (1978) (per curiam), as well as *American Telephone and Telegraph Co. v. United States*, 307 F.3d 1374 (Fed. Cir. 2002) (*AT&T V*) may be cited for the very opposite of the *Beta/Chris Berg* line of cases, that is: the doctrine of waiver precludes a contract from challenging the validity of a contract under an unlawful regulation or other illegality where the contractor fails to raise the problem prior to execution or litigation.

Id. at 412.

The Court reconciled the apparent division of authority through what it found to be the "key factual distinction" between the two lines of cases cited – the distinction being that, where waiver was found, "the contractors either complained during contract formation or, at the very least, at an early stage in the history of the conflict." Id. at 413 (quoting Hermes I, 58 Fed. Cl. at 19).

The cases where the courts are not inclined to entertain a waiver against a claim of "illegality," are those where strong public policy is evident. E.g., Clark v. United States, 95 U.S. 539 (1877) (refusing to permit waiver of statute designed to "prevent and punish fraud" by requiring contract to be in writing). However, as demonstrated by the number of cases we have cited where waiver has been found, not every contracting irregularity renders a contract void or voidable. Instead, a case-by-case analysis is required.

The Restatement (Second) of Contracts explains this analysis as follows:

> (1) . . . an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against enforcement of the term.
>
> (2) In weighing the interest in the enforcement of a term, account is taken of:

> (a) the parties' justified expectations,
> (b) any special public interest in the enforcement of the particular term.
>
> (3) In weighing a public policy against enforcement of a term, account is taken of
>
> (a) the strength of that policy as manifested by legislation [including regulations] or judicial decision,
> (b) the likelihood that refusal to enforce the term will further that policy,
> (c) the seriousness of any misconduct involved and the extent to which it was deliberate, and
> (d) the directness of the connection between that misconduct and the term.

Restatement § 178.

Given the facts here – that there is no congressional statement of purpose; that the public is unaffected by Clause B19.33 (it cannot be shown to either over or understate prices, nor to dampen competition); that Plaintiff is sophisticated seller; that it bid with full awareness of the escalator; that Plaintiff never complained about B19.33; that it continued to bid on the contracts; and that Plaintiff did not submit a claim until one contractor obtained a windfall in a case in which the Government chose not to contest liability (Pride) – the analysis could not advance plaintiff's case.

Regarding the Government's fault in administering contracts generally, the rule also is well-established. A contractor that believes the Government has materially breached a contract cannot simply continue contract performance, without protesting the breach, without waiving the claim. Ling-Temco-Vought, Inc. v. United States, 475 F.2d 630, 637 (Ct. Cl. 1973); accord Federal Elec. Corp. v. United States, 486 F.2d 1377 (Ct. Cl. 1973).

E. Walters & Co., Inc. v. United States, 576 F.2d 362 (Ct. Cl. 1978), is the controlling application of this rule. There, a supplier claimed that the Government had violated a FAR

predecessor (the ASPR) by exercising an option that, in effect, permitted the Government to procure additional fuses at a lower price than if it had purchased the entire amount in a single order.[20] The ASPR prohibited the Government from exercising an option when "the option quantities represent known requirements for which procurement funds are available," and the Government had just such a requirement. 576 F.2d at 365. Based upon the ASPR, Walters assumed that the option would not be exercised for the funded requirement. Later, Walters learned that its assumption was wrong, but it said nothing when the Government exercised the option. After delivery, Walters submitted a claim seeking the higher price. The contracting officer and the board of contract appeals concluded that the claim was waived. Id. at 366.

On appeal, the court held that the option provision was "in direct conflict with" the ASPR, but that Walters consciously chose to "fully perform the contract as if there were contemporaneous agreement of the parties on the proper interpretation of the terms of he [solicitation]," and "the Government was prejudiced." Id. at 368. As the court explained it:

> [T]he doctrine of estoppel is also for application. Had plaintiff protested the use of the option provision at the time of award, defendant would have been in a position to either reaffirm its use of the option provision, in apparent disregard of the ASPR prohibition, with the further knowledge that it could later be faced with a claim for the [higher] price; or it could have elected instead, to award the non set-aside quantity in the next least expensive manner . . . . Plaintiff's silence deprived the Government of that relatively painless alternative.

Id.

Walters reflects well-established logic in this circuit. In Whittaker Electronic Systems v.

---

[20] The price schedule included price ranges such that unit prices increased with order size. The solicitation specified, however, that the Government could order a base amount, then, at its option, purchase an additional 50 percent of the base amount at the base price.

Dalton, 124 F.3d 1443 (Fed. Cir. 1997), for example, the contractor attempted to avoid the payment terms of an option it had performed, alleging the option was invoked in violation of DAR §1-1502(b)(ii). Although it assumed a regulatory violation, the court, following Walters, rejected the claim because the contractor substantially completed the contract before asserting its claim. This, the court held, "constituted a waiver of the grounds for rescinding or voiding the contract because of a violation of the regulation, even assuming the option clause indeed violated the regulation." 124 F.3d at 1446. A contractor cannot recover "where it fails to raise the problem prior to execution, or even prior to litigation . . . ." Id.

Similarly, in Union Pacific Railroad Co. v. United States, 847 F.2d 1567 (Fed. Cir. 1988), the court invoked equitable estoppel and refused to entertain a contractor's argument that longstanding contract provisions violated tax laws. The court explained that the railroad could have signed the contract under protest to preserve its claim. Id. at 1570. See also Hartford Accident & Indem. Co. v. United States, 127 F. Supp. 565, 567 (Ct. Cl. 1955) (surety that executed performance and payment bonds with knowledge of terms of Government contract was estopped to assert that contract was executed without authority); PCL Construction Services, Inc. v. United States, 41 Fed. Cl. 242, 252 (1998) (contractor waived objection to provision that "was apparent on the face of the solicitation").

In American Telephone & Telegraph Co. v. United States, 177 F.3d 1368 (Fed. Cir. 1999) (en banc) ("AT&T III"), Judge Plager's opinion (dissenting-in-part, concurring-in-part) explained the logic underlying the Walters approach. There, AT&T asserted that its contract was void *ab initio*, because the Navy failed to take the steps necessary to authorize its contract as a fixed-price contract. Id. at 1371. Thus, AT&T claimed, it was entitled to relief in *quantum merit*. The majority disagreed, explaining that the law does not favor invalidation of a fully-

performed contract, based upon governmental noncompliance with internal reporting procedures. Id. at 1375-76. Judge Plager would have held that the contract was invalid, but would have denied a remedy, because AT&T was aware of the missing authorization, and bid nonetheless.

In words firmly rooted in the logic of Walters that are applicable here, Judge Plager explained the reasoning behind waiver:

> AT&T has no rightful claim to another penny of public money. It agreed to build and sell a product to the Government for a fixed price. It performed its end of the deal, and delivered the goods. The Government likewise performed its part of the deal; it paid AT&T the agreed-upon price . . . .
>
> AT&T now seeks to take advantage of the fact that the deal it made with the Government did not result in an enforceable contract, which it likely knew (and certainly should have known) when it proposed to enter into the agreement. AT&T demands more money for which it has been fully paid to do. The answer to that facially nonsensical demand is, in a word, "no."

Id. at 1383-84.

Judge Plager also analyzed what remedy might attach in cases of illegality, noting that, absent a contract, any remedy "must be based on some sort of equitable claim for payment of goods sold and delivered, a quantum valebant claim." Id. Assuming that the court had power to award such a remedy, Judge Plager emphasized that the contractor still should take nothing: "AT&T comes to the court with unclean hands. AT&T is not an innocent bystander being taken advantage of by a predator government. . . . The law in a case like this leaves the parties where it found them." Id. at 1384-85.

This view was strongly endorsed in AT&T V, 307 F. 3d at 1380, where this Court, citing Whittaker and Walters, stated that, even if AT&T had stated a valid claim for reformation, "the court's case law would require a finding that AT&T had waived that claim."

Failing to show that a FAR 16.2 violation is not waivable, plaintiff relies upon Chris Berg, Inc. v. United States, 426 F. 2d 314 (Ct. Cl. 1970), and its offspring, Beta Systems, Inc. v. United States, 838 F. 2d 1179 (Fed. Cir. 1988), LaBarge Prods., Inc. v. West, 46 F.3d 1547, 1557 (Fed. Cir. 1995), and Cessna Aircraft Co. v. Dalton, 126 F.3d 1442 (Fed. Cir. 1997), in which it was said that a Government failure to follow regulations is remediable, and contractors are not bound by their estoppel, acquiescence or failure to protest.

These do not relieve plaintiff of its analytical burden. First, the rule cited in Chris Berg was developed in a series of cases arising under the Merchant Ship Sales Act of 1946, a statute that the court held involved important public policy. Those cases, including Nautilus Shipping Corp. v. United States, 141 Ct. Cl. 391 (1958), and Rough Diamond, 351 F.2d 636, concerned contracts for the sale of Government-owned vessels, by which ship purchasers contracted to pay higher prices than specified by the Act. In ordering refunds to the purchasers, the court held that the statute embodied a strong and clearly discernable congressional purpose. As the court summarized its rulings years later:

> The marine statutes, we thought, embodied the Congressional wish that the Government's surplus ships should be sold at prices, uniform for all purchasers, and ascertainable by mathematical application of the statutory formula, properly interpreted; this Congressional purpose was strong enough to override any general legal doctrine, applicable in other situations, but which, if applied in the instant situation, would result in different persons paying different prices for the same type of ship . . .

Rough Diamond, 351 F.2d at 639-40 (internal quotation marks omitted).

There is no legislative mandate regarding the EPA clauses at issue. It simply is not a matter of national consequence when a seller agrees to an escalation clause that serves the purpose of the regulatory provision at issue.

Second, Chris Berg and Beta involved Government overreaching in the face of timely

protests by contractors who insisted that the law be observed. Chris Berg was a mistake-in-bid case, a unique species of cases. There, the question was how to treat a bid mistake, and the contractor insisted from the outset that the mistaken bid was its intended bid. In Beta Systems, there was similar overreaching, as the contractor protested, at the outset, the Government's refusal to write the contract as the contractor insisted the regulation required. Here, there is no question concerning the intent of plaintiff's offers or satisfaction with its contracts.

Third, estoppel could not lie in these cases, as both contractors timely protested the clauses at issue. Thus, statements in those cases concerning the effect of a contractor's acquiescence or failure to protest is dicta.

Reliance upon LaBarge, 46 F.3d 1547, and Cessna, 126 F.3d 1442, also is inapt. In Cessna, waiver was not at issue, because the regulation was held not to confer a benefit upon the contractor. In LaBarge, 46 F.3d 1547, the Court was asked to determine whether a contractor, who alleged its bid was the product of an improper bid auction, had raised a contractual theory that satisfied the board's jurisdictional requirement. The Government asserted that the contractor had failed to do so, and that its allegations were of the kind "ordinarily made in pre-award bid protests, not after the award of contract." Id. at 1552. The Court responded by citing Chris Berg for the proposition that an unlawful contract may be the basis for a claim, even if accompanied by initial adherence to the unlawful contract. Id. However, on the merits, the Government argued that the contractor had waived any such cause of action. Id. at 1556. That argument, however, the Court specifically refused to entertain, inasmuch as it found no illegal auction or harm to the contractor. Id. Notably, the Court did not reject the argument out of hand, as being precluded by Chris Berg or its progeny. Thus, Labarge cannot be cited as authority for a no waiver rule. Moreover, as the Hermes I court noted, Labarge complained in a

bid protest and "did not significantly delay any legal challenge" to the Government's actions, as Plaintiff has here. 58 Fed. Cl. at 14.

Plaintiff's attempt to draw support from the statement in AT&T III, that, concerning unlawful contracts fully performed, "courts have variously sustained the contract, reformed it to correct the illegal term, or allowed recovery under an implied contract theory." 177 F.3d at 1376. Although that may be true in general, it does not address whether a remedy may be barred if waived. In fact, the lower court eventually adopted none of those alternatives and, instead, dismissed the case for lack of an enforceable claim.

Plaintiff seeks to distinguish Whittaker, by arguing that the waived violation was not "inherent in the award of the contract." Pl. Br. 69. As the Hermes court explained, however, both Whittaker and Walters involved violations of the FAR, every bit as inherent in the award as the provisions here. 58 Fed. Cl. at 15. Indeed, in AT&T V, 307 F.3d at 1381, the Court cited Whittaker and Walters for the proposition that a contractor's failure to "have raised the issues it now presents . . . at the time of contract negotiations" amounted to a waiver. But even if the exercise of the option in Whittaker (and not the award) were the proper focal point, the contractor's waiver occurred when it failed to protest before the option was exercised, a circumstance indistinguishable from what has occurred here, where plaintiff has failed to provide timely notice of the alleged illegality.[21]

Finally, Plaintiff argues that waiver should be precluded on the basis of the Christian doctrine. Pl. Br. at 59. Christian does not apply to every regulatory provision, however – only those "mandatory clauses that express a significant or deeply ingrained strand of public

[21] Plaintiff's emphasis upon the fact that Whittaker claimed its contract was void ab initio is unavailing. Pl. Br. 68-9. Plaintiff effectively seeks the same thing – complete evisceration of the pricing provision.

procurement policy." General Eng'g. & Mach. Works v. O'Keefe, 991 F. 2d 775, 779 (Fed. Cir. 1993). Given the lack of evidence of the failed performance of, or congressional interest in, these clauses, no such strand has been identified or seems apparent.

Plaintiff also purports to have debunked the applicability of Federal Crop Ins. v. Merrill, 332 U.S. 380 (1947), one of the bases of the Hermes II decision, arguing that it cannot support plaintiff's presumed knowledge of the law, because, under that reasoning, it also should be presumed to know it is entitled to receive a "legal" price. Plaintiff complains, however, that it could not have known that its contracts were illegal when signed and, therefore, it is immune from a waiver defense. It argues that the Hermes court's holding "proves too much" because a "contractor could never seek a remedy under an illegal contract." Pl. Br. 66. But, contractors are deemed to know the law. Federal Crop Ins. v. Merrill, 332 U.S. 380 (1947). Thus, they are on notice that, if they wish to insist upon testing presumed rights (e.g., the non-inclusion of a "legal" clause), they may not sleep on those rights. The question of whether a contractor *may* waive its rights is a separate question, discussed above. Thus, Plaintiff's reliance upon Sola Electric Co. v. Jefferson Electric Co.,317 U.S. 173 (1942), Pittsburgh Ry. Co., 250 U.S. 577, and Louisville and Nashville R.R. Co., U.S. 59, 65 (1924), Costanza Coal Min. Co. v. Weirton Steel Co., 150 F.2d 929 (4th Cir. 1945) do not aid its case, because at issue there were national pricing schemes of great importance to the public. Thus, the very element of plaintiff's analysis absent here, (i.e., that the rule is a matter of important public policy) was the deciding factor in the holdings in those cases. See, e.g., Sola Electric, 317 U.S. at 177 ("Local rules of estoppel which would fasten upon the public as well as the petitioner the burden of an agreement in violation of the Sherman Act must yield to the Act's declaration that such agreements are unlawful, and to the public policy of the Act which in the public interest precludes the

enforcement of such unlawful agreements." ); Costanza Coal, 150 F.2d at 935 ("The purposes are stated in Sec. 1 of the Act wherein it is declared that regulation of the sale and distribution of bituminous coal is imperative for the protection of interstate commerce and such coal, and that existing practices of distribution and marketing thereof waste the resources of the nation and disorganize interstate commerce therein so that regulation of prices and unfair methods of competition are necessary").

Here, Plaintiff waived its claims because it knew the regulations and the facts about which it now complains – that the EPA clauses were in their contracts, and that the clauses were based upon the PMM.[22]

In sum, the circumstances of this case are, to the Government's knowledge, unprecedented. In none of the cases cited by Plaintiff did the contractors offer the same clauses year after year without complaint. In none of the cases did contractors have the opportunity to compare over an extended period of time whether the benefits a different clause might have offered (or a different customer might accept) exceeded those offered by the challenged clauses. Here, Plaintiff was in the best position to know whether the clauses at issue provided a benefit and signaled its decision to forego any such benefit year after year. Justice requires that Plaintiff now accept that choice.

**CONCLUSION**

For these reasons, defendant respectfully requests that the Court dismiss the Second

---

[22] Plaintiff also appears to assume that waiver could not occur until a court interprets a regulation, arguing that it filed a claim as soon as it knew such lawsuits could be filed. But, if that were the rule, the doctrine of presumed knowledge of the law would be eviscerated. Hermes II, 58 Fed. Cl. at 416-17 (citing Merrill, 332 U.S. 389, and Catawba Indian Tribe of S.C. v. United States, 982 F.2d 1564, 1570 (Fed. Cir. 1993)).

Amended Complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Steven J. Gillingham
STEVEN J. GILLINGHAM
Assistant Director
Commercial Litigation Branch
Civil Division
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Department of Justice
Washington, D.C. 20530
Tele: (202) 616-2311
Fax: (202) 353-7988

OF COUNSEL:

DONALD S. TRACY
Trial Attorney
Defense Supply Center Richmond
Richmond, VA 23297

HOWARD M. KAUFER
Assistant Counsel
Office of Counsel
Defense Energy Support Center
Ft. Belvoir, VA

Attorneys for Defendant

February 22, 2006

CERTIFICATE OF FILING

I hereby certify that on February 22, 2006, a copy of the foregoing document was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Steven J. Gillingham